UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA

    - against -

ERIC ADAMS,

      Defendant.

No. 24-CR-556 (DEH)

 

**DEFENDANT ERIC ADAMS'S MEMORANDUM OF LAW IN SUPPORT OF
HIS MOTION TO DISMISS COUNT V OF THE INDICTMENT**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........................................................................................ ii

PRELIMINARY STATEMENT ................................................................................ 1

BACKGROUND ........................................................................................................ 3

LEGAL STANDARD ................................................................................................. 5

ARGUMENT .............................................................................................................. 6

I.    SECTION 666 REQUIRES SOLICITING OR ACCEPTING A BENEFIT IN EXCHANGE FOR AGREEING TO PERFORM AN OFFICIAL ACT ........................................................... 6

II.   THE INDICTMENT DOES NOT ALLEGE THAT MAYOR ADAMS AGREED TO ACCEPT A BENEFIT IN EXCHANGE FOR TAKING ACTION ON ANY SPECIFIC AND FORMAL EXERCISE OF GOVERNMENTAL POWER ........................................................ 10

    A.   The Alleged Promised Acts Are Too Vague And Broad To Qualify As Official Acts .... 11

    B.   The Indictment Does Not Allege That Mayor Adams Agreed To Influence The Building-Permit Decision In Exchange For A Benefit ........................................................ 13

III.   MAYOR ADAMS'S SEPTEMBER 2021 MESSAGES TO THE FDNY COMMISSIONER WERE NOT OFFICIAL ACTS ................................................................ 16

CONCLUSION ........................................................................................................... 21

**TABLE OF AUTHORITIES**

**Page(s)**

## Cases

*McDonnell v. United States*,
   579 U.S. 550 (2016)..................................................................7, 8, 9, 10, 11, 12, 17, 19

*Russell v. United States*,
   369 U.S. 749 (1962)..................................................................................................5

*Skilling v. United States*,
   561 U.S. 358 (2010)................................................................................................10

*Snyder v. United States*,
   144 S. Ct. 1947 (2024)..........................................................1, 6, 7, 8, 10, 13, 14, 18

*United States v. Alfisi*,
   308 F.3d 144 (2d Cir. 2002).....................................................................................9

*United States v. Calk*,
   87 F.4th 164 (2d Cir. 2023) ....................................................................................6

*United States v. Ferber*,
   666 F. Supp. 90 (D. Mass. 1997) .........................................................................20

*United States v. Ganim*,
   510 F.3d 134 (2d Cir. 2007)............................................................................6, 14

*United States v. Gonzalez*,
   686 F.3d 122 (2d Cir. 2012)............................................................................5, 18

*United States v. Jefferson*,
   289 F. Supp. 3d 717 (E.D. Va. 2017) ...................................................................12

*United States v. Ng Lap Seng*,
   934 F.3d 110 (2d Cir. 2019)....................................................................................8

*United States v. Rooney*,
   37 F.3d 847 (2d Cir. 1994)....................................................................................20

*United States v. Silver*,
   948 F.3d 538 (2d Cir. 2020)............................................................................9, 12

*United States v. Walsh*,
   194 F.3d 37 (2d Cir. 1999).......................................................................................5

## Statutes

18 U.S.C. § 201(a)(3) ......................................................................................................8

18 U.S.C. § 201(b) ..............................................................................................7, 8, 10

18 U.S.C. § 371 ...............................................................................................................3

18 U.S.C. § 666(a)(1)(B) ...........................................................................1, 3, 6, 7, 8, 10

18 U.S.C. § 1343 .............................................................................................................3

52 U.S.C. § 30109(d)(1)(A) .............................................................................................3

52 U.S.C. § 30121 ...........................................................................................................3

## Other Authorities

Fed. R. Crim. P. 7(c)(1) ...........................................................................................5, 18

Fed. R. Crim. P. 12(b)(1) ................................................................................................5

Fed. R. Crim. P. 12(b)(3)(B) ...........................................................................................5

Fed. R. Crim. P. 12(d) .....................................................................................................5

UNITED STATES DEP'T OF JUSTICE, CRIMINAL RESOURCE MANUAL § 2041 ............................6, 14

Defendant Eric Adams respectfully submits this Memorandum of Law in support of his Motion to Dismiss Count V of the Indictment.

## PRELIMINARY STATEMENT

The indictment in this case alleges a "bribery" scheme that does not meet the definition of bribery and indeed does not amount to a federal crime at all. Just three months ago, the Supreme Court rebuked the Justice Department for adopting an "unfathomable" interpretation of the federal-program bribery statute, 18 U.S.C. § 666(a)(1)(B), that "would leave state and local officials entirely at sea to guess about what gifts they are allowed to accept under federal law, with the threat of up to 10 years in federal prison if they happen to guess wrong." *Snyder v. United States*, 144 S. Ct. 1947, 1958 (2024). As the Court admonished prosecutors, "[t]hat is not how federal criminal law works." *Id.*

Yet here goes the Department again. It appears that after years of casting about for something, anything, to support a federal charge against New York City Mayor Eric Adams, prosecutors had settled on a theory that depended on the Department's longstanding view that Section 666 criminalizes gratuities, including gifts meant to curry favor with governmental officials but not linked to any specific question or matter. When the Supreme Court rejected that interpretation in June, prosecutors simply added a few vague allegations and called their theory *bribery*—"a far more serious offense than gratuities," *id.* at 1953.

