UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

     -v.-

ERIC ADAMS,

               Defendant.

**24 Cr. 556 (DEH)**


**THE GOVERNMENT'S OPPOSITION TO
THE DEFENDANT'S MOTION TO DISMISS COUNT FIVE OF THE INDICTMENT**


DAMIAN WILLIAMS
United States Attorney
Southern District of New York
26 Federal Plaza
New York, New York 10278


Celia V. Cohen
Andrew Rohrbach
Hagan Scotten
Derek Wikstrom
Assistant United States Attorneys
    *Of Counsel*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................... ii

PRELIMINARY STATEMENT .................................................................................... 1

BACKGROUND ........................................................................................................... 1

  I. Factual Background ............................................................................................... 2

  II. Legal Background ................................................................................................. 3

ARGUMENT ................................................................................................................ 4

  I. Count Five States a Federal Crime ....................................................................... 4

    A. Applicable Law .................................................................................................. 4

    B. Discussion ......................................................................................................... 5

  II. Section 666 Does Not Require Jury Instructions on *McDonnell*'s Official Act Requirement ............................................................................................................. 10

  III. The Defendant's Conduct Satisfies any Official Act Requirement ................... 15

    A. Applicable Law ................................................................................................ 15

    B. Discussion ....................................................................................................... 16

      1. Adams Agreed to Perform Specific and Focused Official Acts in Exchange for Bribes ................................................................................................................ 16

      2. Adams Pressured the FDNY ........................................................................ 19

      3. Adams Knew He Was Breaking the Law ..................................................... 23

CONCLUSION ........................................................................................................... 25

# TABLE OF AUTHORITIES

**Page**

*Cases:*

Boone v. United States,
   No. 02 Cr. 1185 (JMF), 2017 WL 398386 (S.D.N.Y. Jan. 30, 2017).................................... 11

Costello v. United States,
   350 U.S. 359 (1956)................................................................................................. 6

Evans v. United States,
   504 U.S. 255 (1992)................................................................................................ 17

Hamling v. United States,
   418 U.S. 87 (1974).................................................................................................. 5

McDonnell v. United States,
   579 U.S. 550 (2016)........................................................................................ *passim*

Monsanto v. United States,
   348 F.3d 345 (2d Cir. 2003)................................................................................... 11

Russell v. United States,
   369 U.S. 749 (1962)........................................................................................... 8, 10

Snyder v. United States,
   144 S. Ct. 1947 (2024)..................................................................................... *passim*

United States. v. Percoco,
   13 F.4th 180 (2d Cir. 2021) .................................................................................. 19

United States v. Aiyer,
   33 F.4th 97 (2d Cir. 2022) ............................................................................... 19, 20

United States v. Alfonso,
   143 F.3d 772 (2d Cir. 1998).................................................................................... 5

United States v. Avenatti,
   433 F. Supp. 3d 552 (S.D.N.Y. 2020)..................................................................... 24

United States v. Bahel,
   662 F.3d 610 (2d Cir. 2011)................................................................................... 13

United States v. Benjamin,
   95 F.4th 60 (2d Cir. 2024) .............................................................................. *passim*

United States v. Biaggi,
   853 F.2d 89 (2d Cir. 1988).................................................................................... 23

United States v. Blagojevich,
   794 F.3d 729 (7th Cir. 2015) ................................................................................ 18

United States v. Bout,
   No. 08 Cr. 365 (SAS), 2011 WL 2693720 n.73 (S.D.N.Y. July 11, 2011) .............. 9

United States v. Boyland,
   862 F.3d 279 (2d Cir. 2017)................................................................... 11, 14, 16, 23

United States v. Burke,
   No. 19 Cr. 322, 2024 WL 3090277 (N.D. Ill. June 21, 2024) ............................... 21

United States v. Crozier,
   987 F.2d 893 (2d Cir. 1993)................................................................................... 13

United States v. Dawkins,
   999 F.3d 767 (2d Cir. 2021)....................................................................... 6, 15, 19

*United States v. De La Pava*,
    268 F.3d 157 (2d Cir. 2001)........................................................5

*United States v. Friedman*,
    854 F.2d 535 (2d Cir. 1988)......................................................18

*United States v. Goldberg*,
    756 F.2d 949 (2d Cir. 1985)........................................................5

*United States v. Gonzalez*,
    686 F.3d 122 (2d Cir. 2012)....................................................8, 9

*United States v. Heard*,
    709 F.3d 413 (5th Cir. 2013) ...................................................24

*United States v. Inzunza*,
    638 F.3d 1006 (9th Cir. 2011) ...................................................18

*United States v. Jefferson*,
    289 F. Supp. 3d 717 (E.D. Va. 2017) ..........................................8

*United States v. Keleher*,
    505 F. Supp. 3d 41 (D.P.R. 2020)...............................................8

*United States v. Kimbrew*,
    944 F.3d 810 (9th Cir. 2019) ...................................................23

*United States v. Lee*,
    919 F.3d 340 (6th Cir. 2019) ..............................................*passim*

*United States v. Madigan*,
    No. 22 Cr. 115 (JBB) (N.D. Ill. Oct. 2, 2024) ............................7

*United States v. MacPherson*,
    424 F.3d 183 (2d Cir. 2005)......................................................19

*United States v. Macrina*,
    109 F.4th 1341 (11th Cir. 2024) .................................................7

*United States v. Mangano*,
    No. 16 Cr. 540 (JMA), 2022 WL 2872670 (E.D.N.Y. July 20, 2022) ............22

*United States v. McClean*,
    528 F.2d 1250 (2d Cir. 1976).....................................................10

*United States v. Menendez*, No.,
    No. 23 Cr. 490 (SHS) (S.D.N.Y. Apr. 11, 2024) ........................8

*United States v. Myers*,
    692 F.2d 823 (2d Cir. 1982).......................................................18

*United States v. Ng Lap Seng*,
    934 F.3d 110 (2d Cir. 2019).................................................*passim*

*United States v. Oaks*,
    302 F. Supp. 3d 716 (D. Md. 2018) ............................................8

*United States v. Paulino*,
    935 F.2d 739 (6th Cir. 1991) ....................................................10

*United States v. Reichberg*,
    5 F.4th 233 (2d Cir. 2021) .......................................................20

*United States v. Resendiz-Ponce*,
    549 U.S. 102 (2007)...............................................................5, 9

*United States v. Rigas*,
    490 F.3d 208 (2d Cir. 2007).......................................................5

*United States v. Roberson,*
    998 F.3d 1237 (11th Cir. 2021) ........................................................ 23

*United States v. Rooney,*
    37 F.3d 847 (2d Cir. 1994) ................................................................ 3

*United States v. Salameh,*
    152 F.3d 88 (2d Cir. 1998) .............................................................. 18

*United States v. Silver,*
    948 F.3d 538 (2d Cir. 2020) ........................................................ 8, 19

*United States v. Stringer,*
    730 F.3d 120 (2d Cir. 2013) .......................................................... 5, 9

*United States v. Walsh,*
    194 F.3d 37 (2d Cir. 1999) .......................................................... 8, 10

*United States v. Wedd,*
    993 F.3d 104 (2d Cir. 2021) ........................................................ 6, 19

