UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

-v.-

ERIC ADAMS,

Defendant.

24 Cr. 556 (DEH)

## THE GOVERNMENT'S OPPOSITION TO THE DEFENDANT'S MOTION FOR SANCTIONS

DAMIAN WILLIAMS
United States Attorney
Southern District of New York
26 Federal Plaza
New York, New York 10278

Celia V. Cohen
Andrew Rohrbach
Hagan Scotten
Derek Wikstrom
Assistant United States Attorneys
    *Of Counsel*

## TABLE OF CONTENTS

RELEVANT FACTS ................................................................................................... 1

    A. Press Coverage of the Investigation ................................................................ 1

        1. Search Warrants .................................................................................... 2

        2. Witness Interviews ............................................................................... 4

        3. Subpoenas ............................................................................................ 5

        4. The Indictment ..................................................................................... 7

    B. Steps Taken in Response to Press Coverage .................................................. 8

ARGUMENT .......................................................................................................... 10

    I. Adams Has Not Made Out a *Prima Facie* Case that the Prosecution Team Leaked Information Subject to Federal Rule of Criminal Procedure 6(e) ................................................. 10

    A. Applicable Law ............................................................................................ 10

    B. Discussion ................................................................................................... 12

        1. Adams Has Not Established that the Prosecution Team Was the Source of Any Improper Disclosures ................................................................................. 12

        2. Adams Has Not Established the Disclosure of Matters Before the Grand Jury ........... 17

    II. Adams Cannot Show Prejudice from the Alleged Leaks .................................... 20

    A. Applicable Law ............................................................................................ 20

    B. Discussion ................................................................................................... 21

    III. The Court Should Not Hold a Hearing ............................................................ 24

CONCLUSION ...................................................................................................... 25

# <u>TABLE OF AUTHORITIES</u>

Page(s)

Cases

*Bank of Nova Scotia v. United States*,
   487 U.S. 250 (1988)............................................................................................ 20

*Barry v. United States*,
   865 F.2d 1317 (D.C. Cir. 1989) ....................................................................... 13

*Blalock v. United States*,
   844 F.2d 1546 (11th Cir. 1988) .................................................................. 18, 19

*In re Grand Jury Investigation (Lance)*,
   610 F.2d 202 (5th Cir. 1980) ........................................................................... 14

*In re Grand Jury Subpoena*,
   103 F.3d 234 (2d Cir. 1996)............................................................................. 11

*In re Motions of Dow Jones & Co.*,
   142 F.3d 496 (D.C. Cir. 1998) ......................................................................... 19

*In re Sealed Case No. 98-3077*,
   151 F.3d 1059 (D.C. Cir. 1998) ....................................................................... 25

*United States v. Blaszczak*,
   No. 17 Cr. 357 (LAK), 2018 WL 1322192 (S.D.N.Y. Mar. 12, 2018) ............................ passim

*United States v. Burke*,
   700 F.2d 70 (2d Cir. 1983)............................................................................... 24

*United States v. Cuervelo*,
   949 F.2d 559 (2d Cir. 1991)............................................................................. 25

*United States v. Eastern Air Lines, Inc.*,
   923 F.2d 241 (2d Cir. 1991) ....................................................................... 11, 18

*United States v. Eisen*,
   974 F.2d 246 (2d Cir. 1992).................................................................. 20, 21, 24

*United States v. Haller*,
   837 F. 2d 84 (2d Cir. 1988)....................................................................... 7, 10, 17

*United States v. Interstate Dress Carriers, Inc.*,
   280 F.2d 52 (2d Cir. 1960)............................................................................... 11

*United States v. Lombardozzi*,
   491 F.3d 61 (2d Cir. 2007)............................................................................... 21

*United States v. Maldonado-Rivera*,
   922 F.2d 934 (2d Cir. 1990)............................................................................. 24

*United States v. Nassimi*,
   No. 04 Cr. 706 (LTS), 2023 WL 3584409 (S.D.N.Y. May 22, 2023).................................... 19

*United States v. Nordlicht*,
   No. 16 Cr. 640 (BMC), 2018 WL 6106707 (E.D.N.Y. Nov. 21, 2018) ................ 12, 13, 19

*United States v. Phillips*,
   843 F.2d 438 (8th Cir. 1988) .................................................................. 11, 18, 19

*United States v. Rioux*,
   97 F.3d 648 (2d Cir. 1996)................................................................................ 11, 18, 24
*United States v. Silver*,
   103 F. Supp. 3d 370 (S.D.N.Y. 2015)....................................................................... 22
*United States v. Skelos*,
   988 F.3d 645 (2d Cir. 2021)............................................................................... passim
*United States v. Skelos*,
   No. 15 Cr. 317 (KMW), 2018 WL 289712 (S.D.N.Y. June 8, 2018)...................... 17
*United States v. Skelos*,
   No. 15 Cr. 317 (KMW), 2015 WL 6159326 (S.D.N.Y. Oct. 20, 2015) ........... passim
*United States v. Stevens*,
   83 F.3d 60 (2d Cir. 1996) ......................................................................................... 24
*United States v. Walters*,
   910 F.3d 11 (2d Cir. 2018)................................................................... 12, 21, 22, 24

Rules

Federal Rule of Criminal Procedure 6 ...................................................................... passim
Federal Rule of Criminal Procedure 41 ............................................................................ 2
Federal Rule of Criminal Procedure 52 .......................................................................... 20

**TABLE OF ARTICLES**

| Short Citation | Full Citation | Cited in Mot.? |
|---|---|---|
| 11/2/23 NYT | William K. Rashbaum et al., "U.S. Investigating Whether Adams Received Illegal Donations from Turkey," *N.Y. Times* (Nov. 2, 2023), https://www.nytimes.com/2023/11/02/nyregion/eric-adams-brianna-suggs-fbi-raid.html | Yes |
| 11/4/23 CNN | Gloria Pazmino et al., "FBI investigation of NYC Mayor Eric Adams fundraiser centers on illegal contributions from foreign nationals," *CNN* (Nov. 4, 2023), ttps://www.cnn.com/2023/11/02/politics/fbi-search-fundraiser-adams-campaign-new-york/index.html | Yes |
| 11/10/23 NYT | William K. Rashbaum et al., "F.B.I. Seizes Eric Adams's Phones as Campaign Investigation Intensifies," *N.Y. Times* (Nov. 10, 2023), https://www.nytimes.com/2023/11/10/nyregion/adams-fbi-investigation-phones.html | Yes |
| 11/11/23 NYP | Rich Calder, "Feds zero in on texts suggesting Adams fast-tracked Turkish diplomatic headquarters," *N.Y. Post* (Nov. 11, 2023), https://nypost.com/2023/11/11/metro/feds-probing-if-eric-adams-fast-tracked-turkish-diplomatic-site/ | No |
| 11/12/23 NYT | William K. Rashbaum et al., "F.B.I. Examining Whether Adams Cleared Red Tape for Turkish Government," *N.Y. Times* (Nov. 12, 2023), https://www.nytimes.com/2023/11/12/nyregion/eric-adams-investigation-turkey-consulate.html | Yes |
| 11/14/23 CNN | John Miller, "Investigation into NYC Mayor Adams focused on campaign money and possible foreign influence," *CNN* (Nov. 14, 2023), https://www.cnn.com/2023/11/14/politics/mayor-eric-adams-investigation-campaign-money-foreign-influence/index.html | Yes |
| 11/16/23 NYT | William K. Rashbaum et al., "F.B.I. Raided Homes of Second Adams Aide and Ex-Turkish Airline Official," *N.Y. Times* (Nov. 16, 2023), https://www.nytimes.com/2023/11/16/nyregion/nyc-adams-turkey-raid-aide.html | Yes |
| 4/5/24 NYT | William K. Rashbaum et al., "F.B.I. Examining Free Airfare Upgrades Received by Adams," *N.Y. Times* (Apr. 5, 2024), https://www.nytimes.com/2024/04/05/nyregion/eric-adams-turkish-airlines-upgrades.html | Yes |
| 5/20/24 NYT | William K. Rashbaum et al., "City Hall Aide is Cooperating with Corruption Investigation into Adams," *N.Y. Times* (May 20, 2024), | Yes |

