UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

    - against -

ERIC ADAMS,

     Defendant.

No. 24-CR-556 (DEH)

**DEFENDANT ERIC ADAMS'S REPLY MEMORANDUM OF LAW IN SUPPORT OF
HIS MOTION TO DISMISS COUNT V OF THE INDICTMENT**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ......................................................................................................... ii

I.    THE GOVERNMENT MISUNDERSTANDS THE LAW GOVERNING THE
SUFFICIENCY OF AN INDICTMENT ........................................................................................ 1

II.   THE GOVERNMENT MISCONSTRUES SECTION 666 ................................................... 3

III.  THE INDICTMENT FAILS TO ALLEGE SECTION 666 BRIBERY ............................... 6

CONCLUSION ............................................................................................................................ 10

# TABLE OF AUTHORITIES

<u>**Page(s)**</u>

## <u>Cases</u>

*1-800-Flowers.Com, Inc. v. Raging Cap. Mgmt., LLC*,
    105 F.4th 46 (2d Cir. 2024) ...................................................................................4

*Fischer v. United States*,
    144 S. Ct. 2176 (2024) ..........................................................................................2

*Hamling v. United States*,
    418 U.S. 87 (1974).................................................................................................1

*McDonnell v. United States*,
    579 U.S. 550 (2016)...............................................................................................7

*Snyder v. United States*,
    144 S. Ct. 1947 (2024)...................................................................................3, 4, 5

*United States v. Aleynikov*,
    737 F. Supp. 2d 173 (S.D.N.Y. 2010)....................................................................2

*United States v. Boyland*,
    862 F.3d 279 (2d Cir. 2017)...............................................................................4, 6

*United States v. Burke*,
    2024 WL 3090277 (N.D. Ill. June 21, 2024) .......................................................10

*United States v. Dawkins*,
    999 F.3d 767 (2d Cir. 2021)................................................................................6, 9

*United States v. De La Pava*,
    268 F.3d 157 (2d Cir. 2001)...................................................................................3

*United States v. Donagher*,
    520 F. Supp. 3d 1034 (N.D. Ill. 2021) ...................................................................2

*United States v. Hansmeier*,
    988 F.3d 428 (8th Cir. 2021) ..................................................................................2

*United States v. Heicklen*,
    858 F. Supp. 2d 256 (S.D.N.Y. 2012)....................................................................2

*United States v. Hillie*,
    227 F. Supp. 3d 57 (D.D.C. 2017) .........................................................................1

*United States v. Lee,*
    919 F.3d 340 (6th Cir. 2019) .................................................................2, 10

*United States v. Mostafa,*
    965 F. Supp. 2d 451 (S.D.N.Y. 2013)...............................................................7

*United States v. Ng Lap Seng,*
    934 F.3d 110 (2d Cir. 2019)..........................................................................4, 6

*United States v. Osiemi,*
    980 F.2d 344 (5th Cir. 1993) .............................................................................2

*United States v. Pacione,*
    738 F.2d 567 (2d Cir. 1984)..............................................................................2

*United States v. Panarella,*
    277 F.3d 678 (3d Cir. 2002)..............................................................................2

*United States v. Pirro,*
    212 F.3d 86 (2d Cir. 2000)......................................................................1, 2, 3

*United States v. Reichberg,*
    5 F.4th 233 (2d Cir. 2021) ..............................................................................10

*United States v. Silver,*
    948 F.3d 538 (2d Cir. 2020)..............................................................................9

*United States v. Stock,*
    728 F.3d 287 (3d Cir. 2013)..............................................................................2

*United States v. Stringer,*
    730 F.3d 120 (2d Cir. 2013)..............................................................................1

*United States v. Tomeny,*
    144 F.3d 749 (11th Cir. 1998) ..........................................................................2

*United States v. Williams,*
    2017 WL 1030804 (N.D. Ga. Mar. 16, 2017)...................................................2

*Wojchowski v. Daines,*
    498 F.3d 99 (2d Cir. 2007)................................................................................4

## **<u>Statutes</u>**

18 U.S.C. § 201(a)(3)..............................................................................................5

18 U.S.C. § 201(b)(2)(A).........................................................................................5

18 U.S.C. § 201(c) ..................................................................................................5

18 U.S.C § 666.................................................................................................1, 3, 4, 5, 6

