UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

v.

ERIC ADAMS,

Defendant.

24 Cr. 556 (DEH)

**OPINION
AND ORDER**

DALE E. HO, United States District Judge:

On September 24, 2024, the Government filed a five-count indictment (the "Indictment") against Defendant New York City Mayor Eric Adams ("Adams," or "Mayor Adams") on bribery and other charges. The Indictment alleges, *inter alia*, that Adams accepted illegal campaign contributions and bribes consisting of various forms of luxury travel. Mayor Adams now moves to dismiss Count V of the Indictment on the ground that the Government's allegations do not meet the legal standard for bribery under 18 U.S.C. § 666(a)(1)(B). For the reasons detailed below, Mayor Adams's Motion to Dismiss Count V is **DENIED**.

## FACTUAL BACKGROUND

On a motion to dismiss, the Court reads the Indictment in its entirety. *See United States v. Hernandez*, 980 F.2d 868, 871 (2d Cir. 1992). This Opinion summarizes various allegations relevant to the alleged bribery scheme, which the Court assumes to be true solely for the purposes of adjudicating this motion. *See United States v. Goldberg*, 756 F.2d 949, 950 (2d Cir. 1985).[1]

---

[1] Defendant's Motion states that only paragraphs 33–43 and 63 of the Indictment are relevant to Count V. Def.'s Mem. Supp. Mot. to Dismiss 3, ECF No. 14 ("Def. Br."). The Government disagrees and states that Count V realleges the allegations made in the preceding paragraphs. Gov't Resp. in Opp. to Def's Mot. to Dismiss, ECF No. 37 at 2 n.1 ("Gov't Br."). Unless otherwise stated, the Discussion section of this Opinion relies on paragraphs 33–43 and 63 of the Indictment.

Adams became Brooklyn Borough President in January 2014. In 2018, he announced plans to run for mayor of New York City. In July 2021, Adams won the Democratic Party primary for the 2021 New York City mayoral election. In November, Adams won the general election, and he assumed office on January 1, 2022. The Indictment alleges that between 2015 and 2022, Adams maintained a relationship with several Turkish government officials and businesspeople (including the "Turkish Official" and the "Turkish Airline Manager"). He also traveled multiple times on a Turkish national airline (the "Turkish Airline").

## I.    The Government's Allegations

In 2015, while serving as Brooklyn Borough President, Adams took two trips to Turkey. *See* Indictment ¶ 10, ECF No. 1 ("Ind."). The trips, which were in August and December, were arranged and/or paid for in part by the Turkish Consulate, a Turkish University, and Turkish business organizations. *Id.* at ¶ 10–11. Adams disclosed the trips to the New York City Conflict of Interest Board ("COIB"). *Id.* at ¶ 10.

In 2016 and 2017, Adams and various of his affiliates received travel benefits worth tens of thousands of dollars from his Turkish contacts in connection with travel to India, Turkey, Sri Lanka, China, France. *Id.* at ¶ 12–15. In his COIB disclosure forms for those years, Adams represented that he had neither received any gifts exceeding $1,000 from persons or entities having no business dealings with the City, nor any gifts exceeding $50 from persons or entities who did have business dealings with the City. *Id.* at ¶ 15c.

In 2017, construction began on Turkey's new, 36-story building at 821 United Nations Plaza in New York City. *Id.* at ¶ 38b. The building is known as the "Turkish House" and now serves as the headquarters of multiple Turkish diplomatic missions, including the Turkish Consulate. *Id.*

In 2018, Adams announced his plans to run for Mayor of New York City. *See id.* at ¶ 1. That year, he and his domestic partner traveled to Hungary via Istanbul and received business class upgrades worth more than $10,000. *Id.* at ¶ 21. Adams did not disclose this travel benefit on his 2018 COIB disclosure form. *Id.*

In 2019, Adams's partner received a business class upgrade on the Turkish Airline on a trip to Turkey, Jordan, and Oman. *Id.* at ¶ 22. During that trip, Adams and his partner received free hotel stays, dinners, and a boat trip. *Id.* at ¶ 23. Adams did not report these benefits on his 2019 COIB disclosure form. *Id.* at ¶ 24.

In June 2021, a member of Adams's staff reached out to the Turkish Airline Manager to arrange travel for Adams and his partner from New York to Istanbul. *Id.* at ¶ 34. Expressing a concern that "[Adams's] every step is being watched right now," the Adams staffer requested that the discounted price "be somewhat real." *Id.* at ¶ 34a. Adams paid $1,100 for each economy class ticket, but received an itinerary for business class tickets valued at more than $10,000. *Id.* For this trip, Adams also arranged to stay at the Four Seasons hotel in Istanbul. *Id.* at ¶ 34c. In text messages to the Adams staffer, the Turkish airline manager promised that "[Adams] is not going to pay" and that "his name will not be on anything." *Id.* at ¶ 34b. Adams also agreed to pay $720 for other activities included on this trip, including a yacht tour and a beach resort stay, representing a discount of nearly $8,000. *Id.* at ¶ 34c. This trip was ultimately canceled, and Adams's payment for the economy class tickets was refunded. *Id.*

In late June 2021, Adams's chief fundraiser for his 2021 Campaign traveled to Istanbul. *Id.* at ¶ 35. The Turkish Official and Turkish Airline provided this fundraiser free transportation from the airport, a free hotel stay, and free access to a VIP room in an airport lounge. *Id.* On June 27, Adams texted the Turkish Official offering to pay for the fundraiser's travel. *Id.* at ¶ 35a. The

Turkish Official responded that no payment was needed and sent Adams a fabricated bill for the hotel stay. *Id.*

Adams was declared the winner of the Democratic mayoral primary election in July of 2021. *Id.* at ¶ 8.

In the summer of 2021, construction was completed on the Turkish House. *Id.* at ¶ 38d. Turkey planned on opening the building for the Turkish President's visit to New York during the United Nations General Assembly in September 2021. *Id.* at ¶ 38c. By late August of that year, however, the building had not yet been inspected by the Fire Department of New York ("FDNY"), and the FDNY had not issued a "letter of defect" identifying remaining fire safety issues with the building. *Id.* at ¶ 38d–e. Without that letter, the building could not receive a Temporary Certificate of Occupancy ("TCO" or "permit") from the New York City Department of Buildings allowing it to open. *Id.*

In early September 2021, Adams, his staffer, and the Turkish Official communicated electronically and via phone call about the TCO issue for the Turkish House. *Id.* at ¶ 38g. The Turkish Official, on a phone call with the Adams staffer, stated that "because Turkey had supported [Adams], it was now his turn to support Turkey." *Id.* When the staffer relayed this message to Adams, Adams responded: "I know." *Id.* Adams then sought a call with the FDNY Commissioner. *Id.* at ¶ 38j. Prior to that call, in August, Adams had declined to commit to retaining the Commissioner were Adams ultimately elected Mayor. *Id.* On September 8, Adams messaged the FDNY Commissioner describing Turkey's need for the TCO. *Id.* The FDNY Commissioner responded that he would "get on it tomorrow," and Adams, thorough a member of his staff, then texted the Turkish Official that he was "on top of this." *Id.* at ¶ 38k.

