UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>ERIC ADAMS,<br>                Defendant. | 24 Cr. 556 (DEH)<br><br>**OPINION AND ORDER** |

DALE E. HO, United States District Judge:

    Before the Court is a Motion for Leave to Request a Bill of Particulars filed by Defendant Eric Adams. *See* ECF Nos. 72-73. For the reasons set forth below, the motion is DENIED.

## BACKGROUND

    On September 24, 2024, the Government unveiled a five-count, fifty-seven-page Indictment against Mayor of New York City Eric Adams ("Mayor Adams" or "Adams"). ECF No. 1. The Indictment charges Mayor Adams with wire fraud (Count II), two counts of solicitation of a contribution by a foreign national (Counts III and IV), bribery (Count V), and conspiracy to commit those substantive offenses (Count I). *Id.*

    On December 17, 2024, the Court denied Mayor Adams's Motion to Dismiss the bribery charges in Count V of the Indictment. *See* Op. & Order 1, ECF No. 68. The Court assumes familiarity with the Indictment's factual allegations as to Count V, which are described in detail in the prior opinion. *See id.* at 2-7. The factual allegations relevant to the remaining counts are described below.

    Count II of the Indictment alleges wire fraud. Mayor Adams allegedly "participated in a scheme to fraudulently obtain Matching Funds for [his 2021 and 2025 mayoral campaigns] by falsely claiming that contributions qualified for Matching Funds when, in fact those

contributions did not." Indictment ("Ind.") ¶ 57, ECF No. 1; *see also id.* ¶ 8. New York City "has a matching funds program that matches small-dollar contributions from individual City residents with up to eight times their amount in public funds." *Id.* ¶ 3. To receive matching funds, candidates for municipal offices, including mayor, are required to file a certification attesting, among other things, that they understand that "submitting fraudulent claims for Matching Funds or otherwise furnishing false information . . . would constitute a fundamental breach of the obligations affirmed as part of the certification." *Id.* ¶ 7b. The Government alleges that Adams applied for matching funds based on known straw contributions—that is, donations in which the true donors conveyed their money through nominal donors who falsely certified that they were contributing their own money, *id.* ¶¶ 2-3—and, in doing so, falsely certified compliance with campaign finance regulations that prohibited straw contributions, *id.* ¶¶ 3, 7d. As part of this scheme, Adams allegedly "transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds" from at least around 2018 through at least around 2024. *Id.* ¶ 57. Adams's 2021 mayoral campaign ultimately received more than $10,000,000 in public funds. *Id.* ¶ 3.

Counts III and IV allege solicitation of a contribution by a foreign national. Count III pertains to Adams's alleged solicitations in or around 2021. *Id.* ¶ 59. Specifically, the Government alleges that Adams "solicited and knowingly accepted straw donations, including from foreign sources," throughout his first mayoral campaign ("2021 Campaign"). *Id.* ¶ 18. Count IV pertains to Mayor Adams's alleged solicitations in or around 2023. *Id.* ¶ 61. Specifically, the Government alleges that in 2023 and 2024 Mayor Adams "again solicited and knowingly accepted . . . foreign contributions, as part of his efforts to raise funds" for his second mayoral campaign ("2025 Campaign"). *Id.* ¶ 44.

The allegations include (but are not limited to) the following alleged instances of solicitation of straw and foreign contributions relevant to Counts II, III, and/or IV:

- In June 2018, a Turkish entrepreneur (referred to in the Indictment as the "Promoter") proposed to an Adams staffer (the "Adams Staffer") that he could fundraise for Adams's campaign in Turkey and offered to donate as much as $100,000 to the campaign. *Id.* ¶¶ 20a, 23. Adams subsequently directed the Adams Staffer to pursue the Promoter's offer. *Id.* ¶ 20a.

- In November 2018, a wealthy Turkish national (referred to as "Businessman-1") met with Adams and "offered to contribute funds to the 2021 Campaign." *Id.* ¶¶ 20b. Adams directed the Adams Staffer to obtain these contributions. *Id.* In January 2019, Adams continued to seek the contributions promised by Businessman-1. *Id.* ¶ 26. In 2021, Adams and Businessman-1 "devise[d] and execute[d] a plan to funnel Businessman-1's money to the 2021 Campaign." *Id.* ¶ 31.

