<u>Exhibit 1</u>
Amici's Proposed Brief

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

United States of America

           -against-

Eric Adams,

               Defendant.

Case No. 24-CR-00556 (DEH)

District Judge Dale E. Ho

---

**BRIEF OF AMICI FORMER UNITED STATES ATTORNEYS**

---

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..............................................................................................ii

IDENTITY AND INTERESTS OF AMICI ...................................................................1

INTRODUCTION ...........................................................................................................2

ARGUMENT ...................................................................................................................5

    I.     The District Court's Gatekeeping Role under Rule 48(a) ......................................5

    II.    "Good Faith" and the "Public Interest" under Rule 48(a) ....................................7

    III.   The Facts in this Case Warrant a Factual Inquiry ..................................................9

# TABLE OF AUTHORITIES

## Cases

*Gaona-Romero v. Gonzales*, 497 F.3d 694 (5th Cir. 2007)...........................................................8

*In re Richards*, 213 F.3d 773 (3d Cir. 2000) ..............................................................5, 6, 8

*Petite v. United States*, 361 U.S. 529 (1960) ...........................................................................8

*Rinaldi v. United States*, 434 U.S. 22 (1977)...........................................................................7

*United States v. Ammidown*, 497 F.2d 615 (D.C. Cir. 1973) ...................................6, 7, 8

*United States v. Armstrong*, 517 U.S. 456 (1996).....................................................................5

*United States v. Aytes*, No. 19-3981 (2d Cir. Apr. 13, 2021) ............................................9

*United States v. Blaszczak*, 56 F.4th 230 (2d Cir. 2022)......................................5, 7, 8, 9

*United States v. Cowan*, 524 F.2d 504 (5th Cir. 1975) ........................................................5

*United States v. Derr*, 726 F.2d 617 (10th Cir. 1984) .........................................................6

*United States v. Flynn*, 507 F. Supp. 3d 116, 128–29 (D.D.C. 2020)...........................7, 9

*United States v. Greater Blouse, Skirt & Neckwear Contractors Ass'n*,
    228 F. Supp. 483 (S.D.N.Y. 1964).............................................................................6

*United States v. Hayden*, 860 F.2d 1483 (9th Cir. 1988) ....................................................9

*United States v. HSBC Bank USA, N.A.*, 863 F.3d 125 (2d Cir. 2017) ...........................8

*United States v. Rosenberg,* 108 F. Supp. 2d 191 (S.D.N.Y. 2000) ...................................8

*United States v. Salinas*, 693 F.2d 348 (5th Cir.1982).........................................................6

*United States v. Stevens,* No. 1:08-cr-00231 (D.D.C. April 8, 2009) ................................9

*United States v. Stevenson*, 425 F. Supp. 3d 647 (S.D.W. Va. 2018).................................5

*United States v. Weber*, 721 F.2d 266 (9th Cir. 1983)..........................................................8

## Rules

Fed. R. Crim. P. 48(a) ..............................................................................................passim

## Other Authorities

Emma Fitzsimmons, *Eric Adams Highlights Coordination With Trump's Border
    Czar on Fox News*, New York Times, Feb. 14, 2025..............................................12

Fox News, *Tom Homan, Mayor Adams reveal 'game changer' move on ICE
    deportations*, YouTube, Feb. 14, 2025...................................................................12

Gregory Kreig, *Eric Adams faces pressure to resign as New York Democrats
    plot next moves*, CNN, Sept. 16, 2024...................................................................11

Thomas Ward Frampton, *Why Do Rule 48(a) Dismissals Require
    "Leave of Court,"* 73 Stan. L. Rev. Online 28, 37 (2020) ......................................7

## IDENTITY AND INTERESTS OF AMICI

Amici are former United States Attorneys who served in New York City and the Tri-state area.[1]  During their tenure, amici acted to uphold a set of values that have guided the United States Department of Justice ("DOJ") for decades.  Amici believe that federal prosecutors are duty-bound to exercise their tremendous power fairly, without regard to partisan politics, and in furtherance of the rule of law.

Amici believe that federal prosecutors should not make criminal charging decisions based on political associations, political activities, or personal allegiances.  They believe that it is inappropriate to treat a defendant more leniently because the defendant is powerful or well-connected.  They directed those who worked for them to pursue justice without fear or favor, and they made their charging decisions based entirely on the facts and the law.  They believe that these values are foundational to a fair and just legal system.

