UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

v.                                                No. 24 Cr. 556 (DEH)

ERIC ADAMS,

                                    Defendant.

---

**THE DEPARTMENT OF JUSTICE'S RESPONSE IN FURTHER SUPPORT OF
MOTION TO DISMISS PURSUANT TO RULE 48(a)**

<u>Table of Contents</u>

INTRODUCTION .................................................................................................................... 1

DISCUSSION ........................................................................................................................... 3

    I.    The Legal Standard For Leave To Dismiss An Indictment Under Rule 48(a).................... 3

        1.    Rule 48(a) Authorizes, At Most, A Narrow And Limited Judicial Inquiry ................ 3

        2.    The Inapposite Prohibition On Prosecutorial Harassment ........................................ 5

        3.    The "Severely Cabined" And Inapposite Prohibition On Bad Faith .......................... 5

     B.    Dismissal Is Required Based On Weaponization ........................................................... 6

     C.    Dismissal Is Required Based On National Security And Immigration Concerns ........... 9

     D.    There Is No Evidence Of Bad Faith .............................................................................. 10

    II.    The Court Should Not Look Beyond The Motion, But Available Evidence
        Confirms That Dismissal Is Necessary ........................................................................ 12

    III.    No Further Procedural Steps Are Appropriate ............................................................. 16

    IV.    Dismissal Should Be Without Prejudice ...................................................................... 17

    V.    The Court Cannot Compel The Department To Devote Resources
        To This Flawed Case .................................................................................................... 17

    VI.    Apparent Deficiencies In SDNY's Bribery Theory Also Support Dismissal ............... 17

CONCLUSION ....................................................................................................................... 19

## INTRODUCTION

The Department of Justice respectfully submits this brief in response to the Court's February 21, 2025 Order, and in further support of the pending motion to dismiss the charges, without prejudice, pursuant to Rule 48(a) of the Federal Rules of Criminal Procedure (the "Motion").  ECF Nos. 122, 136.

The Motion should be granted without additional delay.  The appearances of impropriety are too great based on the conduct of the former U.S. Attorney who initiated the case (U.S. Attorney-1), and the impediments that the case creates to President Trump's national security and immigration objectives are unacceptable.  ECF No. 122 ¶¶ 5-6.  These are both valid reasons for the Department to end this case based on the exercise of prosecutorial discretion that is derived from Article II of the Constitution and has been delegated by President Trump to Attorney General Bondi.

The current record is more than sufficient to allow the Court to promptly reach that conclusion before further irreparable harm is done to public safety and the 2025 elections in New York City.  In addition to the Motion itself, the Department elaborated on the Motion in a public forum at the February 19, 2025 hearing, and Mayor Adams explained under oath that no promises have been made to him regarding the future of the case.  Nothing more is required.

However, if the Court elects to expand the record supporting the Motion, which it should not do, that record reveals additional troubling conduct at the U.S. Attorney's Office for the Southern District of New York (SDNY).  On February 12, 2025, the recently-resigned Acting U.S. Attorney (U.S. Attorney-2) sent herself a draft letter stating that she was "personally disappointed in [her] predecessor's self-serving actions after his departure. . . ."  Ex. A, Attachment 3.[1]  This

---

[1] In a separate letter-motion filed pursuant to Rule 9(e)(i) of the Court's Individual Practices, the Department has requested that the exhibits to this submission be maintained under seal.

1

previously non-public admission shows that U.S. Attorney-2's subsequent contrived protestations about the viability of the Motion were dubious at best.

Similarly, prior to making the public claim that only a "coward" or "fool" would sign the Motion, a recently-resigned AUSA from the SDNY prosecution team (AUSA-1) wrote the following regarding the letter that SDNY filed with the Court on January 22, 2025: "[U.S. Attorney-1] obviously has political ambitions, and I think suggesting we doubt that just costs us credibility." Ex. B at 2; *see also* ECF No. 102. AUSA-1 also wrote that it was "pretty plausible" to him that U.S. Attorney-1 "had a political motive in bringing this case." *Id.* In a separate message, AUSA-1 explained that he hoped to "distance" the SDNY prosecution team from U.S. Attorney-1, "enough that [Judge] Ho and [President] Trump will know we don't approve of what he did, but not so much that we magnify the scandal." Ex. C. A separate exchange of text messages beginning on November 8, 2024 illustrates why AUSA-1 was later interested in using public filings to send messages to President Trump. Just days after the 2024 election, in response to a text message asking if it was "time" for AUSA-1 to "take a seat on the bench," AUSA-1 responded: "Got to convict Adams before I can think about anything else." Ex. D.

