*United States v. Adams*, No. 24 Cr. 556 (DEH)

Exhibit A

March 25, 2025 Government Submission

| | |
|---|---|
| **From:** | Sassoon, Danielle (USANYS) |
| **To:** | Sassoon, Danielle (USANYS) |
| **Date:** | Tuesday, February 11, 2025 9:29:10 AM |
| **Attachments:** | Adams PR.docx |
| | SDNY memo re Dismissal.docx |
| | Adams.docx |

Danielle R. Sassoon
United States Attorney
Southern District of New York

Attachment 1 to Exhibit A

"Adams PR"

As you know, I was directed to dismiss the case against Eric Adams. Without questioning the authority of the President, through the Attorney General to issue such an order, I will not be the agent of a decision that I consider unjust and contrary to my obligations as U.S. Attorney. So I have resigned.

The case team investigating and prosecuting Eric Adams

without fear, favor, sympathy, or

prejudice

and this office's ability and duty to prosecute federal crimes without fear or favor.

I want no part of this political bargain

Have heard many US attorneys say that the best job they ever had was being a line assistant. That may be true, but the past three weeks have been some of the best of my life. It's been the ultimate privilege to learn about

Don't feel sorry for me. Best 8 years. Honor to be in this role at this time and do what I think is right

Do right thing right way for right reason. Sometimes without obstacle. But even when obstacles are there, should be easy.

Attachment 2 to Exhibit A

"SDNY memo re Dismissal"



**U.S. Department of Justice**
*United States Attorney*
*Southern District of New York*

# Memorandum

| | |
|---|---|
| **From:** | Danielle R. Sassoon, United States Attorney |
| **To:** | Attorney General Pam Bondi |
| **Dated:** | February 11, 2025 |
| **Re:** | *United States v. Eric Adams*, 24 Cr. 556 (DEH) |

---

This memorandum is submitted in response to the February 10, 2025 memo of acting Deputy Attorney General Emil Bove, directing this U.S. Attorney's Office to dismiss the above indictment without prejudice, subject to certain conditions. It does not repeat the evidence against Adams that proves beyond a reasonable doubt that he committed serious federal crimes; Mr. Bove has never called into question that the case team conducted this investigation with integrity and that the charges against Adams are serious and supported by fact and law. Rather, this memorandum addresses only why the contemplated dismissal would be inconsistent with the law, the facts, and this office's ability and duty to prosecute federal crimes without fear or favor.

## I. Discussion

### A. The Government Does Not Have a Good-Faith Basis for Seeking Dismissal Without Prejudice

Mr. Bove's memorandum identifies two grounds for the contemplated dismissal. Neither can reasonably be considered consistent with the law.

*First*, Mr. Bove proposes dismissing the charges against Adams in return for his assistance in enforcing the federal immigration laws, analogizing to the prisoner exchange in which the United States freed notorious Russian arms dealer Victor Bout in return for an American prisoner in Russia. Such an exchange with Adams violates commonsense beliefs in the equal administration of justice, the Justice Manual, and the Rules of Professional Conduct. The "commitment to the rule of law is nowhere more profoundly manifest" than in criminal justice. *Cheney v. United States Dist. Ct.*, 542 U.S. 367, 384 (2004) (alterations and citation omitted). Impartial enforcement of the law is the bedrock of federal prosecutions. *See* Robert H. Jackson, The Federal Prosecutor, 24 J. Am. Jud. Soc'y 18 (1940). As the Justice Manual has long recognized, "the rule of law depends upon the evenhanded administration of justice. The legal judgments of the Department of Justice must be impartial and insulated from political influence." JM § 1-8.100. But Adams has effectively argued—and Mr. Bove appears prepared to concede— that Adams should receive leniency for federal crimes solely because he occupies an important public position, necessarily meaning that a less powerful American citizen would be treated more harshly.

But federal prosecutors may not consider a potential defendant's "political associations, activities, or beliefs." *Id.* § 9-27.260; *see also Wayte v. United States*, 470 U.S. 598, 608 (1985) (politically motivated prosecutions violate the Constitution). If a criminal prosecution cannot be used to punish political activity, it likewise cannot be used to induce or coerce such activity. Threatening criminal prosecution even to gain an advantage in civil litigation is considered misconduct for an attorney. *See, e.g.*, D.C. Bar Ethics Opinion 339; ABA Criminal Justice Standard 3-1.6 ("A prosecutor should not use other improper considerations, such as partisan or political or personal considerations, in exercising prosecutorial discretion."). In the Attorney General's own words, "the Department of Justice will not tolerate abuses of the criminal justice process, coercive behavior, or other forms of misconduct." Dismissal of the Indictment for no other reason than to influence Adams's mayoral decision-making would be all three.

