UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

# 22 MAG 9730

In the Matter of a Warrant for All
Content and Other Information
Associated with the iCloud Account
███████████ @aol.com
Maintained at Premises Controlled by
Apple Inc., USAO Reference No.
2021R00778

**TO BE FILED UNDER SEAL**

**AGENT AFFIDAVIT**

**Agent Affidavit in Support of Application for a Search Warrant
for Stored Electronic Communications**

STATE OF NEW YORK          )
                           ) ss.
COUNTY OF NEW YORK   )

███████████ , being duly sworn, deposes and states:

## I. Introduction

### A.  Affiant

1.  I have been a Special Agent with the Federal Bureau of Investigation ("FBI") for over three years.  I am assigned to a public corruption squad in the FBI's New York office and have participated in investigations involving campaign finance offenses and public corruption.  As part of those investigations, I have participated in the execution of search warrants involving electronic evidence.

### B.  The Provider, the Subject Account and the Subject Offenses

2.  I make this affidavit in support of an application for a search warrant pursuant to 18 U.S.C.  §  2703 for all content and other information associated with the iCloud account ███████████ @aol.com (the "Subject Account"), maintained and controlled by Apple Inc. (the "Provider"), headquartered at 1 Infinite Loop, Cupertino, California 95014. The information to be searched is described in the following paragraphs and in Attachment A to the proposed warrant.

09.20.2021

2

SDNY_01_000004435
SUBJECT TO PROTECTIVE ORDER.

3.   As detailed below, there is probable cause to believe that the Subject Account contains evidence, fruits, and instrumentalities of theft of federal funds and wire fraud, and conspiracy to commit the same, in violation of 18 U.S.C. §§ 371, 666, 1343, and 1349 (the "Subject Offenses"). This affidavit is based upon my personal knowledge, my review of documents and other evidence, and my conversations with other law enforcement officers, as well as my training and experience concerning the use of email in criminal activity. Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts I have learned during my investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

**C.  Services and Records of the Provider**

4.   I have learned the following about the Provider:

a.   Apple is a United States company that produces the iPhone, iPad, and iPod Touch, all of which use the iOS operating system, and desktop and laptop computers based on the Mac OS operating system.

b.   Apple provides a variety of services that can be accessed from Apple devices or, in some cases, other devices via web browsers or mobile and desktop applications ("apps"). As described in further detail below, the services include email, instant messaging, and file storage:

i.  Apple provides email service to its users through email addresses at the domain names mac.com, me.com, and icloud.com.

ii. iMessage and FaceTime allow users of Apple devices to communicate in real-time.  iMessage enables users of Apple devices to exchange instant messages ("iMessages") containing text, photos, videos, locations, and contacts, while FaceTime enables those users to conduct audio and video calls.

3

09.20.2021

SDNY_01_000004436
SUBJECT TO PROTECTIVE ORDER.

iii.  iCloud is a cloud storage and cloud computing service from Apple that allows its users to interact with Apple's servers to utilize iCloud-connected services to create, store, access, share, and synchronize data on Apple devices or via icloud.com on any Internet-connected device.  For example, iCloud Mail enables a user to access Apple-provided email accounts on multiple Apple devices and on iCloud.com.  iCloud Photo Library and My Photo Stream can be used to store and manage images and videos taken from Apple devices, and iCloud Photo Sharing allows the user to share those images and videos with other Apple subscribers. iCloud Drive can be used to store presentations, spreadsheets, and other documents.  iCloud Tabs and bookmarks enable iCloud to be used to synchronize bookmarks and webpages opened in the Safari web browsers on all of the user's Apple devices.  iCloud Backup allows users to create a backup of their device data.  iWork Apps, a suite of productivity apps (Pages, Numbers, Keynote, and Notes), enables iCloud to be used to create, store, and share documents, spreadsheets, and presentations.  iCloud Keychain enables a user to keep website username and passwords, credit card information, and Wi-Fi network information synchronized across multiple Apple devices.

iv.  Game Center, Apple's social gaming network, allows users of Apple devices to play and share games with each other.

v.  Find My iPhone allows owners of Apple devices to remotely identify and track the location of, display a message on, and wipe the contents of those devices.  Find My Friends allows owners of Apple devices to share locations.

vi.  Location Services allows apps and websites to use information from cellular, Wi-Fi, Global Positioning System ("GPS") networks, and Bluetooth, to determine a user's approximate location.

09.20.2021

SDNY_01_000004437
SUBJECT TO PROTECTIVE ORDER.

vii. App Store and iTunes Store are used to purchase and download digital content. iOS apps can be purchased and downloaded through App Store on iOS devices, or through iTunes Store on desktop and laptop computers running either Microsoft Windows or Mac OS. Additional digital content, including music, movies, and television shows, can be purchased through iTunes Store on iOS devices and on desktop and laptop computers running either Microsoft Windows or Mac OS.

