Original

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

In re: Warrant and Order For
Prospective Location Information and
Pen Register Information for the
Cellphone Assigned Call Number ██
██6335, USAO Reference No.
2021R00778

**APPLICATION**

# 24 MAG 3434

**Application for Warrant and Order**
**for Cellphone Location and Pen Register Information**

The United States of America, by its attorney, Damian Williams, United States Attorney

for the Southern District of New York, Celia V. Cohen, Assistant United States Attorney, of

counsel, respectfully requests that the Court issue the accompanying proposed Warrant and Order

for prospective and historical location information and pen register information for a cellphone.

As grounds for this Application the Government relies on the following facts and authorities.

**I.  Introduction**

1.      I am an Assistant United States Attorney in the U.S. Attorney's Office for the

Southern District of New York.   This Application is submitted in conjunction with the

accompanying affidavit of a law enforcement agent ("Agent Affidavit"), to be sworn before this

Court, and incorporated by reference herein. I make this Application based on information and

belief, including the Agent Affidavit, my review of other documents in the case, and information

received from investigative personnel.

2.      The Investigating Agency, Target Cellphone, Subscriber, Target Subject, Service

Provider, and Subject Offense referenced in this Application are as specified in the Agent

Affidavit.

SUBJECT TO PROTECTIVE ORDER.

## II. Legal Authority

### A. Prospective Location Information

3.       The Government seeks to obtain both precision location information and cell site data for the Target Cellphone on a prospective basis (the "Prospective Location Information") for a period of 45 days from the date of this order – the same period of time for which a warrant for a tracking device may be granted under Rule 41(e)(2)(C).  It bears noting, however, that while the Prospective Location Information may permit "tracking" the user of the phone in the colloquial sense, this is not an application for a warrant for a "tracking device" as defined in Fed. R. Crim. P. 41(a)(2)(E) and 18 U.S.C. § 3117(b).  Those provisions only apply where an agent is seeking to physically install a tracking device on a given object.   Instead, the Prospective Location Information will be obtained by requiring the Service Provider to provide the information.

4.       The authority for this application is found in 18 U.S.C. § 2703(c)(1), which authorizes a court of competent jurisdiction to require any electronic communication service provider (which includes a cellular telephone service provider[1]) to disclose any "record or other information pertaining to a subscriber" other than the "contents of communications," when the government obtains, *inter alia*, a warrant under the applicable procedures of Rule 41.  *See* 18 U.S.C. § 2703(c)(1)(A).  Because data concerning a subscriber's location, such as precision location information and cell site data, constitutes "information pertaining to a subscriber" that does not include the "contents of communications," that data is among the types of information

---

[1] *See* 18 U.S.C. § 2711(1) (incorporating by cross-reference statutory definitions set forth in 18 U.S.C. § 2510); 18 U.S.C. § 2510(15) (defining "electronic communication service" as "any service which provides to users thereof the ability to send or receive wire or electronic communications").

2019.07.24

SDNY_01_000009488
SUBJECT TO PROTECTIVE ORDER.

available under § 2703(c)(1)(A).[2]  Further, as specified in 18 U.S.C. § 2711(3), this Court is a court of competent jurisdiction under the Stored Communications Act because it has jurisdiction over the Subject Offenses.

     5.      The Government's request for cell site data also implicates the pen register statute, because such data constitutes signaling information used by the Service Provider to route communications to and from the Target Cellphone.  In order to collect such data, a valid pen register order is required.[3]  Accordingly, I hereby certify pursuant to 18 U.S.C. § 3122 that such signaling information is relevant to an ongoing investigation being conducted by the Investigating Agency into suspected violations of the Subject Offenses by the Target Subject.

### B.  Pen Register Information

     6.      The Government also seeks an order pursuant to 18 U.S.C. §§ 3121-26 authorizing the use of a pen register on the Target Cellphone for a period of 45 days from the date of this order.  Specifically, the Government seeks an order directing the Service Provider to furnish any information, facilities, and technical assistance necessary to operate, unobtrusively and with

---

[2] *See In re Application*, 460 F. Supp. 2d 448, 459–60 & n. 55 (S.D.N.Y. 2006) (Kaplan, J.) (cell-phone location information falls within § 2703(c)(1)); *accord, e.g.*, *United States v. Caraballo*, 963 F. Supp. 2d 341, 361 (D.Vt. 2013); *In re Order*, 632 F. Supp. 2d 202, 207 (E.D.N.Y. 2008); *In re Application*, 405 F. Supp. 2d 435, 444-45 (S.D.N.Y. 2005).  *But see In re Application*, 849 F. Supp. 2d 526, 574 (D.Md. 2011) (rejecting view that cellular location data falls within the scope of the SCA and finding that phone must be treated as "tracking device" for purposes of Rule 41 where used to collect location data); *In re Application*, 2009 WL 159187, at *5-*6 (S.D.N.Y. Jan.13, 2009) (McMahon, J.) (same).

[3] *See* 18 U.S.C. § 3121 (prohibiting use of pen register or trap and trace device without an order under the pen register statute); 3127(3) & (4) (defining pen register and trap and trace device to include devices or processes that record, *inter alia*, signaling information).  Although cell site data constitutes "signaling" information within the meaning of the pen register statute, a separate statute precludes the Government from relying "solely" on the authority provided by the pen register statute to ascertain a subscriber's location.  47 U.S.C. § 1002(a).  Here, the Government seeks to obtain such data pursuant to 18 U.S.C. § 2703(c) as well as the pen register statute, rather than "solely" under the latter statute.  *See In re Application*, 460 F. Supp. 2d at 456-59.

2019.07.24

SDNY_01_000009489
SUBJECT TO PROTECTIVE ORDER.

minimum disruption of service, a pen register and trap and trace device to capture all dialing, routing, addressing, or signaling information associated with each call transmitted to or from the Target Cellphone, as specified further in the proposed Warrant and Order (the "Pen Register Information").[4]

7.      I hereby certify pursuant to 18 U.S.C. § 3122 that the Pen Register Information is relevant to an ongoing investigation being conducted by the Investigating Agency into suspected violations of the Subject Offenses by the Target Subjects.

### C.  Sealing and Non-Disclosure Order to Service Provider

8.      When the Government obtains records or information under § 2703(c), it is not required to notify the subscriber or customer. 18 U.S.C. § 2703(c)(3).  Additionally, the Government may obtain an order precluding the Service Provider from notifying the subscriber or any other third-party of the warrant or order obtained, for such period as the Court deems appropriate, where there is reason to believe that such notification will result in endangering the life or physical safety of an individual, flight from prosecution, destruction of or tampering with evidence, or intimidation of potential witnesses, or will otherwise seriously jeopardize the investigation. 18 U.S.C. § 2705(b).

9.      Further, 18 U.S.C. § 3123(d) provides that an order directing installation of a pen register or trap and trace device shall direct the pertinent service provider "not to disclose the

---

[4] The Government is also not seeking authorization to obtain post-cut-through dialed digits ("PCTDD"), or digits that are dialed after a telephone call from the Target Cellphone has been connected.  Pursuant to the attached Order, if possible, the Service Provider will forward only pre-cut-through-dialed digits to the Investigating Agency.  However, if the Service Provider's technical capabilities require it to forward all dialed digits, including PCTDD, to the Investigating Agency, the Investigating Agency will only decode and forward to the agents assigned to the investigation the numbers that are dialed before the call is cut through.

2019.07.24

SDNY_01_000009490
SUBJECT TO PROTECTIVE ORDER.

existence of the pen register or trap and trace device or the existence of the investigation to the listed subscriber, or to any other person unless or until otherwise ordered by the Court."

10.    Accordingly, as explained further in the Agent Affidavit, in light of the confidential nature of the continuing criminal investigation and the adverse consequences expected in the event of premature notification, the Government respectfully requests that the Court direct the Service Provider not to notify the Subscriber or any other person of the Warrant and Order sought herein for a period of one year, subject to extension upon application to the Court, if necessary.

11.    For similar reasons, I respectfully request that the proposed Warrant and Order, this Application, and the accompanying Agent Affidavit, be maintained under seal until the Court orders otherwise, except that the Government be permitted without further order of this Court to serve this Warrant and Order on the Service Provider; provide copies of the Warrant and Order or the supporting Application and Agent Affidavit as need be to personnel assisting the Government in the investigation and prosecution of this matter; and disclose these materials as necessary to comply with discovery and disclosure obligations in any prosecutions related to this matter.

## III.  Prior Requests

12.    On or about August 12, 2024, the Hon. Sarah L. Cave, United Sates Magistrate Judge, Southern District of New York, authorized a warrant and order directing the Service Provider to produce prospective and historical location information and pen register information for the Target Cellphone. That warrant and order expires at midnight on September 25, 2024.

SDNY_01_000009491
SUBJECT TO PROTECTIVE ORDER.

14.    Except as may be set forth above, no prior request for the relief requested herein

has been made.

Dated:  New York, New York
        September 25, 2024

                                    _____
                                      Celia V. Cohen
                                      Assistant United States Attorney
                                      Tel.: 914-993-1921

2019.07.24

6

SDNY_01_000009492
SUBJECT TO PROTECTIVE ORDER.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

In re: Warrant and Order For Prospective
Location Information and Pen Register
Information for the Cellphone Assigned
Call Number ▮▮▮▮6335, USAO
Reference No. 2021R00778

---

# 24 MAG 3434

**AGENT AFFIDAVIT**

24 Mag. _____

### Agent Affidavit in Support of Warrant and Order
### for Cellphone Location and Pen Register Information

STATE OF NEW YORK          )
                           ) ss.
COUNTY OF WESTCHESTER )

▮▮▮▮▮▮▮▮▮▮ being duly sworn, deposes and states:

## I.  Introduction

1.      I have been a Special Agent with the Federal Bureau of Investigation (the "FBI" or "Investigating Agency") since 2019. I am currently assigned to a public corruption squad of the New York Field Office, where, among other things, I investigate crimes involving illegal campaign contributions, wire fraud, and bribery. Through my training and experience, I also have become familiar with some of the ways in which individuals use smart phones and electronic communications, including social media, email, and electronic messages, in furtherance of their crimes, and have participated in the execution of search warrants involving electronic evidence.

2.      **Requested Information.** I respectfully submit this Affidavit pursuant to 18 U.S.C. §§ 2703(c) and (c)(1)(A) and the applicable procedures of Federal Rule of Criminal Procedure 41; 18 U.S.C. §§ 2703(d) & 2705; and 18 U.S.C. §§ 3121-3126, in support of a warrant and order for prospective location information and pen register information, for the Target Cellphone identified below (collectively, the "Requested Information").

SUBJECT TO PROTECTIVE ORDER.

3.      **Basis for Knowledge.** This Affidavit is based upon my participation in the investigation, my examination of reports and records, and my conversations with other law enforcement agents and other individuals, as well as my training and experience. Because this Affidavit is being submitted for the limited purpose of obtaining the Requested Information, it does not include all the facts that I have learned during the course of this investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated. In addition, unless otherwise indicated, statements by others referenced in this Affidavit were not necessarily made to me, but may have been provided to me by someone else to whom I have spoken or whose report I have read (and who in turn may have had either direct or indirect knowledge of the statement). Similarly, unless otherwise indicated, information in this Affidavit resulting from surveillance does not necessarily set forth my personal observations, but may have been provided to me by other law enforcement agents who observed the events, and to whom I have spoken or whose report I have read.

4.      **Target Cellphone, Subscriber, Target Subject, and Service Provider.** The Target Cellphone referenced in this Affidavit is the cellphone assigned call number ███████6335. As further discussed below, the Target Cellphone is subscribed to in the name of Eric L. Adams (the "Subscriber"). The Subscriber is believed to use the Target Cellphone and is a Target Subject of this investigation. T-Mobile is the Service Provider for the Target Cellphone.

5.      **Precision Location Capability.** Cellphone service providers have technical capabilities that allow them to collect at least two kinds of information about the locations of the cellphones to which they provide service: (a) precision location information, also known as E-911 Phase II data, GPS data, or latitude-longitude data, and (b) cell site data, also known as

2

SDNY_01_000009494
SUBJECT TO PROTECTIVE ORDER.

"tower/face" or "tower/sector" information.  Precision location information provides relatively precise location information about a cellphone, which a provider can typically collect either via GPS tracking technology built into the phone or by triangulating the device's signal as received by the provider's nearby cell towers.  Cell site data, by contrast, reflects only the cell tower and sector thereof utilized in routing any communication to and from the cellphone, as well as the approximate range of the cellphone from the tower during the communication (sometimes referred to as "per-call measurement" ("PCM") or "round-trip time" ("RTT") data).  Because cell towers are often a half-mile or more apart, even in urban areas, and can be ten or more miles apart in rural areas, cell site data is typically less precise than precision location information.  Based on my training and experience, I know that the Service Provider has the technical ability to collect precision location information from any cellphone on its network, including by initiating a signal on the Service Provider's network to determine the phone's location.  I further know that cell site data is routinely collected by the Service Provider in the course of routing calls placed to or from any cellphone on its network.

## II. Facts Establishing Probable Cause

6.    Although I understand that probable cause is not necessary to obtain all of the Requested Information, I respectfully submit that probable cause exists to believe that the Requested Information will lead to Although I understand that probable cause is not necessary to obtain all of the Requested Information, I respectfully submit that probable cause exists to believe that the Requested Information will lead to evidence of violations of (i) 18 U.S.C. §§ 371 and 666(a)(1)(B) (bribery and conspiracy to commit bribery); (ii) 18 U.S.C. §§ 371 and 1343 (wire fraud and attempt and conspiracy to commit wire fraud); and (iii) 18 U.S.C. § 371 and 52 U.S.C. § 30121 (campaign contributions by foreign nationals and conspiracy to commit the same) (collectively, the "Subject Offenses").

2019.07.24

SDNY_01_000009495
SUBJECT TO PROTECTIVE ORDER.

*The Subject Offenses*

7.    On or about September 24, 2024, a grand jury sitting in this District returned an indictment charging Eric Adams with the Subject Offenses (the "Indictment").  A copy of the Indictment is attached hereto as Exhibit A and incorporated by reference herein.

*Adams's Use of Electronic Devices to Commit the Subject Offenses*

8.  As detailed in the Indictment, Adams and his co-conspirators sent and received numerous electronic messages and emails in connection with the Subject Offenses.  Furthermore, certain of those messages were found on Adams's iCloud account or on electronic devices previously seized in November 2023 from Adams's person or custody (including a tablet) pursuant to court authorized warrants, including the messages described in paragraphs 28(g), 38(j)-(k), 38(m)-(n), 38(p), and 40(c) of the Indictment.

9.    Moreover, based on my involvement in this investigation, including my review of electronic communications obtained during the course of this investigation, I am aware that Adams uses Signal to communicate, including in connection with the Subject Offenses, and sometimes encourages others to do so, and that people who work with Adams also use Signal to communicate with him and others. Based on my experience and participation in this and other investigations, I know that Signal is an encrypted messaging application, which allows users to set the application to automatically delete messages at certain intervals. In the course of this investigation, I have learned that on at least some occasions, law enforcement has been able to retrieve Signal messages from seized electronic devices.