But the government's makeover doesn't work. The indictment does not allege that Mayor Adams agreed to perform any official act at the time that he received a benefit. Rather, it alleges only that while serving as Brooklyn Borough President—not Mayor, or even Mayor-elect—he agreed generally to assist with the "operation" or "regulation" of a Turkish Consulate building in *Manhattan*, where he had no authority whatsoever, in exchange for travel benefits (*e.g.*, upgrades

1

to vacant business-class seats and a car ride to a restaurant).  ¶¶ 36, 63.  That extraordinarily vague allegation encompasses a wide array of normal and perfectly lawful acts that many City officials would undertake for the consulate of an important foreign nation, such as arranging meetings with regulators, offering advice about how to navigate the City's bureaucracy, and referring diplomatic personnel to attorneys who specialize in regulatory affairs or building-code disputes.  Although the indictment alleges at one point that then-Borough President Adams sent three messages to the FDNY Commissioner about a building permit that the consulate needed in time for a visit by the president of Turkey, it conspicuously does *not* allege that he agreed *ex ante* to take that specific action in exchange for the travel benefits that he received.

That was not a drafting oversight.  The zealous prosecutors who secured the indictment would have alleged that kind of specific agreement if they had any evidence to support it.  But they do not, and they know that Adams never entered into any such agreement.  And at any rate, even if the government could justifiably allege that Adams had agreed to receive benefits in exchange for assisting with the permitting matter, the three innocuous messages that Adams allegedly sent to the FDNY Commissioner fall far short of the kind of "official act" necessary for bribery.  The bribery count should be dismissed.

To be sure, the remaining counts in the indictment—which all relate to so-called "straw" campaign donations on behalf of foreign nationals—are equally meritless because they rest on a host of false claims evidently attributable to a self-interested staffer with an axe to grind, which will be revealed in the course of litigation.  But with respect to bribery, the deficiencies in the government's case are clear on the face of the indictment.  In this circumstance, the federal rules entitle Adams to a swift dismissal of the charge.

**BACKGROUND**

On September 26, 2024, the government unsealed an indictment accusing Mayor Adams of accepting travel perks and "straw donor" campaign contributions from individuals connected to Turkey or the New York City Turkish community. *See generally* ECF No. 1. The indictment states five counts that invoke four offenses: conspiracy, 18 U.S.C. § 371 (Count I), wire fraud, 18 U.S.C. § 1343 (Count II), soliciting, accepting, and receiving a campaign contribution by a foreign national, 52 U.S.C. § 30121, 30109(d)(1)(A) (Counts III & IV), and federal-program bribery, 18 U.S.C. § 666(a)(1)(B) (Count V).

The allegations supporting the bribery charge are found at paragraphs 33 to 43 and paragraph 63 of the indictment. They relate to a Turkish Consulate building in Manhattan known as the "Turkish House." ¶ 38b. For reasons that are not apparent (perhaps just sloppiness), the indictment describes the alleged *quid pro quo* in two different ways: either that (i) Adams accepted travel benefits from "a senior official in the Turkish diplomatic establishment" and others in exchange for agreeing "to assist the Turkish Official in the operation of the Turkish Consulate in New York," ¶¶ 4, 36, or (ii) that he accepted travel benefits "in exchange for intending to be influenced in connection with the City of New York's regulation of the Turkish House," ¶ 63. Despite the fact that the indictment reproduces quotes from messages, emails, and conversations to support numerous other points, it does not allege any specific exchanges or conversations in which Adams and the Turkish official entered into this purported *quid pro quo* agreement. Instead, the agreement is alleged only in conclusory terms. *See* ¶¶ 36, 63.

The indictment alleges that between the summer of 2021 and the summer of 2022, Adams solicited or accepted certain travel benefits as part of the supposed agreement. ¶ 63. The indictment contains four allegations related to benefits or potential benefits during that period:

- In June 2021, while Adams was Brooklyn Borough President and a candidate for Mayor, one of his staffers allegedly arranged for Adams and his partner to receive an upgrade to business class on a flight to Istanbul, free lodging at the Istanbul Four Seasons, and a discounted itinerary of sightseeing and domestic travel while in Turkey. ¶ 34a-c. The indictment acknowledges that Adams ultimately canceled the June 2021 trip and so never received any of those benefits. ¶ 34d.

- Around the same time, Adams allegedly coordinated with the Turkish official to arrange for travel benefits for one of his fundraisers during a trip that she took to Turkey—namely, transportation from the airport, a hotel stay, and access to an airport lounge. ¶ 35.