*United States v. Williams,*
    No. 16 Cr. 03 (TCB), 2017 WL 1030804 (N.D. Ga. Mar. 16, 2017) ........... 8

*Statutes:*

18 U.S.C. § 201 ................................................................................ *passim*
18 U.S.C. § 666 ................................................................................ *passim*
18 U.S.C. § 1343 .................................................................................... 16
18 U.S.C. § 1346 .................................................................................... 16
18 U.S.C. § 1951 .................................................................................... 16
21 U.S.C. § 841 ....................................................................................... 9

## PRELIMINARY STATEMENT

The Government respectfully submits this opposition to defendant Eric Adams's motion (Dkt. 14 ("Mot.")) to dismiss Count Five of the Indictment (Dkt. 1 ("Ind.")). The motion should be denied. As further discussed below, the defendant seeks to avoid facing trial on a bribery charge by claiming that the Indictment does not describe the corrupt bargain he entered with sufficient precision. But Count Five describes a *quid pro quo* in which Adams sought and took luxury travel from a foreign official in exchange for influencing New York City's regulation of a Manhattan skyscraper—including by pressuring the FDNY to allow the building to open without an inspection. Courts consistently find such allegations sufficient to demand trial before a jury. Moreover, Adams's legal arguments contradict precedent, and his factual assertions stray far afield. Adams claims that accepting tens of thousand of dollars' worth of benefits in exchange for pressuring a City agency is "routine" and "common." (Mot. 10, 20). But however routine that may have been for Adams, the law permits a jury to conclude that it was nonetheless illegal.

## BACKGROUND

The charges in the Indictment stem from a long-running conspiracy in which the defendant accepted illegal campaign contributions and bribes consisting of various forms of luxury travel. The defendant does not dispute that the Indictment validly alleges a conspiracy count including bribery and campaign finance objects and three substantive campaign finance offenses. (*See* Mot. 1-2; Dkt. 31 at 31 (defendant agreeing that his motions against the Indictment are complete)).

## I. Factual Background

Shortly after becoming Brooklyn Borough President in 2015, Adams began accepting travel provided by the Turkish Official and others. (Ind. ¶¶ 10-11).[1] Although Adams disclosed the benefits he received in 2015 as official travel, from that point forward he concealed what he received on personal trips. (*Id.* ¶ 10). From 2016 through 2019, Adams secretly accepted over $90,000 in benefits during his travel to Turkey and on the Turkish Airline, including free trips to China, France, Turkey, and Sri Lanka; business class tickets to other destinations disguised as economy class tickets; meals; transportation; and stays in opulent hotel suites. (*Id.* ¶¶ 12-16, 22-23, 27, 41). As a condition of receiving this largesse, Adams agreed to cut off contact with a group of his constituents whose political views were at odds with Turkey's regime. (*Id.* ¶ 17). By 2018, Adams's corrupt relationship with the Turkish Official grew to include soliciting not only luxury travel, but also contributions to the defendant's fledgling mayoral campaign. (*Id.* ¶¶ 18-19, 29-30).

By 2021, the Turkish Official had become Turkey's consul general in New York. (*Id.* ¶ 38). As such, the official had responsibility for the Turkish House, a newly built Manhattan skyscraper owned by the Turkish Government. (*Id.*). In exchange for the stream of travel benefits the Turkish Official directed to Adams, the defendant agreed to help the official receive favorable treatment from New York City in regulating the building. (*Id.* ¶¶ 33, 38). That year, Adams pressured the FDNY to allow the Turkish House to open in time to be inaugurated by Turkey's President, even though the building had not yet received a fire safety inspection. (*Id.* ¶ 38). In return, Adams got, among other things, over $12,000 in free airfare on a trip to Africa, an all-expense-paid night on

---

[1] Adams contends that only certain paragraphs of the Indictment support the bribery count (Mot. 3), but the bribery count expressly incorporates all the allegations in the Indictment except for those setting forth the statutory elements of other offenses (Ind. ¶ 62).

the town in Istanbul, and various perks—including transportation, lodging, and a VIP suite in the Turkish Airline's business class lounge for his chief fundraiser. (*Id.* ¶¶ 35, 39-40).[2]

The defendant's corrupt *quid pro quo* with the Turkish Official continued into 2022, when Adams became Mayor. Adams agreed to continue helping the official with regulatory problems "like FDNY approvals" regarding the Turkish House, and the official agreed to continue providing travel benefits. (*Id.* ¶ 44).

## II. Legal Background

Count Five charges Adams with soliciting and accepting bribes in violation of 18 U.S.C. § 666(a)(1)(B). (*Id.* ¶ 63). That statute prohibits state and local officials from "accept[ing] or agree[ing] to accept, anything of value from any person, intending to be influenced or rewarded in connection with any business, transaction, or series of transactions" of the government or agency in which the official serves. 18 U.S.C. § 666(a)(1)(B); *see generally United States v. Ng Lap Seng*, 934 F.3d 110, 122-36 (2d Cir. 2019).[3]

The Supreme Court recently examined Section 666(a)(1)(B) in *Snyder v. United States*, 144 S. Ct. 1947 (2024). *Snyder* analyzed whether the statute prohibits taking both bribes and

---

[2]     Adams also solicited a luxury trip to Turkey, including stays at the Four Seasons Istanbul and luxury beach resorts worth over $20,000, which he planned directly with the Turkish Official as well through the Adams Staffer, then cancelled at the last minute. (Ind. ¶ 34). To the extent Adams suggests that his cancellation has any legal significance (*see* Mot. 4, 13), that is incorrect: Count Five includes solicitation, meaning that Adams completed the crime when he asked the Turkish Official for this bribe. *See* 18 U.S.C. § 666(a)(1)(B); *e.g.*, *United States v. Rooney*, 37 F.3d 847, 852 (2d Cir. 1994) (examining whether unsuccessful solicitation would have resulted in corrupt *quid pro quo* if accepted). Nor is it correct to say that Adams "received no benefits" (Mot. 13) in connection with this episode: Few other New Yorkers could likely reserve a week-long luxury trip to a foreign county, including multiple flights and hotels as well as meals and entertainment, merely by buying two economy class seats, then cancel on the day of their departure and receive a full refund. (Ind. ¶ 34).

[3]     Section 666 also contains certain limitations not at issue here, such as a monetary threshold for the amount of federal aid received by the state or local government. *See* 18 U.S.C. § 666.

gratuities, or only the former. *Id.* at 1951-52. As the Court explained, "bribe" and "gratuity" both describe a payment to a public official in return for the official's actions. *Id.* But whereas bribes are paid or agreed to before an official does what the bribe-payer is paying the official to do, gratuities are paid after the fact, without any advance agreement to be influenced on the part of the official. *See id.* Where the payment is made after the act, the distinction is whether the official takes "(i) a reward given after the act with no agreement beforehand (gratuity) or (ii) a reward given after the act pursuant to an agreement beforehand (bribe)." *Id.* at 1959.[4] Based on the text, history, and purpose of the statute, the Court concluded that Section 666 criminalizes only bribes, not gratuities. *Id.* at 1959-60 ("Section 666 is a vital statute, but its focus is targeted: Section 666 proscribes bribes to state and local officials, while allowing state and local governments to regulate gratuities to state and local officials.").