| | https://www.nytimes.com/2024/05/20/nyregion/adams-fbi-corruption-investigation-aide.html | |
|---|---|---|
| 8/15/24 NYT | William K. Rashbaum et al., "Eric Adams and His Campaign Received Subpoenas in Federal Investigation," *N.Y. Times* (Aug. 15, 2024), https://www.nytimes.com/2024/08/15/nyregion/eric-adams-fbi-investigation.html | Yes |
| 8/15/24 NYP | Craig McCarthy et al., "NYC Mayor Eric Adams hit with first subpoena over 2021 campaign," *N.Y. Post* (Aug. 15, 2024), https://nypost.com/2024/08/15/us-news/nyc-mayor-eric-adams-hit-with-first-subpoena-over-2021-mayoral-campaign/ | No |
| 9/5/24 NYT | William K. Rashbaum et al., "Mayor Eric Adams Faces Crisis as U.S. Investigations Reach Inner Circle," *N.Y. Times* (Sept. 5, 2024), https://www.nytimes.com/2024/09/05/nyregion/banks-sheena-fbi-search-nyc.html | Yes |
| 9/10/24 NYT | William K. Rashbaum et al., "Firm Run by Brother of Top N.Y.C. Officials Is Focus of Bribery Inquiry," *N.Y. Times* (Sept. 10, 2024), https://www.nytimes.com/2024/09/10/nyregion/adams-banks-consultant-investigation.html | Yes |
| 9/23/24 NYT | William K. Rashbaum et al., "U.S. Inquiry Into N.Y. Mayor's Foreign Ties Said to Include 6 Countries," *N.Y. Times* (Sept. 23, 2024), https://www.nytimes.com/2024/09/23/nyregion/fbi-adams-qatar-israel-china-uzbekistan-korea.html | Yes |
| 9/25/24 NYT | "Eric Adams Is Indicted in New York," *N.Y. Times* (Sept. 25, 2024), https://www.nytimes.com/live/2024/09/25/nyregion/eric-adams-indicted-corruption | Yes |
| 10/7/24 NBC | Melissa Russo and Jonathan Dienst, "Adams staffer Rana Abbasova, believed to be cooperating with feds, is fired: Source; 2 others resign," *NBC N.Y.* (Oct. 7, 2024), https://www.nbcnewyork.com/news/local/eric-adams-staffer-rana-abbasova-terminated-from-city-hall-role-as-winnie-greco-resigns-source-says/5865280/ | No |

The Government respectfully submits this opposition to defendant Eric Adams's motion (Dkt. 19 ("Mot.")) for an evidentiary hearing and sanctions based on alleged leaks by the prosecution of matters occurring before the grand jury. To obtain a hearing—let alone sanctions—a defendant must make a *prima facie* showing that disclosed information was subject to grand jury secrecy rules and that the prosecution was responsible for improperly disclosing it; that showing must not be rebutted by evidence offered by the Government in response; and the defendant must demonstrate that the disclosure caused him cognizable prejudice. As discussed below, Adams cannot make any of the requisite showings. The motion should be denied without a hearing.

## RELEVANT FACTS

### A.  Press Coverage of the Investigation[1]

In 2021, the Federal Bureau of Investigation ("FBI"), the New York City Department of Investigation ("DOI"), and prosecutors from the United States Attorney's Office for the Southern District of New York ("USAO-SDNY") began investigating Adams. On November 2, 2023, the FBI and DOI executed search warrants at the homes of five individuals and attempted to interview approximately ten other people (without executing search warrants). Those steps prompted media coverage, which has continued to the present. During the last year, the coverage fell into roughly four categories: reporting about the execution of search warrants, interviews of witnesses, service of subpoenas, and the return of the Indictment. Frequently, articles on the first three topics used information reporters obtained about the nature of the searches or questions to report on the "focus" or "direction" of the investigation. The articles uniformly discussed information known to persons beyond the "prosecution team," *i.e.* the prosecutors and agents conducting the investigation.

---

[1] This recitation is non-exhaustive, and focuses largely—though not exclusively—on the articles on which Adams relies in his motion.

### 1.  Search Warrants

On November 2, 2023, the *New York Times* reported that FBI agents had searched the home of Brianna Suggs, Adams's chief fundraiser. (11/2/23 NYT).[2] The article discussed "a search warrant obtained by The New York Times," and quoted from a search warrant inventory (which is a form agents fill out detailing the property seized pursuant to the warrant) (*id.*)—two documents that agents must leave behind at the location of a search, *see* Fed. R. Crim. P. 41(f)(1)(C).

The Suggs search was not the only one that received press attention. The *Times* also reported about a search of Adams, four days after it occurred. (11/10/23 NYT). That article included statements from both Adams himself and his defense counsel, while FBI and USAO-SDNY spokesmen declined to comment. (*Id.*). On November 16, 2023, the *Times* identified two additional persons whose homes were searched on November 2, 2023. (11/16/23 NYT). In that article, two Adams spokesmen and a defense attorney each commented, while the FBI and USAO-SDNY declined to comment. (*Id.*). And as with the Suggs search, the fact of these additional searches was not known exclusively by law enforcement, but also by the persons searched, anyone else present at the time of the searches, and anyone those people chose to tell about the searches, including, presumably, defense counsel and campaign and City officials. News coverage prompted by the searches continued into the following year.[3] (*See, e.g.*, 4/5/24 NYT (discussing contents of official City email accounts, presumably obtained via Freedom of Information Law requests)).

---

[2] News articles are cited per the Table of Articles above; "Wikstrom Decl." refers to the Declaration of Derek Wikstrom; "Feinzig Decl." refers to the Declaration of Margery Feinzig; "Dkt." refers to entries on the Court's docket. Unless otherwise noted, case quotations omit all internal citations, quotation marks, and previous alterations.

[3] Two of the articles on which Adams relies are about searches conducted in a separate investigation, being conducted by different prosecutors and case agents than the investigation that led to this case. (*See* 9/5/24 NYT; 9/10/24 NYT).

Reporting about the searches was often materially inaccurate, in ways that any member of the prosecution team would have known. For example, in the only article Adams identified that was expressly sourced to "law enforcement officials," CNN reported that the FBI "executed 'numerous search warrants' at homes and businesses throughout the New York area Thursday morning," and that "[o]ne of the companies that was searched is KSK Construction Group in Brooklyn." (11/4/23 CNN). CNN may or may not have had some law enforcement source—for example, a police source who became aware of the searches after the fact or who was aware of them due to the complex logistics involved in executing multiple simultaneous search warrants—but the information it reported was wrong in ways known to the prosecution team. Specifically, none of the November 2023 search warrants targeted "businesses," and KSK was not searched that day, though the company was served a subpoena. (Wikstrom Decl. ¶ 3).