18 U.S.C. § 666(a)(1)(B) ...............................................................................................3

## Other Authorities

5 Wayne R. LaFave et al., *Criminal Procedure* § 19.3(a) (4th ed.) ................................................2

Brief for the United States, *Snyder v. United States*, 144 S. Ct. 1947 (2024)
     (No. 23-108), 2024 WL 1116453, (Mar. 11, 2024) ...............................................................4, 5

The indictment alleges that defendant Eric Adams accepted travel benefits in exchange for agreeing to assist in the "operation" or "regulation" of a diplomatic facility. Such a vague promise is insufficient for bribery under Section 666. The government's arguments rewrite the indictment, conflict with Supreme Court precedent, and contradict the position of the Solicitor General.

## I.    THE GOVERNMENT MISUNDERSTANDS THE LAW GOVERNING THE SUFFICIENCY OF AN INDICTMENT

The government's opposition brief betrays a serious misunderstanding of the requirements of a federal indictment. ECF 37 ("Opp."), at 4-10. In the government's telling, a bribery indictment is sufficient so long as it recites the language of the statute and states the time and place of the alleged bribe, regardless of whether the factual allegations describe conduct that violates the statute. Opp. 5. That erroneous claim rests on four elementary errors.

*First*, it is incorrect that a bribery indictment need only parrot the statute and state the time and place of the offense. As then-Judge Jackson explained, the "'generally applicable rule is that the indictment may use the language of the statute, but that language must be supplemented with enough detail to apprise the accused of the particular offense with which he is charged.'" *United States v. Hillie*, 227 F. Supp. 3d 57, 72 (D.D.C. 2017) (citation omitted). The Second Circuit agrees. *United States v. Pirro*, 212 F.3d 86, 92-93 (2d Cir. 2000). It is true that the Second Circuit has held that for certain self-explanatory elements, reciting the language of the statute suffices. For example, an attempted illegal-reentry charge does not require details on how the defendant attempted to cross the border. *United States v. Stringer*, 730 F.3d 120, 126-27 (2d Cir. 2013). But "'[w]here guilt depends so crucially upon . . . a specific identification of fact'"—such as the "precise falsehoods" and "factual bases for their falsity" in a false-statements prosecution—"'an indictment must do more than simply repeat the language of the criminal statute.'" *Id.* (quoting in part *Hamling v. United States*, 418 U.S. 87, 118 (1974)) (internal quotation marks omitted).

The government cannot seriously dispute that in a bribery case, guilt depends crucially on the terms of the alleged agreement—especially given the constitutional concerns underpinning the Supreme Court's narrow construction of federal bribery statutes.  While the government suggests that no cases have applied the *McDonnell* "official act" requirement at the motion-to-dismiss stage (Opp. 7-8), its own citations show otherwise.  *See, e.g.*, *United States v. Lee*, 919 F.3d 340, 354-55 (6th Cir. 2019); *United States v. Williams*, 2017 WL 1030804, at *3-*4 (N.D. Ga. Mar. 16, 2017); *see also United States v. Donagher*, 520 F. Supp. 3d 1034, 1045-46 (N.D. Ill. 2021) (dismissing Section 666 charges for failure to adequately allege *quid pro quo*).  Of course, the fact that other indictments *satisfied* the standard says nothing about whether this indictment does.

*Second*, contrary to the government's arguments, "[d]ismissal is required where the conduct alleged in the indictment as a factual basis for the offense is not actually prohibited by the language of the statute."  *United States v. Aleynikov*, 737 F. Supp. 2d 173, 176 (S.D.N.Y. 2010) (citing *Pirro*, 212 F.3d at 91, 93; *United States v. Pacione*, 738 F.2d 567, 572 (2d Cir. 1984)).  That is quite literally hornbook law.[1]  Indeed, just months ago, the Supreme Court instructed a lower court to "assess the sufficiency" of an "indictment in light of [its] interpretation of [the statute at issue]."  *Fischer v. United States*, 144 S. Ct. 2176, 2190 (2024).  The government offers no explanation for its position that this rule does not apply to the quo element of a bribery charge.