On September 9, after reviewing a letter describing the Turkish House's fire alarm system, an FDNY employee sent the following message to the Fire Prevention Chief:

> After reviewing the letter, I do not see any way we would be willing to accept it. They have some major issues like central station and fan shutdowns which would be an automatic violation order.  Aside from that, he gave us a list with over 60 defects and some of them list 5-10 problems in each one.  FAIU would not go beyond 20 defects without issuing a violation order.  In my opinion, this document does not take any liability that we would be comfortable with.  I believe it actually tells us this building is not safe to occupy.

*Id.* at ¶ 38*l*.  The next day, on September 10, Adams messaged the FDNY Commissioner inquiring about the inspection.  *Id.* at ¶ 38m.  Referring to the Turkish Official, Adams wrote, "[t]hey really need someone . . . by today if possible.  If it is[ im]possible please let me know and I will manage their expectation[s]."  *Id.*  In response, the FDNY Commissioner relayed that "[t]here seems to be a difference of opinion between the inspector" and the private alarm engineer, but that the FDNY Commissioner was "trying to iron it out."  *Id.*

That same day, Adams messaged the FDNY Commissioner that "[t]hey said the hire [sic] ups at FDNY did not give the inspector authorization to come.  *Id.* at ¶ 38n.  He continued, "[t]he inspector indicated he needs authority to come to day [sic]."  *Id.*  The FDNY Commissioner responded, "[w]orking on that as we speak."  *Id.*  Adams then messaged his staffer that he had again spoken with the FDNY Commissioner, and "[h]e again told me he is on the phone as we speak to try and resolve this."  *Id.*  That afternoon, the FDNY Chief of Department called the Fire Prevention Chief to a meeting and explained, "in substance, that if the FDNY did not assist the Turkish Consulate in obtaining a TCO, [both of them] would lose their jobs."  *Id.* at ¶ 38o.  After that meeting, the Fire Prevention Chief drafted an "unprecedented" "conditional letter of no objection" for the Turkish House.  *Id.*  The letter indicated that the FDNY did not object to the Department of Buildings issuing a TCO so long as the FDNY received assurances that the fire alarm system functioned properly and "assum[ing] the Department of Buildings has inspected, tested and approved the installed water-based fire suppression systems."  *Id.*  After hearing this

news, Adams messaged the Turkish Official that the letter was being drafted. *Id.* at ¶ 38p. The Turkish Official expressed thanks and called Adams "a true friend of Turkey." *Id.*

Four days later, on September 14, 2021, Adams messaged his staffer, "directing her to secure tickets to Pakistan for a trip from November 30 to December 8, 2021." *Id.* at ¶ 39a. The staffer explained that Adams would "pay the economy class price," and asked if he could "upgrade later." *Id.*

In November 2021, Adams was elected Mayor of New York City. *Id.* at ¶ 8.

At the end of November 2021, Adams traveled to Ghana (rather than Pakistan) on the Turkish Airline and received free business class upgrades worth more than $10,000. *Id.* at ¶ 39d. On this trip, Adams had a nine-hour layover in Istanbul, where he received complimentary airport pickup in a luxury vehicle, dinner, and drinks from the Turkish Official. *Id.* at ¶ 39e.

Adams entered office as Mayor of New York City on January 1, 2022. *Id.* at ¶ 42.

## II.    The Indictment

On September 24, 2024, the Government filed a five-count indictment against Adams, alleging (1) conspiracy to commit wire fraud, federal program bribery, and to receive campaign contributions by foreign nationals (18 U.S.C. § 371) (Count I); (2) wire fraud (18 U.S.C. §§ 1343, 2) (Count II); (3) solicitation of a contribution by a foreign national (52 U.S.C. §§ 30121, 30109(d)(1)(A); 18 U.S.C. § 2) (Count III); (4) solicitation of a contribution by a foreign national (52 U.S.C. §§ 30121, 30109(d)(1)(A); 18 U.S.C. § 2) (Count IV); and (5) bribery (18 U.S.C. §§ 666(a)(1)(B), 2) (Count V).

Mayor Adams seeks to dismiss Count V of the Indictment, which charges that:

From at least in or about the summer of 2021, through at least in or about the summer of 2022, in the Southern District of New York and elsewhere, ERIC ADAMS, the defendant, being an agent of a local government, to wit, the City of New York, which, in a one year period, received benefits in excess of $10,000 under a federal program involving a grant, contract, subsidy, loan, guarantee,

insurance, and other form of federal assistance, corruptly solicited and demanded for the benefit of a person, and accepted and agreed to accept, a thing of value from a person, intending to be influenced and rewarded in connection with business, a transaction, and a series of transactions of the City of New York involving a thing of value of $5,000 and more, to wit, ADAMS solicited and accepted free and heavily discounted luxury travel benefits from the Turkish Official and others in exchange for intending to be influenced in connection with the City of New York's regulation of the Turkish House, located at 821 United Nations Plaza, New York, New York.

(Title 18, United States Code, Sections 666(a)(l)(B) and 2.)

Ind. ¶ 63.

## LEGAL STANDARDS

### I.    The Requirements of an Indictment

"'The Fifth Amendment made the' right to indictment by grand jury 'mandatory in federal prosecutions in recognition of the fact that the intervention of a grand jury was a substantial safeguard against oppressive and arbitrary proceedings.'"  *United States v. Gonzalez*, 686 F.3d 122, 127 (2d Cir. 2012) (quoting *Smith v. United States,* 360 U.S. 1, 9 (1959)); *see also* U.S. Const. amend. V ("No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury[.]")

The Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be informed of the nature and cause of the accusation." U.S. Const. amend. VI.  In effectuating this constitutional mandate, Rule 7(c)(1) of the Federal Rules of Criminal Procedure requires that the "indictment or information must be a plain, concise, and definite written statement of the essential facts constituting the offense charged" and that "[f]or each count,

the indictment . . . must give the official or customary citation of the statute, rule, regulation, or other provision of law that the defendant is alleged to have violated." Fed. R. Crim. P. 7(c)(1).[2]

"The Supreme Court has held that an indictment is sufficient if it (1) 'contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend' and (2) 'enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense.'" *United States v. Benjamin*, 95 F.4th 60, 66–67 (2d Cir. 2024) (quoting *Hamling v. United States*, 418 U.S. 87, 117 (1974)), *cert. denied*, -- S. Ct. --, 2024 WL 5112284 (Dec. 16, 2024).

## II.    A Motion to Dismiss an Indictment

Rule 12 permits a defendant to seek dismissal of an indictment for failure to charge an offense. Fed. R. Crim. P. 12(b)(3)(B)(v). On a motion to dismiss an indictment, the Court assumes as true all factual allegations therein. *See Benjamin*, 95 F.4th at 66 (citing *Goldberg*, 756 F.2d at 950); *accord United States v. Bankman-Fried*, 680 F. Supp. 3d 289, 295 (S.D.N.Y. 2023) (same). An indictment challenged before a verdict does not carry a presumption of sufficiency. *See United States v. De La Pava*, 268 F.3d 157, 162 (2d Cir. 2001).