- In January 2019, Adams solicited campaign contributions from a wealthy Turkish national (referred to as "Businessman-3"). *Id.* ¶ 25. Businessman-3 agreed to contribute $50,000 or more to the 2021 Campaign but did not ultimately contribute. *Id.*

- In 2020, Adams solicited and received straw donations from a businessman (referred to as "Businessman-4") who operated a construction company in the New York City area. *Id.* ¶ 28. Businessman-4 was told by Adams's team that "straw contributions would increase [his] influence, and the standing of his community" with Adams. *Id.*

- In April and May 2021, with help from a senior official in the Turkish diplomatic establishment (the "Turkish Official"), Adams solicited and accepted straw donations from a member of New York City's Turkish community ("Businessman-5") who operated a construction company in the New York City area. *Id.* ¶¶ 30, 30d-30e.

- In 2023, Mayor Adams accepted foreign and straw contributions at two fundraisers. *Id.* ¶¶ 45c, 45d, 46. At the first fundraiser, the Promoter collected payments from attendees, many of whom were foreign nationals, then used a portion of those payments to make straw donations to the 2025 Campaign via the Adams Staffer. *Id.* ¶¶ 45c-d. The second fundraiser was hosted by a member of the Turkish-American community in the New York City area, "Businessman-6," who told Mayor Adams he wished to contribute "significant amounts of money to the 2025 Campaign." *Id.* ¶¶ 46, 46e. Mayor Adams told Businessman-6 to coordinate with the Adams Staffer. *Id.*

Count I alleges conspiracy to commit the substantive offenses alleged in the Indictment. *Id.* ¶ 51. It lists twenty-three overt acts in furtherance of the conspiracy and describes the involvement of the Adams Staffer, other Adams Employees, Businessman-1, Businessman-3,

Businessman-4, Businessman-5, Businessman-6, the Turkish Official, and the Promoter.  *Id.* ¶¶ 55a-w.

## LEGAL STANDARDS

Rule 7(f) of the Federal Rules of Criminal Procedure "permits a defendant to seek a bill of particulars in order to identify with sufficient particularity the nature of the charge pending against him, thereby enabling [the] defendant to prepare for trial, to prevent surprise, and to interpose a plea of double jeopardy should he be prosecuted a second time for the same offense." *United States v. Bortnovsky*, 820 F.2d 572, 574 (2d Cir. 1987).[1]  "Generally, if the information sought by [the] defendant is provided in the indictment or in some acceptable alternate form, no bill of particulars is required."  *Id.*  "A bill of particulars is required only where the charges of the indictment are so general that they do not advise the defendant of the specific acts of which he is accused."  *United States v. Chen*, 378 F.3d 151, 163 (2d Cir. 2004).

"The decision of whether or not to grant a bill of particulars rests within the sound discretion of the district court."  *Bortnovsky*, 820 F.2d at 574.  In exercising that discretion, "a court must examine the totality of the information available to the defendant—through the indictment, affirmations, and general pretrial discovery—and determine whether, in light of the charges that the defendant is required to answer, the filing of a bill of particulars is warranted."  *United States v. Murgio*, 209 F. Supp. 3d 698, 719 (S.D.N.Y. 2016) (Nathan, J.).  That is, in considering a motion for a bill of particulars, a court is not limited to information in the indictment alone, and "a bill of particulars is not necessary where the government has made sufficient disclosures concerning its evidence and witnesses by other means."  *Chen*, 378 F.3d at

---

[1] All references to Rules are to the Federal Rules of Civil Procedure.  In all quotations from cases, the Court omits citations, alterations, emphases, internal quotation marks, and ellipses, unless otherwise indicated.

163. A bill of particulars "is not a general investigative tool, a discovery device or a means to compel the government to disclose evidence or witnesses to be offered prior to trial." *Murgio*, 209 F. Supp. 3d at 719 (quoting *United States v. D'Amico*, 734 F. Supp. 2d 321, 335 (S.D.N.Y. 2010)). "Accordingly, 'the proper test in deciding whether a bill of particulars should be required of the Government is whether the bill of particulars is *necessary* for the defense, not whether it would aid the defendant in his preparation.'" *Id.* at 719-20 (quoting *United States v. Trippe*, 171 F. Supp. 2d 230, 240 (S.D.N.Y. 2001)).