Amici believe that these values have been tested by the recent actions of the leadership of the Department of Justice in this case.  They are deeply concerned that those actions threaten public confidence in federal law enforcement, and that the federal courts must not be seen as endorsing law enforcement decisions based on political expediency or false and misleading information.  In this respect, amici believe that they collectively represent the views of the vast majority of men and women, here and elsewhere, who served as federal prosecutors and who

---

[1] Amici consist of John S. Martin Jr. (former United States Attorney for the Southern District of New York (1980-1983) and former Judge for the United States District Court for the Southern District of New York (1990-2003)); Robert J. Cleary (former United States Attorney for the District of New Jersey (1999-2002)); and Deirdre M. Daly (former United States Attorney for the District of Connecticut (2013-2017)).

faithfully supported and defended the Constitution and the laws of the United States.[2]  Amici submit this brief to respectfully advise the Court about the procedural steps the Court can take to ensure that the Court's integrity and the rule of law are protected before ruling on the pending motion to dismiss.

## INTRODUCTION

In the considerable experience of the amici, the events of the past week are unprecedented.  We witnessed a directive from a senior DOJ official to the United States Attorney for the Southern District of New York to dismiss the pending prosecution of the Mayor of New York City, Eric Adams.[3]  (Ex. 2).  The United States Attorney refused the directive, and wrote a letter to the Attorney General saying she could not in good faith move to dismiss the case.  The letter closed with an offer to resign if the DOJ insisted on the dismissal.  (Ex. 3).

The DOJ responded by castigating the United States Attorney, placing members of the prosecution team on administrative leave, opening investigations of the United States Attorney and members of her staff, and removing the United States Attorney's Office ("USAO") from the case.  (Ex. 4).  A member of the prosecution team then wrote a letter saying that the DOJ's stated reasons to dismiss the case were pretextual and opining that only a "fool" or a "coward" would sign the dismissal motion.  (Ex. 5).  When the DOJ subsequently approached the leadership of its

---

[2] Amici note, in this regard, that a public statement regarding recent events in this case was issued on February 14, 2025, by former United States Attorneys Robert B. Fiske, Jr., John S. Martin, Jr., Mary Jo White, James B. Comey, David N. Kelley, Geoffrey S. Berman, and Audrey Strauss.  *See* Benjamin Weiser, *Seven Former Manhattan U.S. Attorneys Voice Support for Sassoon*, New York Times, February 14, 2025.  Additional public statements regarding these events, joined in by hundreds of former federal prosecutors, have been issued or will be issued shortly.

[3] For the Court's convenience, and to make sure that relevant materials are included in the public record of this case, we have attached the materials from the public record to which this brief refers.

Public Integrity Section, the leadership resigned their jobs.  Thereafter, the remaining members of the Public Integrity Section were reportedly given an hour to decide who would file the motion and led to believe that they might be fired if no one came forward.  (Ex. 6).  One senior member of the Section agreed to sign the motion, apparently motivated by the desire to save the jobs of his colleagues.  (*Id.*).  An application for a nolle prosequi finally emerged (Dkt. No. 122), along with a public statement from the DOJ claiming that the Adams prosecution amounted to a "politically motivated witch hunt."  (Ex. 7 at 3–4).

These striking and unprecedented facts raise important issues about the rule of law, executive power, and the authority of courts to preserve the integrity of the federal criminal justice system.  They also raise questions about the use of the machinery of justice to serve political expediency, the professional obligations of federal prosecutors, and the independence of the Department of Justice and its components.  For this Court, the events pose one central question: is the pending motion to dismiss the Adams indictment advanced in good faith, consistent with the public interest?

Amici believe that this Court should conduct a factual inquiry before ruling on the pending request for a nolle prosequi.  Under Rule 48(a) of the Federal Rules of Criminal Procedure, the Court has the authority—indeed the responsibility—to determine if dismissal is sought for appropriate reasons and in the interests of justice.  Accordingly, we believe that the Court should develop a full factual record with respect to the following issues, among others:

- Does the DOJ possess information to support its assertion that the Adams prosecution was brought as a "politically motivated witch hunt?"  Conversely, do the nature of the charges, the strength of the evidence, and the surrounding circumstances indicate that the Adams prosecution was pursued for bona fide law enforcement reasons?