Put simply, the SDNY prosecution team's preference for pretextual public spectacle over adhering to the constitutional order and chain of command is not a basis for prolonging these proceedings. The "scandal" arising from SDNY's handling of this case—to borrow from AUSA-1—requires that the Court immediately grant the Motion.

**DISCUSSION**

## I.  The Legal Standard For Leave To Dismiss An Indictment Under Rule 48(a)

The "leave of court" standard in Rule 48(a) affords the Court with only limited discretion, especially in response to a consented-to motion filed during pretrial proceedings.  The Department has proffered specific reasons for dismissal, there is no risk of harassment to Mayor Adams, and there is no bad faith.  Therefore, the Court should exercise that discretion and grant the Motion.

### A.  The Rule 48(a) Leave-Of-Court Standard

Rule 48(a) "confers the power to file a dismissal by leave of court on the Attorney General . . . ."  Cmt. 2, Fed. R. Crim. P. 48(a).  The government's right to dismiss an indictment prior to trial is "virtually absolute." *United States v. Salim*, 2020 WL 2420517, at *1 (S.D.N.Y. 2020).[2]  "The rationale behind this general rule is that the Executive remains the absolute judge of whether a prosecution should be initiated and the first and presumptively the best judge of whether a pending prosecution should be terminated." *United States v. Doody*, 2002 WL 562644, at *2 (S.D.N.Y. 2002).  Therefore, as discussed in more detail below, any judicial inquiry authorized by Rule 48(a) is narrow, and must be limited to confirming that the prosecution has proffered a non-conclusory basis for dismissal, is not seeking dismissal for the purpose of harassment, and is not acting in bad faith.  All of those requirements are met.

#### 1.  Rule 48(a) Authorizes, At Most, A Narrow And Limited Judicial Inquiry

The main function of the leave-of-court requirement is to require a prosecutor to articulate more than a "mere conclusory" reason for dismissal. *United States v. KPMG LLP*, 2007 WL 541956, at *5 (S.D.N.Y. 2007).  But not much more.

---

[2] Unless otherwise noted, all quotation marks, citations, and alterations are omitted from case citations.

"[T]he 'leave of court' authority in Rule 48(a) . . . confers no new power in the courts to scrutinize and countermand the prosecution's exercise of its traditional authority over charging and enforcement decisions." *United States v. Fokker Servs. B.V.*, 818 F.3d 733, 743 (D.C. Cir. 2016); *see also United States v. Hayden*, 860 F.2d 1483, 1487 (9th Cir. 1988) ("While the judiciary has been authorized to supervise prosecutorial decisions to dismiss, Rule 48(a) was not enacted for the purpose of usurping the traditional role of the prosecutor to determine whether to terminate a pending prosecution."). Courts may not "deny a prosecutor's Rule 48(a) motion to dismiss charges based on a disagreement with the prosecution's exercise of charging authority." *Fokker Servs.*, 818 F.3d at 742; *see also United States v. Rosenberg*, 108 F. Supp. 2d 191, 207 (S.D.N.Y. 2000) ("Neither the trial court nor [an appellate] [c]ourt on appeal can substitute its judgment for the prosecutor's determination or can second guess the prosecutor's evaluation."). Thus, the leave requirement in Rule 48(a) is "no blank check for second-guessing charging decisions." *United States v. Bernard*, 42 F.4th 905, 909 (8th Cir. 2022) (reversing denial of Rule 48(a) motion). That is because "it is not the function of the judiciary to review the exercise of executive discretion whether it be that of the President himself or those to whom he has delegated certain of his powers." *Newman v. United States*, 382 F.2d 479, 482 (D.C. Cir. 1967).

Indeed, "the decision to prosecute is particularly ill-suited to judicial review." *Wayte v. United States*, 470 U.S. 598, 607 (1985). "Such factors as the strength of the case, the prosecution's general deterrence value, the Government's *enforcement priorities*, and the case's relationship to the *Government's overall enforcement* plan are not readily susceptible to the kind of analysis the courts are competent to undertake." *Id.* (emphasis added). "For instance, a court cannot deny leave of court because of a view that the defendant should stand trial notwithstanding

the prosecution's desire to dismiss the charges, or a view that any remaining charges fail adequately to redress the gravity of the defendant's alleged conduct." *Fokker Servs.*, 818 F.3d at 742.