To the extent the Memo suggests that the issue is merely removing an obstacle to Adams's ability to assist with federal immigration enforcement, that excuse does not bear scrutiny. It does not grapple with the differential treatment Adams would receive compared to other elected officials, much less ordinary criminal defendants. And it is entirely unclear why Adams would be better able to aid in immigration enforcement when the threat of future conviction is due to the possibility of reinstatement of the indictment followed by conviction at trial, rather than merely the possibility of conviction at trial. On this point, the possibility of trial before or after the election cannot be relevant, because Adams has selected the timing of his trial.

Rather than be rewarded, Adams's advocacy should be called out for what it is: an improper effort to withhold immigration assistance in exchange for a dismissal of his case. Although Mr. Bove previously disclaimed any intention to exchange leniency in this case for Adams's assistance in enforcing federal law, it no longer seems plausible to deny the nature of the bargain intended here. That is especially so given Mr. Bove's comparison to the Bout prisoner exchange, which was quite expressly a *quid pro quo*, but one carried out by the White House, and not the line prosecutors in charge of Bout's case.[1]

The comparison to the Bout exchange is particularly alarming. That prisoner swap was an exchange of official acts between separate sovereigns (the United States and Russia), neither of which had any claim that the other should obey its laws. By contrast, Adams is an American citizen who is seeking a personal benefit—immunity from federal laws to which he is undoubtedly subject—in exchange for an act—enforcement of federal law—he has no right to refuse. Moreover, the Bout exchange was a widely criticized sacrifice of a valid American interest (the punishment of an infamous arms dealer) which Russia was able to extract only through a patently selective prosecution of a famous America athlete.[2] It is difficult to imagine that the Department wishes to emulate that episode by granting Adams leverage over it akin to Russia's influence in

---

[1] It is typical for participants in a *quid pro quo* to deny they are engaging in such. And while Mr. Bove quotes our Office's characterization of his statements made during with the meeting with Adams's counsel, he admonished a member of our team who took notes during that meeting and directed the collection and shredding of those notes at the meeting's conclusion.

[2] *See, e.g.*, https://thehill.com/homenews/3767785-trump-pans-prisoner-swap-brittney-griner-hates-our-country/.

international affairs. Nor will a court likely find that such an improper exchange is consistent with the public interest. *See United States v. N.V. Nederlandsche Combinatie Voor Chemische Industrie ("Nederlandsche Combinatie")*, 428 F. Supp. 114, 116-17 (S.D.N.Y. 1977) (denying Government's motion to dismiss under Rule 48(a) where Government had agreed to dismiss charges against certain defendants in exchange for guilty pleas by others); *cf. In re United States*, 345 F.3d at 453 (describing a prosecutor's acceptance of a bribe as a clear example of a dismissal that should not be granted as contrary to the public interest).

*Second*, Mr. Bove states that dismissal is warranted because of the conduct of this office's former U.S. Attorney, Damian Williams, which he asserts constituted weaponization of government as defined by the relevant orders of the President and the Attorney General. The generalized concerns expressed by Mr. Bove are not a basis to dismiss an indictment returned by a duly-constituted grand jury, at least where the Government has no doubt in its evidence or the integrity of its investigation, which began before, and continued after, Mr. Williams's tenure.

As Mr. Bove's memo acknowledges, and as he stated in our meeting of January 31, 2025, the Department has no concerns whatsoever about the conduct or integrity of the line prosecutors who investigated and charged this case, and it does not question the merits of the case itself. The investigation began before Williams took office, he did not manage the day-to-day investigation, and the charges in this case were recommended or approved by four experienced career prosecutors, the Co-Chiefs of the SDNY Public Corruption Unit, and career prosecutors at the Public Integrity Unit at Main Justice. Williams's decision to ratify their recommendations does not taint the charging decision. And notably, Adams has not brought a vindictive or selective prosecution motion, nor would one be successful. *See United States v. Stewart*, 590 F.3d 93, 121-23 (2d Cir. 2009); *cf. United States v. Biden*, 728 F. Supp. 3d 1054, 1092 (C.D. Cal. 2024) (rejecting argument that political public statements disturb the "'presumption of regularity' that attaches to prosecutorial decisions").