c. Apple services are accessed through the use of an "Apple ID," an account created during the setup of an Apple device or through the iTunes or iCloud services. The account identifier for an Apple ID is an email address, provided by the user. Users can submit an Apple-provided email address (often ending in @icloud.com, @me.com, or @mac.com) or an email address associated with a third-party email provider (such as Gmail, Yahoo, or Hotmail). The Apple ID can be used to access most Apple services (including iCloud, iMessage, and FaceTime) only after the user accesses and responds to a "verification email" sent by Apple to that "primary" email address. Additional email addresses ("alternate," "rescue," and "notification" email addresses) can also be associated with an Apple ID by the user. A single Apple ID can be linked to multiple Apple services and devices, serving as a central authentication and syncing mechanism.

d. Apple captures information associated with the creation and use of an Apple ID. During the creation of an Apple ID, the user must provide basic personal information including the user's full name, physical address, and telephone numbers. The user may also provide means of payment for products offered by Apple. The subscriber information and password associated with an Apple ID can be changed by the user through the "My Apple ID" and "iForgot" pages on Apple's website. In addition, Apple captures the date on which the account was created, the length of service, records of log-in times and durations, the types of service utilized, the status of the

5

SDNY_01_000004438
SUBJECT TO PROTECTIVE ORDER.

account (including whether the account is inactive or closed), the methods used to connect to and utilize the account, the Internet Protocol address ("IP address") used to register and access the account, and other log files that reflect usage of the account.

e. Additional information is captured by Apple in connection with the use of an Apple ID to access certain services. For example, Apple maintains connection logs with IP addresses that reflect a user's sign-on activity for Apple services such as iTunes Store and App Store, iCloud, Game Center, and the My Apple ID and iForgot pages on Apple's website. Apple also maintains records reflecting a user's app purchases from App Store and iTunes Store, "call invitation logs" for FaceTime calls, "query logs" for iMessage, and "mail logs" for activity over an Apple-provided email account. Records relating to the use of the Find My iPhone service, including connection logs and requests to remotely lock or erase a device, are also maintained by Apple.

f. Apple also maintains information about the devices associated with an Apple ID. When a user activates or upgrades an iOS device, Apple captures and retains the user's IP address and identifiers such as the Integrated Circuit Card ID number ("ICCID"), which is the serial number of the device's SIM card. Similarly, the telephone number of a user's iPhone is linked to an Apple ID when the user signs into FaceTime or iMessage. Apple also may maintain records of other device identifiers, including the Media Access Control address ("MAC address"), the unique device identifier ("UDID"), and the serial number. In addition, information about a user's computer is captured when iTunes is used on that computer to play content associated with an Apple ID, and information about a user's web browser may be captured when used to access services through icloud.com and apple.com. Apple also retains records related to communications

6

09.20.2021

SDNY_01_000004439
SUBJECT TO PROTECTIVE ORDER.

between users and Apple customer service, including communications regarding a particular Apple device or service, and the repair history for a device.

g. Apple provides users with five gigabytes of free electronic space on iCloud, and users can purchase additional storage space. That storage space, located on servers controlled by Apple, may contain data associated with the use of iCloud-connected services, including: email (iCloud Mail); images and videos (iCloud Photo Library, My Photo Stream, and iCloud Photo Sharing); documents, spreadsheets, presentations, and other files (iWork and iCloud Drive); and web browser settings and Wi-Fi network information (iCloud Tabs and iCloud Keychain). iCloud can also be used to store iOS device backups, which can contain a user's photos and videos, iMessages, Short Message Service ("SMS") and Multimedia Messaging Service ("MMS") messages, voicemail messages, call history, contacts, calendar events, reminders, notes, app data and settings, Apple Watch backups, and other data. Records and data associated with third-party apps may also be stored on iCloud; for example, the iOS app for WhatsApp, an instant messaging service, can be configured to regularly back up a user's instant messages on iCloud Drive. Some of this data is stored on Apple's servers in an encrypted form but can nonetheless be decrypted by Apple.

**D. Jurisdiction and Authority to Issue Warrant**

5. Pursuant to 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A), the Government may require a provider of an electronic communications service or a remote computing service, such as the Provider, to disclose all stored content and all non-content records or other information pertaining to a subscriber, by obtaining a warrant issued using the procedures described in the Federal Rules of Criminal Procedure.

7

SDNY_01_000004440
SUBJECT TO PROTECTIVE ORDER.

6. A search warrant under § 2703 may be issued by "any district court of the United States (including a magistrate judge of such a court)" that "has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

7. When the Government obtains records under § 2703 pursuant to a search warrant, the Government is not required to notify the subscriber of the existence of the warrant. 18 U.S.C. § 2703(a), (b)(1)(A), (c)(2) & (3). Additionally, the Government may obtain an order precluding the Provider from notifying the subscriber or any other person of the warrant, for such period as the Court deems appropriate, where there is reason to believe that such notification will seriously jeopardize an investigation. 18 U.S.C. § 2705(b).

## II. Probable Cause

### A. Probable Cause Regarding the Subject Offenses

8. Since in or about August 2021, the FBI and the Office of the United States Attorney for the Southern District of New York have been investigating the possible receipt of so-called "straw" donations by the 2021 New York City mayoral campaign of Eric Adams (the "Adams Campaign") from employees of ███████████████████ a construction company that operates in New York City.[1] Based on my review of publicly available information, among other sources, I know that ███ is affiliated with a larger Turkish company and many of its employees are Turkish nationals. As detailed more fully below, Turkey's Consul General in New York was involved in the arrangement of a ███ fundraiser where straw donations were made to the Adams Campaign, the Consul General has communicated with a member of Adams' staff about this matter, and Adams has communicated with that same staff member about fundraising in the

---

[1] A straw, or "conduit," donation occurs when a donation to a political campaign is made in the name of one donor, but the funds in question in fact belong to a different person.