*Adams's Use of Multiple Cellphones*

10. Based on my involvement in this investigation, including my review of electronic communications obtained pursuant to more than 20 search warrants for electronic devices and

2019.07.24

SDNY_01_000009496
SUBJECT TO PROTECTIVE ORDER.

accounts, my review of records received from cellphone providers, and my interviews of numerous witnesses who have interacted with Adams, I know of at least seven different cellphone numbers that Adams has used during the time period relevant to this investigation.

11. On or about November 6, 2023, I participated in the execution of a court-authorized warrant for electronics within Adams's possession, during which the FBI seized two cellphones and a tablet (as well as a laptop that was subsequently returned without being searched) from Adams. On or about November 7, 2023, Adams's counsel turned over to the FBI, in response to a subpoena, two additional cellphones used by Adams at different times.

12. On or about September 10, 2024, the *New York Post* released an article entitled "Paranoid police officials meeting in parking lots as fed raids leave NYPD, City Hall in shock: sources,"[1] which reports the following information: "The mayor himself — who's had several different phone numbers and is known for using the encrypted messaging app Signal — has kept up his practice, with one City Council source saying the last number they had for Hizzoner was 'two phones ago.'"

13. I also know that since the FBI seized multiple electronic devices from Adams in November 2023, Adams stopped using his longtime personal cellphone number and acquired at least two new cellphone numbers: the number assigned to the Target Cellphone and ████6605 (the "6605 Phone"). The 6605 Phone is subscribed to by the New York City Police Department, but I have reviewed, pursuant to a court-authorized warrant, Signal messages between Adams and other members of his administration from approximately November 19, 2023 through at least February 4, 2024, in which Adams uses the 6605 Phone. Furthermore, the 6605 Phone is saved in

---

[1] Available at https://nypost.com/2024/09/10/us-news/federal-raids-have-paralyzed-nypd-city-hall-and-scared-the-police-brass-into-talking-in-parking-lots-sources/.

2019.07.24

SDNY_01_000009497
SUBJECT TO PROTECTIVE ORDER.

former NYPD Commissioner ████████ phone (seized pursuant to a warrant on or about September 4, 2024) as "EA" and "Eric Adams."

14. Moreover, since the phone seizures from Adams in November 2023, Adams has continued to use electronic devices, and to use Signal, to engage in communications which constitute evidence of the Subject Offenses. For instance, in May 2024 Adams used Signal to exchange messages with Businessman-4, a businessowner active in the New York City Uzbek community, who, as described in the Indictment, had previously orchestrated straw donations to Adams's campaigns, at the behest of Adams Employee-1:[2]

    a. On or about May 16 and May 20, 2024, Adams sent Businessman-4 Signal messages asking Businessman-4 to provide twenty $250 dollar donations from separate individuals to the 2025 Campaign.

    b. On or about May 16, 2024, Adams messaged Businessman-4, "You have always been my strongest go to person."

    c. On or about May 20, 2024, Adams messaged Businessman-4 that for each $250 donation Businessman-4 provided, "The City will match eight to one," a reference to the Matching Funds Program (*see* Indictment ¶7).

    d. Businessman-4 has stated to law enforcement, in sum and substance, that he initially understood Adams to have requested 20 bona fide donations from 20 separate donors, each contributing their own funds.[3] In a subsequent conversation with Businessman-4, however, Adams Employee-1 referred to Adams's request as a request for $5,000.

---

[2] Businessman-4 and Adams Employee-1 are defined terms with the same meaning as in the Indictment.

[3] Businessman-4 provided the information described in this affidavit pursuant to a proffer agreement in the hopes of obtaining leniency in connection with the Government's investigation into the Subject Offenses. In the course of those proffers, Businessman-4 admitted his involvement in

2019.07.24

SDNY_01_000009498
SUBJECT TO PROTECTIVE ORDER.

e.  Based on my training and experience, including my experience in this investigation, I believe Adams Employee-1's statement indicates that Adams had requested that Businessman-4 conduct straw donations, because, among other reasons, describing the request as seeking $5,000 from Businessman-4 is consistent with requesting that Businessman-4 provide $5,000 split among 20 straw donors at $250 each, rather than 20 bona fide donors each separately contributing their own money.

15. I also know, based on my involvement in this investigation, that Adams has taken steps to conceal his electronic messages.  For example, pursuant to a court-authorized warrant, I have reviewed a series of messages between the Adams Staffer and Adams from March 2019 during which, in the context of planning another possible to trip to Turkey for which the Airline Manager would arrange the flights, the Adams Staffer wrote, "To be o[n the] safe side Please Delete all messages you send me," and Adams responded, "Always do."[4]

---

(i) straw donations to Eric Adams's mayoral campaigns and (ii) fraud in connection with applications for lawful-permanent-resident status and citizenship. The information provided by Businessman-4 has proven reliable and is corroborated by other evidence.

[4] The Adams Staffer and Airline Manager are defined terms with the same meaning as in the Indictment.

2019.07.24

SDNY_01_000009499
SUBJECT TO PROTECTIVE ORDER.

16. Furthermore, in proffer sessions with law enforcement, Businessman-4 has stated the following in substance and in part.

a.   On June 13, 2024, the day the FBI searched his home, Businessman-4 went to his office and called Adams Employee-1.  On the ensuing phone call, Businessman-4 told Adams Employee-1 about the FBI's search, and Adams Employee-1—who indicated that he was at City Hall—responded by asking when they could meet.  They set a meeting time that afternoon.  That afternoon, Adams Employee-1 arrived at Businessman-4's office, and questioned Businessman-4 about the FBI's search.  Businessman-4 told Adams Employee-1, among other things, that Businessman-4 had denied to the FBI having participated in straw donations.  Businessman-4 also told Adams Employee-1 that employees of Businessman-4's had also been approached that day by the FBI, and that Businessman-4's employees had denied being reimbursed for their donations to the Adams Campaigns.  Adams Employee-1 told Businessman-4 that if Businessman-4 stuck to that story, everything would be fine.  Adams Employee-1 asked to see the grand jury subpoena that had been left with Businessman-4 after the search, and Adams Employee-1 took a series of photographs of the subpoena, which Businessman-4 believed Adams Employee-1 was sending to Adams.  Adams Employee-1 then had Businessman-4 invite his employees, who had been approached by the FBI, into the office, so that Adams Employee-1 could address them.  When addressing Businessman-4's employees, Adams Employee-1 told the employees that they should stick to their story, and that because they were reimbursed in cash, the Government would be unable to prove that they had received reimbursements for their donations, so everything would be fine.

b.   On the following day, Businessman-4 and Adams Employee-1 met again. Adams Employee-1 told Businessman-4 that he had met with Adams at City Hall before coming to

2019.07.24

SDNY_01_000009500
SUBJECT TO PROTECTIVE ORDER.

Businessman-4's office.  Adams Employee-1 indicated that his meeting with Adams was conducted in private, and that Adams and Adams Employee-1 each left their cellphones outside of the room where they met. Adams Employee-1 reported that Adams had been agitated in their meeting, and that Adams expressed displeasure that Businessman-4 had been searched.  But Adams Employee-1 reported that Adams said it was ok because Businessman-4 was "tight." Adams Employee-1 told Businessman-4 that he asked what Adams meant by "tight," and Adams made a fist, which Adams Employee-1 understood meant that Businessman-4 would not cooperate with law enforcement.[5]

17. Based on my involvement in this investigation, I know that location data for the Target Cellphone and for a cellphone used by Adams Employee-1, obtained pursuant to a court-authorized warrant, is consistent with Adams and Adams Employee-1 meeting at City Hall on June 13 and 14, 2014 as described by Adams Employee-1 to Businessman-4.

18. Furthermore, on or about July 24, 2024, at approximately 6 a.m., FBI agents executed a search warrant at Adams Employee-1's home and seized Adams Employee-1's cellphone.  Based on my review of information from the forensic extraction of that cellphone, I have learned, among other things, that the Signal application was not on the cellphone at the time it was forensically searched, but that according to activity logs for the cellphone, it had been used to access the Signal application as recently as approximately 12:04 a.m. on July 24, 2024, *i.e.* the day of the search.  In

---

[5] Certain prior warrant applications described this conversation as occurring on June 13, 2024 and further described Adams as telling Adams Employee-1 that "tight" meant "strong."  Business-man-4 has since clarified that these were two separate conversations and that Adams Employee-1 did not report Adams using the word "strong," but rather conveyed that conclusion based on Ad-ams's use of his fist.

2019.07.24

SDNY_01_000009501
SUBJECT TO PROTECTIVE ORDER.

other words, Adams Employee-1 deleted Signal from the cellphone FBI agents seized from him sometime between approximately midnight and approximately 6 a.m. on July 24, 2024.[6]

19.    Based on my training and experience, I know that individuals involved in criminal activity commonly use multiple cellphones in order to reduce the chances that law enforcement's discovery or seizure of one phone will reveal or disrupt their illegal activities.

20.    Based on the foregoing, I respectfully submit that the Requested Information will provide evidence of the Subject Offenses because, among other reasons, it will reveal the location of the Target Cellphone, which, as set forth above, is likely to contain evidence of the Subject Offenses.

### III.  Request for Warrant and Order

21.    Based on the foregoing I respectfully request that the Court require the Service Provider to provide the Requested Information as specified further in the Warrant and Order proposed herewith, including prospective precision location and cell site data for a period of 45 days from the date of this Order and pen register information for a period of 45 days from the date of this Order.

22.    **Nondisclosure.** The scope and timing of this ongoing criminal investigation is not publicly known. Specifically, although Eric Adams knows that the Government will be presenting proposed charges to the grand jury, he does not know that an indictment has been returned, that law enforcement has identified the Target Cellphone, or that law enforcement is able to locate Adams based on location information for the Target Cellphone.  Law enforcement intends to

---

[6] In a voluntary interview on or about July 24, 2024, Adams Employee-1—who was traveling to Egypt that evening—admitted that he had recently deleted Signal but claimed that he has a practice of deleting applications that were suspicious before traveling internationally in case he was questioned during his travel.  When agents asked Adams Employee-1 directly whether he had deleted Signal that day, Adams Employee-1 stated that he would not disclose when he deleted Signal.

10

SDNY_01_000009502
SUBJECT TO PROTECTIVE ORDER.

execute court-authorized warrants to seize the Target Cellphone and other electronic devices used by Adams. Premature public disclosure of this affidavit or the requested Warrant and Order could alert Adams, causing him to destroy or conceal electronic evidence or to leave the Target Cellphone in a location that would interfere with law enforcement's ability to locate and seize Adams's other electronic devices and thus otherwise seriously jeopardize the investigation. *See* 18 U.S.C. § 2705(b)(3), (5).

23.    Accordingly, there is reason to believe that, were the Service Provider to notify the subscriber or others of the existence of the warrant, the investigation would be seriously jeopardized. Pursuant to 18 U.S.C. § 2705(b), I therefore respectfully request that the Service Provider be directed not to notify the subscriber or others of the existence of the Warrant and Order for a period of one year, and that the Warrant and Order and all supporting papers be maintained under seal until the Court orders otherwise, as specified in the Application submitted in conjunction with this Affidavit.



Federal Bureau of Investigation

Sworn to me through reliable electronic
means this 25th day of September, 2024.

*Katharine H. Parker*

HONORABLE KATHARINE H. PARKER
United States Magistrate Judge
Southern District of New York

2019.07.24

SDNY_01_000009503
SUBJECT TO PROTECTIVE ORDER.

# EXHIBIT A

SDNY_01_000009504
SUBJECT TO PROTECTIVE ORDER.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

v.

ERIC ADAMS,

Defendant.

**SEALED INDICTMENT**

24 Cr.

**24 CRIM 556**

## Overview

1.      In 2014, ERIC ADAMS, the defendant, became Brooklyn Borough President. Thereafter, for nearly a decade, ADAMS sought and accepted improper valuable benefits, such as luxury international travel, including from wealthy foreign businesspeople and at least one Turkish government official seeking to gain influence over him.  By 2018, ADAMS—who had by then made known his plans to run for Mayor of New York City—not only accepted, but sought illegal campaign contributions to his 2021 mayoral campaign, as well as other things of value, from foreign nationals.  As ADAMS's prominence and power grew, his foreign-national benefactors sought to cash in on their corrupt relationships with him, particularly when, in 2021, it became clear that ADAMS would become New York City's mayor.  ADAMS agreed, providing favorable treatment in exchange for the illicit benefits he received.  After his inauguration as Mayor of New York City, ADAMS soon began preparing for his next election, including by planning to solicit more illegal contributions and granting requests from those who supported his 2021 mayoral campaign with such donations.

2.      ERIC ADAMS, the defendant, sought and accepted illegal campaign contributions in the form of "nominee" or "straw" contributions, meaning that the true contributors conveyed their money through nominal donors, who falsely certified they were contributing their own

SUBJECT TO PROTECTIVE ORDER.

money.   By smuggling their contributions to ADAMS through U.S.-based straw donors, ADAMS's overseas contributors defeated federal laws that serve to prevent foreign influence on U.S. elections.   Wealthy individuals evaded laws designed to limit their power over elected officials by restricting the amount any one person can donate to a candidate.   And businesses circumvented New York City's ban on corporate contributions by funneling their donations through multiple employees, frustrating a law that seeks to reduce corporate power in politics. ADAMS increased his fundraising by accepting these concealed, illegal donations—at the cost of giving his secret patrons the undue influence over him that the law tries to prevent.

3.      ERIC ADAMS, the defendant, compounded his gains from the straw contributions by using them to defraud New York City and steal public funds.  New York City has a matching funds program that matches small-dollar contributions from individual City residents with up to eight times their amount in public funds, to give New Yorkers a greater voice in elections. ADAMS's campaigns applied for matching funds based on known straw donations, fraudulently obtaining as much as $2,000 in public funds for each illegal contribution.  ADAMS and those working at his direction falsely certified compliance with applicable campaign finance regulations despite ADAMS's repeated acceptance of straw donations, relying on the concealed nature of these illegal contributions to falsely portray his campaigns as law-abiding.  As a result of those false certifications, ADAMS's 2021 mayoral campaign received more than $10,000,000 in public funds.

4.      ERIC ADAMS, the defendant, also sought and received other improper benefits from some of the same co-conspirators who funneled straw donations to his campaigns.   In particular, a senior official in the Turkish diplomatic establishment (the "Turkish Official"), who facilitated many straw donations to ADAMS, also arranged for ADAMS and his companions to receive free or discounted travel on Turkey's national airline (the "Turkish Airline"), which is

2

SDNY_01_000009506
SUBJECT TO PROTECTIVE ORDER.

owned in significant part by the Turkish government, to destinations including France, China, Sri Lanka, India, Hungary, and Turkey itself. The Turkish Official and other Turkish nationals further arranged for ADAMS and his companions to receive, among other things, free rooms at opulent hotels, free meals at high-end restaurants, and free luxurious entertainment while in Turkey.