- In November 2021, Adams allegedly received a business-class upgrade on a flight to Ghana as well as an airport escort, a car service, and dinner during a nine-hour layover in Istanbul. ¶ 39.

- In July 2022, after Adams had begun his term as Mayor, an Adams staffer allegedly communicated with the Turkish official about business-class upgrades for four "close associates" of Adams, but the indictment does not allege that Adams was aware of the communications or the upgrades. ¶¶ 43, 55u.

The indictment does not allege that Adams ever took any regulatory action himself, either as Brooklyn Borough President or as Mayor, to benefit the Turkish House—a facility that is located in Manhattan, outside of the Brooklyn Borough President's jurisdiction or authority. The only actual conduct alleged in connection with the supposed bribery scheme relates to a building permit that the Turkish House needed in September 2021. According to the indictment, then-Borough President Adams pressured the New York Fire Department Commissioner to help the Turkish House in Manhattan secure a "temporary certificate of occupancy" (TCO) from the Department of Buildings that would allow it to open in time for a September 20 visit by the president of Turkey.

¶ 38.  Adams supposedly exerted this "pressure" by sending three short messages to the FDNY

Commissioner on September 8 and 10, 2021.  Those messages stated:

- "They said they needed a letter of Defect from FDNY to DOB [*i.e.*, the Department of Buildings]. They know they have some issues but according to them with the letter the DOB wi[ll] give the TCO."  ¶ 38k (September 8).

- "They really need someone . . . by today if possible. If it is[ im]possible please let me know and I will manage their expectation."  ¶ 38m (September 10).

- "They said the hire [sic] ups at FDNY did not give the inspector authorization to come. The inspector indicated he needs authority to come to day [sic]."  ¶ 38n (September 10).

Ultimately, the FDNY allegedly wrote a letter that would allow the Department of Buildings to

issue the TCO.  *Id.* ¶ 38*o*-p.  The indictment does not allege that Adams took any other action to

benefit the Turkish House.

## LEGAL STANDARD

An indictment must be dismissed pretrial if it fails to allege facts that constitute a

prosecutable offense.  Fed. R. Crim. P. 12(b)(1), 12(b)(3)(B).  The government must therefore

allege "the essential facts constituting the offense charged," Fed. R. Crim. P. 7(c)(1), and a

"deficiency in an indictment's factual allegations" cannot be cured simply by reciting the charged

statute, *United States v. Gonzalez*, 686 F.3d 122, 127 (2d Cir. 2012); *see also Russell v. United

States*, 369 U.S. 749, 764-65 (1962) ("[A]n indictment must do more than simply repeat the

language of the criminal statute . . . —it must descend to particulars") (citation omitted).  That is

a constitutional imperative:  The Fifth Amendment requires a charging document to contain a

sufficient amount of "factual particularity" to prevent prosecutors from "fill[ing] in elements of its

case with facts other than those considered by the grand jury."  *United States v. Walsh*, 194 F.3d

37, 44 (2d Cir. 1999) (citation omitted).  Further, purely legal questions presented in a pretrial

motion must be decided "before trial unless [the court] finds good cause" for deferring its ruling.

Fed. R. Crim. P. 12(d).

**ARGUMENT**

The Court should dismiss Count V of the indictment, which charges Mayor Adams with federal-programs bribery under 18 U.S.C. § 666(a)(1)(B), because the indictment does not sufficiently allege that Adams agreed to accept benefits in exchange for performing an official act.

## I. SECTION 666 REQUIRES SOLICITING OR ACCEPTING A BENEFIT IN EXCHANGE FOR AGREEING TO PERFORM AN OFFICIAL ACT

Section 666(a)(1)(B) penalizes any public official who "corruptly solicits or demands for the benefit of any person, or accepts or agrees to accept, anything of value from any person, intending to be influenced or rewarded in connection with any business, transaction, or series of transactions of such organization, government, or agency involving any thing of value of $5,000 or more." 18 U.S.C. § 666 (a)(1)(B); *United States v. Calk*, 87 F.4th 164, 179 (2d Cir. 2023) (quotation marks omitted). Four features of the statute are pertinent here.

*First*, the statute prohibits only bribes, not gratuities. In *Snyder*, *supra*, the Supreme Court rejected the Justice Department's view that Section 666 extends to gratuities. 144 S. Ct. at 1954. Although a gratuity may violate state or local ethics rules, it does not violate Section 666. *Id.* As the Supreme Court explained, that interpretation would impermissibly transform Section 666 into "a vague and unfair trap for 19 million state and local officials." *Id.* at 1956, 1959.

Importantly, gratuities come in two forms: (i) something "given after the fact, as 'thanks' for an act but not in exchange for it," and (ii) something "given with a nonspecific intent to 'curry favor' with the public official to whom it was given." UNITED STATES DEP'T OF JUSTICE, CRIMINAL RESOURCE MANUAL § 2041; *see United States v. Ganim*, 510 F.3d 134, 146 (2d Cir. 2007) (Sotomayor, J., for the Court) (identifying the two types of gratuities and explaining that the latter are lawful even under federal statutes that prohibit some gratuities). After *Snyder*, neither amounts to a violation of the Section 666. *See Snyder*, 144 S. Ct. at 1951 (noting gratuities are "typically"

6

payments made "after an official act as a token of appreciation"); *McDonnell v. United States*, 579 U.S. 550, 579 (2016) (bribery requires agreement on "specific and focused" official act in exchange for payment).