## ARGUMENT

The defendant's attack on Count Five fails for at least three reasons: (I) Count Five pleads a violation of federal law, and the defendant's legal arguments concern the standards for jury instructions, not pleadings; (II) the defendant's legal arguments are incorrect even as to jury instructions; and (III) even if the defendant's legal arguments were correct, the facts of this case would satisfy the standards he asks this Court to adopt.

## I. Count Five States a Federal Crime

### A. Applicable Law

"An indictment is sufficient if it 'first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him

---

[4]      Unless otherwise noted, case quotations omit all internal citations, quotation marks, and previous alterations.

to plead an acquittal or conviction in bar of future prosecutions for the same offense.'" *United States v. Stringer*, 730 F.3d 120, 124 (2d Cir. 2013) (quoting *Hamling v. United States*, 418 U.S. 87, 117 (1974)); *see also United States v. Resendiz-Ponce*, 549 U.S. 102, 108 (2007). To state an offense "an indictment need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime." *United States v. Alfonso*, 143 F.3d 772, 776 (2d Cir. 1998). "An indictment . . . need not be perfect, and common sense and reason are more important than technicalities." *United States v. De La Pava*, 268 F.3d 157, 162 (2d Cir. 2001).

"The dismissal of an indictment is an extraordinary remedy reserved only for extremely limited circumstances implicating fundamental rights." *Id.* at 165. In reviewing a motion to dismiss, courts "accept as true all of the allegations of the indictment," and "[c]ontrary assertions of fact by the defendants will not be considered." *United States v. Goldberg*, 756 F.2d 949, 950 (2d Cir. 1985); *United States v. Benjamin*, 95 F.4th 60, 66 (2d Cir. 2024) (same). Reviewing courts also deem the indictment "to include facts which are necessarily implied by the specific allegations made." *United States v. Rigas*, 490 F.3d 208, 229 (2d Cir. 2007) .

## B. Discussion

Count Five "contains the elements of the offense charged and fairly informs [the] defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." *Hamling*, 418 U.S. at 117. Paragraph 63 of the Indictment indisputably "track[s] the language of the statute charged and state[s] the time and place (in approximate terms) of the alleged crime." *Alfonso*, 143 F.3d at 776. Adams does not, and could not reasonably, deny that Count Five also adequately informs him of the charge and sufficiently specifies his crime to allow him to plead double jeopardy if he is again

prosecuted for it. That is all this Court needs to determine in order to deny the motion. *See Costello v. United States*, 350 U.S. 359, 363 (1956) ("An indictment returned by a legally constituted and unbiased grand jury . . . if valid on its face, is enough to call for trial of the charge on the merits."); *United States v. Dawkins*, 999 F.3d 767, 780 (2d Cir. 2021) ("At the indictment stage, we do not evaluate the adequacy of the facts to satisfy the elements of the charged offense. That is something we do after trial." (quoting *United States v. Wedd*, 993 F.3d 104, 120 (2d Cir. 2021))).

The defendant's contrary arguments mischaracterize the Indictment, the case law, and often both. Adams claims that Count Five charges him with soliciting and taking not bribes, but rather gratuities, which are not covered by Section 666 under *Snyder*. (Mot. 14). Yet the Indictment says he took bribes, not gratuities. (*See* Ind. ¶ 6 ("In exchange for free travel and other travel-related bribes . . . .")). And in holding that Section 666 does not reach gratuities, *Snyder* made emphatically clear that Section 666 "is a bribery statute." *Snyder*, 144 S. Ct. at 1954, 1956, 1959.

Adams's claim that the Indictment does not say what it literally recites (Mot. 14-15) fails on its face, because at this stage of litigation the Indictment's statements are taken as true, and the defendant's contrary assertions "will not be considered." *Benjamin*, 95 F.4th at 66. But the legal premises underlying Adams's assertions also err. *Snyder* made clear that the essential distinction between bribes and gratuities is that bribes are accepted (or solicited) in exchange for the bribe-taker agreeing "to be influenced," whereas gratuities are given as "a token of appreciation," without any agreement on the part of the recipient. *Snyder*, 144 S. Ct at 1951, 1956. The Indictment plainly alleges that Adams sought and took travel benefits "in exchange for intending to be influenced." (Ind. ¶ 63; *see also, e.g.*, *id.* ¶ 33 (Adams took travel benefits "in exchange for" forcing the opening of the Turkish House), ¶ 43 (Adams "continued his agreement with the Turkish Official" to exchange regulatory favors for travel benefits); ¶ 44 (Adams took travel benefits "in

exchange for intending to be influenced" in the City's regulation of the Turkish House)). The assertion that the *quid* was taken "in exchange for" the *quo* alleges a bribery agreement. *Benjamin*, 95 F.4th at 73-74; *see also United States v. Madigan*, No. 22 Cr. 115 (JBB), Dkt. 213 at 17-19 (N.D. Ill. Oct. 2, 2024) (rejecting motion to dismiss under *Snyder* because allegation of payments "in exchange for" actions alleged bribery *quid pro quo*).

Moreover, *Snyder* defeats the defendant's argument that some of the charged bribes must really be charged gratuities because Adams received them after performing official action for the Turkish Official. (*See* Mot. 6-7, 14). Section 666 prohibits not only payments taken "intending to be influenced" but also those taken "intending . . . to be rewarded." 18 U.S.C. § 666(a)(1)(B). In holding that the latter category still meant bribes, not gratuities, the *Snyder* majority reasoned that by including "rewarded" in the statute, "Congress made clear that the timing of the agreement is the key, not the timing of the payment, and thereby precluded such a potential defense." *Snyder*, 144 S. Ct. at 1959; *See, e.g.*, *United States v. Macrina*, 109 F.4th 1341, 1351 (11th Cir. 2024) (rejecting argument that payments made after the corrupt act must be gratuities under *Snyder*).

Most of the defendant's other arguments depend on the premise that bribery under Section 666 requires proving an "official act" as that term is defined in *McDonnell v. United States*, 579 U.S. 550 (2016). (*See* Mem. 7-12, 17-19). As explained below, that is wrong, both because the Second Circuit has squarely held that Section 666 does not require satisfying *McDonnell*'s official act requirement, and because the conduct here would satisfy *McDonnell* even if that was required. But for purposes of this motion, all that matters is that *McDonnell* does not concern pleading standards. Instead, it was a case about jury instructions. *See McDonnell*, 579 U.S. 550 at 577 ("Governor McDonnell argues that his convictions must be vacated because the jury was improperly instructed on the meaning of 'official act' under [18 U.S.C.] § 201(a)(3) . . . . We

agree."). Courts thus consistently reject motions to dismiss under *McDonnell*. *E.g.*, *United States v. Lee*, 919 F.3d 340, 353, 354-55 (6th Cir. 2019), *cert. denied*, 140 S. Ct. 895 (2020); *United States v. Menendez*, No. 23 Cr. 490 (SHS), Dkt. 344 at 50-52 (S.D.N.Y. Apr. 11, 2024) ("Defendants contend that various of the actions alleged by the government in support of its bribery-related counts are not official acts as that term is defined in *McDonnell* . . . . However, this issue may not be decided by the Court now, but is more properly determined by the jury at the end of the case."); *United States v. Keleher*, 505 F. Supp. 3d 41, 48 (D.P.R. 2020) ("The indictment's allegations satisfy the government's burden at this stage, because they sufficiently notify the defendants of the crimes with which they are charged and would allow them to raise a double jeopardy issue should that become warranted. A jury, not this Court, must determine whether [the charged] actions . . . constitute an official act or evidence an agreement to take an official act.'"); *United States v. Oaks*, 302 F. Supp. 3d 716, 726 (D. Md. 2018) ("[T]he Defendant argued at the hearing that an honest services indictment must allege everything *McDonnell* requires in jury instructions. . . . This Court finds no basis to extend the full breadth of *McDonnell* to indictments . . . ."); *United States v. Williams*, No. 16 Cr. 03 (TCB), 2017 WL 1030804, at *4 (N.D. Ga. Mar. 16, 2017).