Other articles not only contained material inaccuracies, but evidently came from sources close to Adams. For instance, on November 11, 2023, the *New York Post* reported that:

> Federal investigators probing Mayor Adams's 2021 campaign are now zeroing in on a series of texts suggesting he helped fast-track the opening of the Turkish government's new diplomatic headquarters in Manhattan, sources close to the case told The Post.
>
> The September 2021 texts between Adams—who was then the Brooklyn borough president and Democratic mayoral nominee—and Turkish Consul General Reyhan Ozgur and then-FDNY Commissioner Daniel Nigro were uncovered by FBI agents Monday after they seized Adams's electronic devices.
>
> The texts were described by sources to The Post.
>
> Since Monday, the feds' questions about the content on the devices—which included three cellphones and two iPads—have centered on these texts, sources said.
>
> However, the messages don't appear to show any criminal activity beyond typical outreach that elected officials do on behalf of constituents, according to several sources briefed on the matter.

(11/11/23 NYP).

The September 2021 text messages that were "described by sources to The Post" appear to be a series of Signal messages between Adams and Ozgur. Although the *Post* reported that those texts were "uncovered by FBI agents Monday after they seized Adams's electronic devices," that was wrong. On November 11, 2023, Adams's devices were still being screened for attorney-client privilege, and had not been given to the prosecution team. The prosecution team later learned that on November 3, 2023, Adams took screenshots of his Signal messages with Ozgur—screenshots that FBI agents found months later when reviewing the seized devices. But at the time of the *Post* article, those messages were known to Adams's team, but not to the prosecution team—so the investigators were not "zeroing in" on them. The article also incorrectly states the number of iPads seized from Adams, and no member of the prosecution team would have described Adams's messages with a foreign official, assisting in obtaining official action, as not "show[ing] any criminal activity beyond typical outreach that elected officials do on behalf of constituents." (*Id.*).

### 2. Witness Interviews

Other articles discussed witness interviews conducted by law enforcement. For instance, also in November 2023, multiple outlets reported about FBI interviews of FDNY officials. That reporting discussed the possibility that Adams had, as one headline put it, "cleared red tape for the Turkish Government." (11/12/23 NYT (noting that the FBI had been questioning Fire Department officials since the spring); *see also* 11/14/23 CNN ("A source who is familiar with the aspects of the probe involving the fire department told CNN that [former FDNY Commissioner Daniel] Nigro received a grand jury subpoena and, sources said, voluntarily spoke to and was interviewed by FBI agents.")). The *Times*'s coverage quoted a "a statement from the mayor," while the FBI and USAO-SDNY "declined to comment." (11/12/23 NYT).

In the Spring of 2024, media coverage of the investigation slowed, but the *Times* reported that a purported witness had been participating in interviews with the Government. (5/20/24 NYT

(reporting that the witness began speaking with investigators "in the weeks after the F.B.I. searched her home")). The reporting was sourced to "three people with knowledge of the matter," with no indication it had come from law enforcement sources. The article quoted one of Adams's defense lawyers, who told the *Times* that the information reported in the article had long been known to Adams's team. The defense lawyer described the purported cooperation as "not a new or meaningful development," explaining that it was "our understanding" that the witness "ha[d] been talking to investigators" since November 2023—the exact understanding that was reported by the article. The FBI and USAO-SDNY, by contrast, "declined to comment." (*Id.*).

### 3. Subpoenas

Early in the investigation, subpoenas were mentioned in the news, if at all, in passing, as witnesses who were searched or interviewed also received subpoenas. (*See, e.g.*, 11/2/23 NYT; 11/14/23 CNN). That changed in August of 2024, when the *New York Times* reported on the issuance of grand jury subpoenas to Adams, City Hall, and Adams's campaign, sourcing the report to "four people with knowledge of the matter." (8/15/24 NYT). Adams now claims that it "is self-evident that only members of the prosecution team had knowledge of all of these subpoenas, including the specific language used in the subpoenas." (Mot. 7). But that is not true. Subpoenas were served on Adams himself and on three entities that Adams led. Adams presumably had knowledge of and access to each subpoena. And many people working for Adams would have had access to or known about the subpoenas, including the teams of lawyers and staff representing Adams and his campaigns, anyone with whom the subpoenas were shared pursuant to a joint-defense or common-interest understanding with Adams, and any number of lawyers and staff members at City Hall and the New York City Law Department who would have been involved in responding to the subpoenas. Indeed, the subpoenaed entities presumably disseminated information about the documents sought by the subpoenas widely, to ensure that responsive

documents could be preserved and collected. And it was not uncommon for members of Adams's staff to work both for his campaigns and his administration, meaning that various staffers likely received directions from multiple entities to preserve documents responsive to multiple different subpoenas. It is thus no surprise—and not proof of a "leak"—that two of the *Times*'s sources indicated that the subpoenas were similar. And again in this story, lawyers and others in Adams's circle gave statements to reporters, while the FBI and USAO-SDNY declined to comment. (*Id.*). If City or campaign employees did receive or disseminate information about the subpoenas, that is not necessarily improper—the recipients of grand jury subpoenas are not bound by the secrecy obligations in Rule 6(e)—and nothing in the *Times* article suggested or established law enforcement sourcing.

One article about the subpoenas—which Adams did not reference in his motion—cited purported "law enforcement sources," though with no indication of prosecution-team sourcing. The *New York Post* wrote that "law enforcement sources" had "confirmed" the *Times*'s reporting about the subpoenas. (8/15/24 NYP). Those sources again appeared to be far-removed from the prosecution team: important details in both stories were inaccurate, in ways that would have been known by an insider. The *Post*'s headline described a "first subpoena," and both outlets reported that "three subpoenas" had been served. (*See* 8/15/24 NYP; 8/15/24 NYT). In fact, as anyone on the prosecution team would have known, Adams was first subpoenaed in November 2023, and there were far more than three subpoenas: in July 2024, the Government served a total of eight subpoenas on Adams, his campaigns, and the Office of the Mayor. These reporters, in other words, may or may not have had actual "law enforcement" sources, but whoever their sources were, they appeared unfamiliar with details of the investigation, and had significant facts wrong.

### 4. The Indictment

On September 24, 2024, a grand jury returned the Indictment.[4] Beforehand, the USAO-SDNY notified Department of Justice officials in Washington that it planned to serve the summons, unseal the anticipated Indictment, and hold a press conference on September 26. After the grand jury voted on the Indictment, the Government returned the Indictment before the Magistrate Judge on duty in Courtroom 5A, and requested the issuance of a summons. The Government informed the Magistrate Judge, in response to a question, that the Government expected to serve the summons on Adams on Thursday, September 26. (Wikstrom Decl. ¶¶ 9-10).