*Third*, "the timing of the defendant's objection is important to the level of scrutiny employed"—a principle the government ignores.  *Pirro*, 212 F.3d at 92.  "Where, for example, a defendant raises an objection after a verdict has been rendered," the Second Circuit has "held that

---

[1]  *See* 5 Wayne R. LaFave et al., *Criminal Procedure* § 19.3(a) (4th ed.); *see also, e.g.*, *United States v. Hansmeier*, 988 F.3d 428, 436 (8th Cir. 2021); *United States v. Stock*, 728 F.3d 287, 292 (3d Cir. 2013); *United States v. Panarella*, 277 F.3d 678, 685 (3d Cir. 2002); *United States v. Tomeny*, 144 F.3d 749, 751 (11th Cir. 1998); *United States v. Osiemi*, 980 F.2d 344, 345 (5th Cir. 1993); *United States v. Heicklen*, 858 F. Supp. 2d 256, 262 (S.D.N.Y. 2012).

an indictment should be interpreted liberally, in favor of sufficiency." *United States v. De La Pava*, 268 F.3d 157, 162 (2d Cir. 2001). But "[a] defendant who objects to the indictment before trial"—as here—"is entitled to a more exacting review of the indictment." *Pirro*, 212 F.3d at 92.

*Finally*, the government mistakenly suggests that an "extraordinary" showing is required to dismiss an indictment for insufficiency. Opp. 5 (quoting *De La Pava*, 268 F.3d at 162). That passage from *De La Pava* was analyzing whether dismissal is an appropriate remedy for violating a consular-notification requirement, not the standard for sufficiency. 268 F.3d at 165.

## II. THE GOVERNMENT MISCONSTRUES SECTION 666

Faced with a recent Supreme Court decision that states twenty-five times that Section 666 requires an "official act" and explains that "Congress modeled the text of § 666(a)(1)(B) for state and local officials on § 201(b)," *Snyder v. United States*, 144 S. Ct. 1947, 1954 (2024), the government asks the Court to stick its head in the sand. Although *Snyder* repeatedly construed Section 666's language to contain an "official act" requirement, the government argues that this Court should deem those statements to be "shorthand" for activity that does *not* amount to an official act. That makes no sense. The Supreme Court would not have used a term so freighted with meaning in the bribery context unless it construed Section 666's quo standard as synonymous with the "official act" requirement of ordinary *quid pro quo* bribery—a requirement that the government concedes applies to both bribery statutes that use that term and those that don't (Opp. 16).[2] And that construction was critical to *Snyder*'s holding, because the Court relied on the conclusion that Congress had enacted Section 666 in order to extend Section 201's bribery

---

[2] The government suggests that *Snyder* did not construe Section 666 to require an official act because the Court expressed concern that the government's position could sweep in teachers, coaches, and others who receive small gifts. Opp. 14 (citing *Snyder*, 144 S. Ct. at 1952, 1957-58). That discussion did not describe what acts the listed public servants might perform, and it is easy to imagine relevant official acts, *e.g.*, giving a student an unearned C to allow him to graduate.

prohibition to state and local officials. *Id.* at 1953, 1955-56. *Snyder*'s authoritative construction of Section 666 supersedes the Second Circuit's decisions in *United States v. Boyland*, 862 F.3d 279 (2d Cir. 2017), and *United States v. Ng Lap Seng*, 934 F.3d 110 (2d Cir. 2019), which reasoned that because "[n]owhere does § 666 mention 'official acts,'" it "plainly covers more than official acts." *Id.* at 133 (internal quotation marks omitted).[3]

Indeed, the prosecutors who wrote the opposition brief apparently did not check with the Solicitor General. In assuring the Supreme Court that the government's interpretation of Section 666 to cover gratuities would not reach too far, she identified as a "[l]imiting feature[] of Section 666" the "requirement that a reward be 'in connection with' particular business or transactions." Brief for the United States, 2024 WL 1116453, at *17 (Mar. 11, 2024). She explained that this requirement "parallel[s]" the Section 201 requirement that payment be "linked to a *particular* '*official act*.'" *Id.* (citation omitted) (emphasis added). It is little wonder, then, that the Court construed Section 666 to incorporate the official-act requirement.