"[A]n indictment need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime." *Benjamin*, 95 F.4th at 66–67 (quoting *United States v. Alfonso*, 143 F.3d 772, 776 (2d Cir. 1998)). However, "a citation to a statutory section alone is not sufficient to cure a defective indictment that fails to allege all the elements of an offense." *Hernandez*, 980 F.2d at 871 (citation omitted). Moreover, "each count of an indictment must be treated as if it were a separate indictment," and "the validity of a count

---

[2] All references to "Rule(s)" herein are to the Federal Rules of Criminal Procedure, unless otherwise stated.

cannot depend upon the allegations contained in any other count not expressly incorporated." *Id.*
"An indictment, however, need not be perfect, and common sense and reason are more important
than technicalities." *De La Pava*, 268 F.3d at 162.

## STATUTORY BACKGROUND

### I.    Federal Program Bribery under 18 U.S.C. § 666(a)(1)(B)

Count V charges Mayor Adams under 18 U.S.C. § 666, which is entitled "Theft or bribery
concerning programs receiving Federal funds," and is often colloquially referred to as "federal
program" or "federal funds" bribery.  The statue makes it a crime when:

> [A]n agent of an organization, or of a State, local, or Indian tribal government, or
> any agency thereof—
>
> corruptly solicits or demands for the benefit of any person, or accepts or agrees to
> accept, anything of value from any person, intending to be influenced or rewarded
> in connection with any business, transaction, or series of transactions of such
> organization, government, or agency involving any thing of value of $5,000 or
> more.

18 U.S.C. § 666(a)(1)(B).  Put simply, § 666 prohibits bribery by state and local officials, as well
as agents of private organizations that receive a certain amount of federal funds.  But as the
Supreme Court has made clear, the "prohibition is not confined to a business or transaction which
affects federal funds." *Salinas v. United States*, 522 U.S. 52, 57 (1997).

While § 666 does not on its face contain a requirement to show a *quid pro quo* agreement,
the Supreme Court has explained that it requires one.  *See generally Snyder v. United States*, 603
U.S. 1 (2024) (holding that § 666 bribery applies only to *quid pro quo* exchanges and not
gratuities); *cf. Benjamin*, 95 F.4th at 67 (assuming without deciding that § 666 requires proof of
a *quid pro quo*).  *Quid pro quo* means "this for that" or "these for those."  *United States v. Ganim*,
510 F.3d 134, 148 (2d Cir. 2007).  To prove a *quid pro quo*, the government must prove that a
defendant had "a specific intent to give or receive something of value in exchange for an . . . act."

*United States v. Dawkins*, 999 F.3d 767, 777 n.2 (2d Cir. 2021) (emphasis omitted) (citing *United States v. Sun-Diamond*, 526 U.S. 398, 404–05 (1999)). In *quid pro quo* bribery schemes, the *quid* is a <u>thing of value</u> that the defendant agrees to accept, the *quo* is an <u>act</u> that the defendant agrees to perform in exchange for the *quid*, and the *pro* is the link between the two: an <u>agreement</u> by the defendant to accept the *quid* in exchange for being influenced to perform the *quo*.

The Second Circuit has held that, while a "*quid pro quo* must be clear and unambiguous," the "showing of a *quid pro quo* [agreement] . . . may be based on inference and need not involve an express statement." *Benjamin*, 95 F.4th at 68, 71. That is, the agreement, or the *pro*, may be "implied from the official's and the [briber's] words and actions." *Id.* at 78. "[T]he agreement must be explicit," which means that it is "plainly evident but not necessarily expressly stated." *Id.* at 68 (quotation marks omitted).

## II.    Section 201 and Section 666

A brief overview of § 666, its history, and its relationship to a different bribery statute—18 U.S.C. § 201—is helpful for the Court's discussion, because, as explained below, the parties' arguments are based in large part on a disagreement about how the two statutes relate to each other.

### A.    "Official Act" in Section 201 and the Supreme Court's 2016 Decision in *McDonnell*

Section 201 is entitled "Bribery of public officials and witnesses," and is known as the general federal bribery statute. It makes it a crime for a public official to "receive or accept anything of value . . . in return for: being influenced in the performance of any official act." 18 U.S.C. § 201(b)(2)(A). Section 201 prohibits *quid pro quo* bribery agreements. *See McDonnell v. United States*, 579 U.S. 550, 573–74 (2016).

To prove a *quid pro quo* under § 201, the Government must establish that a public official agreed to perform a particular kind of *quo*—an "official act," which is defined in the statute as

"*any decision or action on any question, matter,* cause, suit, proceeding or controversy, which may at any time be pending, or which may by law be brought before any public official, in such official's official capacity."  18 U.S.C. § 201(a)(3) (emphasis added).

In *McDonnell*, the Supreme Court held that, for purposes of construing § 201, an "official act" essentially has two components: (1) "the public official must make a decision or take an action" on (2) "something specific and focused that is 'pending' or 'may by law be brought' before a public official."  579 U.S. at 574 (quoting 18 U.S.C. § 201(a)(3)).  With respect to the first component, *McDonnell* explained that a "decision or action may include using [one's] official position to exert pressure on another official to perform an 'official act,' or to advise another official, knowing or intending that such advice will form the basis for an 'official act' by another official."  *Id.*  But simply "[s]etting up a meeting, hosting an event, or calling an official (or agreeing to do so) merely to talk about a [matter] . . . does not qualify as *a decision or action* on the pending question . . .  as long as the public official does not intend to exert pressure on another official."  *Id.* at 573 (emphasis added).

As for the second component, *McDonnell* explained that "[t]he 'question, matter, cause, suit, proceeding or controversy' [pending before a public official] must involve a formal exercise of governmental power that is similar in nature to a lawsuit before a court."  *Id.* at 574.  To qualify, the matter "must be . . . focused and concrete," such as "whether researchers [at a state university] would initiate a study of [a particular drug or nutritional supplement]."  *Id.* at 570.  But more general issues like "[e]conomic development," "national security," or "justice" broadly are "not naturally described as . . . matter[s] 'pending' before a public official—or something that may be brought 'by law' before him."  *Id.*  The question or matter must be "relatively circumscribed—the kind of thing that can be put on an agenda, tracked for progress, and then checked off as complete." *Id.*; *see also United States v. Silver*, 948 F.3d 538, 557 (2d Cir. 2020) ("[A] promise to perform

*some* act to create jobs or lower taxes, or to 'benefit the payor,' without more, cannot be understood to refer to a 'formal exercise of governmental power that is similar in nature to a cause, suit, proceeding or controversy' [because] such a promise is so lacking in definition or specificity that it amounts to no promise at all." (quoting *McDonnell*, 579 U.S. at 569)).

In sum, *McDonnell* held that under § 201, the *quo* in a *quid pro quo* must entail: (1) a decision to take action or to exert pressure on another public official to do so (as opposed to "[s]imply expressing support" for something "at a meeting, event, or call" with another official, "as long as the public official does not intend to exert pressure," 579 U.S. at 573), on (2) a specific *question* or *matter* involving a formal exercise of governmental power (as opposed to something more "nebulous," *id.* at 578, or described at a "higher level of generality," *id.* at 570).

### B.    Section 666 and the Second Circuit's 2019 Decision in *Ng Lap Seng*

As noted, section 666 criminalizes bribery and applies to state and local officials, as well as agents of private organizations receiving federal funds.  It was passed by Congress in response to confusion about whether the general federal bribery provision under § 201 extended to state and local officials.  *See Snyder*, 603 U.S. at 8 (explaining the statutory history of § 666).