"[I]t is not the function of a bill of particulars to allow defendants to preview the Government's theory of its case." *Id.* at 722 (quoting *United States v. Abakporo*, 959 F. Supp. 2d 382, 389 (S.D.N.Y. 2013)). "A defendant will not be permitted to use such a request to compel the government to disclose the manner in which it will prove the charges or preview its evidence or legal theory." *United States v. Savin*, No. 00 Crim. 45, 2001 WL 243533, at *2 (S.D.N.Y. Mar. 7, 2001). "Nor, given that a bill of particulars confines the Government's proof to particulars furnished, should a motion for a bill of particulars be granted where the consequence would be to restrict unduly the Government's ability to present its case, or permit the defendant to tailor her testimony to explain away the Government's case." *United States v. Wey*, No. 15 Crim. 611, 2017 WL 237651, at *17 (S.D.N.Y. Jan. 18, 2017) (Nathan, J.).

## DISCUSSION

Mayor Adams asks that the Court order the Government to produce a bill of particulars containing the following information:

> **Request No. 1:** The specific acts that Mayor Adams agreed to do besides allegedly assist with the [temporary certificate of occupancy ("TCO")] matter; the benefits that he agreed to accept in exchange for these specific acts; the timing of the agreements; the counterparties to the agreements besides the Turkish Official and the Airline Manager; how the agreements were formed, even if implicitly; and Mayor Adams's official position as relevant to the agreements.

> **Request No. 2:** The identities of Mayor Adams's alleged co-conspirators; foreign nationals from whom Mayor Adams allegedly "knowingly and willfully solicited, accepted, and received, and aided and abetted and willfully caused the solicitation, acceptance and receipt of, a contribution" to a local election in 2021 and 2023; and all alleged straw donors.

Def. Mem. Supp. Bill Particulars ("Def. Mem.") 4, ECF No. 73.  Mayor Adams's first set of requests relates to the bribery charge, while the second set concerns the allegations of conspiracy, wire fraud, and solicitation of foreign contributions.  In the alternative, Mayor Adams requests disclosure of trial exhibits earlier than previously ordered.  *Id.* at 17-18.  The Court will address each request in the order presented.

**I.    Requests Related to the Bribery Count**

As explained in the Court's opinion on the Motion to Dismiss, the Indictment alleges two nested *quid pro quo* agreements: one with respect to the regulation of the Turkish House generally, and one with respect to the issuance of the TCO specifically.  Op. & Order 19.  Mayor Adams takes issue with the Government's presentation of both agreements, arguing that the allegations as to the regulation of the Turkish House are too general to permit him to mount a defense and that the allegations as to the TCO lack critical detail.  *See* Def. Mem. 4-13.  He therefore seeks six categories of particulars relating to the two agreements: (1) the "specific acts" he agreed to other than those with respect to the TCO matter specifically; (2) the benefits he agreed to accept in exchange for those specific acts; (3) the timing of the agreements; (4) the counterparties to the agreements; (5) how the agreements were formed; and (6) Mayor Adams's official position "as relevant to" those agreements.  *Id.* at 4.  These requests are denied principally because they seek to preview the Government's evidence and legal theory, which is not appropriate in a bill of particulars.  And, as explained further below, to the extent Mayor Adams seeks information here to which he *is* entitled, that information is sufficiently discernible

6

from the Indictment, the briefing and argument on the Motion to Dismiss, the voluminous but well-organized discovery, and the briefing on this motion.

*Specific Acts.* First, Mayor Adams requests an enumeration of "[t]he specific acts that [he] agreed to do besides allegedly assist with the TCO matter." Def. Mem. 4. His argument appears to be that the Government must either provide more details or admit that it alleges only a "vague agreement." Def. Reply Mem. Supp. Bill Particulars ("Def. Reply") 3, ECF No. 94. This is essentially a re-packaging of the same argument that Mayor Adams raised on his Motion to Dismiss—*i.e.*, that the "regulation" of the Turkish House is too vague and general to constitute the *quo* component of a *quid pro quo*—which this Court has already rejected. *See* Op. & Order 19-22. Mayor Adams's complaint fares no better in this context, as the detail he seeks goes to the Government's evidence and legal theory, not to the nature of the charges against him. It is therefore not properly the subject of a bill of particulars. *See Wey*, 2017 WL 237651, at *17 ("The Government may not be compelled to provide a bill of particulars disclosing the manner in which it will attempt to prove the charges, the precise manner in which the defendants committed the crimes charged, or a preview of the Government's evidence or legal theories."); *Savin*, 2001 WL 243533, at *2 ("A defendant will not be permitted to use . . . a request [for a bill of particulars] to compel the government to disclose the manner in which it will prove the charges or preview its evidence or legal theory.").