- Are there facts that would warrant a finding that the Adams investigation and prosecution were pursued for illegitimate reasons?  Specifically, does the

Department have evidence that the investigation and prosecution were brought as political retribution related to Mayor Adams' calls upon the Biden administration to provide greater resources to address immigration in New York?

- Can the DOJ present evidence to suggest that the return of the indictment was intended or timed to damage the electoral prospects of Mr. Adams?

- Does or will the pendency of the indictment preclude Mayor Adams from enforcing federal, state, and local laws concerning immigration?

- Did Mayor Adams request, or did DOJ offer, the dismissal of Mayor Adams' indictment in exchange for his assistance in immigration enforcement? If so, was this an appropriate use of federal law enforcement authority?

- Did counsel for Mayor Adams meet and/or negotiate with DOJ personnel, without the involvement of SDNY prosecutors, to develop a rationale for dismissing the case against him?

- Does the DOJ have any evidence that Damian Williams, while United States Attorney, took any actions in this case to further a personal political agenda? Is there any reason to believe that any actions he took after leaving the United States Attorney's Office would interfere with the pending prosecution of Mayor Adams?

- To what extent, if any, did Mayor Adams inappropriately attempt to curry favor with President Trump, and did any such efforts influence the decision of DOJ to seek the dismissal of the indictment?

- Is the request to dismiss the indictment without prejudice intended to induce Mayor Adams to cooperate with the Trump Administration's policy objectives or political efforts?

- Given the nature of the charges, the strength of the evidence, and the defendant's position of public responsibility, what facts exist to indicate that dismissal of the indictment would be in the public interest? What impact would such a dismissal have on the public's confidence in the integrity of the judicial process, including among the voters and taxpayers of New York City, who are the constituencies most affected by the crimes charged in the indictment?

We demonstrate below that the Court has abundant authority under Rule 48(a) to consider these and related matters in deciding whether dismissal of the indictment is appropriate and in the public interest.

# ARGUMENT

## I.    The District Court's Gatekeeping Role under Rule 48(a)

Prosecutors have broad discretion to determine "whether *or not* to prosecute." *United States v. Blaszczak*, 56 F.4th 230, 238 (2d Cir. 2022) (citation omitted, emphasis in original).  But the Federal Rules of Criminal Procedure do not permit, much less require, this Court simply to acquiesce to the government's request to dismiss this case.  The Adams indictment was presented to a properly constituted grand jury, and the grand jury voted the indictment and returned it to the Court.  The case is therefore "no longer entirely within the realm of . . . executive authority." *United States v. Stevenson*, 425 F. Supp. 3d 647, 651 (S.D.W. Va. 2018) (emphasis removed).

Rule 48(a) makes this clear in conferring authority on a prosecutor to dismiss an indictment only "*with leave of court*."  That operative phrase originates with an amendment to draft Rule 48 made by the Supreme Court, subsequently adopted by Congress, and "manifest[ly] . . . intended to make a significant change in the common law rule by vesting in the courts the power and the duty to exercise a discretion for the protection of the public interest." *United States v. Cowan*, 524 F.2d 504, 510–13 (5th Cir. 1975) (discussing history of Rule 48(a)) (quoted in *Blaszczak*, 56 F.4th at 240).  The rule "modif[ies] and condition[s] the absolute power of the Executive, consistently with the Framer's concept of Separation of Powers, by erecting a check on the abuse of Executive prerogatives." *Cowan*, 524 F.2d at 513.

Significantly, Rule 48(a) "may serve an important interest as an information- and accountability-producing vehicle . . . that exposes the reasons for prosecutorial decisions." *In re Richards*, 213 F.3d 773, 788 (3d Cir. 2000).  As the *Richards* court put it, "the public has a generalized interest in the processes through which prosecutors make decisions about whom to prosecute," and courts can serve that interest "by inquiring into the reasons for [the] requested

dismissal." *Id.* at 789.  Accordingly, the "leave of court" requirement in Rule 48(a) "allow[s] a court to force prosecutors to publicly reveal their reasons for not proceeding before granting a requested dismissal." *Id.*  This process "may, in turn, lead to attempts by the public to influence these decisions through democratic channels." *Id.*