### 2. The Inapposite Prohibition On Prosecutorial Harassment

"The principal object of the 'leave of court' requirement is apparently to protect a defendant against prosecutorial harassment . . . ." *Rinaldi v. United States*, 434 U.S. 22, 29 n.15 (1977). Even where the risk of harassment is an issue, the appropriate remedy is not denial of a Rule 48(a) motion. Rather, "the judge might rightly condition dismissal on its being with prejudice." *In re United States*, 345 F.3d 450, 453 (7th Cir. 2003); *United States v. Garcia-Valenzuela*, 232 F.3d 1003, 1008 (9th Cir. 2000) ("Where a defendant consents to the government's move to dismiss, it is not clear that the district court has any discretion to deny the government's motion."); *United States v. Gonzalez*, 58 F.3d 459, 461 (9th Cir.1995) (same). In any event, "[t]here is no issue of that sort here." *In re United States*, 345 F.3d at 453.

### 3. The "Severely Cabined" And Inapposite Prohibition On Bad Faith

The Second Circuit has also "suggested (in dictum) that any authority a court might have to deny a Rule 48(a) motion would be limited to cases in which dismissal is 'clearly contrary to manifest public interest.'" *United States v. HSBC Bank USA, N.A.*, 863 F.3d 125, 141 (2d Cir. 2017) (quoting *United States v. Pimentel*, 932 F.2d 1029, 1033 n.5 (2d Cir. 1991)).

> [Courts] that have elucidated this 'public interest' test have stressed how 'severely cabined' it is, 'equat[ing] a dismissal that is clearly contrary to the public interest with one in which the prosecutor appears motivated by bribery, animus towards the victim, or a desire to attend a social event rather than trial'—in other words, bad faith."

*Id.* at 141. Characterizing the bad-faith prong of Rule 48(a) as "severely cabined," *id.*, was a significant understatement:

> A judge could not properly refuse to enforce a statute because he thought the legislators were acting in bad faith or that the statute disserved the public interest; it is hard to see,

therefore, how he could properly refuse to dismiss a prosecution merely because he was convinced that the prosecutor was acting in bad faith or contrary to the public interest.

*In re United States*, 345 F.3d at 453; *cf. Barenblatt v. United States*, 360 U.S. 109, 132 (1959) ("So long as Congress acts in pursuance of its constitutional power, the Judiciary lacks authority to intervene on the basis of the motives which spurred the exercise of that power.").

For purposes of any bad-faith inquiry, the prosecution "does not have the burden of proof." *KPMG*, 2007 WL 541956, at *5. There is a "presumption of good faith on the part of the Government in seeking dismissal of charges." *Id.* at *6; *see also Rinaldi*, 434 U.S. at 30 ("Our examination of the record has not disclosed (*and we will not presume*) bad faith on the part of the Government at the time it sought leave to dismiss the indictment against petitioner." (emphasis added)). The presumption is dispositive "in the absence of clear evidence to the contrary." *United States v. Armstrong*, 517 U.S. 456, 464 (1996); *see also United States v. Toyota Motor Corp.*, 278 F. Supp. 3d 811, 813 (S.D.N.Y. 2017) ("[A]bsent any evidence of bad faith, this Court lacks the authority to second-guess the Government's decision seeking dismissal, and must instead ascribe the presumption of regularity to the Government.").

### B. Dismissal Is Required Based On Weaponization

Dismissal is required, on consent, based on the Department's conclusion that this prosecution reflects an improper weaponization of the criminal justice system, which has given rise to "appearances of impropriety and risks of interference with the 2025 elections in New York City." Mot. ¶ 5; *see also* 2/19/25 Tr. 23.

"Judges do not possess, and should not attempt to exercise, prosecutorial discretion." *In re United States*, 572 F.3d 301, 312 (7th Cir. 2009); *see also In re United States*, 503 F.3d 638, 642 (7th Cir. 2007) ("Exercises of prosecutorial discretion may be overseen only to ensure that the prosecutor does not violate the Constitution or some other rule of positive law."). Instead, "[u]nder

Article II, the Executive Branch possesses authority to decide how to prioritize and how aggressively to pursue legal actions against defendants who violate the law." *United States v. Texas*, 599 U.S. 670, 678 (2023). This is "the special province of the Executive Branch," and "the Constitution vests the entirety of the executive power in the President." *Trump v. United States*, 603 U.S. 593, 620 (2024). That authority is "exclusive" and "absolute." *Id*. at 620.