Any alleged taint from Mr. Williams's oversight of the case can be cured by means well short of a dismissal. Our Office is prepared to seek a superseding indictment from a new grand jury under my leadership; it has already proposed to do so as part of a superseding indictment that would add an obstruction conspiracy count to the indictment. That is more than enough to address any perception of impropriety created by Mr. Williams's personal conduct. The Bove memo acknowledges as much, leaving open the possibility of refiling charges after the November 2025 New York Mayoral Election. Nor is conditioning the dismissal on the incoming U.S. Attorney's ability to re-assess the charges consistent with either the weaponization rationale or the law concerning motions under Rule 48(a) of the Federal Rules of Criminal Procedure, which governs motions to dismiss an indictment. To the contrary, keeping Adams under the threat of prosecution while the Government determines its next steps is a recognized reason for the *denial* of a Rule 48(a) motion. *See United States v. Poindexter*, 719 F. Supp. 6, 11-12 (D.D.C. 1989) (allowing Government to "to keep open the option of trying [certain] counts" would effectively keep the defendant "under public obloquy for an indefinite period of time until the government decided that, somehow, for some reason, the time had become more propitious for proceeding with a trial.").

Regarding the timing of the indictment, the decision to charge in September 2024—nine months before the June 2025 Democratic Mayoral Primary and more than a year before the

November 2025 Mayoral Election—complied with longstanding Department policy regarding election year sensitivities. It is also consistent with charging timelines of other cases involving elected officials, both in this District and elsewhere. *See, e.g., United States v. Robert Menendez*, 23 Cr. 490 (SHS) (S.D.N.Y.) (indictment in September 2023); *United States v. Duncan Hunter*, 18 Cr. 3677W (S.D. Cal.) (indictment in August 2018). I am not aware of any instance in which the Department has concluded that an indictment brought this far in advance of an election is improper because it may be pending during an electoral cycle. Moreover, when first setting the trial date, the District Court and the parties agreed on the importance of completing the trial *before* the upcoming mayoral election—including before the Democratic primary in which Adams is a candidate—so that the voters would know how the case resolved before casting their votes. (*See* Dkt. 31 at 38-43). Adams has decided that he would prefer the trial to take place before rather than after the June 2025 primary, notwithstanding the burden trial preparation would place on his ability to govern the City or campaign for re-election. But that is his choice, and the District Court has made clear that Adams is free to seek a continuance. (*See* Dkt. 113 at 18). The parties therefore cannot argue with candor that dismissing serious charges before an election, but holding open the possibility that those charges could be reinstated if Adams were re-elected, would now be other than "clearly contrary to the manifest public interest." *United States v. Blaszczak*, 56 F.4th 230, 239 (2d Cir. 2022) (internal quotation marks omitted).[3]

With respect to pretrial publicity, the District Court has already determined that Williams's statements have not prejudiced the jury pool. The District Court has also repeatedly explained that there is no evidence that any leaks to the media came from the prosecution team—although there is evidence media leaks came from the defense team—and no basis for any relief. (*See* Dkt. 103 at 3-6; Dkt. 49 at 4-21). (Adams also has not sought to transfer the location of the trial.) Williams's recent op-ed, the Court concluded, generally talks about bribery in New York *State*, and so is not a comment on the case. (Dkt. 113 at 6 n.5). Williams's website does not even reference Adams except in one of many news articles linked there. (*See* Dkt. 99 at 3). And it is well settled that the U.S. Attorney in this and other districts regularly conduct post-arrest press conferences. *See United States v. Avenatti*, 433 F. Supp. 3d 552, 567-69 (S.D.N.Y. 2020) (describing the practice); *see also, e.g.*, "New Jersey U.S. Attorney's Office press conference on violent crime," Youtube, https://www.youtube.com/watch?v=oAEDHQCE91A (announcing criminal charges against 42 defendants). In short, because there is in fact nothing about this prosecution that meaningfully differs from other cases of significant public interest that generate substantial pretrial publicity, a court is likely to view the weaponization rationale as pretextual.