09.20.2021

SDNY_01_000004441
SUBJECT TO PROTECTIVE ORDER.

Turkish community and the potential provision of benefits to the Consul General.  This warrant seeks permission to search an iCloud account used by Eric Adams, who has exchanged communications, likely to be stored on his iCloud account, concerning, among other things, political fundraising from the Turkish community (including ███), and assisting the Consul General in receiving services from the New York City Government.

### The Adams Campaign and New York City's Matching Funds Program

9.  I understand, based on my review of publicly available information, that:

a.  The Adams Campaign accepted matching funds from the New York City Campaign Finance Board throughout a significant part of its campaign ("Matching Funds"), meaning that the Adams Campaign received funds from the New York City government as a result of donations the Adams Campaign received from private donors that were eligible for matching funds.[2]

b.  Under New York City law, the Adams Campaign was eligible to receive $2,000 in Matching Funds, and no more than $2,000 in Matching Funds, for each donation of $250 from an individual donor who resides within New York City, subject to certain exceptions not relevant here.  If an individual donated more than $250, any amount in excess of $250 would not be eligible for matching funds.[3]

---

[2]  *See, e.g.*, https://www.ny1.com/nyc/all-boroughs/news/2021/10/08/eric-adams-is-taking-a-rare-step--turning-down-campaign-cash (reporting on the Adams Campaign's prior acceptance of matching funds and decision to turn down some matching funds as of October 7, 2021); https://www.nyccfb.info/VSApps/CandidateSummary.aspx?as_cand_id=1545&as_election_cycl e=2021&cand_name=Adams%2C+Eric+L&office=Mayor&report=summ (New York City Campaign Finance Board's report detailing total public funds disbursed to Adams Campaign).

[3]  *See* https://www.nyccfb.info/program/how-it-works.

09.20.2021

SDNY_01_000004442
SUBJECT TO PROTECTIVE ORDER.

c.  New York City receives in excess of $10,000 per year in federal funding.[4]

**The Suspected Straw Donations**

10. I understand, based on information provided by the New York City Campaign Finance

Board, that the Adams Campaign received the following donations, among others, on May 7, 2021:

| AMOUNT | NAME | CITY | STATE | OCCUPATION | EMPLOYER NAME |
|---|---|---|---|---|---|
| $1,500 | Arkan, Erden | New York | NY | Owner | |
| $1,200 | ████████ | Flushing | NY | Sr. Prod. Manager | |
| $1,250 | ████ | Brooklyn | NY | Account Manager | |
| $1,250 | ██████ | Flushing | NY | Construction | |
| $1,250 | ██████ | Cliffside Park | NJ | Business Logistics | |
| $1,250 | █████ | Brooklyn | NY | PM | |
| $1,250 | ████ | Brooklyn | NY | Engineer/ Lawyer | |
| $1,250 | ██████ | Brooklyn | NY | Project manager | |
| $1,250 | █████ | Ridgewood | NJ | Finance Director | |
| $1,250 | ████ | Flushing | NY | Partner | |

---

[4]  *See* https://comptroller.nyc.gov/wp-content /uploads/2016/11/Federal_Budget_ Vulnerabilities_Memo.pdf

[5]  The description of ████ as an "Engineer/lawyer" at ████ is taken from the donation form submitted to the New York City Campaign Finance Board as part of her donation, but it appears from publicly available information that ████ may not in fact be employed at ████, although as explained in ¶ 12, her husband does appear to be employed at ████.

10

09.20.2021

SDNY_01_000004443
SUBJECT TO PROTECTIVE ORDER.

| $1,250 | ███ | New York | NY | Accountant | ██ |
|--------|-----|----------|----|-----------:|----|

The individuals listed in this table are hereinafter referred to as the "Donors."

11. I have further confirmed that, with the exception of the donations by ████████ and ████████, Matching Funds were issued in connection with each of the donations identified above.[6]

12. Bank records for ███ indicate that on April 28, 2021, ███ issued checks in the amount of $1,250 to each of the Donors with the exception of Arkan and ███, and also issued a $1,250 check to ████████. I know from law enforcement databases that ███ is ███ spouse. I know from my review of emails sent to and from each of the Donors except for ███ and also including emails sent to and from ███ (collectively, the "███ Emails"), obtained pursuant to a search warrant, that ███ is also employed by ███. As noted above, Arkan's donation to the Adams Campaign identifies Arkan as an or the owner of ███. Thus, on April 28, 2021, ███ paid each of the Donors the amount of their May 7, 2021 donation, with the exceptions of ███, whose husband instead received a check for that amount; Arkan, whose donation form describes him as the owner of ███; and ████ who donated $50 less to the Adams Campaign than ███ received from ███.

***The ███ Emails***

13. I know from my review of the ███ emails, in substance and in part, that:

---

[6] I understand that Matching Funds are only available for donations made by persons who reside in New York City, and both ████ and ████ reside in New Jersey.