5.      ERIC ADAMS, the defendant, and others working at his direction, repeatedly took steps to shield his solicitation and acceptance of these benefits from public scrutiny. ADAMS did not disclose the travel benefits he had obtained in annual financial disclosures he was required to file as a New York City employee. Sometimes, ADAMS agreed to pay a nominal fee to create the appearance of having paid for travel that was in fact heavily discounted. Other times, ADAMS created and instructed others to create fake paper trails, falsely suggesting that he had paid, or planned to pay, for travel benefits that were actually free. And ADAMS deleted messages with others involved in his misconduct, including, in one instance, assuring a co-conspirator in writing that he "always" deleted her messages.

6.      In September 2021, the Turkish Official told ERIC ADAMS, the defendant, that it was his turn to repay the Turkish Official, by pressuring the New York City Fire Department ("FDNY") to facilitate the opening of a new Turkish consular building—a 36-story skyscraper—without a fire inspection, in time for a high-profile visit by Turkey's president. At the time, the building would have failed an FDNY inspection. In exchange for free travel and other travel-related bribes in 2021 and 2022 arranged by the Turkish Official, ADAMS did as instructed. Because of ADAMS's pressure on the FDNY, the FDNY official responsible for the FDNY's assessment of the skyscraper's fire safety was told that he would lose his job if he failed to acquiesce, and, after ADAMS intervened, the skyscraper opened as requested by the Turkish Official.

3

SDNY_01_000009507
SUBJECT TO PROTECTIVE ORDER.

### New York City's Public Matching Funds Program

7.      The New York City Campaign Finance Board ("CFB") oversees and administers a publicly funded campaign finance system for municipal elections in New York City, including a matching funds program (the "Matching Funds Program") that provides eligible candidates with public funds to match small-dollar contributions from New York City residents ("Matching Funds"). The Matching Funds Program is intended to incentivize candidates to finance their campaigns by engaging with average New Yorkers, instead of seeking large contributions from a limited number of influential donors, and to empower more candidates to run for office, even without access to wealth. For mayoral candidates in the 2021 and 2025 election cycles, the Matching Funds Program operated, as relevant here, in the following manner:

       a.      Candidates that collected a minimum number of contributions and raised a minimum amount of qualifying contributions from New York City residents were eligible to opt into the Matching Funds Program.

       b.      Candidates that opted into the Matching Funds Program were required to file a signed and notarized certification attesting, among other things, that they understood that they were responsible for reading, understanding, and complying with, and ensuring their campaigns' compliance with, various statutes and rules; that submitting fraudulent claims for Matching Funds or otherwise furnishing false information to the CFB would constitute a fundamental breach of the obligations affirmed as part of the certification; and that, in the event of such a breach, they would be ineligible to receive additional Matching Funds and would be required to return all Matching Funds previously received.

       c.      The Matching Funds Program would provide up to $8 in Matching Funds for each $1 of eligible contributions up to $250 from New York City residents. In other words,

4

SDNY_01_000009508
SUBJECT TO PROTECTIVE ORDER.

for each eligible contribution of at least $250, a participating candidate could collect up to $2,000 in Matching Funds. The Matching Funds Program would provide up to $12,952,888 in Matching Funds for qualifying mayoral candidates during the primary and general elections in the 2021 election cycle, and up to $14,101,334 in Matching Funds for qualifying mayoral candidates during the primary and general elections in the 2025 election cycle.

        d.     Certain kinds of contributions were prohibited entirely, including (i) straw contributions; (ii) contributions from a person who was not a United States citizen or a lawful permanent resident of the United States; (iii) contributions from foreign entities and organizations; (iv) contributions from corporations; and (v) contributions that were made, received, solicited, or otherwise obtained in violation of any local, state, or federal law.

        e.     Through its Campaign Finance Handbook, the CFB informed candidates and their campaign staff that straw contributions were not only prohibited, but also illegal.

        f.     Candidates that opted into the Matching Funds Program were required to regularly submit to the CFB disclosure statements that, among other things, identified all contributions received during a particular reporting period, regardless of whether those contributions were eligible for matching funds. These disclosure statements were required to be submitted electronically by either the candidate or the campaign's treasurer using a unique login. In order to submit a disclosure statement, the filer was required to (i) identify him or herself as either the candidate or the treasurer and (ii) electronically sign a verification stating, "This disclosure statement is true and correct to the best of my knowledge, information and belief and I understand that by clicking 'Verify' below I am electronically signing my disclosure statement, which shall have the same validity and effect as a signature affixed by hand."

5

SDNY_01_000009509
SUBJECT TO PROTECTIVE ORDER.

8.      ERIC ADAMS, the defendant, was aware that the law prohibited foreign, conduit, and corporate contributions. At least as early as 2018, ADAMS, began raising money to fund his first mayoral campaign (the "2021 Campaign"). In September 2019, ADAMS submitted the required certification to opt into the Matching Funds Program. During the 2021 election cycle, ADAMS and persons acting at his direction regularly submitted and signed disclosure statements attesting to the veracity of the information being provided to the CFB. ADAMS won his party's primary election in July 2021, and was elected Mayor in November 2021. While serving as Mayor, ADAMS again opted into the Matching Funds Program and began fundraising for his 2025 reelection campaign (the "2025 Campaign," and together with the 2021 Campaign, the "Adams Campaigns"), continuing at least to the date of this Indictment.

### ADAMS Travels to Turkey and Begins Accepting Illegal Campaign Contributions and Personal Benefits

9.      Within a year of becoming Brooklyn Borough President, ERIC ADAMS, the defendant, began building relationships with foreign nationals who were seeking influence with him. In the years that followed, ADAMS solicited and knowingly accepted illegal campaign contributions and improper personal benefits from those foreign nationals.

#### *In 2015, ADAMS travels to Turkey and establishes corrupt relationships*

10.     In 2015, ERIC ADAMS, the defendant, took two official trips to Turkey. His first trip, in August 2015, was arranged by the Turkish Consulate General in New York City (the "Turkish Consulate") and paid for in part by the Turkish Consulate and in part by a for-profit educational conglomerate based in Istanbul (the "Turkish University"). The second trip, in December 2015, was arranged by the Turkish Official and a Turkish entrepreneur (the "Promoter") whose business includes organizing events to introduce Turkish corporations and businesspeople to politicians, celebrities, and others whose influence may benefit the corporations and

6

SDNY_01_000009510
SUBJECT TO PROTECTIVE ORDER.

businesspeople. For both trips, ADAMS received free business class tickets on the Turkish Airline. Unlike ADAMS's subsequent travel with the Turkish Airline, ADAMS reported his 2015 travel to Turkey on financial disclosure forms filed with the New York City Conflict of Interest Board (the "COIB"), as he was required to do annually at all times relevant to this Indictment.

11.    The 2015 travel to Turkey by ERIC ADAMS, the defendant, involved several people relevant to events described in this Indictment, including:

a.    The Turkish Official, who helped arrange ADAMS's travel to and within Turkey in 2015, and who later steered illegal contributions and improper gifts to ADAMS to gain influence with and, eventually, to obtain corrupt official action from ADAMS.

b.    The Promoter, who arranged straw contributions to both of the Adams Campaigns and favorable treatment in Turkey for ADAMS in 2017 and 2019, hoping to leverage ADAMS's considerable fame in Turkey to benefit the Promoter's clients.

c.    The owner and chairman of the Turkish University ("Businessman-1"), who met with ADAMS in Istanbul in 2015 and again in Brooklyn, New York in 2018. Businessman-1, who was considering a business venture in Brooklyn, and also sought to enhance his own status by befriending ADAMS, later made illegal contributions to the 2021 Campaign.

d.    A volunteer at Brooklyn Borough Hall (the "Adams Staffer"), who then served as ADAMS's "Liaison to Eastern Europe Muslim Countries," including Turkey. The Adams Staffer subsequently became a paid member of ADAMS's staff at Borough Hall and, later, City Hall. The Adams Staffer accompanied ADAMS on his 2015 travel to Turkey, and later, at ADAMS's direction, coordinated many of the illegal campaign contributions and improper personal travel benefits relevant to this Indictment.

SDNY_01_000009511
SUBJECT TO PROTECTIVE ORDER.

e.    A wealthy Turkish businesswoman (the "Businesswoman"), who later gave ADAMS multiple free or steeply discounted stays in a luxury hotel she owned, and organized contributions to the 2021 Campaign.

### In 2016, ADAMS secretly begins accepting free luxury travel

12.    After ERIC ADAMS, the defendant, first traveled to Turkey in 2015, the Turkish Official introduced ADAMS to the Turkish Airline's general manager in the New York City area (the "Airline Manager"). In 2016 and twice in 2017, ADAMS solicited and accepted free and heavily discounted luxury air travel from the Turkish Airline, as part of the Turkish Official's efforts to gain influence over ADAMS, on three separate trips:

a.    In October 2016, ADAMS and his domestic partner ("Adams's Partner") traveled to India. Adams's Partner purchased economy class tickets for herself and ADAMS on the Turkish Airline for approximately $2,286. Two days before their flight was scheduled to depart, ADAMS accepted upgrades for himself and his partner by the Turkish Airline to business class at no cost. Business class is the highest class offered by the Turkish Airline. Had ADAMS and his partner purchased their business class tickets, the tickets would have cost approximately $15,000 total.

b.    In July and August 2017, ADAMS, a close relative of ADAMS (the "Adams Relative"), and a member of ADAMS's staff who has served as ADAMS's liaison to the Asian-American communities in New York City (the "Adams Liaison") traveled to Nice, France; Istanbul, Turkey; Columbo, Sri Lanka; and Beijing, China. ADAMS accepted free business class tickets from the Turkish Airline, worth more than $35,000 total, for himself and his companions.

c.    In October 2017, ADAMS and the Adams Liaison traveled to Nepal through Istanbul and Beijing. ADAMS accepted free business class tickets from the Turkish Airline for

8

SDNY_01_000009512
SUBJECT TO PROTECTIVE ORDER.

himself and the Adams Liaison for the flights from New York to Istanbul and Istanbul to Beijing, and for the corresponding return flights, worth more than $16,000 total.

13.     Because the Turkish Airline provided free travel benefits worth tens of thousands of dollars to ERIC ADAMS, the defendant, he flew the Turkish Airline even when doing so was otherwise inconvenient.  For example, during the July and August 2017 trip, Adams's Partner was surprised to learn that ADAMS was in Turkey when she had understood him to be flying from New York to France.  ADAMS responded, in a text message, "Transferring here. You know first stop is always instanbul [sic]."  When Adams's Partner later inquired about planning a trip to Easter Island, Chile, ADAMS repeatedly asked her whether the Turkish Airline could be used for their flights, requiring her to call the Turkish Airline to confirm that they did not have routes between New York and Chile.

14.     ERIC ADAMS, the defendant, also accepted valuable travel and hospitality benefits for himself and his companions during their time in Turkey.  For example, during a stay in Istanbul during the July and August 2017 trip, ADAMS, the Adams Relative, and the Adams Liaison accepted a heavily discounted stay at the St. Regis Istanbul, arranged by the Promoter. The St. Regis Istanbul is owned by the Businesswoman, who sought to ingratiate herself with ADAMS.  ADAMS stayed in the "Bentley Suite," portions of which are depicted here:

9

SUBJECT TO PROTECTIVE ORDER.



*Bentley Suite Bedroom*



*Bentley Suite Bathroom*

Although booking the Bentley Suite for two nights would have cost approximately $7,000, ADAMS paid a total of less than $600.

SDNY_01_000009514
SUBJECT TO PROTECTIVE ORDER.

15.    In order to conceal the valuable flight, hotel, and other travel benefits that ERIC

ADAMS, the defendant, accepted from foreign nationals seeking influence over him, he did not

disclose any of these trips on his annual disclosure forms, despite a legal requirement to do so.

a.    By law, certain New York City elected officials and candidates for elected

office are required to file annual reports with the COIB disclosing their financial information and

outside positions and interests, as well as those of their spouses or domestic partners and

unemancipated children.  The purpose of the annual disclosure law is to provide transparency to

ensure that there are no prohibited conflicts of interest between public servants' official duties and

their private interests.

b.    At all times relevant to this Indictment, ADAMS was an elected New York

City official required to file annual disclosure forms with the COIB.

c.    On his 2016 and 2017 COIB Annual Disclosure Forms, ADAMS was asked

whether he had received "any gift or gifts from the same person, entity or donor or affiliated donors

who had no business dealings with the City, other than a relative, in the total amount or with a total

value of $1,000 or more during" the year.  ADAMS answered "no."  ADAMS also answered "no"

to a similar question asking whether he had received any gifts worth $50 or more from "a person,

entity, donor, or affiliated donors" who did have business with New York City.

d.    The valuable travel benefits ADAMS solicited and accepted—including the

free business class upgrade for two for travel from New York to India; the free business class

tickets for three from New York to France, Turkey, Sri Lanka, and China; the heavily discounted

stay in the Bentley Suite; and the free business class tickets for two from New York to China

through Turkey—for each of the 2016 and 2017 trips described in paragraphs 12 through 14 each

11

SDNY_01_000009515
SUBJECT TO PROTECTIVE ORDER.

exceed $1,000 in value, as would be obvious to anyone who, like ADAMS, had extensive experience traveling overseas.

16.    ERIC ADAMS, the defendant, also sought to conceal the luxury travel benefits he solicited and accepted from foreign nationals by creating fake paper trails, which members of ADAMS's staff assisted in at his direction. For example, ADAMS attempted to create a fake paper trail suggesting he had paid for his 2017 flights on the Turkish Airline, when in fact he had not.

a.    As Brooklyn Borough President, ADAMS employed a scheduler (the "Adams Scheduler") who managed his appointments, meetings, and other official events. Despite her status as a New York City employee, the Adams Scheduler was used by ADAMS to perform personal tasks for him, such as collecting rent at a Brooklyn property he owned. ADAMS also assigned the Adams Scheduler to pay various personal expenses for him, after which ADAMS would reimburse the Adams Scheduler in cash.

b.    In 2017, ADAMS sent a series of emails to the Adams Scheduler, directing the Adams Scheduler to pay for the free 2017 flights he and his companions had already taken on the Turkish Airline. But the emails provided inconsistent explanations: in some, ADAMS suggested that the Adams Scheduler should pay by using ADAMS's credit card, while in others, ADAMS claimed to have left cash in an envelope for the Adams Scheduler to send to the Turkish Airline.

c.    For example, on November 25, 2017, ADAMS sent an email to the Adams Scheduler saying that with respect to the "July trip," meaning the July and August 2017 trip on the Turkish Airline, "I left you the money for the international airline in an envelope in your top desk draw. [sic] Please send it to them." Given the cost of the international business class tickets for ADAMS alone, ADAMS's email suggested that he left, at a minimum, well over $10,000 in cash

12

SDNY_01_000009516
SUBJECT TO PROTECTIVE ORDER.

in the Adams Scheduler's desk drawer to "send" to the Turkish Airline as payment for flights taken months earlier. He did not do that, as records from the Turkish Airline confirm that ADAMS did not pay the airline, in cash or otherwise, because the tickets were complimentary.