*Second*, like other federal bribery statutes, federal-program bribery requires that the defendant agreed to perform an "official act." Although that term does not appear in the statute, the Supreme Court has construed the statutory language to encompass the ordinary official-act requirement for bribery. In the first sentence of its opinion in *Snyder*, the Supreme Court stated that "Section 666 . . . makes it a crime for state and local officials to 'corruptly' solicit, accept, or agree to accept 'anything of value from any person, intending to be influenced or rewarded' *for an official act*." *Id.* at 1951 (quoting 18 U.S.C. 666(a)(1)(B) (emphasis added). The Court went on to repeat the "official act" requirement twenty-five times in its majority opinion. *See, e.g.*, *id.* at 1954 ("Section 666(a)(1)(B) makes it a crime for state and local officials to 'corruptly' accept a payment 'intending to be influenced or rewarded' for an official act."); *id.* ("Section 666 shares the defining characteristics of [18 U.S.C.] § 201(b)'s bribery provision: the corrupt state of mind and the intent to be influenced in the official act."); *id.* at 1959 ("In sum, § 666 tracks §201(b), the bribery provision for federal officials. A state or local official can violate § 666 when he accepts an up-front payment for a future official act or agrees to a future reward for a future official act.").

Indeed, even the three dissenting Justices agreed that the statute requires an official act. As Justice Jackson explained (in agreement with the majority on this point): "There is no dispute that § 666 criminalizes bribes. This Court has also been clear about what a bribe requires: 'a quid pro quo.' A quid pro quo means 'a specific intent to give or receive something of value *in exchange for an official act*.'" *Id.* at 1962 (emphasis added; citations omitted).

Accordingly, although the Second Circuit had previously concluded that the "'official act' standard does not apply to § 666," *United States v. Ng Lap Seng*, 934 F.3d 110, 142 (2d Cir. 2019), that holding is no longer good law in the wake of *Snyder*. The Second Circuit's view rested on the absence of the phrase "official act" from Section 666 and the contrasting presence of that phrase in the federal-official bribery statute, 18 U.S.C. § 201(b). *See id.* at 132-33, 137 n.28. But *Snyder* has fatally undermined the first premise by deeming the statutory language in Section 666 to be synonymous with an official-act element. Moreover, in construing Section 666, *Snyder* explained that it "tracks" Section 201(b), noting that "Congress modeled the text of § 666(a)(1)(B) for state and local officials on § 201(b)." 144 S. Ct. at 1954, 1959; *see also id.* at 1955 ("Section 666 shares the defining characteristics of § 201(b)'s bribery provision: the corrupt state of mind and the intent to be influenced in the official act."). *Snyder* thus rejected the Second Circuit's distinction between Section 666 and Section 201(b).

*Third*, as construed in *McDonnell*, *supra*, the official-act requirement has two components: "The Government must prove that [i] the public official made a decision or took an action on [ii] a 'question, matter, cause, suit, proceeding or controversy' that 'may at any time be pending' or 'may by law be brought' before a public official." 579 U.S. at 567 (quoting 18 U.S.C. § 201(a)(3)).

Under the first requirement, "[s]etting up a meeting, hosting an event, or calling an official (or agreeing to do so) merely to talk about [a question or matter] or to gather information" are insufficient for criminal liability. *Id.* at 573. Likewise, "[s]imply expressing support for [a particular course of action] at a meeting, event, or call . . . does not qualify as a decision or action on the [question or matter], as long as the public official does not intend to exert pressure on another official or provide advice, knowing or intending such advice to form the basis for an 'official act.'" *Id.*

Under the second requirement, to qualify as a "question" or "matter," the activity that the official seeks to influence must "involve a formal exercise of government power that is similar in nature to a lawsuit, administrative determination, or hearing" and "must also be something specific and focused." *Id.* at 571, 574. General or high-level goals are insufficient. *See id.* at 578; *see also, e.g.*, *United States v. Alfisi*, 308 F.3d 144, 149 (2d Cir. 2002) ("[B]ribery involves the giving of value to procure a specific official action from a public official"). As the Second Circuit explained in *United States v. Silver*, 948 F.3d 538 (2d Cir. 2020), "at the time the bribe is made, the promised official act must relate to . . . [a] focused, concrete and specific [ ] question or matter." *Id.* at 556-57. While Second Circuit precedent does not require the defendant to agree to perform "a particular act of influence," the defendant "must do more than promise to take some or any official action beneficial to the payor as the opportunity to do so arises; she must promise to take official action on a particular question or matter as the opportunity to influence that same question or matter arises." *Id.* at 552-53 (emphasis omitted).