Adams offers no contrary authority. He cites cases concerning *McDonnell*, but those cases also address jury instructions, not pleading standards. *See United States v. Silver*, 948 F.3d 538 (2d Cir. 2020); *United States v. Jefferson*, 289 F. Supp. 3d 717 (E.D. Va. 2017). And his citations on pleading standards do nothing to suggest that *McDonnell* bears on his motion to dismiss. (*See* Mot. 5 (citing *United States v. Gonzalez*, 686 F.3d 122, 127 (2d Cir. 2012); *Russell v. United States*, 369 U.S. 749, 764-65 (1962); *United States v. Walsh*, 194 F.3d 37, 44 (2d Cir. 1999))).

For example, *Gonzalez* considered an indictment's failure to plead the quantity of cocaine in charging a violation of 21 U.S.C. § 841(b)(1)(B). *Gonzalez*, 686 F.3d at 123. Section 841(b)(1)(B) imposes a mandatory minimum sentence for offenses involving 500 grams or more of cocaine. *Id.* Because the indictment did not allege that any particular quantity of cocaine was involved, the Circuit concluded that Gonzalez had not been charged with violating the statute. *Id.* Adams claims that *Gonzalez* stands for the proposition that, "Prosecutors cannot simply insert a conclusory allegation of 'pressure' and make out a charge of bribery." (Mot. 18). In fact, *Gonzalez* stands for nearly the opposite proposition: Exactly what was missing in the *Gonzalez* indictment was a conclusory allegation that the defendant sold at least 500 grams of cocaine. *See Gonzalez*, 686 F.3d at 132 (to have charged Gonzalez with distributing "500 grams or more of cocaine," the grand jury needed "to have alleged that fact in words."). Thus, even if the Indictment were required to allege that Adams "pressured" the FDNY, that the Indictment does make that allegation (Ind. ¶¶ 6, 38, 39) would suffice. *See, e.g.*, *United States v. Bout*, No. 08 Cr. 365 (SAS), 2011 WL 2693720, at *5 n.73 (S.D.N.Y. July 11, 2011) ("To the extent [the defendant's] challenges are to the sufficiency of the Government's evidence to *satisfy*—as opposed to the sufficiency of the Indictment to *allege*—the federal elements of the crimes charged, those arguments are not appropriately decided on a motion to dismiss."), *aff'd*, 731 F.3d 233 (2d Cir. 2013).

Even further afield is the defendant's reliance on *Russell*. The Second Circuit has described *Russell* as "a 50 year-old precedent, which is one of the very rare cases in which an indictment that tracked the statutory language and furnished the pertinent dates was held insufficient." *Stringer*, 730 F.3d at 125. *Stringer* went on to stress the unique facts of *Russell*, which arose in the prosecution of a witness for refusing to answer questions during the notorious McCarthy-era hearings. *Id.* at 125-26 (citing *Resendiz-Ponce*, 549 U.S. 102). Courts thus regularly

distinguish *Russell* in cases falling outside its idiosyncratic context. *See Walsh,* 194 F.3d at 45; *United States v. McClean,* 528 F.2d 1250, 1257 (2d Cir. 1976); *United States v. Paulino,* 935 F.2d 739, 750 n.4 (6th Cir. 1991). But even on its own terms, *Russell* does not aid Adams. In that case, the indictment alleged the refusal to answer questions pertinent to a subject under inquiry by a congressional committee, but did not specify the subject under inquiry. *Russell*, 369 U.S. at 764. That left the defendant unprepared to defend against the charge, because he could not know with certainty what he had been accused of. *Id.* at 764-65. Adams makes no claim that the detailed indictment here leaves him in similar doubt.

The defendant's final pleading standards case, *Walsh*, is—as just noted—one of those cases that distinguished *Russell* en route to denying a motion to dismiss. Adams quotes portions of *Walsh*'s statement that the "Indictment Clause of the Fifth Amendment requires that an indictment contain some amount of factual particularity to ensure that the prosecution will not fill in elements of its case with facts other than those considered by the grand jury." *Walsh*, 194 F.3d at 44. But Adams make no claim that the Indictment lacks sufficient particularity, and nothing in *Walsh* suggests otherwise. This Court can thus safely follow *Walsh* and deny the defendant's motion to dismiss Count Five. *See id.* at 44-45.

## II. Section 666 Does Not Require Jury Instructions on *McDonnell*'s Official Act Requirement

Because Count Five contains all the elements of a federal offense, and sufficiently informs Adams of the charge against him, this Court need proceed no further to resolve the instant motion. If, however, the Court examines the defendant's legal arguments on their own terms, it will discover that they squarely contradict Second Circuit precedent.

Most of Adams's arguments depend on the premise that Section 666 criminalizes his conduct only if he agreed to perform an "official act" as *McDonnell* defined that term in 18 U.S.C.

§ 201. (*See* Mem. 7-12, 17-19). Section 201 applies to federal officials who take or receive bribes "to influence any official act," 18 U.S.C. § 201(b)(1), and provides a detailed definition of "official act," *id.* § 201(a)(3). Section 666 does not contain the term "official act," but rather applies to those who take bribes "intending to be influenced or rewarded in connection with any business, transaction, or series of transactions of" the government or agency of which the bribe-taker is an agent. 18 U.S.C. § 666(a)(1)(B). And the Second Circuit held that Section 666 does not require proof of an official act as defined in *McDonnell* in *Ng Lap Seng*, 934 F.3d at 132-36 (district court erred in instructing jury that Government must satisfy *McDonnell* to prove violation of Section 666); *see also United States v. Boyland*, 862 F.3d 279, 291 (2d Cir. 2017).