On September 25, 2024, the Government submitted applications for various search warrants to Magistrate Judges in this District and two other districts where there was reason to believe Adams could be found. That same day, the Government wrote to the duty Magistrate Judge and requested that the Indictment be unsealed and assigned to a District Judge at 10:30 a.m. on September 26, 2024. The Government understands that the planned timing of the service of the summons was disseminated—completely understandably—to court personnel who would need to be involved in any proceedings. Also that day, the Government fielded inquiries from officials at the courthouse and the U.S. Marshals Service who would arrange a court appearance for the sitting Mayor of New York City. (Wikstrom Decl. ¶¶ 11-12).

Adams's counsel emailed the Government at 12:47 p.m. on September 25, stating, "We are hearing from *numerous sources* that there will be charges against the Mayor announced

---

[4] Certain information about the grand jury proceedings is relevant to this motion but remains subject to Rule 6(e)'s secrecy provisions, and its disclosure would reveal information about matters occurring before the grand jury. The Government is filing a declaration providing this information to the Court, which it requests be filed *ex parte* and under seal. *See* Fed. R. Crim. P. 6(e)(5) ("[T]he court must close any hearing to the extent necessary to prevent disclosure of a matter occurring before the grand jury."); *United States v. Haller*, 837 F. 2d 84, 87-88 (2d Cir. 1988) (discussing sealing of matters relating to grand jury proceedings).

tomorrow." (Wikstrom Decl. ¶ 13 (emphasis added)). Around 9:00 p.m., press outlets began

issuing reports to that effect. (*See* 9/25/24 NYT ("Mayor Eric Adams is indicted" entry).

**B.  Steps Taken in Response to Press Coverage**

Despite the indicia discussed above suggesting that leaks were not coming from the

prosecution team, the Government took the media coverage of this case seriously, and took various

steps intended to mitigate the potential for the dissemination of confidential information. For

example, after reporting in November 2023, prosecutors at the USAO-SDNY sent the following

email to the FBI and DOI agents working on the investigation:

> As you may have heard, the media appears to have acquired information about our
> investigation that was likely known only to law enforcement and certain subjects
> of our investigation. We don't know how the media obtained that information and
> want to be clear that we are not accusing anyone of leaking. But we also want to
> stress, in the strongest possible terms, that any leaks of law enforcement
> information are incredibly damaging to the investigation, entirely at odds with our
> shared duty to maintain confidential information, and quite possibly criminal
> acts. Please ensure that everyone who is involved in this investigation, or otherwise
> in a position to learn confidential information about it, understands this. We cannot
> stress how seriously our Office takes this.

(Wikstrom Decl. ¶ 6).

In November 2023, and again in August 2024 after the reporting about the subpoenas

discussed above, the United States Attorney directed that USAO-SDNY conduct interviews to

confirm that no leak had come from this Office. The FBI also took steps to restrict the availability

of information about the investigation by, among other things, avoiding discussing developments

in the investigation with FBI personnel who were not participating in the investigation, limiting

the dissemination of certain internal FBI reporting, and requesting that supervisors briefed about

certain aspects of the investigation closely hold that information. (Wikstrom Decl. ¶ 5).

On June 7, 2024, Adams's counsel wrote to the Government alleging a "series of leaks of

confidential and grand jury information" that "warrant[ed] an investigation," and requested "a

response confirming that the office has opened an investigation." (Dkt. 20-1). The Government did not respond to that letter; the Government generally would not discuss with a private party whether it had opened an investigation. On August 13, 2024, in a phone call, Adams's counsel raised the press coverage with the Government. Counsel said that they had heard media rumors about subpoenas issued to Adams's campaigns and to City Hall, and that they would send a second letter about leaks. The Government explained that media coverage of the investigation was not in the Government's interest and made the investigation more difficult. The Government assured Adams's counsel that the Government had taken significant measures to safeguard the secrecy of confidential information, and suggested that counsel consider the possibility that reporters were relying on sources other than law enforcement. Defense counsel said they understood. (Wikstrom Decl. ¶ 7). That same day, counsel sent the second letter. (Dkt. 20-2).

A week later, on August 20, 2024, the Government and Adams's counsel again discussed leak allegations by phone. The Government told counsel, among other things, that (1) the prosecutors had received their letters and conveyed them to supervisors; (2) the Government takes disclosure of confidential information seriously, because leaks make investigations more difficult, so the Government makes significant efforts to protect confidential information; and (3) while the Government understood Adams's counsel's desire for an assurance that the Government was investigating possible leaks, the Government could not provide such an assurance as a matter of policy. Adams's counsel then stated that the parties were aligned in not wanting leaks, and that counsel understood leaks made the Government's task more difficult. (Wikstrom Decl. ¶ 8).

Despite counsel's agreement in August 2024 that the prosecution team did not have an interest in leaking information, on September 30, 2024, after 10:00 p.m., counsel that had newly joined Adams's defense team sent a third letter to the Government, accusing the prosecution team

of having leaked grand jury information. (Dkt. 20-3). The letter does not seem to have been intended to obtain a response, because counsel filed the instant motion before 6:00 a.m. the following day, just shy of eight overnight hours after sending the letter.

## ARGUMENT

### I.  Adams Has Not Made Out a *Prima Facie* Case that the Prosecution Team Leaked Information Subject to Federal Rule of Criminal Procedure 6(e)

Adams has not established either the disclosure of information that is actually subject to the secrecy protections of Federal Rule of Criminal Procedure 6(e), or that any such disclosure came from a member of the prosecution team. As a result, his motion fails at the threshold.

#### A.  Applicable Law

The "proper functioning of our grand jury system depends upon the secrecy of grand jury proceedings," because absent that secrecy, "prospective witnesses may be deterred from testifying, those who do testify may be less likely to do so truthfully, targets of investigations may flee, and persons who are the subject of an ultimately meritless investigation may face public embarrassment." *Haller*, 837 F.2d at 87-88. Grand jury secrecy is codified in Federal Rule of Criminal Procedure 6(e)(2).

The "core" of what Rule 6(e)(2) protects is "evidence that is actually presented to the grand jury," but "[p]rotection also extends beyond the literal evidence that is presented to include 'anything that may tend to reveal what transpired before [the grand jury], such as summaries of grand jury testimony.'" *United States v. Skelos*, No. 15 Cr. 317 (KMW), 2015 WL 6159326, at *9 (S.D.N.Y. Oct. 20, 2015) (quoting *United States v. Eastern Air Lines, Inc.*, 923 F.2d 241, 244 (2d Cir. 1991)). "[T]he Rule is intended only to protect against disclosure of what is said or what takes place in the grand jury room." *United States v. Interstate Dress Carriers, Inc.*, 280 F.2d 52, 54 (2d Cir. 1960). Thus, for example, even where documents are produced pursuant to a grand jury

10

subpoena, if they are never actually shown to the grand jury, then they are "not 'matters occurring before a grand jury' and are not subject to the secrecy provisions of rule 6(e)." *United States v. Phillips*, 843 F.2d 438, 441 (8th Cir. 1988); *see also In re Grand Jury Subpoena*, 103 F.3d 234, 238-39 (2d Cir. 1996) (quoting *Phillips*).

The Rule also "does not apply to disclosures of information obtained independently of the grand jury process, even if the same information might later be presented to the grand jury." *Skelos*, 2015 WL 6159326, at *10. When the Government gathers information outside of the grand jury, "through wiretaps, search warrants, and interviews with witnesses not expected to appear before the grand jury," that information "is not subject to Rule 6(e) provisions on disclosure." *Id.*; *see also Eastern Air Lines*, 923 F.2d at 244 (Rule 6(e) not violated by disclosure of search warrant affidavit, even if information from affidavit might later be presented to the grand jury).