At any rate, even if this Court concludes that *Snyder* is not an intervening change in the law, the meaning of Section 666 would not differ from Section 201 in a way that is material here, as the motion to dismiss explained. *See* ECF 14 ("Mot."), at 10. The hallmark of an "official act" under Section 201—the use of an official position to effect a specific and formal exercise of governmental power—comports with the text, history, and purpose of Section 666. Begin with the text: "any business, transaction, or series of transactions of such organization, government, or agency." "Transactions" and "series of transactions" are specific, discrete events, not general

---

[3]    Where, as here, an "intervening Supreme Court decision has so clearly undermined [circuit] precedent that it will almost inevitably be overruled," a district court need not follow it. *1-800-Flowers.Com, Inc. v. Raging Cap. Mgmt., LLC*, 105 F.4th 46, 54 n.36 (2d Cir. 2024); *see, e.g.*, *Wojchowski v. Daines*, 498 F.3d 99, 106 (2d Cir. 2007).

areas of policy, like "regulation."  Mot. 10.  And while the word "business" could be read broadly, that would render the other two terms superfluous.  That is why the Solicitor General has construed the language to refer to "a specific . . . activity."  2024 WL 1116453, at *37-*38.

That view accords with the history of Section 666.  *Snyder* explained that "[i]n the 1970s and early 1980s, confusion emerged in the Courts of Appeals over whether the federal bribery and gratuities laws in § 201(b) and § 201(c) applied not only to federal officials but also to state and local officials."  144 S. Ct. at 1953; *see* S. Rep. 98-225, at 369 (1983).  "In response," Congress passed Section 666.  *Snyder*, 144 S. Ct. at 1953.  As the Solicitor General explained, "Congress first enacted Section 666 in 1984 to *extend Section 201's prohibitions* on bribery and illegal gratuity to cover state and local officials" and employees of other entities receiving federal funds.  2024 WL 1116453, at *27-28 (emphasis added).  Given that undisputed purpose, the government's theory that Section 666 covers a much broader and more amorphous set of agreements than Section 201(b) is not plausible.

The history of the provision also explains why the relevant language of Section 666 differs from the corresponding language in Section 201(b) ("the performance of any official act").  18 U.S.C. § 201(b)(2)(A).  Because Section 666 applies not only to government officials but also to private recipients of federal funds, it would have been incongruous to use the term "official act."  *See* 18 U.S.C. § 201(a)(3).  Congress therefore wrote a phrase that captures the same concept of an agreement to perform a specific action on behalf of an organization but that also applies to private parties.  That is, in fact, exactly what the Solicitor General told the Supreme Court when explaining why the language of the "parallel" quo requirements of Sections 201 and 666 differs: "Section 666 does not adopt the Section 201 term 'official act' [] presumably because it would not have obvious application to nongovernmental organizations."  2024 WL 1116453, at *37-38.

Accordingly, whatever other differences might exist between Section 201 and Section 666, with respect to bribes of government officials they both require an agreement to use one's official position to effect a specific and formal exercise of governmental power.  No pre-*Snyder* Second Circuit precedent conflicts with that interpretation.  Although the government seems to suggest otherwise (Opp. 14-15), the one case that it discusses at any length held only that (i) the term "business" is not limited to commercial activity (irrelevant here), and (ii) as a matter of evidentiary sufficiency, the statutory language was satisfied by a scheme to bribe college coaches "in connection with [enumerated] aspects of the universities' business"—specifically, the use of their official authority "to steer . . . student-athletes toward particular financial advisors."  *United States v. Dawkins*, 999 F.3d 767, 785-87 (2d Cir. 2021).  That discrete exercise of official authority is consistent with Adams's (and the Solicitor General's) interpretation of Section 666.[4]

## III.    THE INDICTMENT FAILS TO ALLEGE SECTION 666 BRIBERY

Under the proper construction of Section 666, the indictment fails to adequately allege bribery.  At most, the factual allegations describe a type of gratuity that not even Section 201 prohibits (gifts based on an official's position).  The government's jerry-rigged bribery theory has two independently fatal flaws: (i) the only agreement alleged—in June 2021, months before the permit issue arose—did not entail a promise to effect a specific exercise of governmental power (Mot. 10-16); and (ii) even if the indictment had alleged that Adams agreed to assist on the permit issue in exchange for a benefit, it does not sufficiently allege that Adams agreed to pressure the FDNY (Mot. 16-20).  The government's responses lack merit.