As explained further in the Discussion, the main source of the dispute between the parties here is whether the definition of "official act" in § 201 also applies to § 666—that is, whether § 666 requires that the *quo* that a defendant performs in exchange for a bribe be an "official act" as that term is defined under § 201, or whether § 666 applies to a broader range of conduct.

While § 201(b)(2)(A) uses the term "official act" in its the text, § 666(a)(1)(B) does not. Section 201(b)(2)(A) prohibits the acceptance of "anything of value . . . in return for being influenced in the performance of *any official act*." § 201(b)(2)(A) (emphasis added).  "By contrast, § 666 prohibits bribery 'in connection with any business, transaction, or series of transactions of [an] organization, government, or agency.'" *United States v. Ng Lap Seng*, 934 F.3d 110, 133 (2d

Cir. 2019) (emphasis omitted) (quoting 18 U.S.C. § 666(a)(1)(B)).  The Second Circuit, in *Ng Lap Seng*, noted that, "[n]owhere does § 666 mention 'official acts,'" and expressly held "that the *McDonnell* 'official act' standard, derived from the *quo* component of bribery as defined by § 201(a)(3), does not necessarily delimit the *quo* components of other bribery statutes, such as § 666." *Id.* at 132–33 (also noting the "textual differences among various bribery statutes").

In so ruling, the Circuit relied on its previous decision in *United States v. Boyland*, 862 F.3d 279, 291 (2d Cir. 2017).  *See Ng Lap Seng*, 934 F.3d at 133.  In *Boyland*, the Circuit reasoned that, as a matter of plain meaning, § 666's *quo* language—"in connection with any business, transaction, or series of transactions"—"is more expansive than [the term "official act" as used in] § 201." *Id.* at 133 (quoting *Boyland*, 862 F.3d at 291).  The Circuit further noted that, while the term "official act" is defined in the text of § 201 itself, § 666 does not analogously "place any definitional limits on the business or transactions to be influenced—beyond requiring them to be 'of' the organization receiving more than $10,000 in federal funding and to have a 'value of $5,000 or more.'" *Id.* at 133 (quoting 18 U.S.C. § 666(a)(2)).  The Circuit then reaffirmed its holding from *Boyland* that "*McDonnell*'s official act standard for the *quo* component of bribery as proscribed by § 201 does not apply to the more expansive language of § 666." *Id.* (citing *Boyland* 862 F.3d at 291) (internal quotation marks omitted).  The Circuit observed that other circuits that have considered this issue have all held or reasoned similarly, *see id.* at 134 (citing cases), and concluded that the district court in *Ng Lap Seng* had erred (albeit, harmlessly) in instructing the jury that it needed to find an "official act" in order to find the defendant guilty of bribery under § 666. *See id.* at 139.

Thus, while § 201 requires an "official act"—a formal exercise of governmental power with respect to a specific and focused matter to be decided upon—the Second Circuit has been unequivocal that § 666 does not.

C.    The Supreme Court's Recent Decision in *Snyder*

Last term in *Snyder*, however, the Supreme Court used the words "official act" in connection with § 666.  *Snyder* considered whether § 666's prohibitions extended beyond bribes to also prohibit "gratuities," and held that they do not.  *See Snyder*, 603 U.S. at 19.  Both bribes and gratuities describe a payment to a public official in return for an action, but while "bribes are payments made or agreed to *before* an official act," "[g]ratuities are typically payments made to an official *after* an official act as a token of appreciation."  *Id.* at 5.  The Court held that, in determining whether something is a bribe or a gratuity, "the timing of the agreement is the key, not the timing of the payment."  *Id.* at 19.  The Court acknowledged that there are instances of bribery "where the agreement was made before the act but the payment was made after the act."  *Id.* at 18.  But the Court explained that a bribe occurs where there is an agreement (the *pro*) made *before* the defendant acts (the *quo*), and that if there is no agreement before the act, then anything given of value after the fact is a gratuity.  *See id.* at 19.

Notably, throughout its opinion, the Court used the words "official act" to refer to § 666's *quo* requirement.  *See, e.g.*, *id.* at 10 ("Section 666(a)(1)(B) makes it a crime for state and local officials to 'corruptly' accept a payment 'intending to be influenced or rewarded' for an official act.").  This is largely the foundation of Mayor Adams's position in this motion—namely, that the Supreme Court's decision in *Snyder* signaled that § 666 liability requires an "official act" pursuant to the § 201 standard as set forth in *McDonnell*.

## DISCUSSION[3]

Mayor Adams moves to dismiss Count V of the Indictment alleging *quid pro quo* bribery under § 666(a)(1)(B), challenging the sufficiency of the Indictment's allegations to support the

---

[3] Many of the cases discussed by the parties and in this Opinion concern jury instructions related to bribery counts.  While these cases provide useful guidance on bribery law, in adjudicating this

*quo* and the *pro*. After careful review, the Court concludes that the Indictment sufficiently charges § 666 bribery under the Second Circuit's precedent in *Ng Lap Seng*, *Dawkins*, and *Benjamin*.

## I.    The Alleged *Quo*

To charge bribery under § 666, the government must allege that the defendant agreed to act "in connection with any business, transaction, or series of transactions of [the] organization, government, or agency" of which they are an agent. 18 U.S.C. § 666(a)(1)(B). Mayor Adams makes two arguments regarding the sufficiency of the Indictment as to the *quo*.

First, he argues that, under § 666, the *quo* must be a discrete exercise of governmental power, but his alleged interventions with respect to the "regulation" of the Turkish House were not. According to Mayor Adams, the Supreme Court's recent decision in *Snyder* requires that the *quo* in § 666 bribery must be an "official act" as that term is used in the general federal bribery statute, § 201, and as construed by the Supreme Court in *McDonnell*. *See, e.g.*, Def. Br. at 7–8; Def.'s Reply Mem. Supp. Mot. to Dismiss 3-4, ECF No. 41 ("Def. Reply Br."). In the alternative, he argues that, irrespective of *Snyder*'s use of "official act," § 666 itself requires that the official's conduct be some sort of "specific and formal exercise of governmental power" or "discrete exercise of official authority." Def. Br. at 10; Def. Reply Br. at 6. Mayor Adams concludes that, whether or not *Snyder* narrowed the *quo* element of § 666, assisting with the "regulation" of the Turkish House "is too vague and broad" to form the *quo* of a *quid pro quo*. Def. Br. at 11; *see also* Def.'s Reply at 7.

Second, Mayor Adams argues that the Indictment does not allege that he exercised formal governmental power for three reasons: because as Brooklyn Borough President he lacked any

---

motion, the Court notes at the outset that it is tasked with reviewing only the sufficiency of the Indictment and whether the Indictment alleges facts that state a crime under § 666 as a matter of law.

*authority* over the FDNY; because the Indictment does not allege that he *used* his official role as Brooklyn Borough President in reaching out to the FDNY; and/or because his alleged outreach did not amount to *pressure* on the FDNY. *See* Def. Br. at 16–20.

The Court addresses each argument in turn.

### A.    The Specificity of the *Quo* Under Section 666

#### 1.    Whether *Snyder* Clearly Undermined *Ng Lap Seng*

The Court first considers whether the Supreme Court's decision in *Snyder* clearly undermined the Second Circuit's holding in *Ng Lap Seng* that § 666 bribery does not require an "official act" as defined in *McDonnell*.  As explained below, the Court concludes that the Second Circuit's holding on this question remains binding on this Court.