Indeed, Mayor Adams has already gained significant insight into the Government's theory of the "regulation" *quid pro quo* through the briefing and argument on the Motion to Dismiss. *See, e.g.*, Gov't Opp. Mot. Dismiss ("Gov't Opp.") 17, ECF No. 37 (explaining that the Indictment alleges an agreement to help with "pending problems regarding" the Turkish House "[l]ike FDNY approvals" and arguing that "[t]here is no requirement that Adams's intent translated into action"). To be sure, if the Government sought to prove that Mayor Adams

7

received a bribe in exchange for action on a matter unrelated to the Turkish House, that would understandably be a surprise at this point. But there is no indication in the Indictment or in the briefing on the various motions that have been filed that the Government aims to prove a *quid pro quo* unrelated to the Turkish House. Nor does Mayor Adams suggest that anything that he has received in discovery indicates that the Government may try to prove an unrelated *quid pro quo*.

    **Benefits.** Mayor Adams also seeks a bill describing "the benefits that he agreed to accept in exchange for these specific acts," referring to the specific acts he sought in his first request (*i.e.*, those unrelated to the TCO matter specifically). Def. Mem. 4. But the Government has already provided a seven-item chart of benefits Mayor Adams is alleged to have received between 2016 and 2021. Ind. ¶ 41. Because "[t]his case does not present the quintessential 'needle in a haystack' problem in which a defendant is faced with sifting through thousands of legitimate transactions in an attempt to discover which transactions the government seeks to prove were fraudulent," the Government need not provide a more detailed accounting. *United States v. Tuzman*, 301 F. Supp. 3d 430, 453 (S.D.N.Y. 2017). Mayor Adams himself can readily judge, from the allegations in the Indictment and the Government's other disclosures, which benefits will be presented at trial as bribes in exchange for official conduct.

    Mayor Adams takes particular issue with the Indictment's reference to travel benefits received in 2016 and 2017, asserting that "[i]t is not at all clear whether the government believes that those purported benefits are relevant" to the alleged agreement with respect to the Turkish House. Def. Mem. 6. But, again, "it is not the function of a bill of particulars to allow defendants to preview the Government's theory of its case." *Murgio*, 209 F. Supp. 3d at 722. The Government offered some details as to its theory at oral argument on the Motion to Dismiss, *see* Nov. 1 Hr'g Tr. 26, and it need not elucidate it further at this time.

***Timing of Agreements.***  Mayor Adams next requests particularization of the timing of the agreements, arguing that "the timing of the agreement is the key" in federal-program bribery cases.  Def. Mem. 6-7 (quoting *Snyder v. United States*, 144 S. Ct. 1947, 1959 (2024)).  Mayor Adams is correct that the timing of an agreement is critical, but only insofar as bribery requires that a defendant agree to accept something of value prior to the contemplated or consummated action.  *See Snyder*, 144 S. Ct. at 1959 (explaining that it is the timing of the agreement and not the timing of the payment that distinguishes an unlawful bribe from a lawful gratuity).  The Government will thus have to prove a pre-existing agreement; but it need not commit to proving a precise date on which that agreement was formed.  *See United States v. Starks*, No. 24 Crim. 126, 2024 WL 4528169, at *5 (S.D.N.Y. Oct. 18, 2024) (rejecting request for bill of particulars detailing "*specific* dates" on which agreement was allegedly reached, where indictment was sufficiently clear in "alleging the payment of bribes 'in exchange for'" benefits under *Snyder* and defendant could "prepare his defense accordingly").  As the Second Circuit has noted, "evidence of a corrupt agreement in bribery cases is usually circumstantial, because bribes are seldom accompanied by written contracts, receipts or public declarations of intentions."  *United States v. Friedman*, 854 F.2d 535, 554 (2d Cir. 1988).