Under the case law, two requirements follow from Rule 48(a)'s "leave of court" clause.  First, a court presented with a motion to dismiss an indictment under Rule 48(a) has the authority to develop a factual record sufficient to support the court's decision to grant or deny leave to dismiss.  "[T]he Rule contemplates public exposure of the reasons for the abandonment of an indictment . . . in order to prevent abuse of the uncontrolled power of dismissal previously enjoyed by prosecutors." *United States v. Greater Blouse, Skirt & Neckwear Contractors Ass'n*, 228 F. Supp. 483, 486 (S.D.N.Y. 1964); *see also United States v. Ammidown*, 497 F.2d 615, 622 (D.C. Cir. 1973) ("The requirement of judicial approval entitles the judge to obtain and evaluate the prosecutor's reasons.").  A court, "to honor the purpose of the rule . . . at the very least must know the prosecutor's reasons for seeking to dismiss the indictment and the facts underlying the prosecutor's decision." *United States v. Derr*, 726 F.2d 617, 619 (10th Cir. 1984).  Further, the prosecutor seeking dismissal "is under an obligation to supply sufficient reasons [to support the motion to dismiss]—reasons that constitute more than a mere conclusory interest." *United States v. Salinas*, 693 F.2d 348, 352 (5th Cir. 1982) (internal quotation marks, citation and footnote omitted); *see also Richards*, 213 F.3d at 788.

Second, in assessing the factual record, Rule 48(a)'s touchstone is good faith.  *Blaszczak*, 56 F.4th at 240.  As the Second Circuit has explained, a district court should grant a motion brought under Rule 48(a) "absent a finding of bad faith or disservice to the public interest." *Id.* at 240–41 (citation omitted).  The court's examination of the "public interest" should focus on

"the motive of the prosecutor" in seeking dismissal of the case.  *Id.*  "The salient issue" under

Rule 48(a) is whether the government's effort to "terminate the prosecution" is "tainted with

impropriety."  *Rinaldi v. United States*, 434 U.S. 22, 30 (1977); *see also* Thomas Ward Frampton,

*Why Do Rule 48(a) Dismissals Require "Leave of Court,"* 73 Stan. L. Rev. Online 28, 37 (2020)

("[Rule 48(a)] arm[s] district judge[s] with a powerful tool to halt corrupt or politically

motivated dismissals of cases").

> One reason that Rule 48(a) requires court approval to dismiss an indictment is to

prevent unfairness to the defendant, and to prevent the government from gaining tactical

advantage by dismissing a case and then later obtaining a new indictment.  Here, of course, Mr.

Adams will not interpose an objection to the dismissal of the case, particularly since the

Department has indicated that any reexamination of the case will not take place until after the

November mayoral election.  But that does not alter the Court's authority: Rule 48(a) has "been

held to permit the court to deny a Government dismissal motion to which the defendant has

consented if the motion is prompted by considerations clearly contrary to the public interest."

*Rinaldi*, 434 U.S. at 29 n.15 (declining to decide the issue); *Ammidown*, 497 F.2d at 620 (noting

that the court must determine whether a Rule 48(a) motion is proper even where a defendant

consents to the motion); *United States v. Flynn*, 507 F. Supp. 3d 116, 128–29 (D.D.C. 2020).

The Court has the authority under Rule 48(a) and otherwise to protect the integrity of the judicial

process irrespective of Mr. Adams' position on the motion.

## II.    "Good Faith" and the "Public Interest" under Rule 48(a)

> Courts tasked with assessing a Rule 48(a) motion have equated "bad faith" with requests

to dismiss that are "contrary to the public interest" and "good faith" with requests that are "not

clearly contrary to manifest public interest."  *United States v. Rosenberg*, 108 F. Supp. 2d 191,

7

204 (S.D.N.Y. 2000). The Second Circuit has noted in dicta that some courts have "equat[ed] a dismissal that is clearly contrary to the public interest with one in which the prosecutor appears motivated by bribery, animus towards the victim, or a desire to attend a social event rather than trial." *United States v. HSBC Bank USA, N.A.*, 863 F.3d 125, 141 (2d Cir. 2017) (quoting *Richards*, 213 F.3d at 78–88). The D.C. Circuit has explained that "bad faith" in this context means an act that so departs "from sound prosecutorial principle as to mark it an abuse of prosecutorial discretion." *Ammidown*, 497 F.2d at 622. And, as the Third Circuit has noted, a district court may conduct a hearing in furtherance of its "inherent authority to ensure that its processes are not being abused." *Richards*, 213 F.3d at 788–99.