Prosecutors have also cited higher-level Executive Branch policy decisions to support dismissal determinations. *See United States v. Goudarzi*, 2016 WL 750934, at *1 (S.D.N.Y. 2016) ("The conduct of the foreign policy of the United States is committed to the political branches of government and not to the judiciary. It suffices that the government has now set forth considerations in a non-conclusory manner that are not on their face clearly contrary to the public interest."); *see also United States v. Amos*, 2025 WL 275639, at *3 (D.D.C. 2025) (granting dismissal motion based on "government's reliance on a policy assertion made in the presidential proclamation that such prosecutions should not be continued"); *Koskotas v. Roche*, 740 F. Supp. 904, 908 (D. Mass. 1990) ("A *nolle prosequi* of the criminal action was filed in the Southern District of New York on January 17, 1990, citing 'the importance to the foreign policy interests of the United States of completing KOSKOTAS's extradition without undue delay.'"); *cf.* ECF No. 130, *United States v. Bout*, No. 08 Cr. 365 (S.D.N.Y. Nov. 29, 2022) ("The Government respectfully seeks, based on significant foreign policy interests of the United States, an Order enabling the U.S. Marshals Service to take Bout [out of prison]."). Courts did not second-guess those motions.

"The government may elect to eschew or discontinue prosecutions for any of a number of reasons," including a "change" in "Justice Department policy." *United States v. Blaszczak*, 56 F.4th 230, 238-39 (2d Cir. 2022). The *Blaszczak* panel cited *Petite v. United States*, where the

government was permitted to vacate a federal conviction—as opposed to the still-pending charges at issue here—based on the "policy of the Department in discharging its responsibility for the control of government litigation." 361 U.S. 529, 530 (1960). The government reached that conclusion "wholly apart from the question of the legal validity of the claim of double jeopardy," *i.e.*, irrespective of whether the defendant had committed the crime. *Id.*; *see also United States v. Container Corp. of Am.*, 273 F. Supp. 18, 29 (M.D.N.C. 1967) (describing "the publicly announced policy of the Department of Justice to recommend that indictments under the Antitrust Laws be nolle prossed in the event that defendants voluntarily submit a program . . . which goes beyond anything that might be achieved by successful criminal prosecution and which binds them to a course of conduct deemed to be in the public interest").

In this case, the Department has exercised the capacious prosecutorial discretion that supports the Motion pursuant to the anti-weaponization policy articulated by President Trump on his first day in office. Specifically, Executive Order 14147, entitled *Ending the Weaponization of the Federal Government*, sets forth the following policy: "It is the policy of the United States to identify and take appropriate action to correct past misconduct by the Federal Government related to the weaponization of law enforcement . . . ." 90 Fed. Reg. 8235. The express "purpose" of the policy is to "ensure accountability for the previous administration's weaponization of the Federal Government against the American people," which included conduct "oriented more toward inflicting political pain than toward pursuing actual justice or legitimate governmental objectives." *Id.*

It cannot be denied that President Trump's anti-weaponization policy is in the public interest as an important reform in response to recent abuses of the criminal justice system. The purpose of the policy, like the *Petite* policy, "is to protect the individual from any unfairness."

8

*Rinaldi*, 434 U.S. at 31.  "The defendant, therefore, should receive the benefit of the policy whenever its application is urged by the Government."  *Id.*  Here, for the reasons set forth in the Motion and at the February 19, 2025 hearing, that means the pending charges must be dismissed.

### C.  Dismissal Is Required Based On National Security And Immigration Concerns

Dismissal is also required, on consent, based on the Department's independent, alternative conclusion that continuing this prosecution interferes with President Trump's efforts to protect public safety and to manage national security and immigration.  Mot. ¶ 6.  As explained at the February 19, 2025 hearing, these risks arise from, *inter alia*, the fact that the pending prosecution has been used as a basis to deny Mayor Adams access to sensitive information that is needed for him to govern and to help protect New York City in connection with ongoing federal immigration initiatives that implicate national security.  *See* 2/19/25 Tr. 27-28.

Article II provides President Trump with "important foreign relations responsibilities," including "managing matters related to terrorism . . . and immigration."  *Trump*, 603 U.S. at 607.

> It is pertinent to observe that any policy toward aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations, the war power, and the maintenance of a republican form of government.  Such matters are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference.