### B. Adams's Consent Will Not Likely Aid the Department's Arguments

In the typical case, the defendant's consent makes it significantly more likely for courts to grant Rule 48(a) motions. *See United States v. Welborn*, 849 F.2d 980, 983 (5th Cir. 1988) ("if

---

[3] To the extent Mr. Bove's concerns specifically relate to the possibility that Williams will challenge Adams in the 2025 Mayoral election, the period for collecting signatures to obtain ballot access for the primary begins on February 25, 2025. *See* "2025 Political Calendar," Board of Elections, *https://elections.ny.gov/system/files/documents/2024/12/2025-political-calendar-quad-fold-final-12.5.2024.pdf*. Accordingly, the validity of that theory will become evident imminently, and well before trial.

the motion is uncontested, the court should ordinarily presume that the prosecutor is acting in good faith and dismiss the indictment without prejudice"). But Adams's consent—which was negotiated without my Office's awareness or participation—would not guarantee a successful motion, given the basic flaws in the Department's rationales. *See Nederlandsche Combinatie,* 428 F. Supp. at 117 (declining to "rubber stamp" dismissal because although defendant did not appear to object, "the court is vested with the responsibility of protecting the interests of the public on whose behalf the criminal action is brought").

The Government "may, with leave of court, dismiss an indictment" under Rule 48(a) of the Federal Rules of Criminal Procedure. "The principal object of the 'leave of court' requirement is apparently to protect a defendant against prosecutorial harassment, *e.g.*, charging, dismissing, and recharging, when the Government moves to dismiss an indictment over the defendant's objection." *Rinaldi v. United States,* 434 U.S. 22, 30 n.15 (1977). "But the Rule has also been held to permit the court to deny a Government dismissal motion to which the defendant has consented if the motion is prompted by considerations clearly contrary to the public interest." *Id.*; *see also* JM 9-2.050 (reflecting Department's position that a "court may decline leave to dismiss if the manifest public interest requires it).

"Rarely will the judiciary overrule the Executive Branch's exercise of these prosecutorial decisions." *Blaszczak*, 56 F.4th at 238. But courts, including the Second Circuit, will nonetheless inquire as to whether dismissal would be clearly contrary to the public interest. *See, e.g., id.* at 238-42 (extended discussion of contrary to public interest standard and cases applying it); *see also* JM 9-2.050 (requiring "a written motion for leave to dismiss . . . explaining fully the reason for the request" to dismiss for cases of public interest as well as for cases involving bribery). Although it appears rare, at least one court in our district has rejected a dismissal under Rule 48(a) as contrary to the public interest, regardless of the defendant's consent. *See Nederlandsche Combinatie*, 428 F. Supp. At 116-17 ("After reviewing the entire record, the court has determined that a dismissal of the indictment against Mr. Massaut is not in the public interest. Therefore, the government's motion to dismiss as to Mr. Massaut must be and is denied.").

The cases show some inconsistency concerning what courts should do if they find the standard for dismissal without prejudice not met. Some have instead dismissed indictments with prejudice. *See, e.g., United States v. Madzarac*, 678 F. Supp. 3d 43 (D.D.C. 2023). The better-reasoned view, however, is that courts considering a Rule 48(a) motion to dismiss without prejudice must either grant or deny the motion as made—they cannot grant the dismissal, but do so with prejudice, unless the Government consents. *See United States v. B.G.G.*, 53 F.4th 1353, 1369 (11th Cir. 2022) ("[R]ule 48(a) does not give the district court the discretion to rewrite the government's dismissal motion from one without prejudice to one with prejudice."); *United States v. Flotron*, 17 Cr. 00220 (JAM), 2018 WL 940554, at *5 (D. Conn. Feb. 19, 2018) (denying Government's motion to dismiss without prejudice as contrary to public interest and requiring Government to proceed to trial); *see also In re United States*, 345 F.3d 450, 453 (7th Cir. 2003) (suggesting that courts might condition grant of Rule 48(a) motion on Government's consent that prejudice attach).

The assigned District Judge, the Honorable Dale E. Ho, appears likely to conduct a searching inquiry in this case. Although Judge Ho is a recent appointee with little judicial track record, he has resolved the motions in this case in lengthy written opinions that included research

5

beyond the parties' submissions. He has also stressed transparency during this case, specifically explaining his strict requirements for non-public filings at the initial conference (*see* Dkt. 31 at 48-49). That is consistent with his background as a litigator, where he represented the ACLU and other NGOs in various immigration-related cases, including *Department of Commerce v. New York*, 588 U.S. 752 (2019), in which he convinced the Supreme Court to find that the Government's stated rationale for taking the challenged action was pretextual and therefore invalid. Given that Judge Ho will find precedent supporting a similarly rigorous inquiry here, it appears likely he will conduct one.