11

09.20.2021

SDNY_01_000004444
SUBJECT TO PROTECTIVE ORDER.

a. On April 10, 2021, Arkan sent an email (the "April 10 Email") in Turkish[7] to seven individuals, five of whom have corporate email addresses indicating involvement in the construction industry. Arkan also copied seven ███ employees, of whom four are Donors and one of whom, ███ is the husband of a Donor. Arkan wrote, in substance and in part, that: In the previous week he had met with (then) Brooklyn Borough President Eric Adams, and the New York General Consul (who I understand, based on information discussed below, to be Turkey's New York General Consul) also joined them; Adams is running for New York City Mayor and has warm feelings for Turkish business people; Arkan knows that the recipients of the email have been supporting Adams so far, but "they" (from context, ███) are organizing a very special event in Arkan's office on May 5th, between 5 and 6:30 pm; the recipients of the email should participate in the event and contribute; this may "feel like swimming against the current" but unfortunately, this is how things are done in this country; and this will hopefully be a successful fundraising event.

b. On April 21, 2021, Arkan sent an email to four individuals to thank them all for participating in an unspecified event. Arkan further wrote that in the morning, he had spoken with "Consul General Mr. ███ who was very happy and thought that mid-May would be an appropriate target date. I know from publicly available materials that ███ ███ is the consul general of Turkey's New York consulate.

c. On April 26, 2021, ███ ███ (a Donor and ███ employee) asked Arkan: "Do you want me to email all the people on our list that are capable of making contributions

---

[7]      Many of the ███ emails are written wholly or partly in Turkish. I have reviewed draft summaries of those emails prepared by a Turkish linguist employed by the FBI, which are reflected in this Affidavit. Quotations to these emails are to the summaries prepared by the linguist.

SDNY_01_000004445
SUBJECT TO PROTECTIVE ORDER.

to find out if they are willing to do it? Also Food and beverages, who would you like me to get to cater it?"  Arkan responded by forwarding ███ the April 10 Email.

d.   From on or about April 27, 2021 through on or about May 7, 2021, ███ sent a series of emails inviting persons and businesses associated with ███, including the recipients of the April 10 Email, to attend a fundraiser for the Adams Campaign, which Adams personally was scheduled to attend, hosted by ███ on May 7, 2021. Arkan and ███ were consistently copied on these emails.

e.   On April 27 and 28, 2021, Arkan exchanged three emails with ███ who is not a Donor but, based on his email address and the statements in his email, is a ███ employee. In the first email, ███ responds to one of the emails sent by ███ described above in paragraph 13(d), asking whether he should set up a " 'go fund me' kind of thing and share the link with everyone" so that the group could raise funds for Adams toward a target amount using a website. Arkan replied in Turkish and only to ███, stating that it would "cramp their style" to use the method proposed by ███ Arkan further explained that "the goal is to host the man there and to hand the checks to his secretary," that ███ method "is too professional" and that ███ "need[s] to be hands on." ███ replied that he would "polish his checkbook" and attend. According to other ███ Emails I have reviewed, ███ donated $200 to the Adams Campaign.

f.   On May 5, 2021, Arkan emailed ███ and ██ (another Donor and ███ employee): "Don't forget to remind our guest for fundraising event!"  Subsequently on May 5, 2021, ███ sent a "friendly reminder regarding our fundraiser with 'Eric Adams for Mayor'" to the parties described above in paragraphs 13(a) and 13(d).

g.   On May 7, 2021, shortly after the scheduled time for the fundraiser, Arkan thanked ███ ██, and ███ (another Donor and ███ employee) for their hard work

13

SDNY_01_000004446
SUBJECT TO PROTECTIVE ORDER.

in making "this event" successful.  Arkan copied ▮▮▮ on this email.  As noted above, also on May 7, 2021, the Donors made donations to the Adams Campaign that largely matched the amount of money ▮▮ had paid them on April 28, 2021.

14. On May 10, 2021, ▮▮▮ sent ▮ an email with no subject heading or body, attaching a photograph of a handwritten list (the "List").  The List is entitled "Eric Adams 2021 Donation," and consists of a column of names with corresponding dollar amounts.  The List includes all of the Donors and accurately reflects the amount of their donations, except that ▮▮ is listed as a donor of $1,250, when according to records maintained by the New York City Board of Elections, it was ▮▮▮ wife, ▮▮▮▮,[8] who donated that amount.  The List also reflects smaller donations by ten other individuals or corporations, most of whom appear to have received the emails from ▮▮▮ and Arkan urging contribution that are described above in paragraphs 13(a) and 13(d).  In total, the list records $20,000 in donations, of which nearly 70% came from the Donors.

### *The* ▮▮▮ *Messages*

15. I know from my review of media reports, among other sources, that ▮▮▮▮ is a longtime advisor of Eric Adams who worked in the Special Counsel's office of the Brooklyn Borough President when Adams was Brooklyn Borough President, was involved with the Adams Campaign, and now works in the Mayor's Office for International Affairs.  As detailed below, during the course of the Adams Campaign, ▮▮▮ had contact both with Turkish consular officials and with ▮▮, and  was personally involved with the May 7, 2021 Adams fundraiser held by ▮▮, pursuant to which the Donors made their straw donations.