17.     In return for travel benefits the Turkish Official provided or arranged in or about 2015 and 2016, ERIC ADAMS, the defendant, granted a political request from the Turkish Official. Prior to ADAMS's 2015 travel to Turkey—which ADAMS knew, and disclosed to the COIB, had been funded by, among other entities, the Turkish Consulate, the Turkish Airline, and three separate municipalities in Turkey—ADAMS had maintained a relationship with a Turkish community center in Brooklyn (the "Community Center"). In or about 2016, the Turkish Official told ADAMS that the Community Center was affiliated with a Turkish political movement that was hostile to Turkey's government, and that if ADAMS wished to continue receiving support from the Turkish government, ADAMS could no longer associate with the Community Center. ADAMS acquiesced.

***ADAMS begins accepting straw contributions and continues to receive luxury travel benefits***

18.     By 2018, ERIC ADAMS, the defendant, began raising funds for the 2021 Campaign. ADAMS was closely involved in the details of fundraising, which he regarded as vital to his success. As he texted a close supporter later in the campaign: "You win the race by raising money . . . . Have to raise money. Everything else is fluff." ADAMS further explained, "I have a 7 million dollar race. I have a clear plan to raise it and each night we are out executing the plan." Throughout the 2021 Campaign, ADAMS solicited and knowingly accepted straw donations, including from foreign sources, while continuing to secretly accept free and heavily discounted travel benefits from the Turkish Official, the Promoter, and the Airline Manager.

13

SDNY_01_000009517
SUBJECT TO PROTECTIVE ORDER.

19.     As part of these efforts, ERIC ADAMS, the defendant, solicited and knowingly accepted straw donations to the 2021 Campaign that were facilitated by the Turkish Official and the Airline Manager, among others.

a.     Beginning at least as early as April 2018, ADAMS asked the Airline Manager to fundraise for the 2021 Campaign, and the Airline Manager sought to organize a fundraiser.

b.     On June 14, 2018, the Turkish Official exchanged messages with the Adams Staffer, asking "how much can companies donate?"[1]  The Adams Staffer explained that only individuals could donate to the 2021 Campaign.

c.     On June 22, 2018, ADAMS attended a fundraiser for the 2021 Campaign. The Airline Manager, among others, organized and attended the event.  Following the event, the Turkish Official messaged the Adams Staffer, asking for the "list of the participants of the June 22 meeting."  The Adams Staffer then sent the Turkish Official "The list for 6/22/18," which included the names of various persons who donated to the 2021 Campaign in the preceding days or who donated in the following days, raising in excess of $15,000.

d.     A promotional flyer for the June 22, 2018 fundraiser listed as one of the fundraiser's hosts a friend of the Airline Manager who owned an airport transportation business ("Businessman-2").  In a series of messages exchanged with the Adams Staffer, Businessman-2 stated that he had facilitated a straw donation through an associate.  Records from the CFB show that the associate ultimately donated $3,000 in his own name and described himself as unemployed.

---

[1]     Many of the conversations quoted in this Indictment, including this conversation between the Adams Staffer and the Turkish Official, were held in a language other than English.

14

SDNY_01_000009518
SUBJECT TO PROTECTIVE ORDER.

20.    ERIC ADAMS, the defendant, also sought to arrange for his campaigns to receive unlawful contributions from Turkish nationals, which would be routed through U.S.-based straw donors.

a.    On June 22, 2018—the same day as the fundraising event just described—the Adams Staffer and the Promoter discussed by text message a possible trip by ADAMS to Turkey. The Promoter stated, in part, "Fund Raising in Turkey is not legal, but I think I can raise money for your campaign off the record." The Adams Staffer inquired, "How will [ADAMS] declare that money here?" The Promoter responded, "He won't declare it . . . Or . . . We'll make the donation through an American citizen in the U.S. . . . A Turk . . . I'll give cash to him in Turkey . . . Or I'll send it to an American . . . He will make a donation to you." The Adams Staffer replied, "I think he wouldn't get involved in such games. They might cause a big stink later on," but "I'll ask anyways." The Adams Staffer then asked, "how much do you think would come from you? $?" The Promoter responded, "Max $100K." The Adams Staffer wrote, "100K? Do you have a chance to transfer that here? . . . We can't do it while Eric is in Turkey," to which the Promoter replied, "Let's think." After this conversation, the Adams Staffer asked ADAMS whether the Adams Staffer should pursue the unlawful foreign contributions offered by the Promoter, and contrary to the Adams Staffer's expectations, ADAMS directed that the Adams Staffer pursue the Promoter's illegal scheme.

b.    In November 2018, Businessman-1—the wealthy Turkish national who owned the Turkish University, a for-profit educational conglomerate in Turkey, and whom ADAMS met there in 2015—visited New York City. ADAMS and the Adams Staffer met with Businessman-1 at Brooklyn Borough Hall. At the close of the meeting, Businessman-1 offered to contribute funds to the 2021 Campaign. Although ADAMS knew that Businessman-1 was a

15

SDNY_01_000009519
SUBJECT TO PROTECTIVE ORDER.

Turkish national who could not lawfully contribute to U.S. elections, ADAMS directed the Adams Staffer to obtain the illegal contributions offered by Businessman-1. Following up on this directive, ADAMS wrote to the Adams Staffer that Businessman-1 "is ready to help. I don't want his willing to help be waisted [sic]." As ADAMS directed, the Adams Staffer maintained contact with Businessman-1 through intermediaries, culminating in ADAMS accepting straw donations of Businessman-1's money, discussed below.

21.     In 2018, ERIC ADAMS, the defendant, also continued to secretly solicit and accept free and heavily discounted luxury travel benefits provided by the Turkish Official and the Airline Manager. In January 2018, ADAMS and Adams's Partner traveled to Budapest, Hungary, through Istanbul. Several months earlier, Adams's Partner had purchased two economy class tickets on the Turkish Airline for approximately $560 each. In December 2017, the Adams Staffer, acting at ADAMS's direction, asked the Airline Manager to upgrade the tickets to business class, which he did for free. Had ADAMS and Adams's Partner purchased their business class tickets, the tickets would have cost more than $14,000 total. Consistent with his prior actions, ADAMS concealed this free and heavily discounted travel the Turkish Airline provided by omitting it from his 2018 COIB disclosure form, despite the requirement to report it.

### As the 2021 Mayoral Election Approaches, ADAMS Continues to Solicit and Accept Illegal Campaign Contributions

#### *In 2019, ADAMS travels to Istanbul and solicits foreign contributions*

22.     In January 2019, ERIC ADAMS, the defendant, and Adams's Partner traveled to Turkey, Jordan, and Oman with the assistance of the Promoter. Because ADAMS made his travel arrangements through the Promoter and not through the Airline Manager, the Airline Manager did not upgrade ADAMS's economy class tickets on the Turkish Airline, instead arranging a full upgrade only for Adams's Partner. Had Adams's Partner purchased her business class ticket, it

SDNY_01_000009520
SUBJECT TO PROTECTIVE ORDER.

would have cost at least approximately $7,000. In an effort to monopolize flight travel as a method of gaining influence with ADAMS, the Airline Manager observed that difficulty arose in upgrading ADAMS because the arrangements had been made through others. When exchanging messages about another potential trip later in 2019, the Adams Staffer requested an upgrade for ADAMS from the Airline Manager and explained, in part, that "He learned his lesson last time. We're writing directly to you this time." After the 2019 trip, ADAMS exclusively arranged his flights on the Turkish Airline through the Airline Manager, allowing the Airline Manager, the Turkish Official, and the Turkish government to increase their influence over ADAMS.

23.    During his 2019 trip, ERIC ADAMS, the defendant, solicited and accepted travel benefits from the Promoter—the Turkish entrepreneur who, as described above, facilitated ADAMS's second 2015 trip to Turkey and in 2018 proposed to ADAMS via the Adams Staffer raising campaign contributions illegally in Turkey. Specifically, ADAMS solicited and accepted free hotel stays, dinners, and a boat trip, among other things, from the Promoter, including a free two-night stay in the Cosmopolitan Suite of the St. Regis Istanbul, depicted below:



*Cosmopolitan Suite Living Room*

17

SUBJECT TO PROTECTIVE ORDER.



*Cosmopolitan Suite Bedroom*

Had ADAMS paid for a two-day stay in this luxury suite, the cost would have been approximately $3,000 total. ADAMS also solicited and accepted from the Promoter free transportation, meals, and entertainment, including a car and driver, a boat tour to the Princes' Islands in the Sea of Marmara, a Turkish bath at a seaside hotel, and at least one meal at a high-end restaurant.

24.     ERIC ADAMS, the defendant, did not report any of the free travel benefits he received during his 2019 stay in Istanbul on his 2019 COIB disclosure form.

25.     ERIC ADAMS, the defendant, also solicited unlawful foreign campaign contributions while in Istanbul in January 2019. During ADAMS's trip, the Promoter arranged for ADAMS to meet a wealthy Turkish businessman ("Businessman-3"). The Turkish Official, through the Adams Staffer, discouraged ADAMS from meeting Businessman-3, who was then under suspicion of wrongdoing. ADAMS did so nonetheless. During their meeting, ADAMS and the Promoter solicited campaign contributions from Businessman-3, who as a Turkish national could not lawfully contribute to any U.S. campaign. During the meeting, Businessman-3 agreed

18

SDNY_01_000009522
SUBJECT TO PROTECTIVE ORDER

to contribute $50,000 or more to the 2021 Campaign, believing that ADAMS might one day be the President of the United States and hoping to gain influence with ADAMS. In subsequent messages, the Promoter and the Adams Staffer discussed how to funnel Businessman-3's planned contributions to the 2021 Campaign through U.S. straw donors. Before any of the discussed straw donations could occur, however, Businessman-3's legal troubles in Turkey and the United States became more public. ADAMS declined to meet with Businessman-3 when Businessman-3 later visited New York, and Businessman-3 did not ultimately contribute to the 2021 Campaign.

26.    Businessman-3 was not the only wealthy Turkish national from whom ERIC ADAMS, the defendant, sought illegal campaign contributions. Also in January 2019, ADAMS continued to seek the illegal foreign contributions promised by Businessman-1 (the Turkish national who owned the Turkish University), telling the Adams Staffer in a text message to confirm Businessman-1's continued willingness to support the 2021 Campaign.

27.    ERIC ADAMS, the defendant, continued to conceal the benefits he received from foreign nationals seeking to gain influence over him. ADAMS did not report any of the 2019 gifts he received from the Airline Manager or the Promoter on his annual disclosure form. In addition, in March 2019, while exchanging text messages to plan another possible to trip to Turkey in which the Airline Manager would arrange travel for ADAMS, the Adams Staffer texted ADAMS, "To be o[n the] safe side Please Delete all messages you send me." ADAMS responded, "Always do."

### *In December 2020, ADAMS solicits and accepts straw contributions from a New York construction company*

28.    In 2020, ERIC ADAMS, the defendant, solicited and received straw donations from a businessman who operated a construction company in the New York City area ("Businessman-4"). Although Businessman-4 was not part of New York's Turkish community, his contributions were sought and made for similar reasons to the many Turkish nationals and

19

SUBJECT TO PROTECTIVE ORDER.

Turkish Americans whom the Turkish Official and the Promoter induced to make illegal contributions to the 2021 Campaign: Businessman-4 was a prominent member of a different ethnic community in New York City, and he was told by ADAMS's representatives that straw contributions would increase Businessman-4's influence, and the standing of his community, with ADAMS.

        a.      In December 2020, two volunteers for the 2021 Campaign who later became employees of ADAMS at City Hall ("Adams Employee-1" and "Adams Employee-2", and together, the "Adams Employees") asked Businessman-4 to contribute $10,000 to the 2021 Campaign. The Adams Employees were liaisons to Businessman-4's community, playing roles similar to the Adams Staffer's role in the Turkish community. The Adams Employees told Businessman-4, among other things, that donating $10,000 would give Businessman-4 influence with ADAMS, which would help Businessman-4's business interests and his community when ADAMS became mayor, and that gaining such influence with ADAMS would be more expensive at a later date.

        b.      Businessman-4 agreed to contribute and offered to write a $10,000 check from his company's bank account. The Adams Employees informed Businessman-4 that he could not donate through his corporate bank account.

        c.      Businessman-4 then offered to write a $10,000 check from his personal bank account. The Adams Employees informed Businessman-4 that he could not donate more than $2,000. The Adams Employees then explained that Businessman-4 should instead direct his employees to contribute to the 2021 Campaign and then reimburse the employees.

        d.      Businessman-4 followed the Adams Employees' directions. Businessman-4 personally contributed $2,000 to the 2021 Campaign and reimbursed four of his

SDNY_01_000009524
SUBJECT TO PROTECTIVE ORDER.

employees for their $2,000 contributions to the 2021 Campaign. Businessman-4 and his employees made these contributions at a fundraiser that ADAMS personally attended, which was held at Businessman-4's offices.

e.    The 2021 Campaign requested, and received, Matching Funds for these straw donations.

f.    After ADAMS was elected mayor, Businessman-4 sought to benefit from the influence with ADAMS that the Adams Employees assured Businessman-4 would result from the straw contributions. Among other things, Businessman-4 sought assistance from ADAMS and the Adams Employees with arranging events celebrating the national heritage of Businessman-4's ethnic community, and ADAMS and the Adams Employees worked with Businessman-4 to arrange such events with City sponsorship.

g.    Businessman-4 also sought and received assistance resolving issues with the New York City Department of Buildings ("DOB"), including from ADAMS himself. On February 5, 2023, Businessman-4 sent a text message to ADAMS saying, among other things, "I always supported you," but that Businessman-4 was "having a hard time with DOB" getting a stop-work order lifted, and that although ADAMS's staff had assisted, "we reached a certain limit that only you can lift." ADAMS responded, "Let me look into this." Approximately a week and a half later, Businessman-4 replied to ADAMS "Mayor, brother I want to thank you for your help. DOB issue partially resolved and they promised to expedite the process. Thank you, you have my continued support."

### *In May 2021, ADAMS receives straw contributions from another New York construction company, as arranged by the Turkish Official*

29.    ERIC ADAMS, the defendant, accepted support from the Turkish Official throughout the 2021 Campaign, and the Turkish Official repeatedly informed ADAMS that he was

21

SDNY_01_000009525
SUBJECT TO PROTECTIVE ORDER.

providing such support.  When a fundraising effort organized or facilitated by the Turkish Official failed to raise the amount of funds that the Turkish Official had promised ADAMS, the Turkish Official told ADAMS and the Adams Staffer that he would "close the gap" by obtaining sufficient funds from other sources to reach the promised amount.