*Fourth*, and relatedly, the government must prove that "the public official agreed to perform an 'official act' *at the time of* the alleged quid pro quo." *McDonnell*, 579 U.S. at 572-73 (emphasis added). As *Silver* put it, "*McDonnell* re-emphasizes that the relevant point in time in a *quid pro quo* bribery scheme is the moment at which the public official accepts the payment." 948 F.3d at 556.

These four requirements rest in part on constitutional concerns. *See McDonnell*, 579 U.S. at 575-77. For example, without a clear definition of what conduct is covered by federal bribery laws, the threat of criminal sanction would chill speech by state and local officials, who "might wonder whether they could respond to even the most commonplace requests for assistance," and "citizens with legitimate concerns might shrink from participating in democratic discourse." *Id.*

at 575.  To comport with due process, moreover, a bribery offense must be sufficiently definite so "that ordinary people can understand what conduct is prohibited" and prosecutors cannot engage in "arbitrary and discriminatory enforcement"—for example, by prosecuting high-profile political figures for common conduct.  *Id.* at 576 (quoting *Skilling v. United States*, 561 U.S. 358, 402-03 (2010)).  And reading federal bribery statutes broadly would disrupt our federal system by supplanting state and local policy judgments about what gifts officials can permissibly accept with a draconian federal criminal prohibition.  *See Snyder*, 144 S. Ct. at 1956; *McDonnell*, 579 U.S. at 576.

For that reason, even if the contours of an "official act" under Section 666 differed somewhat from the defined term under the Section 201(b), the core requirement would be the same: An official must at minimum have used his or her official position to take action, or to pressure or advise another official to take action, resulting in a specific and formal exercise of governmental power.  That is consistent with the text of Section 666(a)(1)(B), which requires that the defendant have demanded or accepted a benefit "in connection with any business, transaction, or series of transactions of [a governmental] organization" that receives federal funds.  As all nine Justices agreed in *Snyder*, the language of the statute invokes *quid pro quo* bribery, 144 S. Ct. at 1959; *id.* at 1962 (Jackson, J., dissenting), and the matters that the statute identifies—"business, transaction, and series of transactions"—are specific and concrete governmental actions, not abstract or general objectives.

## II.  THE INDICTMENT DOES NOT ALLEGE THAT MAYOR ADAMS AGREED TO ACCEPT A BENEFIT IN EXCHANGE FOR TAKING ACTION ON ANY SPECIFIC AND FORMAL EXERCISE OF GOVERNMENTAL POWER

This Court should dismiss the Section 666 bribery charge against Mayor Adams because the indictment does not allege a *quid pro quo* agreement to take action (or pressure or advise another official to take action) on any specific question or matter involving the formal exercise of

governmental power. It alleges only that Adams agreed to "assist" in the "operation" of the Turkish Consulate or in "the City of New York's regulation of the Turkish House." ¶¶ 36, 63. Those vague allegations do not identify any concrete and specific exercise of governmental power, and they would at any rate encompass a variety of routine activities that do not qualify as official acts, such as setting up meetings or relaying information to other officials. The only specific acts that the indictment alleges in connection with the Section 666 count are three messages that Adams sent to the FDNY Commissioner on September 8 and 10, 2021, for the purpose of getting "the FDNY to permit the Turkish Consulate to occupy a skyscraper that had not passed a fire safety inspection," ¶ 33, *see also* ¶ 38, but it does not allege that Adams ever agreed to assist with that specific matter in exchange for a benefit. The indictment therefore does not allege the *sine qua non* of bribery—the solicitation or acceptance of something of value in exchange for an official act.

### A. The Alleged Promised Acts Are Too Vague And Broad To Qualify As Official Acts

The indictment's factual allegations state vaguely that Adams agreed to accept travel benefits like seat upgrades and car rides in exchange for "assist[ing] the Turkish Official in the operation of the Turkish Consulate in New York." ¶ 36. The indictment's statutory allegations state, somewhat inconsistently but also vaguely, that the agreed-upon act was some unspecified activity "in connection with the City of New York's regulation of the Turkish [Consulate]." ¶ 63.

Those exceedingly general allegations are insufficient to allege an agreement to perform an "official act" for two reasons.

*First*, they do not identify a "specific and focused" formal exercise of governmental power to which the promised actions pertained. *McDonnell*, 579 U.S. at 574. Merely alleging that Adams agreed to assist in the "operation" or "regulation" of the Turkish Consulate is the opposite of

11

"specific and focused." That is nothing like the examples of concrete exercises of governmental power cited in *McDonnell* and *Silver*—"questions or matters such as whether state universities will research a particular drug, or whether the state will provide funding to research a particular disease." *Silver*, 948 F.3d at 557.