Adams claims that *Snyder* overruled *Ng Lap Seng* and made *McDonnell* applicable to Section 666. (*See* Mot. 8). But *Snyder* did not purport to address whether *McDonnell* applied to Section 666. As discussed above, the question in *Snyder* was whether Section 666 applied to gratuities as well as bribes, and *Snyder* held only that gratuities fall outside the statute. Nowhere did *Snyder* analyze what an official must agree to do in order to constitute bribery under Section 666, much less examine whether *McDonnell* had any bearing on that question. This Court should therefore decline the defendant's invitation to find that the Supreme Court overruled *Ng Lap Seng* without even touching on its holding. *See Monsanto v. United States*, 348 F.3d 345, 351 (2d Cir. 2003) (even if a Supreme Court case is "in tension" with Second Circuit precedent, courts in this Circuit are required to follow the Circuit's precedent "unless and until that case is reconsidered by [the Second Circuit] sitting in banc (or its equivalent) or is rejected by a later Supreme Court decision."); *Boone v. United States*, No. 02 Cr. 1185 (JMF), 2017 WL 398386, at *1 (S.D.N.Y. Jan. 30, 2017) (district courts must follow circuit precedent unless a Supreme Court

decision "so conclusively supports th[e] finding that the Second Circuit or the Supreme Court is all but certain to overrule" that precedent).

The defendant's attack on *Ng Lap Seng* tries several angles, all foreclosed by the cases he cites. *First*, Adams notes that *Snyder* reasoned that Section 666 "tracks" Section 201(b). (Mot. 8). But *Snyder* was not referring to the "official act" language in Section 201(b), which appears prominently in that statute and is quite obviously absent from Section 666. Rather, *Snyder* focused on the appearance of "corruptly" in both statutes, which the Court found to connote only bribery, not gratuities. *Snyder*, 144 S. Ct. at 1954-55. The Court's analysis of a word that appears in both statutes does not imply that the Court also found that two very different statutory phrases "track[]" each other, and thus does not put *Snyder* in tension with *Ng Lap Seng*.

*Second*, Adams points out that *McDonnell* was driven not only by the statutory text of Section 201, but also by constitutional concerns. (Mot. 9-10). The Second Circuit agreed, and thus analyzed those constitutional concerns in *Ng Lap Seng*. As the Circuit explained, Section 666 does not present the same constitutional issues as Section 201, or the other statutes where courts have found *McDonnell* applicable. *See Ng Lap Seng*, 934 F.3d at 134-39. In particular, the Circuit found that Section 666 provides sufficient clarity on its face to avoid vagueness concerns, and does not pose federalism concerns because Congress expressly chose to regulate state and local governments based on their acceptance of federal funds. *Id.*

Nothing in *Snyder* undermines that reasoning. To the contrary, *Snyder* cites *McDonnell* twice: Once for the proposition that vague statutes give too much power to prosecutors, and once for the proposition that federalism concerns should bear on the interpretation of Section 666. *Snyder*, 144 S. Ct. at 1958. And the Court found both concerns satisfied by limiting the statute to bribery and not gratuities, without any hint that Section 666's application to bribery also needed

more constraints. *See id.* at 1959-60. *Snyder* cannot therefore be read as conflicting with the considered constitutional analysis of *Ng Lap Seng*.

*Third*, there can be no dispute that *Snyder* uses the words "official act" many, many times. (*See* Mot. 7). But the Court never suggested that it was using the phrase as a term of art, meant to require the detailed jury instructions that *McDonnell* found necessary to elucidate the statutory definition in Section 201. Rather, "official act" is a fairly generic term that need not always carry the full freight of *McDonnell*. Adams appears to acknowledge as much. (*See* Mot. 10 (addressing the possibility that "the contours of 'official act' under Section 666" may "differ[] somewhat from the defined term under . . . Section 201(b)"). The Second Circuit also noted that the phrase "official act" is not synonymous with the defined term in Section 201. *See Ng Lap Seng*, 934 F.3d at 132 ("not all federal bribery statutes identify 'official act,' much less official act as defined in § 201(a)(3)"). Thus, in pre-*McDonnell* cases, the Circuit sometimes used "official act" as shorthand for what the bribed official must agree to provide under Section 666, when it obviously was not referring to Section 201, and could not have been referring to *McDonnell*. *See, e.g.*, *United States v. Bahel*, 662 F.3d 610, 636 (2d Cir. 2011); *United States v. Crozier*, 987 F.2d 893, 898 (2d Cir. 1993). Given that *Snyder* never discussed *McDonnell*'s explication of "official act," it is apparent that the opinion was doing the same thing: using the phrase as shorthand for what an official agrees to provide in exchange for a bribe, to avoid continuously repeating the cumbersome "intending to be influenced or rewarded in connection with any business, transaction, or series of transactions of such organization, government, or agency involving any thing of value of $5,000 or more," 18 U.S.C. § 666(a)(1)(B); *see Snyder*, 144 S. Ct. at 1954-55 & n.2 (stating that "Section 666(a)(1)(B) makes it a crime for state and local officials to 'corruptly' accept payment 'intending to be influenced or rewarded' for an official act," then providing full statutory text in footnote).

Reading the opinion as a whole makes it even clearer that *Snyder* did not secretly hold that Section 666 incorporates *McDonnell*'s official act requirement in a case that never presented that question. Much of *Snyder*'s reasoning turned on the fear that if Section 666 covered gratuities, any of America's "19 million state and local officials" would commit a federal crime by accepting even the smallest gift. *Snyder*, 144 S. Ct. at 1951. Section 666 would then extend, the Court said, to "the mail carrier," a "public school teacher," a "trash collector," "snowplow drivers," and "high school basketball coaches," among many others, for accepting a "holiday tip" or "end-of-year gift basket." *Id.* at 1952, 1957-58. The Court made no effort to suggest that anyone doing these jobs might have performed an official act within the narrow meaning of *McDonnell*, yet concluded that if Section 666 applied to gratuities, then all these officials would be subject to prosecution for accepting a framed photo or a burrito. *Id.* at 1958. It is thus clear that *Snyder* did not rule, or even hint, that the official act requirement in *McDonnell* applies to Section 666. *See also id.* at 1969-70 (Jackson, J., dissenting (criticizing the majority opinion for failing to consider possible limits that could mitigate its parade of horribles, and giving as one example *McDonnell* "clarifying the 'official act' requirement in § 201(a)(3)")).[5]

That is not to say that Section 666 places no limits on what an official must agree to do in return for a bribe. The statute provides its own definition of the required *quo*: "intending to be influenced or rewarded in connection with any business, transaction, or series of transactions of such organization, government, or agency involving any thing of value of $5,000 or more," 18 U.S.C. § 666(a)(1)(B). There are precedents interpreting that language. *See Boyland*, 862 F.3d at

---

[5]     The alternative is even less palatable for Adams. If using the phrase "official act" means that *Snyder* delimited the extent of official actions that can satisfy Section 666, then rather than adopting *McDonnell*, *Snyder* held that nearly anything goes. A statute that criminalizes accepting a gift basket offered in exchange for a year of teaching math, *cf. Snyder*, 144 S. Ct. at 1957-58, plainly covers the defendant's conduct, and far less.