Where a defendant claims that grand jury matters were disclosed in violation of Rule 6(e), he must first "establish a *prima facie* case of the violation." *United States v. Rioux*, 97 F.3d 648, 662 (2d Cir. 1996). To determine whether the defendant has made out a *prima facie* case:

> [T]he court should examine, among other factors: (1) whether the media reports disclose matters occurring before the grand jury; (2) whether the media report discloses the source as one prohibited under Rule 6(e); and (3) evidence presented by the government to rebut allegations of a violation of Rule 6(e).

*Id.*; *see also, e.g.*, *United States v. Skelos*, 988 F.3d 645, 662 (2d Cir. 2021) (same); *United States v. Blaszczak*, No. 17 Cr. 357 (LAK), 2018 WL 1322192, at *3 (S.D.N.Y. Mar. 12, 2018) (same). In the second prong, the sources "prohibited" under the rule include, as relevant here, an "attorney for the government," and law enforcement agents to whom disclosures are made under Fed. R. Crim. P. 6(e)(3)(A)(ii). *E.g.*, *United States v. Walters*, 910 F.3d 11, 19 & n.4 (2d Cir. 2018); *see also Skelos*, 988 F.3d at 662 (distinguishing between "a 'government source' or 'law-enforcement sources'" cited in articles and "government investigators" subject to Rule 6(e)). Where the

"sole…direct evidence" of a Rule 6(e) violation is media reporting, courts evaluate whether the reporting itself contains protected grand jury information, because "if the article contains no information of the sort Rule 6(e) protects, then no *prima facie* case can be made out." *Blaszczak*, 2018 WL 1322192, at *3 n.30; *accord United States v. Nordlicht*, No. 16 Cr. 640 (BMC), 2018 WL 6106707, at *3 (E.D.N.Y. Nov. 21, 2018).

### B. Discussion

Adams has not met his burden of "mak[ing] a *prima facie* showing that (1) there has been disclosure of a matter or matters occurring before the grand jury; and (2) that the source of the disclosure was an attorney or agent of the government." *Skelos*, 2015 WL 6159326, at *9. While it is clear—and regrettable—that information about the investigation that the Government would have preferred remain confidential was published, the articles Adams cites do not prove his allegation that it is "clear that the prosecution team is responsible." (Mot. 1). Nor, in any event, does the reporting on which Adams relies reveal "matters occurring before the grand jury."

### 1. Adams Has Not Established that the Prosecution Team Was the Source of Any Improper Disclosures

The articles Adams's motion cites do not establish that any leaked information came from the prosecution team. Indeed, only one of the articles in the motion even mentions law enforcement sources, and the details in that article tend to show that its sources were not involved in the investigation. Across all of the articles, the information reported could just as likely have come from sources other than the prosecution team. Adams's principal argument, that articles sourced to persons "familiar with the federal investigation," or "with knowledge of the matter," could only have come from the prosecution team (Mot. 14-15), is incorrect.

*First*, the paradigmatic *prima facie* case involves far more express law enforcement sourcing for alleged leaks. *See, e.g.*, *Barry v. United States*, 865 F.2d 1317, 1325 (D.C. Cir. 1989)

(multiple articles sourced to law enforcement officials with knowledge of particular testimony given to a grand jury). Where the sourcing is less clear, courts are reluctant to draw the conclusion Adams leaps to, that anonymous sources "close to" or "familiar with" an investigation must be the personnel conducting that investigation. *See Blaszczak*, 2018 WL 1322192, at *6 ("[N]either the article's attribution of sources—unspecified 'people familiar with the probe'—nor its substance sufficiently points to the government."); *Skelos*, 2015 WL 6159326, at *11 ("[N]one of the news articles or the letter indicates that a government attorney or agent was the source of the information, and at least one explicitly states that the U.S. Attorney's Office and FBI representatives declined to comment."). Further, even where reporters *expressly* cite law enforcement or government sources, the Second Circuit has refused to lightly infer that those sources were members of the prosecution team. *See Skelos*, 988 F.3d at 662 ("[T]he media outlets only identified a 'government source' or '[l]aw-enforcement sources,' not government investigators."). Thus, Adams's claim that generic terms for anonymous sources are "euphemisms for government insiders" (Mot. 14) finds no support in case law. Indeed, one district court described a subset of this same defense team as "grasping at straws" when they alleged, in another case, that "government agents were the sources of the disclosures based on the terms used in the Cited Articles to describe unnamed sources, such as persons 'with direct knowledge of the matter,' 'briefed on the investigation,' and 'not authorized to speak publicly on the matter.'" *Nordlicht*, 2018 WL 6106707, at *4 ("These descriptions do not warrant the conclusion that the sources in the Cited articles were government agents or government attorneys.").

 *Second*, the information discussed in the various articles was not known only, or even principally, by the prosecution team. For example, the initial article about the Suggs search relied on three documents—a search warrant, a search warrant inventory, and a grand jury subpoena—

all of which the FBI properly left with Suggs. (11/2/23 NYT). Suggs was free to share those documents with whomever she chose—lawyers, family members, friends, and colleagues who worked with her for Adams and his campaigns. It is at least equally likely that Suggs, her counsel, anyone in a joint defense agreement with Suggs, or someone else she or her counsel shared that information with spoke to the *Times*, rather than a source within the prosecution team.

That same dynamic persists for article after article. FBI agents knew that they interviewed and served a subpoena on former FDNY Commissioner Daniel Nigro. But so did Nigro himself, his counsel, and anyone else they chose to tell about it. (*See* 11/14/23 CNN). And the search warrants executed on Adams were known not only to the prosecution team, but also to Adams, the multiple law enforcement officials on his security detail, the members of his staff who were present, and anyone those people chose to tell (and anyone they told, and so on). (*See, e.g.*, 11/10/23 NYT). Similarly, CNN's reporting that "the FBI has the records of checks and wire transfers from KSK, returning money to employees in the same amounts as the contributions" (11/14/23 CNN) reports on documents shown to more than ten different witnesses interviewed in November 2023, as any one of those witnesses or their lawyers would have known. To be sure, as a general matter, "[i]t is not necessary for the article to expressly implicate the Justice Department as the source of the disclosures if the nature of the information disclosed furnishes the connection." *In re Grand Jury Investigation (Lance)*, 610 F.2d 202, 218 (5th Cir. 1980). But here the information was not the kind that was uniquely in law enforcement's ken, and that could therefore give rise to the inference that an anonymous source "close to the investigation" was in fact on the prosecution team.[5]

---

[5] Information that Adams asserts could only have been known by law enforcement would, in fact, have been relatively widely understood. He claims, for instance, that the fact that separate teams of agents conducted the searches on November 2, 2023 was known only to the prosecution team.