1. The *quid pro quo* that forms the basis for Count V is alleged in paragraphs 36 and 63 of

---

[4]    While *Boyland* and *Ng Lap Seng* held that the Section 666 quo language is "more expansive" than *McDonnell*'s "official act" standard, they did not specify the scope of that element beyond referring to its text.  *Ng Lap Seng*, 934 F.3d at 133 (quoting *Boyland*, 862 F.3d at 291).

the indictment:  In June 2021, in exchange for travel benefits, Adams allegedly "understood" that he was "expected to assist the Turkish Official in the operation of the Turkish Consulate in New York."  ¶ 36; *see id.* ¶ 63 ("in exchange for intending to be influenced in connection with the City of New York's regulation of the Turkish House").  That is not a "specific and focused" exercise of governmental power.  *McDonnell v. United States*, 579 U.S. 550, 574 (2016).  The alleged quo is simply too general and vague, and it readily encompasses a variety of actions that do not involve the exercise of governmental power, such as giving advice on City bureaucracy or introducing diplomatic officers to regulatory officials.  To quote the Solicitor General, the alleged agreement did not involve "a specific . . . activity."

The government's principal response is to rewrite the indictment.  Opp. 16-19.  The government begins by reimagining the alleged quo as "help[ing] the [Turkish] official *receive favorable treatment* from New York City in regulating the building"—an allegation found nowhere in the indictment.  Opp. 2 (emphasis added).  That inaccurate paraphrase seems designed to exclude all the non-official actions covered by the promise that the indictment actually describes.

The government goes on to claim that the indictment alleges an agreement to assist on the permit matter specifically in exchange for travel benefits, relying principally on paragraph 33.  Opp. 16-17.  But an indictment must "be read as a whole," *United States v. Mostafa*, 965 F. Supp. 2d 451, 461 (S.D.N.Y. 2013), and it is clear that the indictment does not actually allege a *quid pro quo* about the permit matter—no doubt because prosecutors presented the grand jury no evidence to support that.  Although paragraph 33 states that Adams intervened in the permit issue in September 2021 "in exchange for" travel benefits, the ensuing paragraphs make clear that the alleged agreement was reached months earlier, before the permit issue arose in late August.  *See* Indictment ¶¶ 33, 34, 36, 38f.  In context, paragraph 33 is alleging only that Adams helped on the

permit issue in *furtherance* of his earlier agreement to assist in the "operation" of the consulate building—not that he ever accepted benefits specifically in exchange for assistance on the permit matter, either expressly or implicitly. *Id.* ¶¶ 33, 36. That is insufficient for bribery. Just as a lawmaker who accepts a campaign contribution in exchange for a promise to push for deregulatory policies is not liable when she later invokes her oversight authority to thwart a particular agency action, a general promise to assist with the operation of an important foreign nation's diplomatic facility does not become an *ex post facto* bribe because the official later helps on a specific matter.

The government also relies on paragraph 38, but that paragraph only confirms that the indictment does not allege the specific *quid pro quo* arrangement claimed in the government's brief. It states that in September 2021, Adams "agreed to pressure a New York City agency to help the Turkish Consulate secure a [TCO]," but it does *not* allege or even imply that he agreed to do so in exchange for a benefit. Prosecutors would have alleged that if they could. Likewise, although the government makes much of Adams supposedly telling a staffer "I know" in response to the relayed message that it was "his turn" to support Turkey, Opp. 18-19, that exchange does not suggest any new agreement beyond the insufficient June 2021 agreement. The same is true of the allegation that Adams sought further benefits in September 2021.

The only other passage that the government cites consists of three words in paragraph 43b. Opp. 17.[5] That paragraph says that in July 2022, an Adams staffer told the "Turkish Official" to ask about any problems with the consulate building, "[l]ike FDNY approvals." The indictment does not allege that the staffer promised to take any action; that any such promise was made in exchange for benefits; or that Adams was even aware of this conversation. Moreover, paragraph

---

[5]   At one point the government also cites paragraph 44 (Opp. 6-7), but it appears that the government intended to refer to paragraph 63, addressed above.