There is no dispute that the Second Circuit in *Ng Lap Seng* clearly held that § 666 does not require an "official act" as that term is defined in *McDonnell*.  *See Ng Lap Seng*, 934 F.3d at 132–33; Def. Br. at 8; Gov't Br. at 11.  Absent clear direction to the contrary from the Supreme Court, this Court remains bound by that ruling.  The Second Circuit has explained that "[i]n rare cases, a district court can decline to follow [Circuit] precedent if it concludes that an intervening Supreme Court decision has so clearly undermined [Circuit] precedent that it will almost inevitably be overruled."  *Packer ex rel. 1-800-Flowers.Com, Inc. v. Raging Cap. Mgmt., LLC*, 105 F.4th 46, 54 n.36 (2d Cir. 2024) (citing *Wojchowski v. Daines*, 498 F.3d 99, 105–08 (2d Cir. 2007) (agreeing with the district court's conclusion that Circuit precedent was no longer binding given its inconsistency with an intervening Supreme Court ruling)).  This case is not one of those "rare cases" for at least two reasons.

First, the question presented in *Snyder* was whether § 666 criminalizes gratuities in addition to bribes.  *See Snyder*, 603 U.S. at 5 (stating that § 666 "prohibits state and local officials from accepting *bribes*" and that "[t]he question in this case is whether § 666 also makes it a crime

for state and local officials to accept *gratuities*").  *Snyder* considered whether § 666 criminalizes the acceptance of "payments . . . as a token of appreciation" after the fact if the defendant never agreed beforehand to do something in return for it.  *Id.*  In other words, *Snyder*'s focus was the *pro*, not the *quo*.  There is no clear indication that the Court contemplated, let alone sought to define or limit, the *quo* requirement for § 666 bribery.  Importing the § 201 "official act" standard into § 666 without comment would have been highly unusual given that every Circuit to have ruled on this question prior to *Snyder*—the Second, Fourth, Sixth, and Eleventh—has held that § 666 does *not* require the same "official act."[4]

While *Snyder* used the term "official act" repeatedly in reference to § 666, it is not clear that in doing so it sought to import the precise meaning of that term as defined in § 201 and *McDonnell*.  Generally speaking, public corruption statutes prohibit, *inter alia*, a government or quasi-public actor from agreeing to accept something of value in exchange for certain conduct— and one might naturally describe that conduct as an "official act" of some sort, consistent with the ordinary meaning of those words.  *See Official*, Oxford English Dictionary (3d ed. 2004) ("Of or relating to an office, post, position of trust, or service; belonging or relating to the discharge of

---

[4] *See United States v. Lindberg*, 39 F.4th 151, 166 (4th Cir. 2022) ("[G]iven the absence of any reference to the term 'official act' in 18 U.S.C. § 666, we find no cause to depart from the consensus of our good colleagues in declining to import *McDonnell*'s interpretation of a term found in a separate statute."); *United States v. Porter*, 886 F.3d 562, 565 (6th Cir. 2018) ("In *McDonnell*, the Supreme Court limited the interpretation of the term 'official act' as it appears in § 201, an entirely different statute than the one at issue here [*i.e.*, § 666]."); *United States v. Roberson*, 998 F.3d 1237, 1247 (11th Cir. 2021) ("Consistent with the views of our sister Circuits, we hold that *McDonnell* does not disturb this court's [precedent] and we do not read into section 666 limitations unsupported by the language of the statute."), *cert. denied*, 142 S. Ct. 1109 (2022); *cf. United States v. Maggio*, 862 F.3d 642, 646 n.8 (8th Cir. 2017) (declining to revisit precedent holding that § 666 requires no nexus between charged bribe and federal funding, explaining that "*McDonnell* had nothing to do with § 666"); *but see United States v. Carrasco*, 79 F.4th 153, 161 (1st Cir. 2023) (acknowledging, but not deciding, the question whether § 666 requires an "official act" as defined in *McDonnell*), *cert. denied*, -- S. Ct. --, 2024 WL 4874674 (Nov. 25, 2024).

duties; connected with the tenure of office."); *Act*, Oxford English Dictionary (3d ed. 2010) ("Something done or effected; a deed."). So while "official act" is a term of art as defined in § 201 and interpreted in *McDonnell*, it is not clear that the Court's mere use of those words in *Snyder* was intended to invoke that precise definition—particularly given the absence of those words from § 666. *Cf. Ng Lap Seng*, 934 F.3d at 132 (noting the "textual differences among various bribery statutes"). Indeed, *Snyder* did not invoke the definition of "official act" under § 201, nor did it rely on *McDonnell* to define that term. In the context of a case in which the defendant was a former mayor, the Court's use of the words "official act" in *Snyder*, could reasonably be read according to their ordinary meaning—as a shorthand for an action or course of conduct taken by a public official, without necessarily intending a technical legal meaning.

Second, even if the Court in *Snyder* meant the term "official act" to have the same meaning as in *McDonnell*, it is not clear that it sought to *limit* the *quo* element under § 666. As noted, the Second Circuit held in *Ng Lap Seng* "that section 666 . . . bribery [is] not textually *limited* to 'official acts' as defined in § 201(a)(3) and *McDonnell*." 934 F.3d at 131 (emphasis added). That is, *Ng Lap Seng* held that § 666 captures acts falling into the "official act" definition of § 201 *as well as* other conduct. *Snyder*'s language describing § 666 as applying to "official acts" is therefore not necessarily in tension with that holding.

Undoubtedly, the interpretation and application of federal public corruption statutes has evolved substantially in recent years.[5] It is not inconceivable that the Second Circuit or the

---

[5] *See, e.g.*, *McDonnell v. United States*, 579 U.S. 550 (2016) (construing "official act" in § 201); *Snyder v. United States*, 603 U.S. 1 (2024) (construing § 666 to cover bribes but not gratuities); *Ciminelli v. United States*, 598 U.S. 306 (2023) (rejecting a right-to-control theory under which wire fraud can be found based on deprivation of potentially valuable information); *Percoco v. United States*, 598 U.S. 319 (2023) (rejecting position that a private citizen who may have some control or domination over decisions of government officials can violate "the intangible right of honest services" in the federal wire fraud statute).

Supreme Court might, at some point in the future, hold that an "official act" as defined in *McDonnell* is necessary under § 666, at least as to government actors. But as the Circuit has made clear, "[d]istrict courts . . . are obliged to follow [Circuit] precedent, even if that precedent *might* be overturned in the near future." *1-800-Flowers.Com*, 105 F.4th at 54 (emphasis added) (quotation marks omitted). Here, the Court cannot conclude that *Snyder* "so clearly undermined" *Ng Lap Seng* so as to make this one of the "rare case[s]" in which a district court may ignore Circuit precedent. *Id.* at 54 n.36. Until more clearly instructed otherwise, this Court is bound by *Ng Lap Seng*.

Accordingly, in charging § 666 bribery, the Government is not obligated to allege conduct to satisfy the "official act" requirement as articulated in *McDonnell*.[6]

### 2.    Application of the Second Circuit's Section 666 Precedent to the Indictment

The next issue is whether the Indictment sufficiently alleges a *quo* under § 666 as interpreted by the Second Circuit. For the reasons that follow, the Court concludes that it does.