Mayor Adams makes much of the Court's prior acknowledgement that he "raises fair questions" as to the timing of the alleged TCO agreement.  *See* Def. Mem. 10 (citing Op. & Order 29 n.12); Def. Reply 4 (same).  But the Court also concluded that "these questions are appropriately resolved at trial."  Op. & Order 29-30.  They need not be resolved in a bill of particulars because Mayor Adams is not entitled to "a preview of the Government's evidence or legal theories," *Wey*, 2017 WL 237651, at *17, beyond the significant preview he has already been given in the Indictment, motions practice, argument, and discovery.  Requiring the Government to provide specific dates on which the agreements were formed would unduly limit

9

the Government's proof at trial. *See United States v. Payden*, 613 F. Supp. 800, 817 (S.D.N.Y. 1985) ("Because the government is entitled to prove a conspiracy through the use of circumstantial evidence, disclosure of the type of information [the defendant] seeks would unduly limit the government's proof at trial."); *Wey*, 2017 WL 237651, at *17 (a motion for a bill of particulars should not be granted "where the consequence would be to restrict unduly the Government's ability to present its case").

Nor is Mayor Adams entitled to know "what correspondence, conversation, or course of conduct the government thinks created an illicit agreement," Def. Reply 5, beyond what he can already discern from the allegations, arguments, and discovery. *See United States v. Skelos*, No. 15 Crim. 317, 2015 WL 6159326, at *13 (S.D.N.Y. Oct. 20, 2015) ("[A] defendant is not entitled to disclosure of the manner in which the government will attempt to prove the charge, the precise manner in which the government will allege the defendant committed the crimes charged, or a preview of the government's evidence or legal theories.").

***Counterparties.*** Mayor Adams requests "the counterparties to the agreements besides the Turkish Official and the Airline Manager." Def. Mem. 4. In response, the Government states that "[t]he indictment leaves no doubt that the Turkish Official was the counterparty with respect to the improper agreements regarding the Turkish House." Gov't Opp. 10. Mayor Adams argues that this response is vague, leaving open the possibility of other counterparties, Def. Reply 5—but "the" counterparty indicates just one. In any event, the Government has sufficiently described the participants in the alleged bribery scheme, in the Indictment and elsewhere, rendering a bill of particulars on this point unnecessary.

***Form of Agreements.*** Next, Mayor Adams requests particularization of "how the agreements were formed, even if implicitly." Def. Mem. 4. As discussed above, this request

10

seeks "the precise manner in which the government will allege the defendant committed the crimes charged," *Skelos*, 2015 WL 6159326, at *13, and is therefore denied.

***Official Position.*** Finally, Mayor Adams wishes to know his "official position as relevant to the agreements," Def Mem. 4, and specifically "the government's theory about what official position Mayor Adams was allegedly invoking in entering into the agreement," *id.* at 7. As the Government notes, the Indictment already indicates "what City positions [Mayor Adams] held on what dates." Gov't Opp. 10. The additional information Mayor Adams seeks about the Government's "theory" is not properly the subject of a bill of particulars. *See, e.g.*, *Wey*, 2017 WL 237651, at *17.

## II.     Requests Related to the Identities of Alleged Co-Conspirators and Contributors

Mayor Adams's second category of requests seeks the identities of (1) "Mayor Adams's alleged co-conspirators"; (2) "foreign nationals from whom Mayor Adams allegedly 'knowingly and willfully solicited, accepted, and received, and aided and abetted and willfully caused the solicitation, acceptance and receipt of, a contribution' to a local election in 2021 and 2023"; and (3) "all alleged straw donors." Def. Mem. 4. These requests, too, "may be denied for targeting evidentiary detail that is plainly beyond the scope of a bill of particulars." *Wey*, 2017 WL 237651, at *20.

***Co-Conspirators.*** Mayor Adams first seeks the identities of all alleged co-conspirators. "There is no clear rule in the Second Circuit as to when a bill of particulars for unindicted co-conspirators should be granted." *United States v. Block*, No. 16 Crim. 595, 2017 WL 1608905, at *6 (S.D.N.Y. Apr. 28, 2017). Nevertheless, "courts in this circuit frequently exercise their discretion to deny requests to identify co-conspirators through a bill of particulars." *Murgio*, 209 F. Supp. 3d at 721. "That is particularly true where . . . the allegations in the indictment are specific and the Government has provided discovery that will enable a defendant to adequately

11

prepare his defense." *Id.* at 721-22.  Here, the Court declines to order further particularization of the alleged co-conspirators because the Indictment and the discovery—together with the information the Government has offered to provide in response to specific questions—suffice to permit Mayor Adams to prepare his defense.