Opinions authorizing dismissal under Rule 48(a) help to illuminate a court's role in assessing a prosecutor's dismissal request. It is permissible under Rule 48(a), for example, for a prosecutor to dismiss an indictment that violates a newly "announced [] general policy against multiple prosecutions arising out of a single transaction or against a federal prosecution that would be duplicative of a state prosecution," *Blaszczak*, 56 F.4th at 238 (quoting *Petite v. United States*, 361 U.S. 529 (1960)), or a change in generally applicable immigration policy relevant to the charges brought in a particular case. *Id.* at 239 (quoting *Gaona-Romero v. Gonzales*, 497 F.3d 694 (5th Cir. 2007)). A prosecutor's motion to dismiss under Rule 48(a) is similarly appropriate where the prosecutor represents that she has "developed a serious and substantial doubt as to [the defendant's] guilt," *id*. at 239 (quoting *United States v. Weber*, 721 F.2d 266 (9th Cir. 1983)), or the prosecutor confesses error on the ground that the charges cannot meaningfully be distinguished from charges found to be legally deficient in another case. *Id*. at 241 (quoting *United States v. Aytes*, No. 19-3981, Dkt. No. 70 (2d Cir. Apr. 13, 2021)). In sum, the Second Circuit has explained that a Rule 48(a) motion should be granted on a record that demonstrates

that "the prosecutor acted in good faith at the time he moved for dismissal." *Id.* at 240 (citation

omitted); *United States v. Hayden*, 860 F.2d 1483, 1488 (9th Cir. 1988) ("As the district judge

properly found, when the government requests a Rule 48(a) dismissal in good faith, the district

court is duty bound to honor the request.").

      The way to develop an appropriate record lies within the court's discretion.  In *United*

*States v. Flynn,* Judge Emmett Sullivan appointed the Honorable John Gleeson as amicus curiae

to present arguments in opposition to the government's Rule 48(a) application to dismiss the

pending charges.  No. 1:17-cr-00232 (D.D.C. May 13, 2020) (Dkt. No. 205).  A Presidential

pardon ultimately rendered the matter moot.  *Id.* (Dkt. No. 311).  In the prosecution of United

States Senator Ted Stevens, after being presented with a defense motion to dismiss the

indictment for prosecutorial misconduct, the court appointed outside counsel to investigate

whether the Department of Justice had committed contempt of court, and directed the

Department to cooperate with outside counsel and to provide counsel with "access to

investigative files, witnesses, and other information as requested."  *United States v. Stevens,* No.

1:08-cr-00231 (D.D.C. April 8, 2009) (Dkt. No. 375).[4]

### III.    The Facts in this Case Warrant a Factual Inquiry

      Although a factual inquiry may not be necessary in every case, this case is extraordinary.

Here, the DOJ does not seek dismissal for well-recognized law enforcement purposes.  On the

contrary, the facts in the public record suggest that the government is seeking a nolle prosequi for

reasons that may be pretextual, and contrary to the public interest.  The DOJ's asserted reasons

---

[4] Here, the Court's factfinding process could seek written and testimonial evidence as
appropriate.  For instance, the Court could require testimony and documents regarding
communications among Mr. Bove, counsel for Mr. Adams, and others.  The Court could also
inspect the handwritten notes the DOJ apparently seized from counsel during a meeting that took
place on January 31, 2025.  (*See* Ex. 3 at 3 n.1).

for seeking dismissal are not supported by any facts in the record, and the existing incomplete record contradicts its claims.  The public record to date therefore could be read to suggest that the application for a nolle prosequi amounts to an abuse of the Court's processes.

The DOJ's bare-bones application for a nolle prosequi avoids any reference to the extraordinary circumstances that preceded its filing.  (Dkt. No. 122).  There is no reference to the resignation of the Acting United States Attorney, no reference to her lengthy letter to the Attorney General explaining why dismissal of the Adams indictment is not appropriate, no mention of the views of the SDNY prosecution team agreeing with Ms. Sassoon's analysis, and no discussion of the resignations of members of the DOJ's Public Integrity Section, who likewise believed that a dismissal would be contrary to the public interest.