*Harisiades v. Shaughnessy*, 342 U.S. 580, 588-89 (1952).  Similar to prosecutorial discretion, this authority is "exclusive," and the "discretion in exercising such authority cannot be subject to further judicial examination."  *Trump*, 603 U.S. at 608.  Courts have "no power" to do so.  *Marbury v. Madison*, 5 U.S. 137, 166 (1803).  Accordingly, the Court must grant the Motion.

9

### D. There Is No Evidence Of Bad Faith

There is no evidence of bad faith on the part of the Department—much less the "clear evidence" required by *Armstrong* to rebut the presumption of regularity—in connection with the Motion.

Proposed amici have seized on false claims by SDNY to suggest that the Motion involves some kind of improper *quid pro quo*.  *See, e.g.*, ECF No. 152-1 at 10-12.  These arguments are frivolous to such an extent that they only serve to reveal the underlying improper political motivations of their proponents.  A senior official from the Department has represented to the Court that the Motion is not based on a *quid pro quo*. 2/19/25 Tr. 43-44, 48-49.  More importantly, Mayor Adams swore under oath at the February 19, 2025 hearing that he has no other agreements with the government, unwritten or otherwise, and that nothing else was promised to induce his consent to the Motion.  2/19/25 Tr. 20-21.  Particularly in light of the record created by the Court at that hearing, "[g]eneralized allegations of improper motive do not disturb the presumption of regularity." *United States v. Sanchez*, 517 F.3d 651, 671 (2d Cir. 2008).

As a legal matter, the Department's conclusion that dismissal would serve the public good by deterring weaponization, and promoting Executive Branch national security and immigration objectives, is entirely proper.  Every action that a diligent public servant takes should be designed to advance the public good, which is what the Motion seeks to achieve.  If taking such steps were treated as the equivalent of a personal gift or bribe, whether under the ethics rules or bribery laws, government would literally grind to a halt.  That is why "a proposal to trade one public act for another, a form of logrolling, is fundamentally unlike the swap of an official act for a private payment." *United States v. Blagojevich*, 794 F.3d 729, 734 (7th Cir. 2015).

More broadly, the government routinely requires defendants to commit to undertakings in exchange for leniency.  Sometimes those undertakings involve monetary payments.  *See KPMG*,

2007 WL 541956, at *7 ("[D]eferred prosecution agreements with restitution and/or other monetary components are entirely consistent with the fundamental principle that the Executive Branch alone is vested with the power to decide whether or not to press charges."). Sometimes defendants are required to do even more. In *United States v. Paracha*, the court dismissed terrorism charges based on the conclusion that "dismissing the Indictment under the circumstances presented is the best available option to protect the public and preserve national-security equities." ECF No. 179 ¶ 16, No. 03 Cr. 1197 (S.D.N.Y. Mar. 16, 2020). There, the prosecution conditioned the dismissal on the defendant's agreement "to renounce his status as a lawful permanent resident" and to "immediate repatriation from the United States to Pakistan." *Id.* Defense counsel expressed "serious concerns" that language used by the prosecution in the dismissal motion "unnecessarily risk[ed] compromising" the defendant's "safety in Pakistan." *Id.*, ECF No. 197 at 4. Despite the fact that the defendant in *Paracha* was required to give up important rights, and to risk his physical safety in connection with those forfeitures, the court granted the motion. In contrast, the Department has not asked or required Mayor Adams to do anything.

The decisions by U.S. Attorney-2 and AUSA-1 to resign, rather than carry out their obligations under the Department's chain of command, are not a basis to question the Motion. Each U.S. Attorney's authority is derivate of the Executive Power that the President has delegated to the Attorney General. *See* 28 U.S.C. §§ 503, 509, 515. So too is the residual power of AUSAs, who are removable by the Attorney General. *See* 28 U.S.C. § 542. The Attorney General explained on February 5, 2025 that "it undermines the constitutional order and deprives the President of the benefit of his lawyers" when the Department's attorneys "refuse to advance good-faith arguments . . . ."[3] SDNY's prosecution team and Executive Staff did just that, preferring

---

[3] https://www.justice.gov/ag/media/1388521/dl?inline.

"political theatre" over their obligations to the Constitution and the public.  *Bragg v. Jordan*, 669 F. Supp. 3d 257, 275 (S.D.N.Y. 2023).