Nor is there any realistic possibility that Adams's consent will prevent a lengthy judicial inquiry that is detrimental to the Department's reputation, regardless of outcome. In that regard, although the *Flynn* case may come to mind as a comparator, it is distinct in one important way. In that case, the Government moved to dismiss an indictment with the defendant's consent and faced resistance from a skeptical district judge. But in *Flynn*, the Government sought dismissal with prejudice because it had become convinced that there was insufficient evidence that General Flynn had committed any crime. That ultimately made the Government's rationale defensible, because "[i]nsufficient evidence is a quintessential justification for dismissing charges." *In re Flynn*, 961 F.3d 1215, 1221 (D.C. Cir.), *reh'g en banc granted, order vacated*, No. 20-5143, 2020 WL 4355389 (D.C. Cir. July 30, 2020), and *on reh'g en banc*, 973 F.3d 74 (D.C. Cir. 2020). Here no one in the Department has expressed any doubts as to Adams's guilt, and even in *Flynn*, the President ultimately chose to cutoff the extended and embarrassing litigation over dismissal by granting a pardon.

### C. The United States Attorney's Office Cannot in Good Faith Request the Contemplated Dismissal

For the reasons just explained, I do not believe there are reasonable arguments in support of a Rule 48(a) motion to dismiss a case that is well supported by the evidence and the law. I understand that Mr. Bove disagrees, and I am mindful of the Attorney General's recent order reiterating prosecutors' duty to make good-faith arguments in support of the Executive Branch's positions. *See* Feb. 5, 2025 Mem. "General Policy Regarding Zealous Advocacy on Behalf of the United States." But because I do not see any good-faith basis for the proposed position, I cannot make such arguments consistent with my duty of candor. N.Y.R.P.C. 3.3; *id.* cmt. 2 ("A lawyer acting as an advocate in an adjudicative proceeding has an obligation to present the client's case with persuasive force. Performance of that duty while maintaining confidences of the client, however, is qualified by the advocate's duty of candor to the tribunal.").

In particular, the rationale given by Mr. Bove—an exchange between a criminal defendant and the Department of Justice akin to the Bout exchange with Russia—is, as explained above, a fundamentally corrupt bargain. Moreover, the Department's attempt to maintain leverage over Adams by dismissing without prejudice and with the express option of again indicting him in the future creates obvious ethical problems, by implicitly threatening future prosecution if Adams's cooperation with enforcing the immigration laws proves unsatisfactory to the Department. *See In re Christoff*, 690 N.E.2d 1135 (Ind. 1997) (disciplining prosecutor for threatening to renew a dormant criminal investigation against a potential candidate for public office in order to dissuade the candidate from running); Bruce A. Green & Rebecca Roiphe, *Who Should Police Politicization of the Doj?*, 35 Notre Dame J.L. Ethics & Pub. Pol'y 671, 681 (2021) (noting that the Arizona

6

Supreme Court disbarred the elected chief prosecutor of Maricopa County, Arizona, and his deputy, in part, for misusing their power to advance the chief prosecutor's partisan political interests). Finally, given the highly generalized accusations of weaponization, weighed against the strength of the evidence against Adams, this office cannot regard it as other than pretextual—a straightforward conclusion courts will likely share. *See, e.g., United States v. Greater Blouse, Skirt & Neckward Contractors*, 228 F. Supp. 483, 487 (S.D.N.Y. 1964) (courts "should be satisfied that the reasons advanced for the proposed dismissal are substantial and the real grounds upon which the application is based").

I remain baffled by the rushed and superficial process by which this decision was reached, in seeming collaboration with Adams's counsel and without my direct input on the ultimate stated rationales for dismissal. Mr. Bove admonished me to be mindful of my obligation to zealously defend the interests of the United States and to advance good-faith arguments on behalf of the Administration. It should be uncontroversial that soliciting and considering the concerns of the U.S. Attorney overseeing the case serves rather than hinders that goal.