---

[8]    On the records provided by the New York City Campaign Finance Board, ▮▮▮ first name is spelled "▮▮▮.  On ▮▮▮ bank records as well as the underlying donation slip, however, she uses the common spelling ▮▮▮▮."

09.20.2021

SDNY_01_000004447
SUBJECT TO PROTECTIVE ORDER

16. Phone records indicate that from between February 8, 2021 and January 14, 2022, a phone number subscribed in ██████ name (the "██████ Number") exchanged 22 calls with a phone number subscribed to the Turkish Consulate General (the "Consulate Number").[9]  This includes a call on April 2, 2021.  As explained above, in the April 10 Email, Arkan stated that he had met with the Consul General and Adams in the prior week, and planned to hold a fundraiser for Adams.

17. I have reviewed photographs posted to the Internet on November 18, 2021 by the Turkish General Consulate in New York City showing persons I believe to be ██████, ██████ (the Consul General), and Eric Adams together.

18. Toll records indicate that on May 19, 2021, a phone number subscribed to by ██████ ██████ and a phone number subscribed to by Arkan exchanged two calls, one of which resulted in a call of one minute and 11 seconds duration and the other of which did not result in a listed duration (possibly indicating that the call was not answered).

19. From my review of the contents of an iCloud account and Apple iPhone used by ██████, obtained pursuant to search warrants, I know that ██████ exchanged messages, including over encrypted messaging applications WhatsApp and Signal, with ██████ (Turkey's Consul General in New York), Adams, and ██████ ██████ a fundraiser for the Adams Campaign, among others, including the following, in substance and in part:

a. On June 14, 2018, ██████ and ██████ exchanged messages concerning the legal limits for corporate donations in elections.

---

[9]      These records are not complete, but rather do not include April 2022 and parts of March and May 2022.

09.20.2021

SDNY_01_000004448
SUBJECT TO PROTECTIVE ORDER.

b.  On June 28, 2018, ███████ texted █████ "The list for 6/22/18," which appears to be a list of names and dollar amounts.  I know from my review of records maintained by the New York City Campaign Finance Board that this list reflects, in part, donations to the Adams Campaign, which had already begun fundraising at that time.

c.  In October and November 2018, ████████ and Adams exchanged text messages that appear to involve one or more meetings with individuals associated with Turkey, because, among other reasons, the messages referred to the "Group from Turkey (from yesterday meeting)," "my guy from ██████████," and several names that I recognize from my experience in this case as commonly used by people of Turkish heritage.  On November 6, 2018, after an event that Adams described as "Went well," Adams told ████████ "They showed me a lot of love.  Lol.  Let's move to the next level."

d.  On April 4, 2019, Adams and ████████ exchanged text messages in which Adams informed ████████ that "the Turkish school" could not "do the event according to the compliance attorney. They have to be a citizen or a green card holder to sponsor an event."  Based on the context of these messages and my understanding of laws concerning campaign contributions, I believe Adams to be informing ████████ that he received legal advice that "the Turkish school" could not lawfully hold a fundraising event for Adams, because federal law prohibits most campaign contributions by non-citizens who are not lawful permanent residents of the United States.

e.  On January 13, 2021, ██████ and ████████ exchanged messages in which ██████ sought a meeting with Adams.  ████████ asked █████ "what will the topic be?" ██████ replied, in a series of messages, "The election," "that's what," "Turkish community support to him," and "What can we do, let's talk."

09.20.2021

SDNY_01_000004449
SUBJECT TO PROTECTIVE ORDER.

f.   Between January 20 and February 13, 2021, ███████ communicated ███ to set up a meeting which eventually occurred on February 14, 2021, and which ███ and Adams attended.

g.   On April 1, 2021, ███████ sent ████ a "List of people who will attend the meeting," which included Arkan and ████   As discussed above, the ████ Emails, among other evidence, reflect Arkan stating that he met Adams and ████ in early April 2021, after which the events leading to the straw donations occurred.

h.   Between April 11, 2021, and April 21, 2021, ██████ and ███████ exchanged messages that I believe to concern the ████ fundraiser held for the Adams Campaign on May 7, 2021, discussed above.  For example, on April 15, 2021, ██████ and ████ exchanged a series of proposed dates for "the event," and settled on May 7, 2021.  In response to a question from ████████ about "the location," ██████ replied "████████████████ – Headquarters," and supplied the phone number and a link to the address of ████.

i.   On or about April 21, 2021, ███████ sent ████ the following message: "Also I gave your number to one of the gentleman [*sic*] from last time dinner[.] He has questions regarding campaigns[.] His name is Erden Arkan[.]"

j.   On May 7, 2021, ███████ asked ████ for "forms," stating: "They already collect the checks."  Based on ██████ status as a fundraiser for the Adams Campaign and this message being sent on the day of the ████ fundraiser at which checks for the straw donations were given to the Adams Campaign, I believe that in this message ████████ requested contribution forms for the already-made ████ donations.

k.   Between September 6 and 10, 2021, ███████ and ██████ exchanged a series of messages, the substance of which ██████ then relayed to Adams, concerning, in substance

17

SDNY_01_000004450
SUBJECT TO PROTECTIVE ORDER.