30.    In May 2021, ERIC ADAMS, the defendant, sought and accepted straw donations from another businessman ("Businessman-5") who operated another construction company in the New York City area.  Businessman-5 is a prominent member of New York City's Turkish community and made these donations at the behest of the Turkish Official.

a.    In January 2021, the Turkish Official messaged the Adams Staffer, asking for a meeting with ADAMS.  The Turkish Official and the Adams Staffer then exchanged the following messages:

| | |
|---|---|
| Adams Staffer: | What will the topic be? |
| Turkish Official: | The election<br>that's what |
| Adams Staffer: | okay |
| Turkish Official: | Nov 2nd 2021 [the date of the 2021 mayoral election] |
| Adams Staffer: | His favorite topic |
| Turkish Official: | Turkish community support to him<br>What can we do, let's talk |
| Adams Staffer: | okay |

b.    ADAMS, the Turkish Official, the Airline Manager, the Adams Staffer, and the lead fundraiser for the 2021 Campaign (the "Adams Fundraiser") met at a restaurant for dinner on February 14, 2021.  At the dinner, the Turkish Official committed to "support" the 2021 Campaign.

22

SDNY_01_000009526
SUBJECT TO PROTECTIVE ORDER.

     c.     The Turkish Official then organized a larger dinner to plan specific donations to the 2021 Campaign. Businessman-5, the Turkish Official, ADAMS, the Adams Fundraiser, and the Adams Staffer attended that dinner, which occurred on April 2, 2021. At the dinner, ADAMS explained the Matching Funds Program and solicited contributions from Businessman-5. The Turkish Official told ADAMS, "we are supporting you."

     d.     After the April 2, 2021 dinner, Businessman-5 worked with the Turkish Official, the Adams Fundraiser, and the Adams Staffer, among others, to plan a fundraiser for ADAMS. Businessman-5 attempted to recruit others in the construction industry and the Turkish community, writing, in part, this "may feel like swimming against the current but unfortunately this is how things work in this country." The day before the scheduled fundraiser, the Turkish Official sent Businessman-5 at least one check, and Businessman-5 sent the Turkish Official a message confirming that "As of now, the checks that reached us are 17,000."

     e.     On May 7, 2021, Businessman-5 held a fundraiser for the 2021 Campaign at his construction company's offices. ADAMS, Businessman-5, the Adams Fundraiser, and the Adams Staffer attended. The Turkish Official did not attend but sent his driver to deliver several additional contribution checks. Prior to the fundraiser, Businessman-5's construction company, at the direction of Businessman-5, had provided $1,250 per employee to ten of its employees. Each of those employees then contributed that amount to the 2021 Campaign, with the exception of one employee who donated in his wife's name, and another who donated $1,200 of the funds. The Adams Staffer sent the Turkish Official a list of the contributions collected at the fundraiser.

     f.     Following the fundraiser, the Turkish Official sent Businessman-5 a message asking, "how much is the total?" to which Businessman-5 replied, "I think I got to 22[.] He just left[.] The girls, [ADAMS's] assistants, were very happy[.]" The Turkish Official

23

SUBJECT TO PROTECTIVE ORDER.

subsequently asked the Adams Staffer to tell ADAMS, "we will continue supporting you," which the Adams Staffer did.

g.     The 2021 Campaign requested Matching Funds for eight of these straw donations that were made in the names of New York City residents, fraudulently obtaining public funds to which the campaign was not entitled.

**_In September 2021, ADAMS accepts straw contributions from a Turkish national_**

31.     In 2021, Businessman-1—the Turkish national who owned the Turkish University, as described above—attempted to make good on his earlier commitments to contribute to ERIC ADAMS, the defendant.  ADAMS and Businessman-1 used the Promoter and the Adams Staffer, among others, to devise and execute a plan to funnel Businessman-1's money to the 2021 Campaign, knowing full well that these donations would violate the law against U.S. political campaigns receiving contributions from foreign nationals.

a.     On July 9, 2021, the Adams Staffer exchanged messages with ADAMS about raising funds from the Turkish University, among other sources.  ADAMS explained that he was "Not doing [an] in person fundraiser for less than $25K."

b.     On July 11, 2021, the Adams Staffer asked the Promoter how much would be donated, explaining in a message that she needed to "tell [ADAMS] a net number."  When the Promoter estimated between $35,000 and $50,000, the Adams Staffer replied that the Promoter earlier "had mentioned 200K."  When the Promoter explained that the requisite number of straw donors could not be gathered, the Adams Staffer offered to help with that aspect of the scheme. The Promoter responded, "Hmmm then great," and when the Adams Staffer then wrote "From what I gathered you'll distribute the money," the Promoter responded "Yes."  The Adams Staffer later told ADAMS that the estimated total amount of the foreign donations would be $45,000.

24

SDNY_01_000009528
SUBJECT TO PROTECTIVE ORDER.

c.      In August 2021, the Promoter, the Adams Staffer, and the president of the Turkish University's American campus (the "University President") exchanged messages and voice notes explicitly discussing the plan to funnel Businessman-1's contribution to the 2021 Campaign through the Turkish University's U.S.-based employees.  The Promoter assured the Adams Staffer that those employees are "[U.S.] citizens and green card holders."  The Adams Staffer told ADAMS about the plan to funnel Businessman-1's contribution through U.S.-based straw donors, and ADAMS approved the plan, knowing that Businessman-1 was a Turkish citizen.

d.      On August 27, 2021, the University President messaged the Adams Staffer that the Turkish University would donate $20,000 to the 2021 Campaign by "dividing it amongst our employees in appropriate amounts."  The Adams Staffer responded that "if the donation is not more than $25K, then Mr. President"—referring to ADAMS, who was then Brooklyn Borough President—"does not participate in person."  The University President then informed the Adams Staffer that in addition to the Turkish University's contribution, others would donate to reach the $25,000 threshold.

e.      On August 27, 2021, the University President informed the Adams Staffer that the Turkish University would donate only $10,000.  Because that meant that ADAMS would no longer appear at an in-person event, the Adams Staffer asked the Adams Fundraiser to create an internet link through which the Turkish University's straw donors could contribute.  In a series of messages with ADAMS and the Adams Staffer, the Adams Fundraiser sent the link to the Adams Staffer.  To remind the Adams Staffer of the mechanics of the plan they had discussed— that the foreign donations would be concealed by routing them through U.S.-based straw donors who could lawfully contribute in their own names—ADAMS wrote to the Adams Staffer and the Adams Fundraiser, "We can't take any money from people who are not US citizens."  The Adams

25

SDNY_01_000009529
SUBJECT TO PROTECTIVE ORDER.

Staffer inquired, "What about green card holders?" The Adams Fundraiser responded, "Yes we can," confirming that the Promoter's plan to use green card holders as straw donors would work.

    f. The Turkish University ultimately made its straw contributions on September 27, 2021, when three U.S.-based employees of the Turkish University made $2,000 contributions to the 2021 Campaign and were then reimbursed, as directed by Businessman-1 and the University President. The University President and another U.S.-based employee of the Turkish University each also made $2,000 contributions from their own funds. The contributions occurred during a period when the 2021 Campaign had begun to wind down fundraising and were ultimately refunded by the campaign, but not before ADAMS submitted a disclosure statement to the CFB that falsely claimed the U.S.-based Turkish University employees were the true donors.

    g. On November 2, 2021, ADAMS was declared the winner of the 2021 mayoral election. The next day, Businessman-1 and the Promoter exchanged the following messages:

| | |
|---|---|
| Promoter: | Good morning<br>The president is our brother from now on, sir. |
| Businessman-1: | Good morning |
| Promoter: | May it be auspicious for all of us.<br>We messaged each other. |
| Businessman-1: | Are the elections over? |
| Promoter: | It was yesterday, sir<br>Everyone messaged me that he was elected.<br>Congratulations messages<br>He is most likely going to assign me as a representative, sir.<br>I'm going to go and talk to our elders in Ankara about how<br>we can turn this into an advantage for our country's lobby. |
| Businessman-1: | That would be nice |

26

SUBJECT TO PROTECTIVE ORDER.

h.     The Promoter also celebrated ADAMS's prospects with additional people, telling others—including ADAMS himself—that ADAMS would soon be President of the United States.  Similarly, the Turkish Official wrote to the Adams Staffer that given ADAMS's increasing prominence, "at this point," the Foreign Minister of Turkey "is personally paying attention to him" and ADAMS "should not bother with" his other Turkish benefactors.

32.     All told, the 2021 Campaign reaped over $10 million in Matching Funds based on the false certifications that the campaign complied with the law, when in fact ERIC ADAMS, the defendant, knowingly and repeatedly relied on illegal contributions.

**In 2021, ADAMS Accepts Bribes From the Turkish Official and Intervenes on the Turkish Official's Behalf with the Fire Prevention Chief**

33.     In 2021, ERIC ADAMS, the defendant, intervened with the FDNY to permit the Turkish Consulate to occupy a skyscraper that had not passed a fire safety inspection, in exchange for, among other things, luxury travel benefits provided by the Turkish Official and the Airline Manager.

34.     In late June 2021, ERIC ADAMS, the defendant, sought luxury travel to Turkey arranged by the Turkish Official and the Airline Manager.  When the Adams Staffer began coordinating this travel for ADAMS, at ADAMS's direction, ADAMS again attempted to create a false record suggesting that he would pay his own way, when, in fact, ADAMS had the Adams Staffer coordinate with the Airline Manager to provide ADAMS with free and steeply discounted travel benefits.  ADAMS approved the itinerary, and, to create the false impression of payment, the Turkish Official, ADAMS, and the Adams Staffer agreed that ADAMS would collect invoices from vendors in Turkey regardless of whether he actually paid and would make some small credit card payments to conceal the fact that he was taking a vacation that was mostly paid for by the Turkish government.

27

      a.     On June 22, 2021, ADAMS, through the Adams Staffer, requested that the Airline Manager book flights to Istanbul for ADAMS. In order to conceal the favorable treatment, the Adams Staffer requested that the Airline Manager charge ADAMS what would appear to be a "real" price:

| | |
|---|---|
| Adams Staffer: | How much does he owe?<br>Please, let them call me and I will make the payment. |
| Airline Manager: | It is very expensive because it is last minute. I am working on a discount |
| Adams Staffer: | Okay.<br><br>Thank you. |
| . . . | |
| Airline Manager: | I am going to charge $50 |
| Adams Staffer: | No |
| Airline Manager: | That would work wouldn't it |
| Adams Staffer: | No, dear. $50? What?<br>Quote a proper price. |
| Airline Manager: | How much should I charge? :) |
| Adams Staffer: | His every step is being watched right now<br>$1,000 or so<br>Let it be somewhat real.<br>We don't want them to say he is flying for free.<br>At the moment, the media's attention is on Eric. |

ADAMS paid approximately $1,100 each for roundtrip economy tickets on the Turkish Airline for himself and Adams's Partner, which were immediately upgraded to business class at no cost. Had ADAMS purchased business class tickets on the open market, they would have cost more than $15,000 total.

28

SDNY_01_000009532<br>SUBJECT TO PROTECTIVE ORDER.

      b.     At ADAMS's direction, the Adams Staffer also coordinated luxury lodging for ADAMS and Adams's Partner, which would be secretly provided at no cost to ADAMS, as the Adams Staffer and the Airline Manager discussed:

| Adams Staffer: | He is also asking where else they can go in Turkey<br>Do you have a recommendation? |
|---|---|
| Airline Manager: | Four Seasons |
| Adams Staffer: | It's too expensive |
| Airline Manager: | Why does he care?<br>He is not going to pay<br>His name<br>will not be on anything<br>either |
| Adams Staffer: | Super |

      c.     The Turkish Official also arranged an itinerary for ADAMS and Adams's Partner in Turkey, which, in addition to the stay at the Four Seasons, would include a yacht tour, a three-day stay at a luxury beach resort, and a car and driver, as well as a domestic flight between Istanbul and the resort. The Adams Staffer forwarded details of this itinerary to ADAMS. To assist ADAMS in concealing the nature and extent of the travel benefits he was soliciting and accepting, the Turkish Official suggested a nominal price of approximately $720, although the true price of this itinerary would in fact have been approximately $8,500 or more. ADAMS approved the itinerary and the nominal price.

      d.     On June 26, 2021 (the same day the trip was supposed to start), the Adams Staffer informed the Turkish Official and the Airline Manager that ADAMS was cancelling his trip. The Turkish Airline refunded ADAMS's payment for economy class tickets—the only payment ADAMS had made for the late June 2021 trip to Istanbul.

29

SDNY_01_000009533<br>SUBJECT TO PROTECTIVE ORDER.

35.     At around the time of this cancellation, ERIC ADAMS, the defendant, solicited various travel benefits for the Adams Fundraiser—the 2021 Campaign's chief fundraiser who, as noted above, helped coordinate the straw contributions from Businessman-5's construction company one month earlier in May 2021—from the Turkish Official and the Airline Manager. Continuing their efforts to influence ADAMS, the Turkish Official and the Airline Manager ultimately provided the Adams Fundraiser with transportation from the airport, a free hotel, and free use of a VIP room in the Turkish Airline's business class lounge.

a.     On June 27, 2021, when the Adams Fundraiser was scheduled to travel to Istanbul, ADAMS created a message thread between himself, the Adams Fundraiser, and the Turkish Official. ADAMS informed the Turkish Official that the Adams Fundraiser would be arriving in Istanbul shortly and needed transportation from the airport and a hotel, which the Turkish Official promptly arranged. When ADAMS suggested that ADAMS would pay for the Adams Fundraiser's expenses, the Turkish Official told ADAMS, "Eric no prob, it was set through Turkish Hospitality Services. I hope she enjoyed her stay." ADAMS responded, "It was amazing. Thanks for all the coordination and attention." In the same message thread with ADAMS, the Turkish Official also provided the Adams Fundraiser with a fake bill for the hotel stay, to allow ADAMS and the Adams Fundraiser to create the appearance that the Adams Fundraiser had paid for her hotel stay, when in fact, as ADAMS knew, she had not.

b.     On the day the Adams Fundraiser was scheduled to depart Istanbul, ADAMS created a message thread between himself, the Adams Fundraiser, and the Airline Manager. ADAMS wrote, "[Adams Fundraiser] this is [the Airline Manager]. 1. He will try to help the issue with the form[.] 2. He can see about a hotel or the business class lounge." The Airline Manager then arranged for the Adams Fundraiser—who was otherwise flying on an

30

SUBJECT TO PROTECTIVE ORDER.

economy ticket—to have access not only to the Turkish Airline's business lounge, but also to an exclusive private suite inside the lounge, complete with a bed and free food. The Airline Manager explained, "This is our suite for our VIPs [a]nd we want you to feel your self [sic] Vip :) ." At another point in this exchange, ADAMS wrote, "Thanks a million [Airline Manager]. My Brother," to which the Airline Manager responded, "Anytime brother."

36.    ERIC ADAMS, the defendant, and the Turkish Official understood that in exchange for the benefits described in paragraphs 34 and 35, and future travel benefits for ADAMS, ADAMS was expected to assist the Turkish Official in the operation of the Turkish Consulate in New York.