*Second*, even if those allegations had identified a specific and focused exercise of governmental power, they are so broad that they would encompass a wide variety of acts of assistance that do not qualify as officials acts. For example, "assistance" with the "operation" or "regulation" of the Turkish House could encompass making an introduction to City officials; passing along a concern to the responsible regulators; giving general opinions about how to navigate City bureaucracy; referring Turkish representatives to attorneys who specialize in building-code disputes; or making public statements touting the opening of the embassy. Even "hosting an event" aimed at generating support for the private party's objectives, or "expressing support" for those objectives in one's official capacity, does not constitute an official act without more. *McDonnell*, 579 U.S. at 573; *see also, e.g.*, *United States v. Jefferson*, 289 F. Supp. 3d 717, 740 (E.D. Va. 2017) (vacating conviction where defendant said he would "make sure" an application "got approved" and "that lack of specificity might mean that [defendant] intended only to assist . . . by showing support and arranging meetings").

The deficiencies in the government's allegations are deepened by a fact that the indictment minimizes: that Adams was not the Mayor—or even Mayor-elect—at the time he allegedly agreed to assist in the operation or regulation of the Turkish House in exchange for travel benefits. Rather, he was serving as the Brooklyn Borough President. As the indictment itself makes clear, Adams had no authority with respect to the Turkish Consulate because the building is located in Manhattan, not Brooklyn. ¶ 38a ("ADAMS had authority under the New York City Charter to

affect the administration of City services within his Borough[.]").  Although Adams was a *candidate* for mayor at that time, a mere aspirant to public office cannot exercise the powers of that office.  It is therefore little wonder that the indictment fails to allege that Adams agreed to take official action on any specific matter related to the Turkish House.  He had no authority to do so.

Accordingly, the alleged agreement here—travel benefits in exchange for assisting with the "operation" or "regulation" of the Turkish House—is insufficient to support a federal-programs bribery count.

### B.    The Indictment Does Not Allege That Mayor Adams Agreed To Influence The Building-Permit Decision In Exchange For A Benefit

The only specific acts that the indictment alleges in connection with the Section 666 count are three messages that Adams allegedly sent to the FDNY Commissioner with respect to the building-permit issue on September 8 and 10, 2021.  ¶ 38k, m-n.  But even assuming for the moment that those actions amounted to "official acts" (*but see* Section III, *infra*), nowhere does the indictment allege that Adams "accept[ed] an up-front payment" or "agree[d] to a future reward" in exchange for taking action on that specific matter—a requirement under *Snyder*, *McDonnell*, and *Silver*.  *Snyder*, 144 S. Ct. at 1959; *see* p.9, *supra*.

The indictment alleges that in June 2021, months before the permit issue arose, Adams accepted upgraded tickets on a Turkish airline flight and related travel benefits (and then cancelled the trip and received no benefits).  ¶ 34.  It also alleges that the same month, Adams obtained for his fundraiser travel perks like a car ride from the airport and access to a suite in an airport lounge.  ¶ 35.  But the indictment does not claim that these supposed benefits were solicited or accepted in exchange for his agreement to help on the permit matter specifically.  Indeed, that would not make sense given that the permit matter did not arise until August 31, 2021.  *See* ¶ 38d, f.  Rather, the indictment alleges only that these benefits received in June 2021 were in exchange for Adams's

agreement to "assist the Turkish Official in the operation of the Turkish Consulate" generally. ¶ 36. For the reasons explained above, that is insufficient to plead an agreement to perform an official act. It is at best an allegation that the official intended to "curry favor" with Adams—a classic gratuity (and the kind of gratuity that even federal gratuity prohibitions do not criminalize). *See Ganim*, 510 F.3d at 146; UNITED STATES DEP'T OF JUSTICE, CRIMINAL RESOURCE MANUAL § 2041. The indictment's allegation that the Turkish official told an Adams staffer that it was "his turn" to help Turkey when the permit matter arose is fully consistent with that kind of gratuity. ¶ 38g.

The indictment also alleges that *after* the permit matter was resolved, Adams received a business-class upgrade on a flight to Ghana (originally scheduled for Pakistan) as well as an airport escort, car service, and dinner during a nine-hour layover in Istanbul. ¶ 39e-f. But absent an *ex ante* agreement relating to the permit matter specifically, any benefits that Adams received later could at most amount to gratuities, which fall outside the compass of Section 666. *Snyder*, 144 S. Ct. at 1944, 1959.[1]

Thus, nowhere does the indictment allege that Adams agreed to take action on the permit matter (or any specific matter) in exchange for benefits. To be sure, the lead-in paragraph to the factual allegations related to the bribery count states that Adams "intervened with the FDNY to permit the Turkish Consulate to occupy a skyscraper that had not passed a fire safety inspection, in exchange for, among other things, luxury travel benefits." ¶ 33. But it is clear from the more specific allegations that follow (as well the statutory allegation on Count V) that the government alleges only a general agreement to assist in the "operation" or "regulation" of the Turkish House

---

[1] While the statutory allegations claim that Adams solicited and accepted benefits in 2022, ¶ 63, the factual allegations do not actually identify any such benefits. At any rate, those after-the-fact benefits could not legally qualify as bribes under *Snyder*.

at the time that Adams accepted benefits in June 2021.  The indictment does not allege a specific agreement about the permit matter, which had not yet arisen at the time the agreement was allegedly formed in June 2021, and over which Adams, then-Brooklyn Borough President, had no authority at the time, as the government itself admits.  ¶¶ 36, 63.  The lead-in paragraph is thus alleging that Adams intervened in the permit matter in furtherance of his earlier general promise to assist in the "operation" or "regulation" of the Turkish House.  But without any *ex ante* promise to intervene in that matter or any other specific matter in exchange for a benefit, there is simply no bribery.  Were it otherwise, elected officials who make general promises to donors to assist on broad policy objectives, like reducing regulatory red tape in particular industries, or on matters over which they have no authority, could be liable for bribery whenever they raise problems with regulators.  That cannot be right.