291 (examining the textual differences between Sections 666 and 201); *Ng Lap Seng*, 934 F.3d at 132-33 (explaining that the textual differences between Sections 666 and 201 are consistent with the different constitutional concerns at issue in the two statutes). For example, the Circuit recently interpreted the scope of "business, transaction, or series of transactions" in *Dawkins*. That case involved bribes given to basketball coaches at federally funded universities, in return for which the coaches steered their star players to a bribe-paying sports agent. *Dawkins*, 999 F.3d at 777. On appeal, the Circuit affirmed a jury instruction that "the phrase 'business or transaction' is not limited to transactions or to commercial business of the universities, but includes intangible aspects of the business of the organization,' and that the 'business or transaction' involved in this case was 'the operation and administration of the university's men's basketball program.'" *Id.* at 785-87. The "City of New York's regulation of the Turkish House" (Ind. ¶ 63) falls comfortably within those instructions. Thus, even if indictments had to allege everything that might be required in an eventual jury charge, Count Five would pass muster.

## III.  The Defendant's Conduct Satisfies any Official Act Requirement

The defendant also errs when claiming that his conduct is not criminal under *McDonnell*. Although that case is inapplicable to the present motion twice over—because *McDonnell* does not concern pleading standards or Section 666—Adams's crimes present none of the concerns *McDonnell* identified when refining the definition of "official act" in Section 201.

### A.  Applicable Law

As noted above, *McDonnell* examined the jury instructions required to determine whether a defendant committed an "official act," which is a defined term in the bribery statute for federal officials, 18 U.S.C. § 201. As it concluded:

> In sum, an "official act" is a decision or action on a "question, matter, cause, suit, proceeding or controversy." The "question, matter, cause, suit, proceeding or controversy" must involve a formal exercise of governmental power that is similar

> in nature to a lawsuit before a court, a determination before an agency, or a hearing before a committee. It must also be something specific and focused that is "pending" or "may by law be brought" before a public official. To qualify as an "official act," the public official must make a decision or take an action on that "question, matter, cause, suit, proceeding or controversy," or agree to do so. That decision or action may include using his official position to exert pressure on another official to perform an "official act," or to advise another official, knowing or intending that such advice will form the basis for an "official act" by another official. Setting up a meeting, talking to another official, or organizing an event (or agreeing to do so)—without more—does not fit that definition of "official act."

*McDonnell*, 579 U.S. at 574 (quoting 18 U.S.C. § 201(a)(3)). Courts have since held that *McDonnell* requires jury instructions to that effect in certain other bribery statutes, such as honest services fraud under 18 U.S.C. §§ 1343 and 1346, and extortion under color of official right under 18 U.S.C. § 1951. *See Boyland*, 862 F.3d at 290-91 (holding that Sections 1346 and 1951, but not Section 666, require such instructions).

## B. Discussion

### 1. Adams Agreed to Perform Specific and Focused Official Acts in Exchange for Bribes

Adams solicited and accepted luxury travel in return for agreeing to perform official acts that were "specific and focused" and "similar in nature to a determination before an agency." *McDonnell*, 579 U.S. at 574. Adams agreed to ensure the Turkish House received a temporary certificate of occupancy ("TCO"), and to intervene with respect to similar regulatory issues with the building, "[l]ike FDNY approvals." (Ind. ¶¶ 33, 38, 43). Adams does not address those allegations so much as pretend that they do not exist. He all-but admits that his intervention on the TCO qualifies as an official act, but then argues that other paragraphs in the Indictment undo the very specific statement that he "intervened with the FDNY to permit the Turkish Consulate to occupy a skyscraper that had not passed a fire safety inspection, in exchange for, among other things, luxury travel benefits provided by the Turkish Official and the Airline Manager." (Mot.

14-15 (quoting Ind. ¶ 33)). Neither law nor logic supports his claim that because the Indictment *also* describes other corrupt things Adams did, it somehow ceases to specify this particular one.

The defendant offers even less with respect to his agreement to have his administration address "pending problems regarding" the Turkish House "[l]ike FDNY approvals." (Ind. ¶ 43). Adams argues that the phrase "pending problems" is "too generalized" (Mot. 16) only by ignoring the specificity that "[l]ike FDNY approvals" obviously adds. And his argument that he never "actually received word of any 'pending problems' or acted on them" (Mot. 16) ignores the statutory text. Section 666 criminalizes soliciting or accepting things of value—something Adams repeatedly did—"corruptly . . . *intending* to be influenced or rewarded." 18 U.S.C. § 666(a)(1)(B) (emphasis added). There is no requirement that Adams's intent translated into action, so long as he took payments with that intent. The same is true for other federal bribery statutes, including those that apply *McDonnell*.[6] Thus, even if Adams had not actually taken official action by pressuring the FDNY to allow the Turkish House to open, protesting that he did not also perform other corrupt official acts would be beside the point.

Many of Adams's remaining arguments about *McDonnell* amount to comparing imaginary fact patterns to inapplicable standards. For example, Adams says that the Indictment "does not allege any specific exchanges or conversations in which Adams and the Turkish official entered into this purported *quid pro quo* agreement." (Mot. 3). But an indictment need not allege all the supporting facts that will prove its allegations—as the Circuit made clear just this year, on exactly

---

[6] *See, e.g.*, *Evans v. United States*, 504 U.S. 255, 268 (1992) ("[T]he offense is completed at the time when the public official receives a payment in return for his agreement to perform specific official acts; fulfillment of the *quid pro quo* is not an element of the offense."); *cf.* 18 U.S.C. § 201(b)(2)(A) (prohibiting public officials from "agree[ing] to receive or accept anything of value . . . in return for . . . being influenced in the performance of an official act"). Indeed, unlike in Section 666, under *McDonnell* there is no requirement that "the public official in fact intend to perform the 'official act,' so long as he agrees to do so." *McDonnell*, 579 U.S. at 572.

this point. *See Benjamin*, 95 F.4th at 73-74. And in any event, the Government need not offer proof of such a conversation at any point in the case, given that "evidence of a corrupt agreement in bribery cases is usually circumstantial, because bribes are seldom accompanied by written contracts, receipts or public declarations of intentions." *United States v. Friedman*, 854 F.2d 535, 553 (2d Cir. 1988). Courts thus routinely reject a defendant's claim that "a bribery agreement would become legal if he simply avoided memorializing it expressly in words or in writing." *Benjamin*, 95 F.4th at 75; *see, e.g.*, *United States v. Blagojevich*, 794 F.3d 729, 738 (7th Cir. 2015) ("Few politicians say, on or off the record, 'I will exchange official act X for payment Y.'"); *United States v. Inzunza*, 638 F.3d 1006, 1014 (9th Cir. 2011) ("An official may be convicted without evidence equivalent to a statement such as: 'Thank you for the $10,000 campaign contribution. In return for it, I promise to introduce your bill tomorrow.'"); *United States v. Myers*, 692 F.2d 823, 844 (2d Cir. 1982) (undercover agents offering bribe need not say "Congressman, I have here a cash bribe to be exchanged for your corrupt promise to be influenced in your official action.").