*Third*, there is especially good reason to suspect alternative sources here, because some articles made clear that the "sources close to the investigation" were in Adams's circle. Perhaps the best example is the November 2023 *New York Post* article reporting that "sources close to the case" had "told The Post" that the Government was "now zeroing in on a series of text[ messages]." (11/11/23 NYP). But as noted above, the messages investigators were said to be focusing on were messages that Adams had recently screenshotted, but that the prosecution team had *not discovered yet*. Similarly, articles lamenting the "expansive" scope of grand jury subpoenas served on City Hall, Adams, and the campaigns are far more likely to have come from members of the defense team—who also raised scope concerns with the Government—than from the prosecution team. (9/23/24 NYT). That article also discussed an investigative focus beyond Turkey that had long been known to the Government, but that was only revealed to Adams's team in July 2024, and that had "not been previously reported" before the article. (*Id.*).

*Fourth*, many of the articles that Adams lays at the feet of the prosecution team contain errors that anyone participating in the investigation would not have made. For instance, as discussed above, multiple articles misreported basic details like the number of subpoenas that had been served on Adams, City Hall, and his campaigns. (*See, e.g.*, 8/15/24 NYT (saying that three

---

(Mot. 5-6 (quoting 11/16/23 NYT)). On that day, law enforcement executed five search warrants and approached ten other witnesses, almost simultaneously and in multiple states. It would not have been possible for a single team to take all of those steps in the same morning, as any reporter would have easily discerned upon speaking with any two or more witnesses. Similarly, Adams concedes that the prosecution team, grand jurors, and court staff would all have known about the sealed indictment, but asserts that on September 25, 2024, "only the prosecution team would have been privy to the government's plan to announce additional details the next day." (Mot. 1). That, too, is wrong. As discussed above, the Government submitted a time-delayed unsealing order to the Court, obtained warrants in three districts, and reported its plans for the following day to various officials in three different law enforcement agencies. More to the point, any reporter would have easily surmised that upon unsealing an indictment against the Mayor of New York City, prosecutors could be "expected to announce more details." (*Id.* (citation omitted)).

subpoenas had been served, when, in truth, eight subpoenas had been served)). As Judge Kaplan recognized in *Blaszczak*, those kinds of errors are "the most obvious flaw" in a leak allegation: while it was possible a government source leaked inaccurate information, "the far simpler and overwhelmingly more likely conclusion is that the source of the [incorrect] assertion…was not a government agent but, instead…some person 'familiar' with incomplete information [who] speculated incorrectly to a reporter." 2018 WL 1322192, at *5.

*Fifth*, with respect to the only article Adams identifies citing "law enforcement officials" (Mot. 4 (citing 11/4/23 CNN)), while the information may have come from someone in law enforcement generally, it cannot be linked to the prosecution team. That article gave a high-level description of the investigation based on "officials who are familiar with the search warrants," and cited "multiple law enforcement sources" as stating that FBI agents had "executed 'numerous search warrants' at homes and businesses throughout the New York area Thursday morning." (11/4/23 CNN). But the thrust of the investigation could easily have been gleaned by merely reading the warrants left with each of the subjects whose homes were searched. And the description of the searches conducted that day, as noted above, is incorrect: the prosecution team knew that the FBI and DOI had executed five search warrants, and none were on businesses.

As for the August 2024 *Post* article—which Adams did not even rely on—it is the only article in the record that both (1) concretely asserts it was based on sources working for law enforcement and (2) mentioned the grand jury, albeit only in reference to the issuance of subpoenas. (8/15/24 NYP). Yet that article merely confirmed earlier reporting, and the information it attributed to purported law enforcement sources was incorrect, as would have been known by anyone working on the investigation. Even if Adams had relied on that article, those errors would cast doubt on the notion that the information came from the prosecution team.

*Sixth*, as detailed in a declaration submitted by Margery Feinzig, a Deputy Chief of the Criminal Division who was not involved in this investigation, each of the prosecutors and agents assigned to the investigation has confirmed that he or she did not disclose information about the investigation to any member of the press. (*See* Feinzig Decl.). That mirrors a declaration filed in *Skelos*, which both the district court and the Second Circuit considered in holding that a *prima facie* case had not been made. *See United States v. Skelos*, No. 15 Cr. 317 (KMW), 2018 WL 289712, at *8 (S.D.N.Y. June 8, 2018) (denying hearing and finding no *prima facie* case where Government's declaration "affirm[ed] that all of the AUSAs, investigators, and FBI agents involved in this investigation did not speak to the press"), *aff'd* 988 F.3d at 662 (affirming denial of hearing, where the Government's declaration affirmed "that none of the Assistant United States Attorneys, investigators, and FBI agents involved in this investigation spoke to the press").

*Seventh*, the prosecution team has specific motives not to leak. As the Government emphasized both internally and to defense counsel, leaks are damaging to the Government's investigation for reasons that largely dovetail with the purposes of grand jury secrecy: when information about criminal investigations is publicly reported, it can lead to the destruction of evidence, to witness tampering, and to witnesses coordinating stories, making themselves unavailable, or becoming unwilling to talk to investigators. *Cf. e.g.*, *Haller*, 837 F.2d at 87-88.

### 2.  Adams Has Not Established the Disclosure of Matters Before the Grand Jury

Even if Adams had proof that reporting was sourced to the prosecution team, his claim that the prosecution team has violated Rule 6(e) would still fail, because most of the articles on which he relies do not even mention the grand jury, and none disclose matters occurring before it. Reporting in November 2023 was focused largely on the execution of search warrants.[6] But the

---

[6] *See, e.g.*, 11/2/23 NYT (discussing Suggs search); 11/10/23 NYT (discussing Adams search); 11/12/23 NYT (discussing one "focus" of the investigation, based on the "search warrant obtained

law is clear that search warrants are outside of the scope of Rule 6(e)'s protections. *Eastern Air Lines*, 923 F.2d at 244; *Skelos*, 2015 WL 6159326, at *10; *see also, e.g.*, *Blalock v. United States*, 844 F.2d 1546, 1551 (11th Cir. 1988) (per curiam).

Other articles discussed interviews that uniformly took place outside, not before, the grand jury, as well as the purported trajectory of the investigation, as gleaned from interviews or warrants. (*See, e.g.*, 11/12/23 NYT; 4/5/24 NYT). That information likewise is not subject to Rule 6(e). *See, e.g.*, *Rioux*, 97 F.3d at 662 (denying similar motion where "[m]ost of the media surrounding the Rioux investigation…discussed federal investigations without actually discussing matters before the grand jury"); *Blalock*, 844 F.2d at 1551 (no violation of Rule 6(e) based on alleged disclosure of interviews that occurred outside of the grand jury). Indeed, even if these articles had discussed evidence gathered via grand jury process—rather than from warrants and interviews—Rule 6(e) still would not yet have applied, because the information had not been presented to the grand jury.[7] *See, e.g.*, *Phillips*, 843 F.2d at 441; *Blaszczak*, 2018 WL 1322192, at *5 & n.36 (article at issue "did not identify" the defendant "as a target of a grand jury," and could not have, because the article "pre-dated the presentation of evidence to the grand jury").

Nor is it clear that even the articles mentioning the service of grand jury subpoenas[8] reveal information protected by Rule 6(e). Since records received pursuant to a grand jury subpoena are

---

by The New York Times for" the search of Suggs); 11/16/23 NYT (discussing other search warrant executions that took place the same day as the Suggs search).