43's first sentence alleges only that the conversation "continued" the preexisting agreement to assist in the "regulation" of the consulate building—an agreement insufficient for bribery.

The government buries a litany of half-formed legal arguments in a footnote. It claims, for example, that the Second Circuit's decision in *Dawkins* "does not require such specificity in how the quo is described" (Opp. 19 n.7), but that is incorrect; the quo in *Dawkins* was the specific act of "steer[ing] . . . student-athletes toward particular financial advisors." 999 F.3d at 787. The footnote also observes that an agreement can involve more than one quo and that an official can reach a new agreement to maintain a stream of payments. Those principles are irrelevant here, however, because the indictment does not allege that Adams ever agreed to assist on any specific matter to obtain or maintain travel benefits. Finally, the footnote claims that in *United States v. Silver*, 948 F.3d 538 (2d Cir. 2020), the quos were "tax abatement and rent stabilization programs," suggesting those were as general as the alleged promise here. But that misreads *Silver*. There the quo was to "help[] pass legislation" concerning those programs—"specific, identified provisions of the Rent Act of 2011." *Id.* at 562, 571. That is as specific as it gets.

2. At any rate, Adams's alleged intervention in the permit matter did not involve the exercise of official power, either under the *McDonnell* standard or any other plausible view of the sort of "official act" necessary under Section 666. Given that Adams lacked any relevant regulatory power over the FDNY, the indictment rests solely on an allegation of "pressure." Indictment ¶ 39. But that conclusory assertion is contradicted by the factual allegations describing the so-called pressure campaign, which show nothing of the sort. Importantly, the government concedes through its silence that a Section 666 charge cannot rest on Adams's potential future position as Mayor and that the mere allegation that other people *felt* pressure is not sufficient. *See* Mot. 18-20.

In defending the "pressure" theory, the government obscures what the indictment actually says.  For example, the government says that for "over a week" the "Fire Protection Chief resisted entreaties" to allow the consulate building to open and caved only when "told he would be fired if he failed to comply."  Opp. 20.  But the entreaties were made by *other* "New York City officials and employees," ¶ 38f, and the indictment does not allege that Adams was aware of either the entreaties or the firing threat, ¶ 38*o*.  Likewise, the indictment does not allege that Adams knew that the FDNY letter was "*sui generis*."  Opp. 20.  The government asserts that the indictment alleges "a burst of communication that also included phone calls," Opp. 20, but it doesn't describe the content of any call, much less allege that Adams conveyed any pressure over the phone.  As for the government's claim that Adams pushed "for fast action," the allegations simply say that Adams conveyed the inherently time-sensitive nature of the issue while assuring the Commissioner, "If it is[ im]possible please let me know and I will manage their expectation."  ¶ 38m.

There is just nothing about what is alleged that amounts to "pressure."[6]  The government has alleged no facts beyond ordinary communications among officials about an important matter— a visit by the president of a country of over 80 million people.  If this indictment suffices, prosecutors could virtually always circumvent the Supreme Court's constitutionally based limits on bribery statutes by characterizing everyday activities as "pressure."

## CONCLUSION

For the foregoing reasons, this Court should dismiss Count V of the Indictment.

---

[6]    In *United States v. Lee*, 919 F.3d 340 (6th Cir. 2019), the defendant had advised a prosecutor to bring charges against someone ("I'm trying to make you think"), not just alerted another official to an issue.  *Id.* at 344-45, 354.  The government's other citations are likewise far afield from this case.  Opp. 20-21, citing *United States v. Reichberg*, 5 F.4th 233, 249 (2d Cir. 2021) ("making an arrest"); *United States v. Burke*, 2024 WL 3090277, at *16 (N.D. Ill. June 21, 2024) (defendant tried to "sway the permit evaluation in his favor").

Date:  October 25, 2024

Respectfully submitted,

QUINN EMANUEL URQUHART
& SULLIVAN, LLP

By:  */s/ Alex Spiro*

Alex Spiro
51 Madison Avenue, 22nd Floor
New York, NY 10010
(212) 849-7000

William A. Burck
John F. Bash (*admitted pro hac vice*)
Avi Perry
1300 I Street NW, 9th Floor
Washington, D.C. 20005
(202) 538-8000

*Attorneys for Mayor Eric Adams*