The Government explains that there are two *quos* alleged in the Indictment: (1) the regulation of the Turkish House, and (2) the TCO for the Turkish House. *See* Mot. to Dismiss Oral Arg. Tr. 24, ECF No. 57 ("Tr.") ("There are at least two alleged *quid pro quos* in the indictment, and they are nested within each other. . . the TCO . . . [and] the regulation of the Turkish House."); *see also* Gov't Br. at 16 (describing agreements "to intervene with respect to . . . regulatory issues with [the Turkish House]," and "to ensure the Turkish House received a temporary certificate of occupancy" (citing Ind. ¶¶ 33, 38, 43)); Ind. ¶¶ 63, 38 (including allegations that the travel benefits were "to be influenced in connection with the City of New

---

[6] Because the Court follows Second Circuit precedent holding that § 666 liability does not require an "official act" under *McDonnell*, it does not directly address whether the allegations in the Indictment satisfy the *McDonnell* standard.

York's regulation of the Turkish House," and "to pressure a New York City agency to help the Turkish Consulate secure a temporary certificate of occupancy ('TCO') for [the Turkish House]").

Mayor Adams takes particular issue with the Government's first theory, arguing that— even leaving aside *Snyder*—being "influenced in connection with the City of New York's regulation of the Turkish House" is simply too general or vague to constitute the requisite *quo* for bribery under § 666. Def. Reply Br. at 6–7; *see also* Def. Br. at 11. He contends that the words "business," "transaction," and "series of transactions" in § 666 refer to "specific and concrete governmental actions, not abstract or general objectives." Def. Br. at 10. He further argues that to the extent the word "business" could be read broadly, it should not be—because that would render the terms "transaction" and "series of transactions" superfluous. *Id.* Adams seeks, in effect, to imbue the *quo* element of § 666 with a degree of specificity that, even if not identical to *McDonnell*'s "official act," embodies a "core requirement [that] would be the same: . . . a specific and formal exercise of governmental power." Def. Br. at 10.

Mayor Adams's arguments on this point have some force. As noted, *supra*, a principal purpose of § 666 was to clarify the range of *actors* subject to criminal liability for bribery in light of confusion as to the applicability of § 201 to state and local officials. *See Snyder*, 603 U.S. at 8. But there is no indication that § 666 was meant to capture a wider swath of *conduct* by government officials than § 201. *Cf. Snyder*, 603 U.S. at 19 (noting that "§ 666 tracks § 201(b), the bribery provision for federal officials"). As enacted, § 666 also covers certain private actors as well: agents of organizations receiving federal funds. *See* 18 U.S.C. § 666(a)(2). Adams argues that, in light of § 666's history, the omission of the term "official act" simply reflects the fact that the statute covers a wider range of actors beyond government officials, and that "it would have been incongruous to use the term 'official act'" to refer to a private actor's conduct—rather than a broadening of the proscribed *conduct* by government actors. Def. Reply Br. at 5.

To be sure, the "regulation" of the Turkish House is a somewhat general concept.  But it is not clear to this Court that § 666 requires the kind of discrete governmental act that Mayor Adams urges—as a matter of text or precedent.  The argument about surplusage, for example, seems to run equally the other way: if, as Mayor Adams urges, § 666 requires that the *quo* relate to a discrete "transaction," then it is unclear what purpose, if any, the term "business" serves in the statute.  In any event, the regulation of the Turkish House would appear to fall within § 666's "in connection with any business [or] transaction" text, § 666(a)(1)(B), as that language has been interpreted by the Second Circuit.  In *United States v. Dawkins*, 999 F.3d 767 (2d Cir. 2021), the Circuit held that the district court did not err in instructing the jury that the acceptance of a bribe in connection with the "operation and administration of [a] university's men's basketball program" was sufficient under § 666, *id.* at 785–87, and it is hard to see how the "regulation" of the Turkish House is any more "vague" or "broad" than that.  *See also id.* at 786 (affirming that "business or transaction" "includes intangible aspects of the business of the organization").[7]

Separately, regardless of whether the "regulation" of the Turkish House is specific enough to form the requisite *quo* at the indictment stage, there is no real dispute that the issuance of a TCO is a specific and formal exercise of governmental power.  While Mayor Adams raises other issues with the TCO as the alleged *quo* (addressed *infra*), he does not appear to argue that the issuance of a TCO fails to satisfy his narrower reading of § 666.  (Nor, for that matter, does he meaningfully

---

[7] Mayor Adams notes that the defendant in *Dawkins* was accused of accepting bribes in exchange for steering student-athletes to particular financial advisors, which constitutes a "discrete exercise of official authority" consistent with his interpretation of § 666.  Def. Reply Br. at 6, 9.  That may be true as to the facts in *Dawkins*, but nonetheless, the Circuit's broader holding remains instructive.  *See United States v. Dawkins*, 999 F.3d 767, 786 (2d Cir. 2021) (holding that the district court correctly instructed the jury that the term "business" in § 666 includes the "operation and administration" of a basketball program, and the "intangible aspects of the business of the organization").

dispute that it satisfies the "official act" standard under *McDonnell*).  With respect to the TCO, Mayor Adams argues only that: (1) the allegations do not establish that he improperly pressured the FDNY, *see* Def. Br. at 17–20; Def. Reply Br. at 9–10; and (2) the factual allegations do not establish that he made an *ex ante* agreement related to the TCO when he accepted or agreed to accept travel benefits, *see* Def. Reply Br. at 8–9.  But those are different questions than whether the issuance of the TCO is sufficiently specific or focused to constitute a prohibited *quo* under § 666.  For the reasons above, the Court concludes that, under Second Circuit precedent, it is.  Mayor Adams's remaining arguments related to the TCO are addressed below.

### B.      Formal Authority and the Government's Pressure Theory

Next, Mayor Adams argues that, even if the Indictment adequately alleges a *quo*, it nonetheless fails to allege that he himself took any formal action with respect to the Turkish House. *See* Def. Br. at 16–20; Def. Reply Br. at 9–10.  The only specific alleged acts attributed to Adams in the Indictment that might qualify as intervention in the permit matter are the three messages that he allegedly sent to the FDNY Commissioner about the TCO.  Ind. ¶ 38k, m–n; *see* Def. Br. at 13, 16–17.  Adams argues that these alleged communications regarding the permit matter could not have involved the exercise of official power because he was only Brooklyn Borough President and a candidate for Mayor at the time, noting that he did not have formal authority over the FDNY or the Turkish Consulate.  Def. Br. at 13, 17.  He further argues that the allegations suggest he used his potential future position as Mayor—not his *actual* position as Brooklyn Borough President— to pressure the FDNY, making § 666 inapplicable.  Def. Br. at 19–20.  And finally, he contends that, even if he theoretically could have exerted some pressure, his alleged actions did not amount to such pressure.  Def. Br. at 17–19.