The fifty-seven-page speaking Indictment is specific and detailed.  It alleges twenty-three overt acts in furtherance of the conspiracy, frequently including the pseudonyms of the co-conspirators involved in those acts.  Ind. ¶¶ 55a-w.  That is enough to provide Mayor Adams with much of the detail he seeks.  To the extent that Mayor Adams has questions about the identities of specific individuals named pseudonymously in the Indictment or whether those individuals are alleged to be co-conspirators with respect to specific overt acts, he is directed to confer with the Government in good faith to resolve those uncertainties.  *See* Gov't Opp. 14 (representing that the Government has offered to identify any pseudonymously named individuals in the Indictment who are unknown to Mayor Adams[2]); *id.* at 19 n.8 (answering Mayor Adams's question about whether Businessman-4 was alleged to have contributed foreign funds and stating that such discrete uncertainties are best resolved through conferral).  Because "the allegations in the indictment are specific," *Murgio*, 209 F. Supp. 3d at 721, the Court is not inclined to order particularization of the co-conspirators.

Moreover, the discovery produced by the Government is extensive and well organized. *See, e.g.*, Gov't Opp. Ex. A (Index to Dec. 4, 2024 Production) (filed under seal).  It includes search warrants and detailed, lengthy affidavits identifying and describing the evidence and the

---

[2] Although the Government asserts that Mayor Adams "knows who all of" the pseudonymously named individuals in the Indictment are, Gov't Opp. 14, any suggestion that "the defendant knows what the government alleges that he did and with whom he dealt" is "a premise inconsistent with the presumption of innocence" and should not be taken as a reason to defeat a bill of particulars. *United States v. Trie*, 21 F. Supp. 2d 7, 21 (D.D.C. 1998).

contours of the alleged scheme; records documenting the seizure of physical evidence; electronic evidence extracted from multiple devices and accounts, including communications among co-conspirators; documents obtained from relevant individuals and entities; and certain witness statements, including redacted interview reports.  Gov't Opp. 7; *see also* Gov't Opp. Ex. A.  And the Government represents that it "offered to answer any questions defense counsel may have regarding where to find materials in discovery."  Gov't Opp. 7.  Courts in other public corruption cases have denied requests for particularization of unindicted co-conspirators where the discovery is similarly extensive and organized.  *See, e.g.*, *United States v. Menendez*, No. 23 Crim. 490, Dkt. 344 at 33-34 (S.D.N.Y. Apr. 11, 2024).

Mayor Adams has not demonstrated that the information he seeks regarding co-conspirators is necessary to the preparation of his defense, rather than merely useful.  *See Wey*, 2017 WL 237651, at *17; *Payden*, 613 F. Supp. at 816.  Although Mayor Adams cites several cases in which courts in this Circuit have ordered the identification of co-conspirators, *see* Def. Mem. 13-14, such cases typically involve either unusually sprawling conspiracies or particularly sparse indictments (or both).[3]  For example, in *United States v. Savin*, the court ordered the Government to name the alleged co-conspirators where the indictment's single paragraph

---

[3] *See, e.g.*, *United States v. Bin Laden*, 92 F. Supp. 2d 225, 236 (S.D.N.Y. 2000) (where "the charged conspiracies involve[d] a wide range of conduct, occurring over a long period of time, in various countries around the world," overt acts "described only in terms as general as engaging in 'travel' and conducting 'business'" provided "too little information to the [d]efendants and their counsel to permit them reasonably to focus their trial preparations"), *aff'd sub nom. In re Terrorist Bombings of U.S. Embassies in E. Afr.*, 552 F.3d 93 (2d Cir. 2008); *United States v. Lino*, No. 00 Crim. 632, 2001 WL 8356, at *1 (S.D.N.Y. Jan. 2, 2001) (granting in part requested bills of particulars in a twenty-three-defendant RICO case involving "four conspiracies to commit securities fraud, wire fraud and commercial bribery, nine substantive securities fraud offenses, two money laundering conspiracies, a union pension fund fraud and illegal kickback conspiracy, and one count of witness tampering"); *United States v. Rajaratnam*, No. 09 Crim. 1184, 2010 WL 2788168, at *2 (S.D.N.Y. July 13, 2010) (granting bill of particulars in what the government had described as "the largest hedge fund insider trading case in history").

describing the core allegations of conspiracy "d[id] not provide detailed notice of the conspiracy allegations and the means and methods of the conspiracy." 2001 WL 243533, at *4.  Here, by contrast, the Indictment's detailed narrative of the players involved and the long list of overt acts under the conspiracy count provide sufficient notice of the conspiracy allegations.  *See, e.g.*, Ind. ¶¶ 55a-w.  Accordingly, the Court declines to order a bill of particulars identifying all alleged co-conspirators.