In the accompanying attachments, amici have placed more of the surrounding circumstances into the record.  We respectfully refer the Court to the letter dated February 12, 2025, from Danielle Sassoon to Attorney General Bondi.  (Ex. 3).  That letter speaks for itself.  At a minimum, the letter demonstrates why the Court should question whether a nolle prosequi is in the public interest, and why there should be a searching inquiry into the DOJ's asserted bases for seeking a nolle.

The DOJ's response to the Sassoon letter reinforces the need for further inquiry.  Mr. Bove's letter to Ms. Sassoon, dated February 13, 2025, refers to this case as "a politically motivated prosecution," and the DOJ thereafter issued a public statement referencing a "politically motivated witch hunt."  (Exs. 4, 7 at 3–4).  Its application for a nolle prosequi does not use this language; it refers obliquely to "appearances of impropriety" and risks of electoral

10

interference.  (Dkt. No. 122 ¶ 5).[5]  By conducting a factual inquiry including, if necessary, an evidentiary hearing, the Court can determine whether the *Adams* prosecution was politically inspired or litigated to achieve political ends, or whether the DOJ's "weaponization" claim is pretextual and itself represents a politicization of the criminal justice process.

Further inquiry is also appropriate to test the DOJ's assertion that the pendency of the indictment interferes with Mr. Adams' "ability to govern" in New York City, which exposes the city to "unacceptable threats to public safety, national security, and related federal immigration initiatives and policies."  (Dkt. No. 122 ¶ 6).  Amici note, in this regard, that Mayor Adams himself has repeatedly and vociferously stated that the pending indictment has had no impact on his mayoral duties.[6]  And the DOJ's stated concern about the Mayor's inability to get a security clearance is insubstantial; the Court can take judicial notice that President Trump has by Executive Order both revoked security clearances and ordered them granted.

A further inquiry is also necessary to determine whether, as Ms. Sassoon and Mr. Scotten have claimed, the DOJ is attempting to use a dismissal of the indictment without prejudice, and the prospect of its reinstatement, as a means of securing Mr. Adams' cooperation with the Administration's anti-immigration policies.  Ms. Sassoon's concerns regarding a "quid pro quo" are based on statements she personally heard at a January 31, 2025 meeting involving Mr.

---

[5] The application also cites a website maintained by Damian Williams, along with an op-ed he wrote.  (Dkt. No. 122 ¶ 5).  Mr. Williams created the website and wrote the op-ed after he left public service.  The DOJ asserts that the website and the op-ed establish Mr. Williams' ambition to pursue a political career.  But this obviously does not automatically transform an indictment prosecuted during his tenure into a political "witch hunt," particularly where there has not even been a claim of vindictive or selective prosecution.  (*Cf.* Dkt. No. 103 at 5 (concluding that Mr. Williams' op-ed and website did "not change the Court's analysis" regarding its decision to deny Mr. Adams' motion for an evidentiary hearing and sanctions)).

[6] Gregory Kreig, *Eric Adams faces pressure to resign as New York Democrats plot next moves*, CNN, Sept. 16, 2024.

Adams' counsel, Mr. Bove, and prosecutors from the Southern District of New York.  (Ex. 3 at 3 n.1).  Although Mr. Bove has denied the existence of any "quid pro quo" relationship with Mayor Adams, amici direct the Court's attention to Mr. Adams' recent appearance on a television show with Thomas Homan, the Administration's "border czar."[7]  During that appearance, the Mayor reiterated his intention to work with the President to detain and deport immigrants who have committed crimes.  Mr. Homan then warned Mr. Adams that the Administration would be watching for his compliance, and he added the following: "If he doesn't come through, I'll be back in New York City, and we won't be sitting on the couch — I'll be in his office, up his butt, saying, 'Where the hell is the agreement we came to?'"[8]

        If indeed there was a "quid pro quo" agreement between the DOJ and Mayor Adams that resulted in the pending request for a nolle prosequi, amici believe that the Court should not become a party to its implementation.  To be sure, the Department of Justice is part of the Executive Branch of government and should act to carry out the policies of the President.  However, this proposition has its limits.  Amici have long believed that, while the President has the right to set broad law enforcement priorities, law enforcement decisions in individual cases should not be politicized, and the President should not direct individual prosecutive decisions within the DOJ.  The DOJ's Principles of Federal Prosecution forbid prosecutors from making decisions for political purposes.  U.S. Dep't. of Justice, *Justice Manual* § 9-27.260 (2018).  Although the Constitution does not expressly establish prosecutorial independence, it has been for many decades a defining feature of the federal system for the administration of justice.