SDNY has taken a markedly different tack in other cases by conceding that the office is bound by the Department's senior leadership.  In *Blaszczak*, SDNY felt "constrained" to "confess error at the direction of the Solicitor General's Office" and to ask the Second Circuit to "set aside" *trial convictions* on several fraud counts.  ECF No. 453 at 8, No. 18-2811 (2d Cir. Apr. 2, 2021); *see also id.* at 2 (noting that SDNY was "constrained to follow" the Department's position); *id.* at 12 ("[T]he Government is constrained to concede that the § 641 object of each conspiracy was legally invalid. . . .").  In *Paracha*, an AUSA told the court that, because the dismissal motion had been "approved at the highest levels of the Department of Justice," "w[e] *do not have authority* to make any changes to that document."  ECF No. 197 at 7 (emphasis added), No. 03 Cr. 1197 (S.D.N.Y. Dec. 20, 2019).  Here, too, the SDNY prosecution team lacked authority to countermand a decision authorized by the Attorney General.  Their misconduct is not a basis to extend this litigation, much less deny the Motion.

## II.    The Court Should Not Look Beyond The Motion, But Available Evidence Confirms That Dismissal Is Necessary

In response to the Court's second question, a federal court is not a "roving commission." *HSBC*, 863 F.3d at 137; *see also United States v. Dupris*, 664 F.2d 169, 175 (8th Cir. 1981) ("[W]e are not at liberty, public interest notwithstanding, to depart from 'case and controversy' limits."). Courts "normally decide only questions presented by the parties."  *United States v. Sineneng-Smith*, 590 U.S. 371, 376 (2020).  The Court need not, and should not, test the outer bounds of these propositions in the context of a consented-to Motion seeking pretrial dismissal, which is intended to alleviate appearances of impropriety at SDNY and to protect the public.

Proposed *amici* have claimed that an "evidentiary hearing" and "factual inquiry" are necessary to resolve these questions. ECF No. 152-1. That is false. In *Flynn*, for example, the en banc opinion of the D.C. Circuit, which reversed a panel's decision to grant mandamus relief in response to the district court's extensive reliance on amicus participation, was careful to note that neither the *amicus* nor the district court contemplated fact finding when the mandamus petition was filed. *See In re Flynn*, 973 F.3d 74, 81 (D.C. Cir. 2020) ("As the District Judge's Attorney noted at oral argument, *amicus* does not seek discovery or an evidentiary hearing.").

If the Court elects to expand the record beyond the sworn testimony and representations at the February 19, 2025 hearing, however, the results of the Department's ongoing investigation provide additional support for the Motion. At least one of the prosecutors was as aggressive and careerist as U.S. Attorney-1. For example, on July 18, 2024, AUSA-1 exchanged messages with another AUSA on the SDNY prosecution team (AUSA-2) about efforts to "exclude" a "defense witness" in this case. Ex. E. AUSA-1 remarked that an "invocation is better" than "[l]etting him come in and refuse cross." *Id.* On September 5, 2024, another AUSA on the SDNY prosecution team (AUSA-3) acknowledged in a text message to AUSA-1 that "we did a lot of gymnastics around the influence point" in the Indictment, and argued that "maybe making him the one exploiting the corrupt relationship works better." Ex. F. On November 8, 2024, AUSA-1 received a message with the following question: "You think it's time to take a seat on the bench? Lol." Ex. D. AUSA-1's response included, "Got to convict Adams before I can think about anything else." *Id.*

Members of the SDNY prosecution team also recognized that the conduct of U.S. Attorney-1 was a serious problem. On January 19, 2025, AUSA-1 circulated a draft of the letter SDNY ultimately filed on January 22, 2025, in which the prosecutors argued—wrongly—that Mayor

Adams' "criticism of the article and the fact of its publication are beside the point." ECF No. 102. In the email attaching the draft of the letter, AUSA-1 explained, "[b]asically, I tried to . . . distance us from [U.S. Attorney-1] enough that [Judge] Ho and [President] Trump will know we don't approve of what he did, but not so much that we magnify the scandal." Ex. C. In response to the draft, AUSA-3 argued, "I think we want to create distance between those prosecutors and the [] US Attorney." *Id.* Another AUSA on the SDNY prosecution team (AUSA-4) added, "I agree that we should create some space from [U.S. Attorney-1], but I also think we should avoid anything that looks like us fighting with [U.S. Attorney-1] (which would be counterproductive)." *Id.*

As the SDNY prosecution team continued to debate the substance of the draft letter, AUSA-4 suggested that the prosecutors should argue that Mayor Adams was "wrong about his claim that our prosecution is motivated by [U.S. Attorney-1's] political interests." Ex. C. AUSA-1 pushed back. "I know that none of us were motivated by [U.S. Attorney-1's] political aspirations, but I don't think any of us know for sure what motivated [U.S. Attorney-1]." *Id.* AUSA-1 added the following comments in the draft of the letter:

- "[T]he point to me is just to separate ourselves from [U.S. Attorney-1]."