When I took my oath of office three weeks ago, I vowed to well and faithfully discharge the duties of the office on which I was about to enter. You and I have yet to meet, let alone discuss this case. I deem it necessary to the faithful discharge of my duties to raise the concerns expressed in this letter with you and to request an opportunity to meet to discuss them further. I cannot fulfill my ethical obligations, effectively lead my office in carrying out the Administration's priorities, or credibly represent my office before the courts, if I seek to dismiss the Adams case on this record.

In the alternative, if you are unwilling to meet, I offer my resignation. In the event of my resignation, I intend to publicly express my reasons for declining to carry out the directive delivered by Mr. Bove, despite your authority to make that demand.

Attachment 3 to Exhibit A

"Adams"

Dear Attorney General Bondi:

I am writing to schedule a meeting with you to discuss the directive from Acting Deputy Attorney General Emil Bove III to dismiss the pending charges in *United States v. Adams*, No. 24 Cr. 556 (SDNY). When I took my oath of office three weeks ago, I vowed to well and faithfully discharge the duties of the office on which I was about to enter. I deem it necessary to the faithful discharge of my duties to meet with you before taking any additional action on a directive to dismiss a case for reasons that Mr. Bove acknowledges have nothing to do with an assessment of the strength of the evidence or the legal theories on which the case is based. Indeed, during our meeting on January 31, 2025, and in our conversations since, Mr. Bove has never called into question that the case team conducted this investigation with integrity and that the charges against Adams are serious and supported by fact and law.

Mr. Bove admonished me to be mindful of your recent policy memorandum reiterating the duty of those serving in the Department of Justice to zealously defend the interests of the United States and to advance good-faith arguments on behalf of the Administration. It should be uncontroversial that honoring a request to discuss the case directly, and the rationale for the abrupt directive to dismiss the charges, serves rather than hinders that goal. While the Attorney General has the authority to order the dismissal of pending charges, the goal of restoring faith in the Department of Justice is harmed by forcing such action without considering the concerns of the U.S. Attorney overseeing the case. A considered decision that is in the interests of justice would only benefit from my direct input.

I have not been given any opportunity to raise my concerns with you and the restricted discussions with Mr. Bove to date are no substitute. I will describe them briefly here. Mr. Bove first indicated to me on January 27, 2025, that he was leaning toward seeking to have the case dismissed without prejudice. I expressed concern that a decision should not be reached prior to the confirmation of the President's nominee for Deputy Attorney General, Todd Blanche. Mr. Bove informed me that Todd Blanche was on the "same page," and there was "no need to wait."

Subsequently, Mr. Bove allotted my team forty minutes to address the chronology of the investigation, and another forty minutes to hear from Adams's attorneys about the impact of the case on his ability to govern and assist in the Administration's immigration efforts. That simply does not suffice. The nature of the discussion to date have also been alarming. Mr. Bove directed a member of my team to shred his notes after our meeting with defense counsel. My request to receive a copy of Adams's post-meeting submission dated February 3, 2025, was ignored until after I received the directive to dismiss the case and renewed my request.

I was also never provided an opportunity to address a number of issues that bear on the decision to seek dismissal of the case. While I was personally disappointed in my predecessor's self-serving actions after his departure, including the creation of a personal website, there are myriad ways to address any arising prejudice or perception of weaponization well short of a dismissal—steps routinely taken in other cases with pretrial publicity—but I have never had a chance to raise them. My assessment that a judge will view a request to dismiss without prejudice with skepticism, even on the parties' consent, was summarily dismissed, despite prior practice and precedent that merit further consideration before acting impulsively. And Adams's advocacy should be called out for what it is: an improper effort to withhold immigration assistance in exchange for a dismissal of his

case. Mr. Bove's comparison to the Victor Bout prisoner exchange is particularly telling—that was a political decision made by the prior Administration without the participation or blessing of the U.S. Attorney. Such political decisions are the prerogative of the President—whether via the pardon power, or in Bout's case, a prisoner exchange—rather than the responsibility of prosecutors whose duty is to pursue justice without fear or favor.

I remain baffled by the urgent and superficial process by which this decision was reached. I cannot effectively lead my office in carrying out the Administration's priorities, or credibly represent my office before the courts, if I seek to dismiss the Adams case on this record.

I am available to travel to Washington D.C. at your convenience, limited only by any instructions by my doctor to limit travel before my baby's due date in early March.