and in part, obtaining a Temporary Certificate of Occupancy for the official opening of a building associated with the Turkish Consulate in New York in time for a visit by Turkey's president. In these messages, ███ repeatedly asked ████ to have "Eric," who I understand to be Eric Adams, ensure that the Temporary Certificate of Occupancy is issued by the Fire Department of New York. When ████ relayed these requests to Adams, Adams told her that he was speaking with FDNY personnel by phone who assured Adams that they were working to "resolve this." Adams also stated that he had spoken directly "to the council [*sic*] general," who I understand to be ███ on this subject. On September 10, 2021, ████ wrote Adams "Problem was resolved[.] Thank you very much," and Adams replied, "Anything for you ████"

l.    On April 21, 2022, ███ and ████ exchanged a series of messages in which ███ asked ████ in substance, to confirm that Adams would not make "A statement about the Armenia Genocide" on "24th of April," and ████ replied, "No" "He wont." I am aware, based on my review of publicly available information, that April 24 is Armenian Genocide Remembrance Day and that the Turkish Government denies that the Armenia Genocide (which was committed by Turkey's government between 1915 and the early 1920s) occurred. ████ made further requests related to "the Armenians," and ████ replied, "We try to stop the official requests as much as we can," and "We do not let him get into these kinds of conflicts."

m.    On July 11, 2022, ████ encouraged ███ to "Ask her all your pending problems regarding this building … Like FDNY approvals." Based on the messages detailed *supra* ¶ 19(k), I believe ████ is referencing a building associated with the Turkish Consulate in New York.

09.20.2021

SDNY_01_000004451
SUBJECT TO PROTECTIVE ORDER.

**B. Probable Cause Regarding the Subject Account**

20. I have reviewed records provided by the Provider showing that the Subject Account is registered using Adam's phone number and his home address, in addition to using his name as part of the account name.

21. Furthermore, I have consulted with a forensic examiner with the FBI's Computer Analysis Response Team about these records from the Provider, and I understand that based on the settings on the Subject Account, the Subject Account is likely to contain copies of messages sent to or by Adams using certain applications such as iMessage (which is often used to exchange text messages on the Provider's devices) and various email programs, to the extent Adams used those methods of communication, as well as photographs and calendar, contact, and location information reflecting meetings and other associations. I also know from my experience in this case searching other iCloud accounts like the Subject Account that they may contain communications exchanged on applications such as WhatsApp and Signal, even if that cannot be discerned from the records I currently possess.

22. For the reasons detailed above, I submit that there is probable cause to believe that evidence of Adams' communications concerning the May 7, 2021 fundraiser which was facilitated by the Turkish General Consulate and at which the straw donations occurred, potential assistance by Adams to the Turkish General Consulate in New York, and other evidence of the Subject Offenses described in Section II of Attachment A to the proposed warrant are likely to be found in the Subject Account.

23. <u>Temporal Limitation</u>. This application is limited to all content created, sent, or received on or after January 1, 2018, which is the year in which the current records reflect Adams, ███████ and ██████ beginning to communicate about the Consul General's assistance to the Adams Campaign.

19

09.20.2021

SDNY_01_000004452
SUBJECT TO PROTECTIVE ORDER.

### C. Evidence, Fruits and Instrumentalities

24. Based upon the foregoing, I respectfully submit there is probable cause to believe that information stored on the Provider's servers associated with the Subject Account will contain evidence, fruits, and instrumentalities of the Subject Offenses, as more fully described in Section II of Attachment A to the proposed warrant.

### III. Review of the Information Obtained Pursuant to the Warrant

25. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for service of a search warrant issued under § 2703, or for the collection or production of responsive records. Accordingly, the warrant requested herein will be transmitted to the Provider, which shall be directed to produce a digital copy of any responsive records to law enforcement personnel within 30 days from the date of service. Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) will retain the records and review them for evidence, fruits, and instrumentalities of the Subject Offenses as specified in Section III of Attachment A to the proposed warrant.

26. In conducting this review, law enforcement personnel may use various methods to locate evidence, fruits, and instrumentalities of the Subject Offenses, including but not limited to undertaking a cursory inspection of all emails within the Subject Account. This method is analogous to cursorily inspecting all the files in a file cabinet in an office to determine which paper evidence is subject to seizure. Although law enforcement personnel may use other methods as well, particularly including keyword searches, I know that keyword searches and similar methods are typically inadequate to detect all information subject to seizure. As an initial matter, keyword searches work only for text data, yet many types of files commonly associated with emails,

20

09.20.2021

SUBJECT TO PROTECTIVE ORDER.

including attachments such as scanned documents, pictures, and videos, do not store data as searchable text. Moreover, even as to text data, keyword searches cannot be relied upon to capture all relevant communications in an account, as it is impossible to know in advance all of the unique words or phrases that investigative subjects will use in their communications, and consequently there are often many communications in an account that are relevant to an investigation but that do not contain any keywords that an agent is likely to search for.