37.    On July 6, 2021, ERIC ADAMS, the defendant, declared victory in his party's mayoral primary. On the morning of July 7, 2021, the Airline Manager sent ADAMS the following text message: "Brother congratulations." ADAMS responded, "Cannot thank you enough."

38.    In September 2021, ERIC ADAMS, the defendant, agreed to pressure a New York City agency to help the Turkish Consulate secure a temporary certificate of occupancy ("TCO") for a building it owned and operated.

a.    As Brooklyn Borough President, ADAMS had authority under the New York City Charter to affect the administration of City services within his Borough, such as those provided by the FDNY and other city agencies, including through: holding public hearings; introducing legislation before the City Council; overseeing the coordination of a borough-wide public service complaint program; and consulting with the Mayor of the City of New York on the executive capital budget and other budget recommendations. In addition to, or in the course of, the performance of these duties, as Brooklyn Borough President, ADAMS met with members of the FDNY from time to time.

31

SDNY_01_000009535
SUBJECT TO PROTECTIVE ORDER.

b.      In 2017, construction began on a 36-story building located at 821 United Nations Plaza, New York, New York, and referred to as the Turkish House or Turkevi Center (the "Turkish House").  The Turkish House was designed to serve as, and now serves as, the headquarters of multiple Turkish diplomatic missions, including the Turkish Consulate.  The cost of the Turkish House was significant and was a topic of political debate in Turkey.



*The Turkish House*

c.      The Turkish Consulate planned to open the Turkish House on September 20, 2021, so that Turkey's President could formally open the building during his visit for that year's opening of the United Nations General Assembly.  Ensuring the Turkish House

32

SDNY_01_000009536
SUBJECT TO PROTECTIVE ORDER.

opened on schedule was a priority for the Turkish Official, who was at this time Turkey's Consul General in New York.

      d.      As of August 31, 2021, construction on the Turkish House was complete, but the DOB had not yet issued a TCO for the building. Without a TCO, the Turkish House could not open during the Turkish President's impending visit.

      e.      The DOB had not issued a TCO because the FDNY had not yet conducted an inspection and issued what the FDNY refers to as a "letter of defect," which was a prerequisite to the issuance of a TCO for the Turkish House. Issuing a letter of defect is a regular FDNY procedure which, in substance, identifies remaining defects in a building's fire safety systems, but also serves to signal that the defects are sufficiently limited that the building can be safely occupied.

      f.      From on or about August 31, 2021, through on or about September 9, 2021, various New York City officials and employees, among others, sought to help the Turkish Official obtain a TCO for the Turkish House by lobbying the chief of the FDNY's Bureau of Fire Prevention (the "Fire Prevention Chief") to provide a letter of defect. The Fire Prevention Chief refused, citing numerous reported fire safety defects, some of which were serious, at the Turkish House, and the likelihood that the building would fail any FDNY inspection.

      g.      On or about September 5, 2021, the Turkish Official began asking ADAMS, both directly and through the Adams Staffer, to intervene with the Commissioner of the FDNY (the "FDNY Commissioner") in order to secure a TCO for the Turkish House. ADAMS, the Turkish Official, and the Adams Staffer discussed these requests through phone calls and electronic messages. In a phone call to the Adams Staffer, the Turkish Official stated that because

33

SUBJECT TO PROTECTIVE ORDER.

Turkey had supported ADAMS, it was now "his turn" to support Turkey. The Adams Staffer relayed this message to ADAMS, and ADAMS responded, "I know."

        h.      On September 6, 2021, ADAMS messaged the Adams Staffer that he would contact the FDNY Commissioner.

        i.      On September 7, 2021, ADAMS messaged the Adams Staffer that he had a scheduled call with the FDNY Commissioner later that day.

        j.      On September 8, 2021, ADAMS messaged the FDNY Commissioner, asking him to call ADAMS. Until that point, the messages between the FDNY Commissioner and ADAMS had consisted of (i) an August 3, 2021 message from the FDNY Commissioner to ADAMS, requesting to continue serving as FDNY commissioner after ADAMS became mayor, and stressing that he was "loyal and trustworthy," to which ADAMS sent a noncommittal response, and (ii) a September 5, 2021 invitation to a September 11 memorial service from the FDNY Commissioner to ADAMS, to which ADAMS responded that he would try to attend and wished to speak with the FDNY Commissioner for "a half hour . . . about FDNY."

        k.      Also on September 8, 2021, ADAMS messaged the FDNY Commissioner, stating, in part, "They said they needed a letter of Defect from FDNY to DOB. They know they have some issues but according to them with the letter the DOB wi[ll] give the TCO." The FDNY Commissioner responded, "We will get on it tomorrow." Through the Adams Staffer, ADAMS assured the Turkish Official, "Don't worry," "I am on top of this."

        l.      On September 9, 2021, after a contractor working for the Turkish Consulate sent the FDNY a letter describing the status of the Turkish House's fire alarm system, an FDNY employee with responsibility for inspecting the system sent the Fire Prevention Chief the following email:

34

SDNY_01_000009538
SUBJECT TO PROTECTIVE ORDER.

From: ██████████████████
Sent: Thursday, September 9, 2021 11:51 AM
To: ██████
Subject: FW: Turkish Embassy - Fire Alarm Request - 821 1st Avenue (21021)

Chief,
After reviewing the letter, I do not see any way we would be willing to accept it. They have some major issues like central station and fan shutdowns which would be an automatic violation order. Aside from that, he gave us a list with over 60 defects and some of them list 5-10 problems in each one. FAIU would not go beyond 20 defects without issuing a violation order. In my opinion, this document does not take any liability that we would be comfortable with. I believe it actually tells us this building is not safe to occupy. Feel free to reach out to discuss further.
Thanks

    m.    On the morning of September 10, 2021, ADAMS messaged the FDNY Commissioner, stating that the Turkish Official had understood that the FDNY was going to inspect the Turkish House the previous day, and "They really need someone . . . by today if possible. If it is[ im]possible please let me know and I will manage their expectation." The FDNY Commissioner wrote back that "There seems to be a difference of opinion between the inspector" and the private alarm engineer responsible for the building, but that the FDNY Commissioner was "trying to iron it out."

    n.    Shortly after noon on September 10, 2021, ADAMS messaged the FDNY Commissioner, "They said the hire [sic] ups at FDNY did not give the inspector authorization to come. The inspector indicated he needs authority to come to day [sic]." The FDNY Commissioner responded, "Working on that as we speak." At approximately 2:06 p.m., ADAMS messaged the Adams Staffer that ADAMS had again spoken with the FDNY Commissioner, and "He again told me he is on the phone as we speak to try and resolve this."

    o.    Also on the afternoon of September 10, 2021, the FDNY Chief of Department summoned the Fire Prevention Chief to a meeting. The Chief of Department was the FDNY Commissioner's direct subordinate and the Fire Prevention Chief's superior. The Chief of Department informed the Fire Prevention Chief, in substance, that if the FDNY did not assist the Turkish Consulate in obtaining a TCO, both the Chief of Department and the Fire Prevention Chief would lose their jobs. The Fire Prevention Chief then drafted a "conditional letter of no objection"

35

SUBJECT TO PROTECTIVE ORDER.

for the Turkish House. The Fire Prevention Chief had never before written a "conditional letter of no objection," which was not standard FDNY procedure. Instead, the Fire Prevention Chief wrote this letter, which he later described as "unprecedented," to inform the DOB that FDNY did not object to issuing the TCO, provided that the private engineers affirmed that the fire alarm system functioned properly, and "assum[ing] the Department of Buildings has inspected, tested and approved the installed water-based fire suppression systems."

        p.      At 2:17 pm on September 10, 2021, the FDNY Commissioner wrote ADAMS, "Letter being drafted now. Everything should be good to go Monday morning." Four minutes later, ADAMS messaged the Turkish Official, "From the commissioner: Letter being drafted now. Everything should be good to go Monday morning." The Turkish Official responded, "You are Great Eric, we are so happy to hear that 🙏🙏. You are a true friend of Turkey." ADAMS replied, "Yes even more a true friend of yours. You are my brother. I am hear [sic] to help." At 2:30 pm, the Turkish Official confirmed, "You are such a friend 🙏." At 2:31 p.m., the Fire Prevention Chief sent the "conditional letter of no objection" to the private alarm engineer.

        39.      After ERIC ADAMS, the defendant, pressured the FDNY to permit a TCO to be issued for the Turkish House, the Turkish Official continued to fulfill his end of the bargain, by providing additional luxury travel benefits to ADAMS. These benefits, which ADAMS accepted, were worth more than $14,000.

        a.      On September 14, 2021—four days after ADAMS caused the FDNY to acquiesce in the TCO—ADAMS messaged the Adams Staffer, directing her to secure tickets to Pakistan for a trip from November 30 to December 8, 2021. The Adams Staffer relayed the request to the Airline Manager, stating, "He'll pay the economy class price," but asking, "Can we upgrade later?" The Airline Manager replied, "Of course."

36

SUBJECT TO PROTECTIVE ORDER.

b.      On September 21, 2021, the Turkish Official messaged the Adams Staffer, seeking a meeting at a particular time between ADAMS and a Turkish Deputy Minister. The Turkish Official wrote, "This is very important. He"—the Deputy Minister—"is the person who makes all the arrangements with one phone call in Turkey. Flight, yacht tour, hotels, rental cars...." The meeting did not occur, because ADAMS was scheduled to meet with a former President of the United States at the time requested for the meeting with the Deputy Minister.

c.      After the Airline Manager and the Adams Staffer further discussed the price and timing of ADAMS's tickets, on September 28, 2021, ADAMS purchased two roundtrip economy class tickets on the Turkish Airline from New York to Pakistan—arriving in Lahore and departing from Islamabad—for a total price of $1,436. On November 17, 2021, the Adams Staffer messaged ADAMS to confirm that he still intended to travel and that she should therefore have his tickets upgraded to business class. ADAMS responded, "Ok, do so." On November 18, 2021, the Adams Staffer messaged the Airline Manager, requesting the upgrade. The Turkish Airline upgraded ADAMS's tickets to business class at no cost to ADAMS.

d.      On November 25, 2021—four days before he was scheduled to depart for Pakistan—ADAMS asked that his destination be changed to Ghana. The Airline Manager changed ADAMS's and Adams's Partner's tickets to business class flights to Ghana at no cost to ADAMS. Had ADAMS paid full price for the business class tickets to Ghana, they would have cost more than $14,000 total.

e.      On November 26, 2021, the Turkish Official informed the Adams Staffer that "we will take care of the layover in Istanbul," referring to a nine-hour layover in Istanbul during ADAMS's just-scheduled flight from New York to Ghana. The Turkish Official then offered various arrangements for ADAMS, including an escort to meet ADAMS and Adams's

37

SDNY_01_000009541
SUBJECT TO PROTECTIVE ORDER.

Partner at the gate of the Istanbul airport, pickup at the Istanbul airport by "luxury vehicle"—later specified as a "BMW 7"—with a driver, dinner at a high-end restaurant where ADAMS would meet a Turkish government official, drinks at a separate location, a boat tour of the Bosporus Strait, and return to the airport in time for ADAMS's business class flight from Istanbul to Ghana. ADAMS selected the airport escort, driver, and dinner, but declined the Bosporus Strait cruise, explaining that he has "done the boat tour a few times." In touting the benefits he provided, the Turkish Official messaged the Adams Staffer, "don't let [the Airline Manager] and others confuse [ADAMS]. We are the state."

      f.      On November 30, 2021, the Adams Staffer relayed to the Turkish Official requests by ADAMS that his excursion into Istanbul receive no media attention, including social media. The Turkish Official agreed that it would be "confidential." Accordingly, the Turkish Official confirmed that during ADAMS's dinner at the Istanbul restaurant, the Turkish Official's "team did not let anyone take any pictures." This was in stark contrast to the Ghana portion of ADAMS's trip, for which ADAMS actively sought and obtained press coverage, and which ADAMS posted about on his social media account.

      g.     After ADAMS completed the layover, the Turkish Official and the Adams Staffer exchanged the following messages:

| | |
|---|---|
| Turkish Official: | Was Eric satisfied? |
| Adams Staffer: | It was great. Thank you for everything. |
| Turkish Official: | 👍👍<br>it's okay if he is happy<br>. . .<br>Is Eric happy then? |
| Adams Staffer: | He is very happy. He is sending you his thanks. |

38

SDNY_01_000009542
SUBJECT TO PROTECTIVE ORDER.

40.     During and shortly after the travel to Ghana and Istanbul described in the preceding paragraphs, ERIC ADAMS, the defendant, took additional actions for those who provided him travel benefits, in exchange for those benefits.

a.     In early December 2021, ADAMS announced the members of his transition committees, which were established to advise the mayor-elect and his team on policies and appointments before he took office.  Initially, there were no members of the Turkish community on any of the committees.

b.     On December 8, 2021, the Adams Staffer sent the Airline Manager a link to a list of ADAMS's transition committees and asked the Airline Manager, "Have you looked at the list?" The Airline Manager responded, "It would suit me well to be lead Or Senior Advisor." Two days later, the Airline Manager sent a message reiterating, "Lead Plz :) Otherwise seat number 52 is empty … On the way back," meaning that if the Airline Manager was not given a position on a transition committee, it would affect ADAMS's travel benefits from the Turkish Airline.

c.     On December 17, 2021, the Adams Staffer sent ADAMS a list of members of the Turkish community to add to ADAMS's transition committees, with the Airline Manager as the top name.  ADAMS informed the Adams Staffer that he had sent the list to the persons responsible for organizing his transition committees.  ADAMS sent the list to a staff member with the direction "Add to transition." The Airline Manager was subsequently added to ADAMS's Infrastructure, Climate and Sustainability Committee transition committee.

d.     On December 23, 2021, a senior Turkish government official sent the Airline Manager a series of text messages, noting the Airline Manager's membership on ADAMS's Infrastructure, Climate and Sustainability Committee and sending applause emojis. The Airline Manager responded that his membership on the transition committee was in service of

39

SDNY_01_000009543
SUBJECT TO PROTECTIVE ORDER.

Turkey: "Thank you, brother. We are doing our best to serve our country adequately. Your support gives us strength here. Thank you. You are always there for us, and we're trying to be worthy."