Finally, the indictment briefly alleges that Adams "took additional actions" in exchange for the travel benefits, but it identifies only one actual action: putting the general manager of a Turkish airline on a transition committee related to infrastructure and climate.  ¶ 40.  The indictment, however, does not claim that the supposed exchange was related to the regulation of the Turkish House, so it does not fall within the scope of Count V.  *See* ¶ 63.  And at any rate, the indictment does not explain how a Mayor-elect's appointment of a private citizen to a transition committee amounts to an exercise of governmental power or the use of an official position.

Beyond that one allegation, the indictment generally alleges that Adams "continued his agreement with the Turkish Official to assist in New York City's regulation of the Turkish House" into 2022, but it does not allege that Adams took any action, let alone any official action, relating to the Turkish House in that year.  ¶ 43.  The only specific claim is that an Adams staffer told the Turkish official to relay to an Adams senior advisor "all your pending problems regarding this

building [that is, the Turkish House] . . . Like FDNY approvals . . . ." ¶ 43b (alteration in original).  The indictment contains no allegations that Adams (or any staffer or advisor for that matter) actually received word of any "pending problems" or acted on them.  Such a generalized offer to assist with hypothetical future problems does not meet the requirements of *Snyder*, *McDonnell*, and *Silver*.

\*　　\*　　\*

In short, the indictment alleges only that Adams agreed to accept benefits in exchange for providing assistance generally with respect to the "operation" or "regulation" of the Turkish House.  For the foregoing reasons, that does not satisfy the official-act element of bribery and therefore cannot sustain Count V.

## III.  MAYOR ADAMS'S SEPTEMBER 2021 MESSAGES TO THE FDNY COMMISSIONER WERE NOT OFFICIAL ACTS

Even if the indictment had adequately alleged an *ex ante* agreement for Mayor Adams to receive benefits in exchange for the assistance he allegedly provided on the building-permit matter (*but see* Section II, *supra*), the three short messages alleged in the indictment do not rise to the level of an "official act."

As an initial matter, there can be no question that Adams did not himself direct the FDNY to issue the letter allowing the Turkish House to open.  None of the alleged messages order the FDNY to do anything at all.  Nor could Adams have done so.  As Brooklyn Borough President, Adams had no regulatory power over the FDNY's inspection work for the Turkish House, which is located in Manhattan, as the indictment's own allegations make clear.  *See* pp. 12-13, *supra*.  And while the indictment asserts that he "had authority under the New York City Charter to affect the administration of City services within his Borough," the generic examples that it provides have nothing to do with FDNY, much less the permitting process.  *Id*. ¶ 38a (alleging Adams could

"hold[] public hearings," "introduce legislation," and "consult[] with the Mayor" on budgetary issues).

Given that Adams lacked any regulatory power over the permitting process in Manhattan, the indictment relies on the allegation that Adams "pressured the FDNY to permit a TCO to be issued for the Turkish House." ¶ 39. While *McDonnell* acknowledged that a defendant could be liable for bribery for "using his official position to exert pressure on another official to perform an 'official act,'" 579 U.S. at 572, the factual allegations here do not show that Adams exerted pressure on anyone.

None of Adams's three brief messages pertaining to the permit issue remotely convey pressure or threats. *See* ¶ 38k, m-n. The messages state that the Turkish House "needed a letter of Defect from FDNY," ¶ 38k, that an inspector needed to visit the property, ¶ 38m, and that the inspector had indicated that he had yet to receive authority from FDNY leadership to do so, ¶ 38n. A reasonable factfinder could not construe such statements as the exertion of pressure on any FDNY official to perform an official act or do anything. They contain no threats, coercion, or even emphatic language. They do not differ from any messages that an elected official might send a regulator to flag a problem for a constituent or (as here) a diplomatic official from a foreign nation.

While Adams indicated that Turkish officials saw the matter as urgent ("They really need someone . . . by today if possible"), merely explaining that a matter is time-sensitive could not reasonably amount to the use of an official position to exert pressure. Construing "official act" that broadly would ensnare myriad routine inquiries that elected officials make on behalf of constituent-donors with pending permit applications and other pressing issues before regulatory agencies. And here, Adams made abundantly clear he was *not* pressuring the FDNY

Commissioner when he told him that "[i]f it is[ im]possible please let me know and I will manage their expectation," ¶ 38m (alteration in original).