In any event, the Indictment describes a conversation that is about as express as courts see in a bribery case. When the Turkish Official needed Adams to intervene with the FDNY, the Turkish Official told the Adams Staffer to remind Adams of all the support Turkey had offered, and that it was now "his turn." (Ind. ¶ 38g). Adams responded, "I know." (*Id.*). The natural reading of that exchange is that Adams was acknowledging a pre-existing bargain. And after performing the corrupt act, Adams reached right back out to collect more payment, requesting what would amount to over $12,000 in luxury travel. (*Id.* ¶ 39). When combined with all the other circumstantial evidence of a corrupt *quid pro quo*, only a portion of which is described in the Indictment, the evidence that Adams agreed to be influenced when he solicited and accepted luxury travel will more than suffice. *See, e.g.*, *United States v. Salameh*, 152 F.3d 88, 143 (2d Cir. 1998)

("as a general rule most evidence of intent is circumstantial"); *United States v. MacPherson*, 424 F.3d 183, 190 (2d Cir. 2005) ("A verdict of guilty may be based entirely on circumstantial evidence as long as the inferences of culpability drawn from the circumstances are reasonable.").[7]

### 2. Adams Pressured the FDNY

The defendant maintains that a "reasonable factfinder could not construe [his] statements as the exertion of pressure on any FDNY official to perform an official act or do anything." (Mot. 17). In asking how a factfinder could permissibly weigh the evidence in his case, Adams leaps far ahead, past pleading standards and jury instructions, all the way to post-trial motions. *See Wedd*, 993 F.3d at 120; *United States v. Aiyer*, 33 F.4th 97, 117 (2d Cir. 2022) (in criminal cases, "summary judgment does not exist," and "although a judge may dismiss a civil complaint pretrial for insufficient evidence . . . a judge generally cannot do the same for a federal criminal indictment."). But his factual arguments will fail even when properly offered, because "pressure" is how FDNY witnesses have described what Adams exerted, and rightly so.

---

[7]    Adams argues at times that the timing of the bribes shows that he did not take them in return for agreeing specifically to intervene with the FDNY. (Mot. 13-15). These claims appear geared primarily to his argument that Count Five secretly charges gratuities, which errs for the reasons explained above. (*See supra* at 7). But to the extent he is claiming that the agreement lacks sufficient specificity for a bribery theory, this claim fails in at least four ways: *First*, the Indictment in fact describes such a specific agreement. (Ind. ¶¶ 6, 33). *Second*, Section 666 does not require such specificity in how the *quo* is described. *See, e.g.*, *Dawkins*, 999 F.3d at 785-87. *Third*, even in statutes governed by *McDonnell*, bribery is not limited to granular agreements to exchange a single action for a single payment. *See, e.g., Silver*, 948 F.3d at 554 (a bribery scheme can involve "this for these or these for these, not just this for that"); *United States. v. Percoco*, 13 F.4th 180, 201 (2d Cir. 2021) ("It would be strange indeed to hold that an original deal between an official and payor somehow froze their agreement in time, excluding the possibility that an official could later commit to take more acts in order to maintain a revenue stream."), *rev'd on other grounds*, 598 U.S. 319 (2023). *Fourth*, under that same standard, a properly instructed jury would conclude that the City's "regulation of the Turkish House" (Ind. ¶ 63) also constitutes a sufficiently focused "matter" for purposes of *McDonnell*. *See, e.g.*, *Silver*, 948 F.3d at 570 (a rational jury would have found a *quid pro quo* "to influence a *particular matter*, namely the relevant tax abatement and rent stabilization programs").

The Indictment outlines that pressure. For over a week, the Fire Prevention Chief resisted entreaties to acquiesce in the opening of the Turkish House without an inspection, and received a report that the building was not only unlikely to pass an inspection, but "not safe to occupy." (Ind. ¶ 38). But then Adams pushed the FDNY Commissioner for fast action, and the Fire Prevention Chief turned on a dime, having been told he would be fired if he failed to comply. (*Id.*). The chief took the "unprecedented" step of writing a *sui generis* letter that raised no objections to opening the skyscraper, provided that its *private* engineers vouched for the fire alarm system, and based on an *assumption* that another agency had verified that the sprinkler systems worked. (*Id.*). Even without the testimony and exhibits that a jury will see to fill out this sketch, it is not hard to see how a reasonable factfinder will understand the pressure exerted here. For example, a bribe-taking official who contacts a prosecutor merely to ask why charges have not been filed in a particular case could reasonably be found to have pressured the prosecutor, at least where the prosecutor testified that the official "had never contacted her in such a way regarding other cases." *Lee*, 919 F.3d at 342; *see also United States v. Reichberg*, 5 F.4th 233, 249 n.70 (2d Cir. 2021) (citing this portion of *Lee* with approval).

Adams resists this conclusion by ignoring the facts. He repeatedly claims to have done nothing more than send "three messages." (Mot. 2, 11, 13). But the indictment reflects a burst of communication that also included phone calls. (Ind. ¶ 38). Plus, the length of communications has little to do with whether they demonstrate a corrupt act: A congressman who sold his vote would not be less guilty because his conduct consisted of the single word "aye." And in any event, neither the messages nor the phone calls are the official action here. They are merely evidence of the action—causing the FDNY to allow a newly-built, 36-story midtown high-rise to be occupied

without passing an inspection. As *McDonnell* explained, although placing a phone call itself is not an "official act" under Section 201:

> If an official sets up a meeting, hosts an event, or makes a phone call on a question or matter that is or could be pending before another official, that could serve as evidence of an agreement to take an official act. A jury could conclude, for example, that the official was attempting to pressure or advise another official on a pending matter. And if the official agreed to exert that pressure or give that advice in exchange for a thing of value, that would be illegal.

*McDonnell*, 579 U.S. at 573. The same reasoning renders irrelevant Adam's repeated assertion that the charges here could "encompass" routine acts like attending meetings. (Mot. 2, 11-12). Many public corruption crimes will include quotidian acts like meetings and phone calls, because that is how senior officials typically get things done. But where, as here, those routine actions are used to sway another official's performance of his duties "in exchange for a thing of value, that would be illegal." *McDonnell*, 579 U.S. at 573.

Nor does it matter that Adams told the FDNY Commissioner that he would "manage . . . expectations" if it turned out to be impossible to send an inspector to the Turkish House that day. (Ind. ¶ 38m). The law does not require the pressure applied to be irresistible or unrelenting. It suffices that Adams tried—here, through the successful application of pressure—to cause the FDNY to change course. *McDonnell* makes this clear, by explaining that simply "advising" another official, which plainly does not force the official to do anything, is enough. *See McDonnell*, 579 U.S. at 574. In *Lee*, for example, the corrupt official expressly told the prosecutor, "I'm not trying to influence you . . . just trying to make you think," but a "juror could easily have heard those words and concluded that they meant the exact opposite—that Defendant was, in fact, trying to influence the prosecutor." 919 F.3d at 340; *see also*, *e.g.*, *United States v. Burke*, No. 19 Cr. 322, 2024 WL 3090277, at *16 (N.D. Ill. June 21, 2024) ("[W]hen the longest-serving alderman and Chairman of the Committee on Finance asks a city official to 'look into' a pending permit, the

request is not taken lightly. The trial evidence supports the reasonable inference that [the defendant] knew or intended his call to sway the permit evaluation in his favor.").