[7] Adams asserts that it is "apparent" that "leaks have specifically involved grand jury information" "because much of the leaked information mirrors the allegations in the indictment." (Mot. 11 (citing *Skelos*, 2015 WL 6159326, at *9)). *Skelos* in fact stands for essentially the opposite proposition, making clear that "Rule 6(e) does not apply to disclosures of information obtained independently of the grand jury process, *even if the same information might later be presented to the grand jury*." *Skelos*, 2015 WL 6159326, at *10 (emphasis added).

[8] *See* 11/2/23 NYT ("The agents also served Ms. Suggs with a subpoena directing her to testify before a federal grand jury hearing evidence in Manhattan."); 11/14/23 CNN ("A source who is familiar with the aspects of the probe involving the fire department told CNN that Nigro received

not subject to Rule 6(e) until actually presented to the grand jury, *see Phillips*, 843 F.2d at 441, it follows that disclosure of the mere service of such a subpoena likewise does not receive protection under the Rule. It is true, as Adams notes (Mot. 12), that the "identities of witnesses or jurors" are protected by Rule 6(e). *In re Motions of Dow Jones & Co.*, 142 F.3d 496, 500 (D.C. Cir. 1998). But Adams merely speculates that the individuals or entities whose grand jury subpoenas were mentioned in any of those articles actually testified before the grand jury. That likewise weighs against a finding that this information revealed anything about the inner workings of the grand jury. *See, e.g.*, *Blalock*, 844 F.2d at 1551 (no violation of Rule 6(e) based on disclosure of interviews that occurred outside of the grand jury); *Nordlicht*, 2018 WL 6106707, at *4 (to violate Rule 6(e), there must be "improper disclosure of the inner workings of the grand jury, not simply information about some aspect of a related government investigation").[9]

Given the absence of evidence that information about the grand jury's inner workings was disclosed, Adams engages in speculation. He claims that leaks "primed the grand jury for Ms. Suggs's testimony." (Mot. 12). But he has no idea whether Suggs testified in the grand jury. Nor does he know whether Nigro did. (*But see* Mot. 12 (referring to "Nigro's prospective grand jury testimony")). Nor does Adams know whether Rana Abbasova did—yet he describes her as

---

a grand jury subpoena and, sources said, voluntarily spoke to and was interviewed by FBI agents."); 8/15/24 NYT ("Federal prosecutors investigating Mayor Eric Adams of New York and his 2021 campaign have served a new round of grand jury subpoenas…issuing them to Mr. Adams himself, to City Hall and to his election committee.").

[9] Adams's reliance on articles reporting that he had been indicted (Mot. 1, 7) is misplaced. The sealing of an indictment, which is otherwise a public document, is addressed not in Rule 6(e)(2), but in a different provision, Rule 6(e)(4), the purpose of which is to "prevent a circumstance in which public notice of the indictment enables the defendant to avoid arrest." *United States v. Nassimi*, No. 04 Cr. 706 (LTS), 2023 WL 3584409, at *3 (S.D.N.Y. May 22, 2023). The publicity surrounding the sealed indictment was regrettable, and harmful to the investigation because it alerted Adams before the FBI could execute a planned search warrant, but it is not a basis for a finding of a grand jury secrecy violation. And in any event, the existence of the Indictment and the timeline for unsealing was known outside the prosecution team, as discussed above.

"another grand jury witness." (Mot. 12). Calling these people "grand jury witnesses" does not make it so, and this kind of speculation does not meet the burden of establishing a *prima facie* violation of Rule 6(e).[10] If anything, it goes to show that there were not prohibited leaks: Adams can only speculate, because what actually occurred in the grand jury room has not been disclosed.

## II.    Adams Cannot Show Prejudice from the Alleged Leaks

Even if Adams could establish that information protected by Rule 6(e) was leaked by the prosecution team, to obtain relief he would also need to demonstrate prejudice. He cannot, and his motion should be denied on that independently sufficient basis as well.

### A.    Applicable Law

The required *prima facie* showing is the beginning, not the end, of the inquiry, because "even if there has been a Rule 6(e) violation, relief may be granted only if the defendant shows prejudice as a result of the violation." *Blaszczak*, 2018 WL 1322192, at *3; *see also United States v. Eisen*, 974 F.2d 246, 261 (2d Cir. 1992) ("[A] defendant seeking…a hearing regarding alleged grand jury abuse must show prejudice or bias."). The requirement of prejudice follows from Federal Rule of Criminal Procedure 52(a)'s harmless-error rule: the Court's supervisory power can only be invoked to correct errors that affect substantial rights. *Bank of Nova Scotia v. United States*, 487 U.S. 250, 254-55 (1988). In the context of an alleged violation of Rule 6(e), the prejudice inquiry is a narrow one, focused on whether the disclosure of grand jury materials "substantially influenced the grand jury's decision to indict, or if there is grave doubt that the decision to indict was free from the substantial influence of such violations." *Walters*, 910 F.3d at 23 (citing *Bank of Nova Scotia*, 487 U.S. at 254-55).

---

[10] For the same reason, Adams's invocation of cases establishing that the "identities of [grand jury] witnesses or [grand] jurors" and "summaries of grand jury testimony" are protected by Rule 6(e) (Mot. 12 (quoting cases)) does not aid him.

**B. Discussion**

Lacking any evidence of prejudice, Adams again resorts to conjecture. His sole argument that is actually addressed to the correct prejudice standard is that Rana Abbasova's purported cooperation was "procured at least in part through a leak," and "affected the grand jury's decision to indict." (Mot. 17). But Adams merely guesses that purported leaks either actually motivated a witness to cooperate or were intended to. (*See id.* (describing this as the "most obvious motivation" for leaks)). He can only say that the "ploy *appears* to have worked," because it "*appears*" that Abbasova did not cooperate immediately, but instead hesitated until leaks put pressure on her. (*Id.* at 16-17 (emphasis added)). In *Walters*, the district court and the Second Circuit rejected this same argument. They held that "attributing [the witness's] cooperation to the news leaks is sheer speculation, and not any basis to conclude that the newspaper articles had any impact whatsoever on the grand jury's decision to indict." *Walters*, 910 F.3d at 24. Here, as in *Walters*, there is "simply…no reason to think" that news coverage precipitated any witness's cooperation. *Id.*

But speculation aside, the argument that a witness was induced by leaks to the press to cooperate, and that this witness's information "substantially influenced" the grand jury, is too attenuated to constitute the requisite substantial influence on the grand jury's decision to indict. Even if the allegation were that leaks induced a witness to stretch the truth to favor indicting, dismissal would still be unwarranted. *See, e.g.*, *United States v. Lombardozzi*, 491 F.3d 61, 79 (2d Cir. 2007) ("[T]he mere fact that evidence presented to the grand jury was unreliable, misleading, or inaccurate, is not sufficient to require dismissal of an indictment."); *Eisen*, 974 F.2d at 261 (no prejudice where, despite allegation that a grand jury leak enabled witnesses to coordinate testimony, the defendant did not actually establish such coordination on cross-examination at trial).