### 1.    Formal Authority

As an initial matter, *McDonnell* makes clear that even under the comparatively stricter "official act" standard of § 201, an official may be liable for bribery by "using [one's] official position to exert pressure on another official to perform an 'official act,' or to advise another official, knowing or intending that such advice will form the basis for an 'official act' by another official." 579 U.S. at 574.[8]  *McDonnell* does not address whether the official exerting pressure must have formal authority over the official whom he is alleged to have pressured. *See id.*  And there is no direct Supreme Court or Second Circuit precedent on this question.  But courts applying *McDonnell* have rejected the notion that a defendant must have formal authority over another official in order to pressure them. *See, e.g.*, *United States v. Mangano*, No. 16 Crim. 540, 2022 WL 2872670, at *3 (E.D.N.Y. July 20, 2022) (rejecting the argument that *McDonnell* requires direct authority between the bribed official and the official who was pressured); *United States v. Lee*, 919 F.3d 340, 352 (6th Cir. 2019) (rejecting, under *McDonnell*, the argument that "an official can only 'exert pressure' on a second official if the first official has 'leverage or power' over the second official"); *United States v. Roberson*, 998 F.3d 1237, 1254 n.22 (11th Cir. 2021) (rejecting the defendant's argument that "advice [under *McDonnell*] must come from someone in a more formal advisory role"), *cert. denied*, 142 S. Ct. 1109 (2022).[9]  These cases support the proposition

---

[8] Many of the cases that address allegations of improper pressure are § 201 cases applying the *McDonnell* "official act" standard.  While the Court does not assess the Indictment under that standard, cases concerning improper pressure under other bribery statutes are instructive here given the lack of precedent discussing this issue under § 666.  The parties do not appear to dispute the relevance of § 201 cases on this point. *See* Def. Br. at 17; Gov't Br. at 21–22.

[9] Though they did not grapple with this issue directly, other cases similarly have permitted bribery charges to proceed under a theory that the defendant sought to influence other officials who lay outside of the defendant's formal chain of command. *See, e.g.*, *United States v. Boyland*, 862 F.3d 279, 292 (2d Cir. 2017) (affirming conviction of state assemblyman for taking bribes to help secure permits from city agencies); *United States v. Biaggi*, 853 F.2d 89, 99 (2d Cir. 1988) (affirming conviction of congressman for attempts to influence city officials).

that an official may be criminally liable for exerting pressure on another official to take an action, even in the absence of direct formal authority.

This is precisely the theory alleged in this case—that, notwithstanding Adams's lack of formal authority over FDNY officials at the time, he pressured them regarding the regulation of the Turkish House, generally, and the issuance of the TCO, specifically. As the pressure-based theory cases demonstrate, a public official may use their role to influence those who are not within their direct line of authority[10]—and federal bribery laws seek to limit the possibility of such corrupt influence.

### 2.      Use of Official Position

Mayor Adams makes a separate but related argument that, even if formal authority is unnecessary, a pressure theory still requires that a defendant "*us[e]* his official position to exert pressure on another official." *McDonnell*, 579 U.S. at 574 (emphasis added). Adams contends that the Indictment fails to allege that any pressure he exerted on the FDNY stemmed from his official position as Brooklyn Borough President. *See* Def. Br. at 19. Rather, he argues, "the government is effectively claiming that Adams used his *potential future position* as Mayor to exert pressure on officials." *Id.*

But the Indictment alleges that, "as Brooklyn Borough President, [Adams] met with members of the FDNY from time to time," Ind. ¶ 38a, and the Government argues that it will prove at trial that it was Adams's position as Brooklyn Borough President that "[got] him in the room,

---

[10] While he seems to dispute this point in his briefs, *see, e.g.*, Def. Br. at 12, Mayor Adams's counsel ultimately appeared to acknowledge at oral argument that direct formal authority is unnecessary for a pressure theory. *See e.g.,* Tr. 7 (stating that a pressure theory "doesn't mean the official has to be a supervisory official over the pressure, of the other official"); Tr. 17 ("I think the government is correct, that many — there are cases that say you don't have to have direct supervisory authority.").

as it were, with the fire commissioner" in order to exert pressure regarding the TCO.  Tr. at 33; *see also id.* at 34 (arguing that the jury could conclude that "the defendant was using his official position as Brooklyn Borough president to let him reach out [to] the fire commissioner on city business with the mayor, that's what got him a room").  Ultimately, whether or not Adams used his official position as Brooklyn Borough President to exert pressure on the FDNY is a factual question for a jury to resolve.  *See United States v. Wedd*, 993 F.3d 104, 121 (2d Cir. 2021) ("Unless the government has made what can fairly be described as a full proffer of the evidence it intends to present at trial, the sufficiency of the evidence is not appropriately addressed on a pretrial motion to dismiss an indictment." (quoting *Alfonso*, 143 F.3d at 776)).

### 3.    Actual Pressure

Finally, Mayor Adams argues that the allegations in the Indictment show that he simply sent a series of "three brief messages" to the FDNY that do not "remotely convey pressure or threats."  Def. Br. at 17.  To the contrary, he argues that his alleged messages to the FDNY Commissioner actually demonstrate a *lack* of pressure, pointing to one message where he allegedly said "[i]f it is[ im]possible [to secure the TCO] please let me know and I will manage their expectation[s]."  Def. Br. at 18 (quoting Ind. ¶ 38m (alteration in original)).  And Adams argues that, even if the FDNY officials subjectively felt pressured, the Indictment fails to allege that Adams himself had the requisite corrupt intent to exert pressure.  *See* Def. Br. at 19.  Ultimately, however, these arguments are not about the sufficiency of the Indictment, but go to the weight of the evidence, which is not for this Court to resolve at the motion to dismiss stage.  *See United States v. Sampson*, 898 F.3d 270, 281 (2d Cir. 2018) ("[A]uthorizing district court judges to resolve dispositive fact-based evidentiary disputes on Rule 12(b) motions risks invading the inviolable function of the jury in our criminal justice system." (quotation marks omitted)).

Accordingly, the allegation that Adams, while Brooklyn Borough President, exerted pressure on FDNY officials to obtain the TCO is sufficient to support the *quo* element of § 666 bribery at the indictment stage.

*                *                *

In sum, whether the Court considers the broader alleged *quo* of assisting in the regulation of the Turkish House or the narrower alleged *quo* of intervening to secure the TCO, the Indictment sufficiently pleads the *quo* element of § 666 bribery under this Circuit's precedents.

## II.    The Alleged *Pro*

Mayor Adams also challenges the Indictment's sufficiency in alleging an "*ex ante* agreement relating to the permit matter specifically." Def. Br. at 14; *see also* Def. Reply Br. at 7–8. Because the Government's theory in this case is that there are two *quos* (the regulation of the Turkish House generally, and the issuance of the TCO specifically), the Court considers whether the Indictment alleges an agreement with respect to each.

First, the Indictment alleges that Adams had an "agreement with the Turkish Official to assist in New York City's regulation of the Turkish House *in exchange for* free or heavily discounted travel benefits." Ind. 43 (emphasis added). Under the Second Circuit's decision in *Benjamin*, this "in exchange for" language is sufficient to allege a *quid pro quo* agreement under § 666. *See Benjamin*, 95 F.4th at 74 (explaining that "the phrase 'in exchange for' [in the indictment] satisfied the *quid pro quo* requirement . . . because it alleged an unambiguous agreement" at the motion to dismiss stage). Indeed, Mayor Adams does not appear to dispute that the Indictment alleges an agreement as to the regulation of the Turkish House generally, so the Court need not delve into this query further. *See* Def. Br. at 13–14 (acknowledging that "the indictment alleges . . . that [travel] benefits received in June 2021 were in exchange for [his]

agreement to 'assist the Turkish Official in the operation of the Turkish Consulate' generally." (quoting Ind. ¶ 36)).