   ***Foreign Contributors.***  Mayor Adams also seeks the identities of foreign nationals from whom Mayor Adams allegedly solicited or aided and abetted the solicitation of campaign contributions in 2021 and 2023.  Def. Mem. 4.  He argues that he is entitled to this information for the same reasons he is entitled to the names of co-conspirators, "to the extent that the government does not consider [the foreign nationals] to be co-conspirators." *Id.* at 15.  His request is denied for reasons similar to those discussed above: the Indictment already provides substantial detail, identifying multiple individuals who agreed to contribute foreign funds on specific occasions.  *See, e.g.*, Ind. at ¶¶ 20, 25, 31, 42, 45, 46.  In its Opposition, the Government further notes that it cannot identify "the ultimate sources of the foreign money" in every incident alleged in the Indictment, *see* Gov't Opp. at 19 (citing Ind. ¶ 45)—and "the Government need not provide particulars where it has none."  *United States v. Rose*, No. 19 Crim. 789, 2021 WL 2117119, at *14 (S.D.N.Y. May 24, 2021).

   More fundamentally, Mayor Adams has not explained why the identities of the foreign nationals themselves are "necessary to the preparation of his defense" or "to avoid prejudicial surprise at trial," *United States v. Torres*, 901 F.2d 205, 234 (2d Cir. 1990), *abrogated on other grounds by United States v. Marcus*, 628 F.3d 36, 41 (2d Cir. 2010).  This is particularly true given that the identities of the individuals who allegedly coordinated the foreign donations can

14

be gleaned from the Indictment, the discovery, and the Government's offers to confer on any specific questions.

***Straw Donors.*** Finally, Mayor Adams seeks the identities of "all alleged straw donors." Def. Mem. 4. As the Government explains, however, "the discovery is replete with information identifying them." Gov't Opp. 17. For example, the straw donors who allegedly contributed at a campaign event in May 2021, *see* Ind. ¶ 30, are listed by name in a chart contained in multiple affidavits disclosed in discovery. *See* Gov't Opp. Ex. C at 4-5 (filed under seal). And the Government represents that the discovery materials "also include contribution cards or online contribution forms, financial records, and electronic communications for straw donors involved in the donations in paragraphs 28, 31 and 45" of the Indictment. Gov't Opp. 17.

In reply, Mayor Adams does not dispute that this information is available and accessible in the discovery. *See* Def. Reply 9-10. Rather, he contends that "the indictment's use of 'at least' renders indeterminate the number of straw donors." Def. Reply 9. He points to paragraph 45(d) of the Indictment, *see* Def. Mem. 15, which alleges that, prior to a fundraiser scheduled for September 20, 2023, "the Adams Staffer . . . distributed $2,100 in cash to at least three straw donors." Ind. ¶ 45d. But the Indictment provides sufficient detail about the events surrounding each bundle of straw donations to permit Mayor Adams to identify the relevant evidence in discovery. In any event, Mayor Adams makes no suggestion that he faces a "needle in a haystack" problem, *Tuzman*, 301 F. Supp. 3d at 453, in which he must sift through thousands of legitimate donations to discover the straw donations.

In sum, the Court concludes that the identities of the alleged co-conspirators, foreign contributors, and straw donors, though not always named in the Indictment, are available to Mayor Adams "in some acceptable alternate form," *Bortnovsky*, 820 F.2d at 574. Accordingly, "no bill of particulars is required," *id.*

15

### III. Request for Early Pre-Trial Disclosure

In the alternative, Mayor Adams requests that the Court order the Government to disclose its exhibits sixty days before trial. Def. Mem. 17-18. Based on input from the parties, the Court previously set a date of March 31, 2025—three weeks before trial—for the mutual exchange of exhibits. Scheduling Order 2, ECF No. 87. In fact, Mayor Adams had requested a date of March 24 for the exchange of exhibits whether the trial date was to be April 1 or April 21. *See* Jt. Letter at 3, 7, ECF No. 64. Mayor Adams does not adequately explain the dramatic change between the one to four weeks he previously requested, and the sixty days he now seeks. *See* Def. Reply 10.[4] The Court is therefore not inclined to revisit its scheduling order.