---

[7] Fox News, *Tom Homan, Mayor Adams reveal 'game changer' move on ICE deportations*, YouTube, Feb. 14, 2025, available at: https://www.youtube.com/watch?v=wy6gmUL-_9I

[8] Emma Fitzsimmons, *Eric Adams Highlights Coordination With Trump's Border Czar on Fox News*, New York Times, Feb. 14, 2025.

Trading a dismissal of an indictment for the defendant's adherence to political objectives would be a departure from the finest traditions of the Department of Justice and the United States Attorney's Office for the SDNY.

Even if such an agreement were to lie within the authority of the Executive Branch, the Court need not, and in our view should not, lend its approval to it. Once the government obtains an indictment and presents it to a court, it no longer has unfettered discretion to use or to abandon the legal process to achieve its objectives. Ours is a system of checks and balances. A grand jury indictment signifies the existence of probable cause to believe that the defendant has committed crimes; the decision whether to abandon the prosecution is no longer within the sole province of the Executive—the court has the authority to decide whether a dismissal is appropriate and in the public interest. Certainly a court should afford the Executive, which speaks through the Department of Justice, a large measure of discretion to weigh competing interests. But where, as here, there are compelling reasons to question whether a dismissal is in the public interest, and whether a dismissal would amount to an abuse of the Court's processes, the Court should not hesitate to withhold its approval, and it should closely examine the underlying facts and circumstances. To do otherwise could undermine the public's confidence in the judiciary as a neutral arbiter free from political or personal influence. And whatever may be the Executive's power to make prosecutive decisions, it clearly does not have the power to enlist the Court's approval on the basis of false, misleading, or incomplete information. The materials in the public record, including Ms. Sassoon's letter to the Attorney General (Ex. 3), raise abundant concerns in this regard.

If the Court should determine, after making a searching inquiry, that the dismissal of the case is not appropriate or in the public interest, it will have to consider what further action might

be warranted. Amici recognize that simply directing the Department of Justice to proceed with the prosecution may be fraught with legal and practical difficulty. But there may be other available remedies if the public interest so requires. In certain contempt cases, courts have appointed special prosecutors where a United States Attorney declined to bring charges. *United States v. Donziger*, 38 F.4th 290, 294 (2d Cir. 2022) (upholding a criminal contempt conviction brought by a special prosecutor appointed under Federal Rule of Criminal Procedure 42(a)(2)). Courts also have the authority to direct federal prosecutors to make evidence, including grand jury materials, available to state and local prosecutors where necessary and appropriate. *See* Federal Rule of Criminal Procedure 6(e)(3)(E).

Aside from continued prosecution, a thorough fact finding may also lead to other necessary and important outcomes. Depending on the evidence developed, these could include a contempt proceeding based on the conduct examined; criminal referrals if warranted; and/or disciplinary recommendations. In short, depending on the circumstances, the Court could have a variety of procedural avenues available to protect the integrity of the Court and the justice system from abuse.

At this stage, however, amici submit that the question of remedy is premature. In the view of amici, the Court need not confront that question until it determines whether to grant the pending application for an order of nolle prosequi. In the extraordinary circumstances of this case, that determination warrants a searching factual inquiry, which the Court unquestionably has the authority to order. What is at stake here is far more than an internal prosecutorial dispute about an individual case. The public furor that has arisen during the past week raises concerns about respect for the rule of law and the division of power between the Executive and Judicial Branches of government in our nation. The best way to address these concerns is to conduct an

inquiry that will allow the Court—and ultimately the public—to determine where the interests of justice may lie.

Dated: February 17, 2025

Respectfully submitted,

/s/ *Carey R. Dunne*
Carey R. Dunne
carey@freeandfair.org
Mark Pomerantz
mark@freeandfair.org
Kevin Trowel
kevin@freeandfair.org
Martha Reiser
martha@freeandfair.org
**FREE & FAIR LITIGATION GROUP**
266 W 37th Street
20th Floor
New York, NY 10018
Telephone: (646) 434-8604

*Counsel for Amici Curiae*