- "To me the point about the statements not naming EA feels a little too lawyerly—almost a technicality in this context since [U.S. Attorney-1] was obviously referring to EA [in the op-ed]."

- "I don't want to ask anyone to reject the theory that [U.S. Attorney-1] had a political motive in bringing this case. Seems pretty plausible to me."

- "I don't want to say anything that picks a fight with EA's accusation of political ambitions against [U.S. Attorney-1]: [U.S. Attorney-1] obviously has political ambitions, and I think suggesting we doubt that just costs us credibility."

Ex. B.

The prosecution team sent a draft of the letter to SDNY's Executive Staff on January 21, 2025.  Later on January 21, AUSA-1 circulated a revised version of the draft with comment bubbles that included:

- With respect to the "beside the point" sentence that was ultimately included in the letter, AUSA-1 noted that U.S. Attorney-2 "suggested this sentence, which makes the point less oblique—her objection to the prior version—while in my view still preserving our effort to distance ourselves from the article."

- AUSA-1 also noted: "I think we have a sufficiently strong ending without the prior ending (any US attorney would signed) which [U.S. Attorney-2] and others felt might be read as an attempt to hem in the new crew at main justice before they had a chance to weigh in on the case."

Ex. G, Attachment 1.  In a separate message, AUSA-1 asserted that he preferred a strategy that "buys us more credibility by first making clear we're not defending the [U.S. Attorney-1] article before then going on the attack."  Ex. H.

The Department directed SDNY to dismiss the charges on February 10, 2025.  *See* ECF No. 128-2.  On February 11, U.S. Attorney-2 sent an email attaching draft materials relating to her anticipated resignation.  Ex. A.  One of the documents was named "Adams PR," *i.e.*, press release, which suggests that she was already planning to publicize her resignation.  Ex. A, Attachment 1.  A another document, styled as a letter to the Attorney General, included the assertion that U.S. Attorney-2 "was personally disappointed in my predecessor's self-serving actions after his departure, including the creation of a personal website."  Ex. A, Attachment 3.  The draft letter also noted, in highlighted text, that "the Attorney General has the authority to order the dismissal of pending charges."  *Id.*  On the day after sending the drafts, U.S. Attorney-2 emailed a letter to the Attorney General that omitted this language and claimed falsely: "The Government Does Not Have a Valid Basis To Seek Dismissal."  ECF No. 128-3.

It is thus apparent from the context that, just as AUSA-1 hoped to convict Mayor Adams as the last notch in his belt before he took a "seat on the bench," Ex. D, U.S. Attorney-2 relied on pretextual arguments to try to justify insubordination in furtherance of the mistaken belief that SDNY's interest in obtaining a conviction could override President Trump's valid policy objectives and the discretion of the Department's senior leadership. Accordingly, although the Court should not expand the record prior to granting the Motion, any additional inquiry will not reflect well on SDNY.

## III.    No Further Procedural Steps Are Appropriate

In response to the Court's third question, no additional steps are appropriate prior to granting the Motion. The Court's February 19, 2025 hearing addressed the public's "generalized interest in the processes through which prosecutors make decisions about whom to prosecute," which "a court can serve by inquiring into the reasons for a requested dismissal." *In re Richards*, 213 F.3d 773, 789 (3d Cir. 2000).

Although "[j]udges often are tempted to seek a larger role in the conduct of litigants that appear frequently before them," that "temptation must be resisted in order to maintain separation between executive and judicial roles." *In re United States*, 398 F.3d 615, 618 (7th Cir. 2005). "[W]here a Rule 48(a) motion is uncontested and the parties' good faith is not in doubt," no supplemental inquiry is warranted. *HSBC*, 863 F.3d at 141. To proceed otherwise would set "coequal branches of the Government . . . on a collision course," in which "[t]he Judiciary is forced into the difficult task of balancing the need for information in a judicial proceeding and the Executive's Article II prerogatives." *Cheney v. U.S. Dist. Ct. for D.C.*, 542 U.S. 367, 389 (2004). Unwarranted "[j]udicial supervision in this area . . . entails systemic costs of particular concern." *Wayte*, 470 U.S. at 607; *see also In re Sealed Case No. 98-3077*, 151 F.3d 1059, 1065 (D.C. Cir.