**IV. Request for Non-Disclosure and Sealing Order**

27. The existence and scope of this ongoing criminal investigation is not publicly known. As a result, premature public disclosure of this affidavit or the requested warrant could alert potential criminal targets that they are under investigation, causing them to destroy evidence, flee from prosecution, or otherwise seriously jeopardize the investigation. As is set forth above, subjects of this investigation are known to use computers and electronic communications, including encrypted messaging applications, in furtherance of their activity and thus could easily delete, encrypt, or otherwise conceal such digital evidence from law enforcement were they to learn of the Government's investigation. *See* 18 U.S.C. § 2705(b)(3).

28. Accordingly, there is reason to believe that, were the Provider to notify the subscribers or others of the existence of the warrant, the investigation would be seriously jeopardized. Pursuant to 18 U.S.C. § 2705(b), I therefore respectfully request that the Court direct the Provider not to notify any person of the existence of the warrant for a period of one year from issuance, subject to extension upon application to the Court, if necessary.

29. For similar reasons, I respectfully request that this affidavit and all papers submitted herewith be maintained under seal until the Court orders otherwise, except that the Government be permitted without further order of this Court to provide copies of the warrant and affidavit as need be to personnel assisting it in the investigation and prosecution of this matter, and to disclose

09.20.2021

SDNY_01_000004454
SUBJECT TO PROTECTIVE ORDER.

those materials as necessary to comply with discovery and disclosure obligations in any prosecutions related to this matter.

## V. Conclusion

30. Based on the foregoing, I respectfully request that the Court issue the warrant sought herein pursuant to the applicable provisions of the Stored Communications Act, 18 U.S.C. § 2703(b)(1)(A) (for contents) and § 2703(c)(1)(A) (for records and other information), and the relevant provisions of Federal Rule of Criminal Procedure 41.

███████████████

Special Agent
Federal Bureau of Investigation

Special Agent ████ attested to this Affidavit by telephone pursuant to F.R.C.P. 4.1(b)(1)(A) on December 2 , 2022

_Stewart D. Aaron_

HONORABLE STEWART D. AARON
United States Magistrate Judge
Southern District of New York

09.20.2021

SDNY_01_000004455
SUBJECT TO PROTECTIVE ORDER.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

In the Matter of a Warrant for All
Content and Other Information
Associated with iCloud Account
███████████@aol.com
Maintained at Premises Controlled by
Apple Inc., USAO Reference No.
2021R00778

# 22 MAG 9730

## SEARCH WARRANT AND NON-DISCLOSURE ORDER

TO:    Apple Inc. ("Provider")

Federal Bureau of Investigation ("Investigative Agency")

**1. Warrant.** Upon an affidavit of Special Agent ██████████ of the Federal Bureau of

Investigation, and pursuant to the provisions of the Stored Communications Act, 18 U.S.C.

§ 2703(b)(1)(A) and § 2703(c)(1)(A), and the relevant provisions of Federal Rule of Criminal

Procedure 41, the Court hereby finds there is probable cause to believe the iCloud account

███████████@aol.com, maintained at premises controlled by the Provider, contains evidence,

fruits, and instrumentalities of crime, all as specified in Attachment A hereto.  Accordingly, the

Provider is hereby directed to provide to the Investigative Agency, within 30 days of the date of

service of this Warrant and Order, the records specified in Section II of Attachment A hereto, for

subsequent review by law enforcement personnel as authorized in Section III of Attachment A.

The Government is required to serve a copy of this Warrant and Order on the Provider within 14

days of the date of issuance.  The Warrant and Order may be served via electronic transmission or

any other means through which the Provider is capable of accepting service.

**2. Non-Disclosure Order.** Pursuant to 18 U.S.C. § 2705(b), the Court finds that there is

reason to believe that notification of the existence of this warrant will result in destruction of or

SDNY_01_000004456
SUBJECT TO PROTECTIVE ORDER.

tampering with evidence, or otherwise will seriously jeopardize an ongoing investigation. Accordingly, it is hereby ordered that the Provider shall not disclose the existence of this Warrant and Order to the listed subscriber or to any other person for a period of one year from the date of this Order, subject to extension upon application to the Court if necessary, except that Provider may disclose this Warrant and Order to an attorney for Provider for the purpose of receiving legal advice.

     **3. Sealing.** It is further ordered that this Warrant and Order, and the Affidavit upon which it was issued, be filed under seal, except that the Government may without further order of this Court serve the Warrant and Order on the Provider; provide copies of the Affidavit or Warrant and Order as need be to personnel assisting the Government in the investigation and prosecution of this matter; and disclose these materials as necessary to comply with discovery and disclosure obligations in any prosecutions related to this matter.

Dated: New York, New York

    12/02/2022            10:47 a.m.
_____    _____
Date Issued                 Time Issued

_____
UNITED STATES MAGISTRATE JUDGE
Southern District of New York

09.20.2021

2

SDNY_01_000004457
SUBJECT TO PROTECTIVE ORDER.

**iCloud Search Attachment A**

**I. Subject Account and Execution of Warrant**

This warrant is directed to Apple Inc. (the "Provider"), headquartered at 1 Infinite Loop, Cupertino, California 95014, and applies to all content and other information within the Provider's possession, custody, or control associated with the iCloud account ███████████ @aol.com (the "Subject Account").