41.     ERIC ADAMS, the defendant, continued to conceal the luxury travel benefits he accepted in exchange for taking actions favorable to the Turkish Official, the Airline Manager, and others, by once again not reporting these gifts on his 2021 annual disclosure form. In total, from 2016 through 2021, ADAMS received the following benefits from the Turkish Official, the Airline Manager, the Promoter, and others, none of which he reported on annual disclosure forms:

40

SUBJECT TO PROTECTIVE ORDER.

| Year | Destination | Benefits | Value | Disclosed? |
|------|-------------|----------|-------|------------|
| 2016 | India (via Turkey) | Free upgrade to business class for two on roundtrip from New York to India | $12,000+ | No |
| 2017 | France, Turkey, China | Free business class tickets for three on roundtrip from New York to France, Turkey, and China; heavily discounted stay in Bentley Suite of St. Regis Istanbul | $41,000+ | No |
| 2017 | China (via Turkey) | Free business class tickets for two on roundtrip from New York to China | $16,000+ | No |
| 2018 | Hungary (via Turkey) | Free upgrade to business class for two on roundtrip from New York to Hungary | $12,000+ | No |
| 2019 | Turkey | Free upgrade to business class for one on flight from New York to Turkey; free stay at Cosmopolitan Suite of St. Regis Istanbul; free meals, transportation, and entertainment in Istanbul | $9,000+ | No |
| 2021 | Turkey (solicited and accepted but then canceled) | Free upgrade to business class for two on roundtrip from New York to Turkey; free or steeply discounted luxury hotel and resort stays, transportation, entertainment, and meals | $21,000+ | No |
| 2021 | Ghana (via Turkey) | Free upgrade to business class for two on roundtrip from New York to Ghana; free meal and transportation during Istanbul layover | $12,000+ | No |

41

SDNY_01_000009545
SUBJECT TO PROTECTIVE ORDER.

### ADAMS Continues His Corrupt Relationships After Becoming Mayor

***After his inauguration, ADAMS favors those who provided him with illegal benefits over those who fell short***

42.    On January 1, 2022, ERIC ADAMS, the defendant, was inaugurated as Mayor of New York City. ADAMS soon began preparing for his next election, in part by planning to solicit more straw contributions, and in part by granting requests by those who supported the 2021 Campaign with significant straw donations, while denying requests from those who fell short.

a.    On January 11, 2022, ADAMS met the Promoter, the Adams Staffer, and others at a high-end New York City restaurant frequented by ADAMS. At one point during the meeting, ADAMS, the Promoter, and the Adams Staffer met separately in a private area. There, the Promoter discussed his prior efforts to collect campaign contributions for ADAMS in Turkey, stated that he could collect more foreign contributions in the future, and indicated that he would be able to raise more money for the 2025 Campaign if ADAMS visited Turkey and met with Turkish businesspeople. ADAMS welcomed the offer of foreign contributions and told the Promoter to coordinate with the Adams Staffer to arrange the contributions.

b.    On April 21, 2022, the Turkish Official messaged the Adams Staffer, noting that Armenian Genocide Remembrance Day was approaching, and repeatedly asked the Adams Staffer for assurances that ADAMS would not make any statement about the Armenian Genocide. The Adams Staffer confirmed that ADAMS would not make a statement about the Armenian Genocide. ADAMS did not make such a statement.

c.    On November 21, 2022, the Promoter messaged the Adams Staffer that Businessman-1 was visiting New York, and asked that ADAMS meet with Businessman-1. In support of the requested meeting, the Promoter stated that the Turkish University "gave support, albeit a little." ADAMS declined the meeting, stating that "they didn't keep their word," meaning

42

SDNY_01_000009546
SUBJECT TO PROTECTIVE ORDER.

that Businessman-1 and the Turkish University had failed to fulfill their commitment to make at least $25,000 in donations to the 2021 Campaign.

43.    ERIC ADAMS, the defendant, also continued his agreement with the Turkish Official to assist in New York City's regulation of the Turkish House in exchange for free or heavily discounted travel benefits from the Turkish Airline for ADAMS and his associates.

a.    From on or about July 8, 2022, to on or about July 12, 2022, the Turkish Official exchanged messages with the Adams Staffer concerning business class upgrades on the Turkish Airline for international travel by four of ADAMS's close associates.

b.    On July 11, 2022, the Turkish Official met with ADAMS's senior advisor and the Adams Staffer, among others, at the Turkish House. In a message, the Adams Staffer referred the Turkish Official to ADAMS's senior advisor, telling the Turkish Official, "ask [the senior advisor] all your pending problems regarding this building [that is, the Turkish House] … Like FDNY approvals . . . ."

### *In 2023 and 2024, ADAMS solicits and accepts straw contributions for his 2025 re-election campaign*

44.    In 2023 and 2024, ERIC ADAMS, the defendant, again solicited and knowingly accepted straw and foreign contributions, as part of his efforts to raise funds for the 2025 Campaign.

45.    In 2023, ERIC ADAMS, the defendant, directed his staff to devise a plan for ADAMS to secretly obtain illegal foreign donations offered by the Promoter, and then knowingly accepted donations of foreign money through straw donors. ADAMS then attended a fundraiser where he thanked the true donors, who he knew to be wealthy foreign nationals.

a.    In the summer of 2023, the Promoter informed the Adams Staffer that he could secure contributions to the 2025 Campaign from Turkish nationals if ADAMS would attend

43

SDNY_01_000009547
SUBJECT TO PROTECTIVE ORDER.

an event with the foreign donors.  The Adams Staffer brought this opportunity to ADAMS, who directed the Adams Staffer to work with the Adams Fundraiser to devise a plan to obtain the illegal donations.

        b.     The Adams Fundraiser suggested that the true foreign donors make their contributions through straw donors considerably in advance of the event at which ADAMS would meet the true foreign donors, so that the event did not appear connected to the contributions.  As the Adams Staffer explained to the Adams Fundraiser in a text message regarding the planned attendees, "Mayor knows most of them from turkey[.]  The People who has business here as well."  The Adams Staffer and the Promoter agreed to execute this plan, which ADAMS approved.

        c.     The Adams Fundraiser, the Promoter, and the Adams Staffer scheduled an event for September 20, 2023 in a private room at a Manhattan hotel.  To conceal the event's true purpose, the Promoter provided a PowerPoint presentation billing the event as a dinner hosted by "International Sustainability Leaders" with the subject "Sustainable Destinations" and an attendance price of $5,000.  The event was not publicized or listed on ADAMS's public calendar.  The Adams Fundraiser entered the event on ADAMS's private calendar as a "Fundraiser for Eric Adams 2025," with the host listed as the Promoter, a goal of "25k," and the note "Total Submitted before the event: $22,800."

        d.     Prior to the scheduled fundraiser, the Promoter collected payments of $5,000 or more from attendees, many of whom were foreign nationals.  The Promoter then used a portion of the attendees' payments to make straw donations to the 2025 Campaign, by sending cash from the foreign national donors to the Adams Staffer.  The Adams Staffer then distributed $2,100 in cash to at least three straw donors who each made an online $2,100 contribution to the 2025 Campaign.

44

SUBJECT TO PROTECTIVE ORDER.

e.    On September 20, 2023, the Promoter hosted the fundraiser, which ADAMS, the Adams Fundraiser, the Adams Staffer, and foreign nationals who had contributed to the 2025 Campaign via straw donors attended.  In one video of the event, the Promoter introduced a foreign-national attendee to ADAMS, explaining that the attendee owned a business and lived in London and Istanbul.  ADAMS proceeded to thank the attendee.

46.    On October 9, 2023, ERIC ADAMS, the defendant, attended a fundraiser at which attendees agreed to make, and ADAMS agreed to accept, straw donations.  The fundraiser was organized by a Turkish American public relations representative (the "PR Representative") and the publisher of a magazine targeted at Turkish Americans (the "Publisher"), both of whom were associates of the Turkish Official, and hosted by the owner of a logistics company ("Businessman-6"), who is part of the Turkish-American community in the New York City area.

a.    From late August 2023 through early September 2023, the Adams Staffer and the Adams Fundraiser discussed the particulars of the fundraiser, including the creation of a unique fundraising link for the event, which the Adams Fundraiser ultimately created.

b.    On September 12, 2023, the PR Representative and the Publisher instructed Businessman-6 on how to make straw donations to the 2025 Campaign, using a system under which the 2025 Campaign routed foreign donations through U.S. citizens, to make it appear that the contribution came from a lawful source.

c.    Beginning at least as early as September 29, 2023, the Adams Staffer sent the Adams Fundraiser updates regarding how much money was being raised in connection with the planned fundraiser.  On October 8, 2023, the day before the event, the Adams Staffer and the Adams Fundraiser exchanged the following messages:

Adams Fundraiser:    And okay are they going to make the limit?

45

| | |
|---|---|
| Adams Staffer: | Yes[.]  They said as agreed we will collect the 25K |
| Adams Fundraiser: | Ok perfect |

d.      Also on October 8, 2023, the Airline Manager sent the Turkish Official the unique fundraising link for the event.

e.      At the October 9, 2023 fundraiser, Businessman-6 told ADAMS that Businessman-6 owned a large corporation and wished to contribute significant amounts of money to the 2025 Campaign.  ADAMS told Businessman-6 to coordinate with the Adams Staffer.  Businessman-6 then explained to the Adams Staffer that his company employed many drivers and that Businessman-6 would contribute to the 2025 Campaign through those employees.  ADAMS scheduled a dinner with Businessman-6 for early November, which was canceled after the federal investigation into ADAMS's conduct became public.

### ADAMS and His Co-Conspirators Attempt to Conceal Their Criminal Conduct

47.      Throughout the commission of the conduct described in paragraphs 1 through 46 of this Indictment, ERIC ADAMS, the defendant, and his agents and co-conspirators sought to conceal their wrongful conduct from scrutiny by the public and law enforcement.  As described above, ADAMS repeatedly did not disclose the free and heavily discounted travel benefits he accepted from the Turkish Official, the Promoter, and the Airline Manager; created a false paper trail to suggest he had paid for this travel when, in fact, he had not; assured the Adams Staffer that he had a practice of deleting all his messages with the Adams Staffer; and directed the Adams Staffer to ensure that his activities in Turkey in 2021 were shielded from public view.  In addition, the purpose of conducting the straw donations discussed throughout this Indictment was to allow ADAMS to benefit from illegal campaign contributions by concealing their true source.

46

SUBJECT TO PROTECTIVE ORDER.

48.    ERIC ADAMS, the defendant, and his co-conspirators and agents continued their efforts to defeat scrutiny of their criminal conduct after the federal investigation into those crimes became known to them.   On November 2, 2023, Special Agents of the Federal Bureau of Investigation (the "FBI") executed search warrants at, among other locations, the residences of the Adams Fundraiser, Businessman-5, and the Adams Staffer.   Each took actions to conceal the criminal conduct they had committed with ADAMS.

a.    After learning that FBI agents had arrived at her residence, but before answering their repeated knocks at her door, the Adams Fundraiser called ADAMS five times, even though the agents had not yet given the Adams Fundraiser any indication of the purpose for their visit.   When the Adams Fundraiser then spoke with the FBI agents, she agreed to discuss many subjects, but refused to say who had paid for her 2021 travel to Turkey.   As the FBI agents departed the Adams Fundraiser's residence, ADAMS attempted to call the Adams Fundraiser's phone.   On the morning that the FBI agents executed this search, ADAMS had flown to Washington, D.C. for a publicized official meeting, but upon learning about the search, ADAMS canceled the meeting and immediately returned to New York City.

b.    Businessman-5 also agreed to speak with FBI agents and acknowledged that he and his employees had contributed to the 2021 Campaign.   Businessman-5 further acknowledged that he had spoken with the Turkish Official about his construction company's fundraiser for the 2021 Campaign.   But Businessman-5 lied in order to conceal the straw donations he orchestrated, falsely denying that he caused his construction company to reimburse his employees for their contributions and that he knew why the company had issued identical checks to ten employees for the amount of their contributions shortly before the fundraiser.

47

SDNY_01_000009551
SUBJECT TO PROTECTIVE ORDER.

      c.     The Adams Staffer also agreed to speak with FBI agents and falsely denied the criminal conduct of herself and ADAMS, among others. At one point during her voluntary interview, the Adams Staffer excused herself to a bathroom and, while there, deleted the encrypted messaging applications she had used to communicate with ADAMS, the Promoter, the Turkish Official, the Airline Manager, and others.

      d.     On November 6, 2023, FBI agents executed a search warrant for the electronic devices used by ERIC ADAMS, the defendant. Although ADAMS was carrying several electronic devices, including two cellphones, he was not carrying his personal cellphone, which is the device he used to communicate about the conduct described in this indictment. When ADAMS produced his personal cellphone the next day in response to a subpoena, it was "locked," such that the device required a password to open. ADAMS claimed that after he learned about the investigation into his conduct, he changed the password on November 5, 2024, and increased the complexity of his password from four digits to six. ADAMS had done this, he claimed, to prevent members of his staff from inadvertently or intentionally deleting the contents of his phone because, according to ADAMS, he wished to preserve the contents of his phone due to the investigation. But, ADAMS further claimed, he had forgotten the password he had just set, and thus was unable to provide the FBI with a password that would unlock the phone.

49.     As the federal investigation into the criminal conduct of ERIC ADAMS, the defendant, continued, so did efforts to frustrate that investigation.

      a.     On June 13, 2024, FBI agents interviewed Businessman-4 and the four employees of his company through whom Businessman-4 had made straw donations to the 2021 Campaign, most of whom denied making straw contributions. Businessman-4 then contacted Adams Employee-1, who, as discussed above, had asked Businessman-4 to make the straw

48

SUBJECT TO PROTECTIVE ORDER.

donations to the 2021 Campaign. Later that day, Adams Employee-1 visited Businessman-4 at his company's offices. Adams Employee-1 stated that he had just met with ADAMS at City Hall. Adams Employee-1 proceeded to discuss with Businessman-4 what had happened with the FBI and encouraged Businessman-4 to lie to federal investigators. Adams Employee-1 then asked to address Businessman-4's four employees who had made straw donations to the 2021 Campaign and encouraged them to lie to federal investigators as well. Adams Employee-1 then took photographs of the subpoena that had been issued to Businessman-4 to send to ADAMS.

    b.   On the following day, Businessman-4 met again with Adams Employee-1. Adams Employee-1 told Businessman-4 that he had met with ADAMS at City Hall earlier that day and that they had left their cellphones outside the room in which they met so that it would be "safe" to talk. Adams Employee-1 explained to Businessman-4 that although ADAMS was upset that law enforcement had approached Businessman-4, ADAMS believed that Businessman-4 would not cooperate with law enforcement.

## STATUTORY ALLEGATIONS

### COUNT ONE
**(Conspiracy to Commit Wire Fraud, Federal Program Bribery, and to Receive Campaign Contributions By Foreign Nationals)**

The Grand Jury charges:

  50.   The allegations contained in paragraphs 1 through 49 of this Indictment are repeated and realleged as if set forth fully herein.

  51.   From at least in or about 2015 through at least in or about 2024, in the Southern District of New York and elsewhere, ERIC ADAMS, the defendant, and others known and unknown, willfully and knowingly combined, conspired, confederated, and agreed together and with each other to commit offenses against the United States, to wit:

49

SUBJECT TO PROTECTIVE ORDER.

a. wire fraud, in violation of Title 18, United States Code, Section 1343;

b. soliciting, accepting, and receiving a campaign contribution by a foreign national, in violation of Title 52, United States Code, Section 30121(a)(2); and

c. bribery, in violation of Title 18, United States Code, Section 666(a)(1)(B).

52. It was a part and object of the conspiracy that ERIC ADAMS, the defendant, and others known and unknown, knowingly having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343.