The indictment does not allege that Adams conveyed any other messages to FDNY officials that could be construed as a form of pressure. There is accordingly nothing about this case to distinguish it from any situation in which one official raises an issue with another official who is not under his supervision or control—an everyday occurrence at all levels of government. Prosecutors cannot simply insert a conclusory allegation of "pressure" and make out a charge of bribery. *Cf., e.g.*, *United States v. Gonzalez*, 686 F.3d 122, 128 (2d Cir. 2012) ("[I]t has long been the rule in this Circuit that a deficiency in an indictment's factual allegations of the elements of an offense is not cured by the fact that the relevant count cited the statute that the defendant is alleged to have violated." (cleaned up)); *see also* Fed. R. Crim. P. 7(c)(1) (requiring a "statement of the essential facts constituting the offense charged").

Without any basis to assert that Adams actually pressured anyone at FDNY to issue the TCO, the indictment essentially suggests that officials might have *felt* pressure because Adams was likely to be elected Mayor, even if Adams did nothing to engender that feeling. But that is legally insufficient for liability under Section 666. It goes almost without saying that a bribery defendant must *intend* to perform an official act. *Snyder*, 144 S. Ct. at 1955. Resting liability on whether other individuals subjectively felt pressure in light of the defendant's office or candidacy for office—even if the defendant's actual words and actions convey nothing of the sort—would effectively circumvent that crucial element dividing innocent conduct from culpable conduct. And it would leave elected leaders with no firm guidance as to whether the very types of activities permitted by *McDonnell*—such as setting up a meeting or raising an issue with another official— will be perceived by lower-ranking officials as "pressure," triggering criminal liability.

Thus, for example, the indictment alleges that over a month before the September 8 and 10 messages, the FDNY Commissioner had asked to continue serving after Adams became Mayor, "to which ADAMS sent a noncommittal response." ¶ 38j. The government apparently means to imply that the Commissioner may have felt it necessary to be responsive to Adams's communications about the permit. But the indictment does not allege that Adams linked the September communications to that earlier exchange or the Commissioner's continued employment in a future administration, so it could not amount to intentional "pressure" on the Commissioner.

The indictment similarly alleges that the FDNY Commissioner himself threatened subordinates that they "would lose their jobs" if they did not assist in obtaining the TCO. ¶ 38*o*. But the indictment contains no allegation that Adams was even aware of that threat, let alone that he himself threatened anyone or directed the FDNY Commissioner to do so. If the government's implication is that the officials were worried that Adams would be elected Mayor and then decline to retain them, that is not enough to show that *Adams* exerted pressure. Otherwise any Senator with presidential ambitions could be accused of bribery for raising issues with regulatory agencies that concern constituent-donors.

The government's theory of "pressure" also has a more fundamental problem, even if the anodyne messages here could somehow amount to threats to terminate FDNY employees. *McDonnell* recognized that pressure could be a form of official action where the defendant uses "us[es] his *official position* to exert pressure on another official to perform an "official act.'" 579 U.S. at 572 (emphasis added). But the government is effectively claiming that Adams used his *potential future position* as Mayor to exert pressure on officials, not the official position he actually held (Brooklyn Borough President). That runs contrary to the text of Section 666, which applies only to an "agent" of a governmental organization, not aspirants to office. *See, e.g.*, *United States*

*v. Ferber*, 966 F. Supp. 90, 100 (D. Mass. 1997) (holding that defendant, an investment advisor, was not an "agent" under Section 666 because he was "neither a servant, employee, partner, director, officer, manager nor representative" of public-entity clients that he allegedly improperly influenced, nor was he authorized to act on their behalf). Although Adams happened to be Brooklyn Borough President while running for Mayor, it would be strange if the fortuity that a candidate occupies a different governmental office could render him criminally liable for threatening the use of his potential future authority, while private-sector candidates would be immune from Section 666 liability for the same conduct. *See, e.g.*, *United States v. Rooney*, 37 F.3d 847, 850, 854 (2d Cir. 1994) (reversing conviction under Section 666 of "private individual involved in a private development project").

In short, the bribery count in the indictment suffers from the same fundamental legal problems that have long plagued the Justice Department's aggressive targeting of prominent public officials: a sweeping view of federal statutes that criminalizes routine conduct and replaces measured ethics rules with the blunt force of federal criminal law. The consequence is a lack of fair notice to defendants and the kind of highly selective enforcement on display here. The Court should dismiss the bribery count for failure to allege a crime.

## CONCLUSION

For the foregoing reasons, this Court should dismiss Count V of the Indictment.


Date:  September 30, 2024

Respectfully submitted,

QUINN EMANUEL URQUHART
& SULLIVAN, LLP

By: */s/ Alex Spiro*

Alex Spiro
51 Madison Avenue, 22nd Floor
New York, NY 10010
(212) 849-7000

William A. Burck
John F. Bash (*pro hac vice forthcoming*)
Avi Perry
1300 I Street NW, 9th Floor
Washington, D.C. 20005
(202) 538-8000

*Attorneys for Mayor Eric Adams*