For similar reasons, it is irrelevant that while Adams was a borough president he lacked direct authority over the FDNY Commissioner. (*See* Mot. 18-19). Section 666 applies to "an agent of . . . a . . . local . . . government." 18 U.S.C. § 666(a)(1). "[T]he term 'agent' means a person authorized to act on behalf of . . . a government and, in the case of an organization or government, includes a servant or employee, and a partner, director, officer, manager, and representative." *Id.* § 666(d)(1). As a borough president, Adams was an officer of the New York City government. *See* N.Y. City Charter § 81(a) ("There shall be a president of each borough . . . ."); *id.* § 192 (describing borough presidents' powers in City government). Thus, when the defendant pressured the FDNY Commissioner (another City officer) regarding the FDNY's inspection of a building in the City—unquestionably City "business," 18 U.S.C. § 666(a)(1)(B)— he satisfied the elements of the statute.[8] And because Adams was indisputably an agent of the City, his citations to cases involving private citizens (*see* Mot. 18-19) have no bearing.

Moreover, even in statutes governed by *McDonnell*, courts have rejected the notion that a defendant can corruptly cause another official to act only if the defendant has formal authority to do so, a requirement absent from both *McDonnell* and the relevant statutes. *See United States v. Mangano*, No. 16 Cr. 540 (JMA), 2022 WL 2872670, at *3 (E.D.N.Y. July 20, 2022) (rejecting argument that *McDonnell* requires a formal relationship between the bribed official and the official who is caused to act); *Lee*, 919 F.3d at 342 ("Defendant claims that an official can only 'provide advice' to a second official if the first official is in an advisory role to the second. However,

---

[8]     In any event, Adams's deal with the Turkish Official continued into 2022, when Adams was Mayor and had direct authority over the "FDNY approvals" he agreed to influence. (Ind. ¶ 43).

nowhere in *McDonnell* did the Supreme Court state that it was creating such a rule. We do not adopt Defendant's additional constraints on the requirements for an official to 'provide advice.'"); *United States v. Roberson*, 998 F.3d 1237, 1254 n.22 (11th Cir. 2021) (rejecting argument that advice "must come from someone in a more formal advisory role"), *cert. denied*, 142 S. Ct. 1109 (2022). There is thus no shortage of cases where officials have been convicted of soliciting bribes to influence other officials who lay outside their chain-of-command. *See Boyland*, 862 F.3d at 292 (affirming conviction of state assemblyman for taking bribes for helping secure permits from city agencies"); *United States v. Biaggi*, 853 F.2d 89, 99 (2d Cir. 1988) (affirming conviction of Congressman for attempts to influence city officials); *United States v. Kimbrew*, 944 F.3d 810, 814, 815 (9th Cir. 2019) (affirming conviction of aide to congresswoman for accepting bribes in exchange for promises to pressure city employees, and explaining that "[t]he bribe recipient need not be the final decisionmaker"), *cert. denied*, 141 S. Ct. 400 (2020); *Lee*, 919 F.3d at 352 (rejecting argument that "an official can only 'exert pressure' on a second official if the first official has 'leverage or power' over the second official").

### 3. Adams Knew He Was Breaking the Law

Adams also errs in invoking the concerns about fair notice and federal regulation of local officials raised in *McDonnell* and *Snyder*. In a bid to show that he accepted little more than common courtesies, Adams minimizes the scale of the benefits he sought and received, as "vacant business-class seats and a car-ride." (Mot. 1). But that is not what the Indictment charges, or what the evidence will show. When Adams was not receiving entirely free flights or hotel suites, he arranged to receive his business class seats and luxury bookings well in advance of his travel, not because the accommodations were unsold, but so that he could reserve extravagant perks while appearing to pay his own way. (*See* Ind. ¶¶ 12a, 14, 15d, 16, 21, 34a-c, 39). For example, for the November and December 2021 personal trip with his partner, in September Adams told his

staffer—a City employee—to obtain economy class tickets to Pakistan. (*Id.* ¶ 39a). As was planned from the start, the tickets were upgraded to business class in November, more than ten days before Adams was scheduled to fly. (*Id.* ¶¶ 39a, c-d). Then four days before he was to fly to Pakistan, Adams had his destination changed to Ghana, receiving a new set of the airline's most expensive seats on an entirely different flight, at no charge. (*Id.* ¶ 39d). Perhaps needless to say, the Government does not expect the evidence to show that the Airline Manager was simply filling vacant seats worth over $14,000 on a flight to Africa when he sold Adams economy class tickets to Asia for about one-tenth the price, over three months before either flight departed. (*See id.* ¶¶ 39a-e). In short, the bribes Adams accepted look nothing like the criminalization of "gift cards, lunches, plaques, books, framed photos, or the like" feared in *Snyder*, 144 S. Ct. at 1951. *Cf. United States v. Heard*, 709 F.3d 413, 420 (5th Cir. 2013) (affirming bribery conviction where bribes consisted primarily of payment for travel expenses).

Adams also cannot defend his avarice as "routine" or "common" conduct. (Mot. 10, 20). It should be clear from the face of the Indictment that there is nothing routine about a public official accepting over $100,000 in benefits from a foreign diplomat, which he took great pains to conceal—including by manufacturing fake paper trails to create the illusion of payment. And it is definitionally not "common" to exert such pressure on the FDNY that it issues an "unprecedented" letter allowing a skyscraper to open without an inspection, especially where the building's foreign owner told the official it was "his turn" to take action for a foreign country. (Ind. ¶¶ 38g, 38o). Thus, absent some evidence that other officials have committed similar crimes yet gone unprosecuted, Adams cannot seriously claim that his prosecution is "highly selective" (Mot. 20). *See United States v. Avenatti*, 433 F. Supp. 3d 552, 563 (S.D.N.Y. 2020) (to make out selective prosecution claim, defendant must show that "others similarly situated have not generally been

proceeded against because of conduct of the type forming the basis of the charge against the defendant, and that the defendant has been singled out for prosecution").

For similar reasons, Adams cannot invoke federal overreach. Although *Snyder* worried about federal prosecution displacing state regulation of gratuities, it had no such concern about bribery. *See Snyder*, 144 S. Ct. at 1951 (regulation of gratuities is varied, but "American law generally treats bribes as inherently corrupt and unlawful."). Nor will anything about this case deter elected officials from "raising issues with regulatory agencies that concern constituent-donors." (Mot. 19). The defendant did more here than raise an issue, the Turkish Official is not a "constituent," and Adams is surely not admitting that the official was a "donor." But even if a foreign diplomat were to receive the same protections that the First Amendment accords to bonafide donors—and even if the bribes charged here were campaign contributions rather than personal luxuries—that would not be a defense to the explicit exchange of benefits for corrupt action charged in Count Five, as the Circuit recently reaffirmed. *See Benjamin*, 95 F.4th at 74-75 (state official had fair warning that *quid pro quo* involving campaign contributions was illegal).

## <u>CONCLUSION</u>

For the reasons set forth above, the motion to dismiss Count Five should be denied.

Dated:      New York, New York
            October 18, 2024

                          Respectfully submitted,

                          DAMIAN WILLIAMS
                          United States Attorney

            By:     _____/s/_____
                          Celia V. Cohen
                          Andrew Rohrbach
                          Hagan Scotten
                          Derek Wikstrom
                          Assistant United States Attorneys
                          (914) 993-1921 / (212) 637-1944 / 2410 / 1085