If the argument is, instead, merely that a witness was induced to tell the truth—and to promise to continue to do so in pursuit of leniency—and that witness's truthful information was provided to the grand jury, then that is no error, and causes no cognizable prejudice. *Walters* recognized as much, rejecting the argument that Walters was prejudiced by leaked grand jury information because he ultimately received "a full and fair trial in which there was overwhelming evidence to support his conviction," so any prejudice at the grand jury stage was cured, because there was no "real concern that an innocent person may have been convicted." *Walters*, 910 F.3d at 24. Here, as in *Walters*, Adams will have a fair trial at which he will have the opportunity to "extensively" "cross-examine[]" witnesses about their "motivation to cooperate," and that is all that is necessary to defeat a claim of grand-jury-stage prejudice. *Id.*

Adams's other prejudice claims do not affect the analysis. He asserts that leaks "likely put pressure on senior Justice Department officials to approve the indictment" (Mot. 17), a claim even more speculative than the one about Abbasova's purported cooperation. Adams goes on to say that the leaks have caused him to "face[] intense scrutiny," have "culminated in calls" for his resignation, and have "distracted from, and made more difficult," his work as a public figure. (Mot. 17-18). It is at least debatable whether these effects were caused by the leaks at all, rather than by the public's discovery of Adams's extensive and long-running criminal conduct. But in any event, none of these claims bear at all on the prejudice question presented by Adams's motion, which is whether the *grand jury's* decision was "substantially influenced." And on that question, as discussed in the Government's *ex parte* filing about the grand jury proceedings, the grand jury's decision was not influenced by the news coverage on which Adams now relies. *See also United States v. Silver*, 103 F. Supp. 3d 370, 379-80 (S.D.N.Y. 2015) (discussing "established precedent holding that the existence of negative pretrial publicity is generally not sufficient to show

substantial influence or actual prejudice," and noting that "unlike a petit jury, the grand jury is not confined to a passive role and therefore presumptively has access to the media without being prejudiced in the absence of evidence to the contrary").

Adams also errs in claiming that he will suffer prejudice at trial. (Mot. 22). *First*, just as Adams has not shown that he has been prejudiced in the grand jury, he also has not established reason to believe that a future trial jury will be prejudiced by the news coverage of this case. *Cf. Skelos*, 988 F.3d at 659-60 (affirming denial of motion based on negative publicity where significant time passed between the news coverage and the trial, and the S.D.N.Y. was sufficiently densely populated that the trial court was able to select a jury comprised of jurors who were either "previously unaware" of the defendants "or who had no prejudgments about the case"). *Second*, Adams's complaints about the publicity this case has received—and his invocation of S.D.N.Y. L. Crim. R. 23.1 and accusation that the Government is "us[ing] strategic disclosures in the media to gain a tactical advantage in this case" (Mot. 18, 22)—are surprising, because Adams himself has contributed to the press interest in this case, both during the investigation[11] and, post-charging.[12] Courts have rejected claims based on pretrial publicity where that publicity was partially "generated by the defendant himself." *United States v. Stevens*, 83 F.3d 60, 66 (2d Cir. 1996); *accord United States v. Maldonado-Rivera*, 922 F.2d 934, 967 (2d Cir. 1990).

---

[11] *See, e.g.*, 11/2/23 NYT (statement by Adams's campaign counsel); 11/4/23 CNN (statement by Adams); 11/10/23 NYT (statements by defense counsel); 4/5/24 NYT (same); 5/20/24 NYT (same); 8/15/24 NYT (same).

[12] For instance, Adams's counsel held a lengthy press conference to announce his filing of the motions in this case. *See* Alex Spiro, Press Conference (Sept. 30, 2024), available at https://www.youtube.com/watch?v=cSnLa6siIoQ (discussing matters of witness credibility and opinions as to Adams's guilt or innocence in violation of Rule 23.1, and discussing "expect[ed]" results of motions). And defense counsel has seemingly disclosed email correspondence with the Government to press outlets in an apparent effort to foster further coverage. *See* 10/7/24 NBC (noting that defense counsel spoke to NBC for the story and that NBC reviewed a redacted version of an email exchange between defense counsel and prosecutors).

### III.   The Court Should Not Hold a Hearing

Finally, a hearing on Adams's motion is not warranted. Adams has not preliminarily shown that matters occurring before the grand jury were leaked, or that members of the prosecution team leaked them, so a hearing is unavailable. *See, e.g.*, *Rioux*, 97 F.3d at 662 ("Before a court will order a hearing on a possible breach of the Grand Jury Secrecy Rule, the defendant must establish a *prima facie* case of a violation of [Rule] 6(e)."); *Skelos*, 2015 WL 6159326, at *12 ("Defendants have failed to make a *prima facie* showing of a Rule 6(e) violation and therefore are not entitled to discovery or a hearing on this issue."). And even if Adams had made both of those requisite showings—even if it were clear that the prosecution team had violated Rule 6(e)—the absence of prejudice would still defeat Adams's request for a hearing. *Walters*, 910 F.3d at 28-29 (affirming district court's denial of a hearing after the Government conceded extensive Rule 6(e) violations by an FBI Agent, where there was no showing of prejudice); *see also, e.g.*, *United States v. Burke*, 700 F.2d 70, 82 (2d Cir. 1983) (affirming denial of hearing based on pre-indictment publicity where the defendant "failed to cite any persuasive evidence of actual grand jury prejudice"); *Eisen*, 974 F.2d at 261 (similar).

Nor, contrary to Adams's claims (Mot. 21-22), is a hearing necessary to consider an appropriate remedy. Absent a *prima facie* case, or any showing of prejudice, a hearing on remedy would make no sense. Nor is a hearing justified to provide Adams the opportunity to cross-examine or challenge the Government's representations in this filing. To the contrary, the Second Circuit has made clear that the Court can consider information proffered by the Government to rebut a *prima facie* case without holding a hearing. *See Skelos*, 988 F.3d at 662 (affirming denial of a hearing where district court found, relying on evidence provided by the Government, that no *prima facie* showing had been made); *Rioux*, 97 F.3d at 662 (affirming district court's decision to deny a hearing based on review of evidence submitted by the Government). And even in other circuits,

where the Government's rebuttal evidence is offered at a so-called "show-cause hearing," the

hearing is held *ex parte* and *in camera*, to avoid revealing information protected by Rule 6(e). *See*

*In re Sealed Case No. 98-3077*, 151 F.3d 1059, 1075-77 (D.C. Cir. 1998) (hearing "should not

proceed in a fully adversarial manner when only a *prima facie* case has been made").[13] In sum,

Adams has not shown his entitlement to a hearing, and the Court should deny his request for one.

## CONCLUSION

For the reasons set forth above, the defendant's motion should be denied.


Dated:        New York, New York
              October 18, 2024

                              Respectfully submitted,

                              DAMIAN WILLIAMS
                              United States Attorney

              By:    _____/s/_____
                              Celia V. Cohen
                              Andrew Rohrbach
                              Hagan Scotten
                              Derek Wikstrom
                              Assistant United States Attorneys
                              (914) 993-1921 / (212) 637-1944 / 2410 / 1085

---

[13] Adams cites this case and mentions its holding, yet he requests a "public evidentiary hearing." (Mot. 21-22). But the sole case he cites to support that request is inapposite. That case, *United States v. Cuervelo*, 949 F.2d 559 (2d Cir. 1991), involved an allegation of outrageous governmental conduct based on a sexual relationship between the defendant and an undercover law enforcement agent during the investigation. The Court of Appeals recognized that the case was *sui generis*. *Id.* at 565 ("We are unaware of any cases in which a federal appellate court has scrutinized the government's investigatory procedures in light of an alleged sexual relationship between a principal undercover agent and a person who is thereafter charged.").