However, given the Court's lengthy discussion above regarding the evolving guidance of higher courts concerning the *quo* requirement for criminal bribery liability, the Court also addresses whether the Indictment adequately alleges an *ex ante* agreement with respect to the narrower *quo* alleged by the Government—the TCO specifically.[11]  The Indictment alleges that Adams "intervened with the FDNY to permit the Turkish Consulate to occupy a skyscraper that had not passed a fire safety inspection, *in exchange for*, among other things, luxury travel benefits provided by the Turkish Official and the Airline Manager."  Ind. ¶ 33 (emphasis added); *see also id.* at ¶ 6 (alleging that Adams "pressure[d] the [FDNY] to facilitate the opening of a new Turkish consular building . . . *[i]n exchange for* free travel and other travel-related bribes in 2021 and 2022" (emphasis added)).   Again, this "in exchange for" language is sufficient to allege an agreement.  *See Benjamin*, 95 F.4th at 74.  The Indictment "contains the elements of the offense charged and fairly informs" Mayor Adams "of the charge against which he must defend," and "enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." *Id.* at 66–67 (quoting *Hamling*, 418 U.S. at 117).

The parties' factual contentions about the timing of the agreement to procure the TCO, however, bear mention.  In arguing against dismissal, the Government emphasizes certain facts alleged in the Indictment, including that "[w]hen the Turkish Official needed Adams to intervene with the FDNY [with respect to the TCO], the Turkish Official told the Adams Staffer to remind

---

[11] It is also prudent to do so because at times, parties seek a stipulated jury instruction in light of potential ambiguity in the governing law.  *Cf. United States v. Percoco*, 13 F.4th 180, 189 (2d Cir. 2021) (noting that "the parties stipulated before the district court that 'bribery' for the purposes of the honest-services fraud statute is defined by reference to 18 U.S.C. § 201," including its "official act" requirement), *rev'd on other grounds*, 598 U.S. 319 (2023).

Adams of all the support Turkey had offered, and that it was now 'his turn'"—to which Adams

later responded to his staffer, "I know."  Gov't Br. at 18 (quoting Ind. ¶ 38g).  The Government

argues that the "natural reading of that exchange is that Adams was acknowledging a pre-existing

bargain," and then notes that after securing the TCO, "Adams reached right back out to collect

more payment, requesting what would amount to over $12,000 in luxury travel."  *Id.*; *see also* Ind.

¶ 39a ("On September 14, 2021—four days after ADAMS caused the FDNY to acquiesce in the

TCO—ADAMS messaged the Adams Staffer, directing her to secure tickets to Pakistan . . . .").

The Government stresses that if "combined with all the other circumstantial evidence of a corrupt

*quid pro quo*, only a portion of which [it represents] is described in the Indictment, the evidence

that Adams agreed to be influenced when he solicited and accepted luxury travel will more than

suffice."  Gov't Br. at 18.

　　　The Government is correct that a *quid pro quo* need not be proven with contemporaneous

or direct evidence.  *Benjamin*, 95 F.4th at 71 ("[A]n explicit *quid pro quo* does not need to be

expressly stated or memorialized and may be inferred from words and actions.").  But Mayor

Adams takes issue with more than just the circumstantial nature of these allegations, contending

that the actual facts alleged in the Indictment—even if sufficiently supported by evidence at trial—

do not show an *ex ante* agreement with respect to the permit matter specifically.  *See* Def. Br. at

13–14; Def. Reply Br. at 7–8.  The majority of the travel benefits that he allegedly sought or

received occurred in June 2021 or earlier, *see, e.g.*, Def. Reply Br. at 7, *before* the Indictment

alleges that "the Turkish Official *began* asking" Adams about the TCO, which was "[o]n or about

September 5, 2021."  Ind. ¶ 38g (emphasis added).  Adams therefore argues that, even crediting

the Government's assertion about a "pre-existing bargain," any such agreement could not have

pertained to the TCO specifically, which had not yet even arisen as an issue before that point.  *See* Def. Reply Br. at 7–8, 13.[12]

Ultimately, while Mayor Adams raises fair questions about the timing of the alleged *ex ante* agreement regarding the TCO, his arguments on this issue ask the Court to "dr[a]w inferences as to the proof that would be introduced by the government at trial."  *Alfonso*, 143 F.3d at 776. However, "such an inquiry into the sufficiency of the evidence [i]s premature."  *Id.* at 776–77.  "At the indictment stage, [the Court] do[es] not evaluate the adequacy of the facts to satisfy the elements of the charged offense."  *Wedd*, 993 F.3d at 121.  Rather, the Government need only apprise Mayor Adams of its contentions as to the time, place, and nature of the alleged criminal conduct.  *See United States v. Pirro*, 212 F.3d 86, 92 (2d Cir. 2000) (explaining that, generally speaking, an indictment need only "track the language of the statute" under which the defendant is charged, and "state the time and place (in approximate terms) of the alleged crime" (quotation marks omitted)).  While the factual allegations in the Indictment as to the alleged agreement on the TCO are perhaps "not a model of clarity," they are "sufficient to provide [Mayor Adams] with

---

[12] The Indictment is not perfectly clear as to the timeline.  The Indictment's earliest allegations regarding the TCO occur on August 31, 2021.  *See* Ind. ¶¶ 38d, 38f.  Mayor Adams does not dispute that the TCO was an issue as of that date.  *See* Def. Br. at 13 (stating that "the permit matter did not arise until August 31, 2021").  If that is correct, then there could have been a "pre-existing bargain" regarding the TCO in place by the time of Adams's conversation with his staffer several days later, on September 5.  In any event, it is unclear if the Government's characterization of a "pre-existing bargain" as of September 5 is a reference to the TCO specifically or the regulation of the Turkish House generally.  If the latter, then there is nothing inconsistent about alleging that Adams also made a separate and more specific agreement to assist in procuring the TCO in exchange for additional future travel benefits—which the Indictment alleges he sought to collect four days after the TCO issue was resolved, *see* Ind. ¶ 39a.  *Cf. Percoco*, 13 F.4th at 201 (noting, in the context of the *McDonnell* "official act" standard, that "[i]t would be strange indeed to hold that an original deal between an official and payor somehow froze their agreement in time, excluding the possibility that an official could later commit to take more acts in order to maintain a revenue stream").

adequate notice of the charges" against him.  *United States v. Walsh*, 194 F.3d 37, 45 (2d Cir. 1999).

In sum, the Indictment adequately alleges a *pro*.  There is no dispute amongst the parties that the Indictment alleges an *ex ante* agreement with respect to the regulation of the Turkish House generally, which the Court holds is sufficient under § 666.  As to an *ex ante* agreement with respect to the TCO specifically, Mayor Adams raises colorable questions regarding the purported timing of such an agreement.  But given that an Indictment need identify the time of the alleged crime only "in approximate terms," *Pirro*, 212 F.3d at 92, the Court determines that these questions are appropriately resolved at trial rather than on a motion to dismiss.

## CONCLUSION

For the reasons stated above, the Indictment is sufficiently pleaded, and dismissal is not warranted.  The Motion to Dismiss is therefore **DENIED**.  The Clerk of Court is respectfully requested to terminate the docket entry at ECF No. 13.

Dated: December 17, 2024
       New York, New York

SO ORDERED.

DALE E. HO
United States District Judge