Mayor Adams points to *United States v. Wey*, in which the court denied a bill of particulars but ordered "identification of certain subsets of the Government's trial exhibits" sixty days before trial. 2017 WL 237651, at *22. But the court in *Wey* ordered that limited disclosure "in light of the relative scarcity of specific allegedly fraudulent misstatements, omissions, and wire communications ascribed to Wey in the Indictment and the Search Warrant Affidavit." *Id.* Mayor Adams has not demonstrated an analogous scarcity of specific allegations here, nor does he tailor his request to "certain subsets" of exhibits that should be disclosed early. Similarly, in *United States v. Bonventre*, the court ordered disclosure of exhibits sixty days before trial in light of "the generic categories of documents listed in the Indictment, the fact that the charges in the Indictment span decades, the sheer volume of documents at issue in this case, the number of

---

[4] Although Mayor Adams suggested the March 24 date before receiving all of the Government's discovery, he had already received several significant productions by that point. *See* Gov't Opp. Ex. A. And the bulk of his motion is directed toward purported ambiguities in the Indictment, not the volume of discovery. *See, e.g.*, Def. Mem. 1-2 (describing, in preliminary statement, Indictment's "general allegations," "vague[ness]," and "fail[ure] to identify . . . alleged co-conspirators," without mentioning discovery). Such concerns were already identifiable at the time he suggested March 24 as the date on which he would receive the Government's exhibits.

Defendants allegedly involved and the difficulty for the Defendants in determining which Defendant is alleged to have produced, or been involved in producing, each document." No. 10 Crim. 228, 2013 WL 2303726, at *7 (S.D.N.Y. May 28, 2013), *aff'd in part*, 646 F. App'x 73 (2d Cir. 2016). Mayor Adams has not shown analogous circumstances here.

Finally, in a letter filed after briefing on this motion was completed, Mayor Adams asserts that the Government continues to produce discovery and refuses to identify its evidence, amplifying the need for a bill of particulars. See ECF No. 104. Mayor Adams appears to have requested general information from the Government about "the supposed evidence" against him, Letter 2, ECF No. 104, rather than for assistance identifying specific information in the newly produced discovery. But, as explained above, he is not entitled to a detailed map of the Government's evidence. *See Murgio*, 209 F. Supp. 3d at 698 (a bill of particulars "is not a general investigative tool, a discovery device or a means to compel the government to disclose evidence or witnesses to be offered prior to trial").[5]

The Court sympathizes with defense counsel's task of reviewing "over 400,000 files from more than 100 custodians" with the "trial date less than four months"—now less than three months—away. Def. Mem. 16-17. But Mayor Adams requested an early trial date knowing full well that the discovery in this case would be extensive. See Oct. 2 Hr'g Tr. 15-20, 37-38. The early disclosure dates the Court has already ordered balance Mayor Adams's need for time to

---

[5] In a footnote, Mayor Adams intimates that the Government's recent production "violates the Rule 5(f) order that the government must produce *Brady* material 'promptly after its existence becomes known to the government.'" Letter at 1 n.1 (quoting ECF No. 25 at 1). But there is no indication on the record before the Court that the Government withheld production of these documents in contravention of the Rule 5(f) Order in this case.

17

prepare his defense with the realities of the accelerated trial schedule in this case.[6] *Cf. Starks*, 2024 WL 4528169, at *6 (denying bill of particulars in light of early disclosure deadlines).

In sum, the Court concludes that neither a bill of particulars nor the even earlier disclosure of exhibits is necessary to enable Mayor Adams to prepare his defense or to avoid prejudicial surprise at trial.

## CONCLUSION

The Motion for Leave to File a Bill of Particulars is **DENIED**. The Clerk of Court is respectfully directed to terminate ECF No. 72.

SO ORDERED.

Dated: February 4, 2025
New York, New York

                                                DALE E. HO
                                                United States District Judge

---

[6] The Court adopted that accelerated schedule in an effort to accommodate Mayor Adams's request for an even faster schedule. However, if Mayor Adams needs additional time to prepare for trial, he remains free to request such relief.