1998) (reasoning that "procedural orders" that "involve discovery and an adversarial hearing" result in "irreparable" harm).

## IV.    Dismissal Should Be Without Prejudice

In response to the Court's fourth question, "[s]everal circuits, including the Second Circuit, have recognized that a dismissal pursuant to Rule 48(a) is generally without prejudice." *United States v. Rosenberg*, 108 F. Supp. 2d 191, 207 (S.D.N.Y. 2000); *see also United States v. Gogarty*, 533 F.2d 93, 95 (2d Cir. 1976). The Department does not believe that a departure from this default rule is necessary in this case.

## V.    The Court Cannot Compel The Department To Devote Resources To This Flawed Case

In response to the Court's fifth question, the Justice Department has assumed responsibility for this case and determined that it should not be prosecuted. If leave is denied, the only additional resources the Department would devote to the matter would be to restore the Rule of Law on appeal. *See In re Richards*, 213 F.3d at 786 ("[T]he substantive reach of the rule appears to be effectively curtailed by the fact that even if the judge denies the motion to dismiss, there seems to be no way to compel the prosecutor to proceed."); *see also ICC v. Brotherhood of Locomotive Engineers*, 482 U.S. 270, 283 (1987) ("[I]t is entirely clear that the refusal to prosecute cannot be the subject of judicial review.").

## VI.    Apparent Deficiencies In SDNY's Bribery Theory Also Support Dismissal

In response to the Court's sixth question, the Department's conclusion that dismissal is necessary is further supported by serious doubts about the legal viability of certain aspects of SDNY's bribery theory. *See* 2/19/25 Tr. 22 ("I do have other concerns . . . .").

Over the last decade, the Supreme Court has repeatedly, consistently, and at times unanimously rejected overbroad prosecution theories that threaten to criminalize routine political

conduct. *McDonnell v. United States*, 579 U.S. 550 (2016); *Kelly v. United States*, 590 U.S. 391 (2020); *Percoco v. United States*, 598 U.S. 319 (2023); *Snyder v. United States*, 603 U.S. 1 (2024). *Percoco* originated in the Southern District of New York, along with a companion case, *Ciminelli v. United States*, 598 U.S. 306 (2023). SDNY failed to garner a single vote across the two.

The through-line of the Supreme Court's jurisprudence in this area is that federal bribery law only "prohibits *quid pro quo* corruption—the exchange of a thing of value for an official act." *McDonnell*, 579 U.S. at 574. The essence of bribery is the corruption of *public power*, which occurs when official action is traded for illicit gain. *See Snyder*, 603 U.S. at 18. "Ingratiation and access," by contrast, "are not corruption"—and may in fact be protected by the First Amendment. *See Citizens United v. FEC*, 558 U.S. 310, 360 (2010). Moreover, under binding precedent, campaign-contribution bribery triggers a materially higher standard in light of the constitutional considerations at stake. *McCormick v. United States*, 500 U.S. 257, 271 (1991).

It is incumbent on local, unelected federal prosecutors to hew closely to this line, resisting the urge to impose their personal views of good government on the Nation. There is significant tension between that principle and this case. *See United States v. Adams*, 2024 WL 5131704, at *10 (S.D.N.Y. 2024) ("It is not inconceivable that the Second Circuit or the Supreme Court might, at some point in the future, hold that an 'official act' as defined in *McDonnell* is necessary under § 666, at least as to government actors."); *id.* at *11 ("Mayor Adams's arguments on this point have some force."); *id*. at *15. ("Mayor Adams raises fair questions about the timing of the alleged *ex ante* agreement regarding the TCO"). While the Department's concerns regarding weaponization, election interference, national security, and immigration policy are controlling, the apparent weakness in SDNY's overly aggressive charging theory is another reason that the Motion is in the public interest.

18

## CONCLUSION

For the foregoing reasons, as well as those stated in the Motion and explained at the

February 19, 2025 hearing, the Court should promptly grant the Motion.

Dated: March 7, 2025

Todd Blanche
Deputy Attorney General
United States Department of Justice

Emil Bove
Principal Associate Deputy Attorney General
United States Department of Justice