A law enforcement officer will serve this warrant by transmitting it via email or another appropriate manner to the Provider. The Provider is directed to produce to the law enforcement officer an electronic copy of the information specified in Section II below. Upon receipt of the production, law enforcement personnel will review the information for items falling within the categories specified in Section III below.

**II. Information to be Produced by the Provider**

To the extent within the Provider's possession, custody, or control, the Provider is directed to produce the following information associated with the Subject Account:

a. *Subscriber and payment information*. All subscriber and payment information regarding the Subject Account, including but not limited to name, username, address, telephone number, alternate email addresses, registration IP address, account creation date, account status, length of service, types of services utilized, means and source of payment, and payment history.

b. *Device information and settings*. All information about the devices associated with the Subject Account, including but not limited to the Integrated Circuit Card ID ("ICCID") number, the Media Access Control address ("MAC address"), the unique device identifier ("UDID"), the serial number, customer device settings, and repair history.

c. *Transactional records*. All transactional records associated with the Subject Account, including any IP logs or other records of session times and durations.

SUBJECT TO PROTECTIVE ORDER.

d.  *Address book information*.   All address book, contact list, or similar information associated with the Subject Account.

e.  *Call history and voicemails*.   All call histories, logs for FaceTime calls, audio voicemails, and visual voicemails associated with the Subject Account.

f.  *Text message content*.  All text messages (including iMessages, Short Message Service ("SMS") messages, and Multimedia Messaging Service ("MMS") messages) sent to or from, stored in draft form in, or otherwise associated with the Subject Account, including all message content, attachments, and header information (specifically including the source and destination addresses associated with each text message, and the date and time at which each text message was sent).

g.  *Email content*.   All emails sent to or from, stored in draft form in, or otherwise associated with the Subject Account, including all message content, attachments, and header information (specifically including the source and destination addresses associated with each email, the date and time at which each email was sent, and the size and length of each email).

h.  *Photos and video*s.  All photographs or videos associated with the Subject Account, including any photographs or videos found on any iCloud Photo Library, My Photo Stream, or iCloud Photo Sharing service linked to the Subject Account.  All associated metadata with any photograph or video including the time and date of creation, the author or creator, the means of its creation, and the GPS location information for where a photo or video was taken.

i.  *Documents*.  All documents stored in or otherwise associated with the Subject Account, including all documents in iCloud Drive, and iWork Apps.

j.  *Search and web histories*. All search history, web history, bookmarks, and iCloud Tabs.

09.20.2021

SDNY_01_000004459
SUBJECT TO PROTECTIVE ORDER.

k. *Third-party application data*. All records, messages, and data relating to third-party applications, including WhatsApp and other third-party messaging applications, stored in or otherwise associated with the Subject Account.

l. *Location data*. All location data associated with the Subject Account.

m. *iOS Device Backups*. All device backups, and the contents of those backups, including but not limited to messages, web history, and preferences.

<u>Temporal Limitation</u>. This application is limited to all content created, sent, or received on or after January 1, 2018.

## III. Review of Information by the Government

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Provider in order to locate any evidence, fruits, and instrumentalities of theft of federal funds and wire fraud, and conspiracy to commit the same, in violation of 18 U.S.C. §§ 371, 666, 1343, and 1349, including the following:

a. Evidence of knowledge or understanding of, or intent to violate, laws and regulations governing the conduct of the 2021 New York City Mayoral campaign on the part of ███████████████ and its employees, officers, or associates ("████"); the Turkish Government, including its Consulate General in New York and its employees, officers, or associates; or the 2021 New York City mayoral campaign of Eric Adams and its employees, officers, or associates (the "Adams Campaign").

b. Evidence relating to coordination between ████ or the Turkish Government and the Adams Campaign concerning political contributions to the Adams Campaign, including, but not limited to, evidence of motive and intent for ████ or the Turkish Government to provide or

09.20.2021

3

SUBJECT TO PROTECTIVE ORDER.

facilitate campaign contributions to the Adams Campaign, and evidence of motive and intent by Adams, the Adams Campaign, or any employees or associates of Adams or the Adams Campaign to provide benefits, whether lawfully or unlawfully, to ███ or the Turkish Government in return for campaign contributions.

  c. Evidence relating to payments to employees, officers, and associates of ███ to facilitate those employees, officers, and associates making campaign contributions to the Adams Campaign.

  d. Evidence relating to the source of funds for payment or reimbursement of employees, officers, and associates of ███ for campaign contributions to the Adams Campaign.

  e. Evidence of individuals or entities who donated to the Adams Campaign before or after receiving transfers of funds similar to the amount of the donation.

  f. Identity of any persons or entities involved, wittingly or unwittingly, in straw donations to the Adams Campaign.

  g. Evidence of the relationship between ███, the Turkish Government, Adams, and/or the Adams Campaign, including all communications with or about, contact information for, and meetings and appointments with co-co-conspirators.

  h. Passwords or other information needed to access user's online accounts, including encrypted data stored in the Subject Account

  i. Evidence sufficient to establish the owner and user of the Subject Account at times relevant to the Subject Offenses.

  j. Evidence of the geographic location of users, computers, or devices involved in the commission of the Subject Offenses at times relevant to the Subject Offenses.

4

09.20.2021

SDNY_01_000004461
SUBJECT TO PROTECTIVE ORDER.