53. It was further a part and object of the conspiracy that ERIC ADAMS, the defendant, and others known and unknown, would and did knowingly and willfully solicit, accept, and receive, directly and indirectly, a contribution and donation from a foreign national, and express and implied promises to make a contribution and donation, in connection with a local election, to wit, mayoral elections in the City of New York, aggregating $25,000 and more in a calendar year, in violation of Title 52, United States Code, Sections 30121(a)(2) and 30109(d)(1)(A)(i).

54. It was further a part and object of the conspiracy that ERIC ADAMS, the defendant, being an agent of a local government, to wit, the City of New York, which, in a one-year period, received benefits in excess of $10,000 under a federal program involving a grant, contract, subsidy, loan, guarantee, insurance, and other form of federal assistance, corruptly solicited and demanded for the benefit of a person, and accepted and agreed to accept, a thing of value from a person, intending to be influenced and rewarded in connection with  business, a transaction, and a series

50

SUBJECT TO PROTECTIVE ORDER.

of transactions of the City of New York involving a thing of value of $5,000 and more, in violation of Title 18, United States Code, Section 666(a)(1)(B).

<u>Overt Acts</u>

55.    In furtherance of the conspiracy and to effect the illegal objects thereof, the following overt acts, among others, were committed by ERIC ADAMS, the defendant, in the Southern District of New York and elsewhere:

a.    In 2016, ADAMS accepted free upgrades to business class for himself and a companion on roundtrip flights from New York to India.

b.    In July 2017, ADAMS accepted free business tickets for himself and two companions on roundtrip flights from New York to France, Turkey, Sri Lanka, and China.

c.    In July 2017, ADAMS accepted a steeply discounted stay at the Bentley Suite of the St. Regis Istanbul.

d.    In October 2017, ADAMS accepted free business tickets for himself and a companion on roundtrip flights from New York to China.

e.    In January 2018, ADAMS accepted free upgrades to business class for himself and a companion on roundtrip flights from New York to Hungary.

f.    In November 2018, ADAMS directed the Adams Staffer to arrange to accept contributions of foreign funds from Businessman-1.

g.    In January 2019, ADAMS accepted a free stay at the Cosmopolitan Suite of a luxury hotel in Istanbul.

h.    In January 2019, ADAMS met with Businessman-3 in Istanbul, where ADAMS agreed to accept campaign contributions of foreign money.

51

SDNY_01_000009555
SUBJECT TO PROTECTIVE ORDER.

i.    In December 2020, the Adams Employees solicited straw donations to ADAMS's campaign from Businessman-4.

j.    In May 2021, ADAMS attended a fundraiser organized by the Turkish Official, among others, where ADAMS accepted straw donations from Businessman-5.

k.    In May 2021, ADAMS submitted a false disclosure statement to the CFB that concealed the straw donations from Businessman-5.

l.    In June 2021 ADAMS solicited steeply discounted business class tickets, stays at a luxury hotel and luxury resort, and transportation (including a domestic flight and a car and driver).

m.    In June 2021, ADAMS solicited a free hotel stay and free use of a VIP room in a business class lounge of the Turkish Airlines for the Adams Fundraiser.

n.    In or about August 2021, ADAMS directed the Adams Staffer to obtain contributions of foreign funds from the Turkish University.

o.    In September 2021, ADAMS caused the FDNY to issue a letter acquiescing in the occupation of the Turkish House.

p.    In September 2021, ADAMS solicited and accepted steeply discounted business class tickets for himself and a companion on roundtrip flights from New York to Pakistan.

q.    In October 2021, ADAMS submitted a false disclosure statement to the CFB that concealed the straw donations from the Turkish University.

r.    In November 2021, ADAMS solicited and accepted a free car and driver and meal at a luxury restaurant for himself and his companion in Istanbul.

s.    In January 2022, ADAMS attended a meeting with the Promoter, among others, where he agreed to accept contributions of foreign money to the 2025 Campaign.

SDNY_01_000009556
SUBJECT TO PROTECTIVE ORDER.

t.    In July 2022, ADAMS's senior advisor and the Adams Staffer met the Turkish Official at the Turkish House, and the Adams Staffer identified ADAMS's senior official as the point of contact for the Turkish Official's "pending problems regarding" the Turkish House such as "FDNY approvals."

u.    In July 2022, the Turkish Official arranged to provide business class upgrades on the Turkish Airline for four of ADAMS's close associates.

v.    In September 2023, ADAMS attended a fundraiser where he thanked foreign donors for contributions of foreign money to the 2025 Campaign made through straw donors.

w.    In October 2023, ADAMS attended a fundraiser where he directed the Adams Staffer to coordinate the receipt of straw donations from Businessman-6.

(Title 18, United States Code, Section 371.)

## COUNT TWO
### (Wire Fraud)

The Grand Jury further charges:

56.    The allegations contained in paragraphs 1 through 49 of this Indictment are repeated and realleged as if set forth fully herein.

57.    From at least in or about 2018 through at least in or about 2024, in the Southern District of New York and elsewhere, ERIC ADAMS, the defendant, knowingly having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, for the purpose of executing such scheme and artifice, to wit, ADAMS participated in a scheme to fraudulently obtain Matching Funds for

53

SUBJECT TO PROTECTIVE ORDER.

the Adams Campaigns by falsely claiming that contributions qualified for Matching Funds when, in fact those contributions did not.

(Title 18, United States Code, Sections 1343 and 2.)

## COUNT THREE
### (Solicitation of a Contribution by a Foreign National)

The Grand Jury further charges:

58.    The allegations contained in paragraphs 1 through 49 of this Indictment are repeated and realleged as if set forth fully herein.

59.    In or about 2021, in the Southern District of New Yok and elsewhere, ERIC ADAMS, the defendant, knowingly and willfully solicited, accepted, and received, and aided and abetted and willfully caused the solicitation, acceptance and receipt of, a contribution and donation from a foreign national, and express and implied promises to make a contribution and donation, in connection with a local election, to wit, mayoral elections in the City of New York, aggregating $25,000 and more in a calendar year.

(Title 52, United States Code, Sections 30121 and 30109(d)(1)(A), and
Title 18, United States Code, Section 2.)

## COUNT FOUR
### (Solicitation of a Contribution by a Foreign National)

The Grand Jury further charges:

60.    The allegations contained in paragraphs 1 through 49 of this Indictment are repeated and realleged as if set forth fully herein.

61.    In or about 2023, in the Southern District of New York and elsewhere, ERIC ADAMS, the defendant, knowingly and willfully solicited, accepted, and received, and aided and abetted and willfully caused the solicitation, acceptance and receipt of, a contribution and donation

54

SDNY_01_000009558
SUBJECT TO PROTECTIVE ORDER.

from a foreign national, and express and implied promises to make a contribution and donation, in connection with a local election, to wit, mayoral elections in the City of New York, aggregating $25,000 and more in a calendar year.

(Title 52, United States Code, Sections 30121 and 30109(d)(1)(A), and
Title 18, United States Code, Section 2.)

## COUNT FIVE
### (Bribery)

The Grand Jury further charges:

62.     The allegations contained in paragraphs 1 through 49 of this Indictment are repeated and realleged as if set forth fully herein.

63.     From at least in or about the summer of 2021, through at least in or about the summer of 2022, in the Southern District of New York and elsewhere, ERIC ADAMS, the defendant, being an agent of a local government, to wit, the City of New York, which, in a one-year period, received benefits in excess of $10,000 under a federal program involving a grant, contract, subsidy, loan, guarantee, insurance, and other form of federal assistance, corruptly solicited and demanded for the benefit of a person, and accepted and agreed to accept, a thing of value from a person, intending to be influenced and rewarded in connection with business, a transaction, and a series of transactions of the City of New York involving a thing of value of $5,000 and more, to wit, ADAMS solicited and accepted free and heavily discounted luxury travel benefits from the Turkish Official and others in exchange for intending to be influenced in connection with the City of New York's regulation of the Turkish House, located at 821 United Nations Plaza, New York, New York.

(Title 18, United States Code, Sections 666(a)(1)(B) and 2.)

55

SDNY_01_000009559
SUBJECT TO PROTECTIVE ORDER.

## **FORFEITURE ALLEGATIONS**

64.    As a result of committing one or more of the offenses alleged in Counts One, Two, and Five of this Indictment, ERIC ADAMS, the defendant, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), any and all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of said offenses, including but not limited to a sum of money in United States currency representing the amount of proceeds traceable to the commission of said offenses.

56

SDNY_01_000009560
SUBJECT TO PROTECTIVE ORDER.

## Substitute Assets Provision

65.     If any of the above-described forfeitable property, as a result of any act or omission

of the defendant:

          a.     cannot be located upon the exercise of due diligence;

          b.     has been transferred or sold to, or deposited with, a third person;

          c.     has been placed beyond the jurisdiction of the Court;

          d.     has been substantially diminished in value; or

          e.     has been commingled with other property which cannot be subdivided

without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p) and

Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of the

defendant up to the value of the above forfeitable property.

(Title 18, United States Code, Section 981;
Title 21, United States Code, Section 853; and
Title 28, United States Code, Section 2461.)

FOREPERSON

Damian Williams
DAMIAN WILLIAMS
United States Attorney

57

SDNY_01_000009561
SUBJECT TO PROTECTIVE ORDER

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

# 24 MAG 3434

**WARRANT AND ORDER**

--------------------------------------------------
In re: Warrant and Order For Prospective
Location Information and Pen Register
Information for the Cellphone Assigned
Call Number ███████6335, USAO
Reference No. 2021R00778
--------------------------------------------------

**24 Mag. _____**

**Warrant and Order**
**for Cellphone Location Information and Pen Register Information**
**and for Sealing and Non-Disclosure**

TO:   T-Mobile US, Inc. ("Service Provider"), and any subsequent provider of service to the
      Target Cellphone specified below ("Subsequent Service Provider")

      The Federal Bureau of Investigation ("Investigating Agency")

      Upon the Application and Agent Affidavit submitted by the Government in this matter:

**I.  Findings**

      The Court hereby finds:

      1.  The Target Cellphone (the "Target Cellphone") that is the subject of this Order is

assigned call number ███████6335, and is currently serviced by the Service Provider.

      2.  Pursuant to 18 U.S.C. § 2703(c)(1)(A) and the applicable provisions of Rule 41 of the

Federal Rules of Criminal Procedure, the Government's application sets forth probable cause to

believe that the prospective location information for the Target Cellphone will lead to evidence of

violations of (i) 18 U.S.C. §§ 371 and 666(a)(1)(B) (bribery and conspiracy to commit bribery);

(ii) 18 U.S.C. §§ 371 and 1343 (wire fraud and attempt and conspiracy to commit wire fraud); and

(iii) 18 U.S.C. § 371 and 52 U.S.C. § 30121 (campaign contributions by foreign nationals and

conspiracy to commit the same) (collectively, the "Subject Offenses").

      3.     Pursuant to 18 U.S.C. § 3123(b)(1), the Government has certified that the pen

register information for the Target Cellphone is relevant to an ongoing investigation by the

SUBJECT TO PROTECTIVE ORDER.

Investigating Agency of Eric Adams in connection with suspected violations of the Subject Offenses.

4.  Pursuant to 18 U.S.C. § 2705(b), there is reason to believe that notification of the existence of this Warrant and Order will result in danger to the physical safety of an individual, intimidation of potential witnesses, or otherwise will seriously jeopardize an ongoing investigation.

NOW, THEREFORE, pursuant to Fed. R. Crim. P. 41, 18 U.S.C. §§ 3121 *et seq.*, 18 U.S.C. §§ 2701 *et seq.*, and 18 U.S.C. § 3103a, IT IS HEREBY ORDERED:

**II.  Order to Service Provider**

5.    **Service Provider.** This Order shall apply to the Service Provider specified above, and to any subsequent provider of service to the Target Cellphone without need for further Order of this Court.

6.    **Prospective Location Information**. The Service Provider shall provide to the Investigating Agency on a prospective basis, for a period of 45 days from the date of this Order, information concerning the location of the Target Cellphone ("Prospective Location Information"), including all available:

a.   precision location information, including GPS data, E-911 Phase II data, and latitude-longitude data; and

b.   cell site data, including any data reflecting (a) the cell towers and sectors thereof utilized in routing any phone, text, or data communication to or from the Target Cellphone, and (b) the approximate range of the target phone from the cell towers during the communication (including per-call measurement ("PCM") or round-trip time ("RTT") data);

2

2019.07.24

SDNY_01_000009563
SUBJECT TO PROTECTIVE ORDER.

7. **Pen register with caller identification and/or trap and trace device.** The Service Provider shall provide to the Investigating Agency, for a period of 45 days from the date of this order, all dialing, routing, addressing, or signaling information associated with each voice, text, or data communication transmitted to or from the Target Cellphone, including but not limited to:

a.  any unique identifiers associated with the phone, including ESN, MEIN, MSISDN, IMSI, IMEI, SIM, MIN, or MAC address;

b.  source and destination telephone numbers and/or Internet protocol ("IP") addresses;[1]

c.  date, time, and duration of the communication; and

d.  cell-site information as specified above.

8. **Technical Assistance.** The Service Provider shall furnish the Investigating Agency all information, facilities, and technical assistance necessary to accomplish the disclosure of all of the foregoing information relating to the Target Cellphone unobtrusively and with the minimum interference to the service presently provided to the Subscriber.

9. **Non-Disclosure to Subscriber.** The Service Provider, including its affiliates, officers, employees, and agents, shall not disclose the existence of this Warrant and Order, or the underlying investigation, to the Subscriber or any other person, for a period of one year from the date of this Warrant and Order, subject to extension upon application to the Court, if necessary.

---

[1] The Service Provider is not required to provide post-cut-through dialed digits ("PCTDD"), or digits that are dialed after a telephone call from the Target Cellphone has been connected. If possible, the Service Provider will forward only pre-cut-through-dialed digits to the Investigative Agency. However, if the Service Provider's technical capabilities require it to forward all dialed digits, including PCTDD, to the Investigative Agency, the Investigative Agency will only decode and forward to the agents assigned to the investigation, the numbers that are dialed before the call is cut through.

2019.07.24

SDNY_01_000009564
SUBJECT TO PROTECTIVE ORDER.

### III.  Additional Provisions

10. **Compensation for Costs.** The Investigating Agency shall compensate the Service Provider for reasonable expenses incurred in complying with the Warrant and this Order.

11. **Sealing.** This Warrant and Order, and the supporting Application and Agent Affidavit, shall be sealed until otherwise ordered by the Court, except that the Government may without further order of this Court: serve this Warrant and Order on the Service Provider; provide copies of the Warrant and Order or the supporting Application and Agent Affidavit as need be to personnel assisting the Government in the investigation and prosecution of this matter; and disclose these materials as necessary to comply with discovery and disclosure obligations in any prosecutions related to this matter.

Dated: New York, New York

Type text here

9/25/2024
_____      _____
Date Issued                          Time Issued

*Katharine H. Parker*
_____
UNITED STATES MAGISTRATE JUDGE
Southern District of New York

4

2019.07.24

SDNY_01_000009565
SUBJECT TO PROTECTIVE ORDER.