# UNITED STATES DISTRICT COURT

for the

Southern District of New York

In the Matter of the Search of

*(Briefly describe the property to be searched or identify the person by name and address)*

A Samsung Cellphone with IMEI Number 352091530069544 Seized from Mohamed Bahi on October 8, 2024

)
)
)
)
)
)

## 24 MAG 3629

Case No.

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the _____Southern_____ District of _____New York_____ , there is now concealed *(identify the person or describe the property to be seized)*:

Please see Attached Affidavit and its Attachment A

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 371 | conspiracy, |
| 18 U.S.C. §§ 666, 1343 | bribery, wire fraud |
| 18 U.S.C. §§ 1512, 1519 | witness tampering, destruction of records |

The application is based on these facts:

Please see Attached Affidavit

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

S/ by the Court with permission

_____
*Applicant's signature*

[signature redacted]

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by _____Telephone_____ *(specify reliable electronic means)*.

Date:     10/11/2024

City and state:  New York, New York

_____
*Judge's signature*

Hon. Robert W. Lehrburger, USMJ, SDNY

*Printed name and title*

| Print | Save As... | Attach | Reset |
|---|---|---|---|

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**24 MAG 3629**

**TO BE FILED UNDER SEAL**

In the Matter of the Application of the United
States of America for the Search of a Samsung
Cellphone       with       IMEI       Number
352091530069544 Seized from Mohamed Bahi
on October 8, 2024, USAO Reference No.
2021R00778

**Agent Affidavit in Support of
Application for Search and Seizure
Warrant**

SOUTHERN DISTRICT OF NEW YORK) ss.:

███████      being duly sworn, deposes and says:

## I.  Introduction

### A.  Affiant

1.      I have been a Special Agent with the Federal Bureau of Investigation ("FBI") since
2019. I am currently assigned to a public corruption squad of the New York Field Office, where,
among other things, I investigate crimes involving illegal campaign contributions, wire fraud, and
bribery. Through my training and experience, I also have become familiar with some of the ways
in which individuals use smart phones and electronic communications, including social media,
email, and electronic messages, in furtherance of their crimes, and have participated in the
execution of search warrants involving electronic evidence.

2.      I make this Affidavit in support of an application pursuant to Rule 41 of the Federal
Rules of Criminal Procedure for a warrant to search a Samsung cellphone with IMEI number
352091530069544 seized from Mohamed Bahi, incident to his arrest, on October 8, 2024 (the
"Subject Device"), for the items and information described in Attachment A. The Subject Device
is presently located at 26 Federal Plaza, New York, New York, in the custody of the FBI. This
affidavit is based upon my personal knowledge; my review of documents and other evidence; my
conversations with other law enforcement personnel; and my training, experience and advice

2017.08.02

2

received concerning the use of electronic devices in criminal activity and the forensic analysis of electronically stored information ("ESI"). Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

**B. The Subject Device**

3.      The Subject Device is a Samsung cellphone with IMEI number 352091530069544 which I seized from Mohamed Bahi, incident to his arrest, on October 8, 2024, and which is presently located at 26 Federal Plaza, New York, New York, in the custody of the FBI.

**C. The Subject Offenses**

4.      For the reasons detailed below, I respectfully submit that there is probable cause to believe that the Subject Device contains evidence, fruits, and instrumentalities of violations of (i) 18 U.S.C. §§ 371 and 666(a)(1)(B) (bribery and conspiracy to commit bribery); (ii) 18 U.S.C. §§ 371 and 1343 (wire fraud and attempt and conspiracy to commit wire fraud); (iii) 18 U.S.C. §§ 371 and 1512 (witness tampering and conspiracy to commit the same); and (iv) 18 U.S.C. § 1519 (destruction of records) (collectively, the "Subject Offenses").

**II. Probable Cause**

**A. Probable Cause Regarding the Subject Offenses**

5.      On or about July 12, 2024, the Honorable Joseph A. Marutollo, United States Magistrate Judge, Eastern District of New York, issued a search warrant to, among other things, seize electronic devices, including cellphones (the "Original Phones"), used by Bahi, and to search the seized devices for evidence of certain of the Subject Offenses, specifically (i) 18 U.S.C. §§ 371 and 666(a)(1)(B) (bribery and conspiracy to commit bribery); (ii) 18 U.S.C. §§ 371 and 1343 (wire

2017.08.02

3

fraud and attempt and conspiracy to commit wire fraud); and (iii) 18 U.S.C. §§ 371 and 1512 (witness tampering and conspiracy to commit the same), among other offenses. A copy of that warrant and the affidavit I submitted in support of it (the "Original Phone Warrant") are attached as Exhibit A and incorporated herein.

6.    On or about September 24, 2024, a grand jury sitting in this District returned an indictment charging New York City Mayor Eric Adams with certain of the Subject Offenses, specifically (i) 18 U.S.C. §§ 371 and 666(a)(1)(B) (bribery and conspiracy to commit bribery); and (ii) 18 U.S.C. §§ 371 and 1343 (wire fraud and attempt and conspiracy to commit wire fraud); among other offenses. A copy of that indictment (the "Indictment") is attached as Exhibit B and incorporated herein.

7.    On or about October 7, 2024, this Court issued a warrant (the "Arrest Warrant") for the arrest of Mohamed Bahi for certain of the Subject Offenses, specifically (i) 18 U.S.C. § 1512 (witness tampering); and (ii) 18 U.S.C. § 1519 (destruction of records). A copy of the complaint (the "Complaint") based on which I sought that arrest warrant is attached as Exhibit C and incorporated by reference herein.

8.    I know, based on my involvement in this investigation, that: (i) Mohamed Bahi is the person referred to in the Indictment as "Adams Employee-1"; (ii) Eric Adams is the person referred to in the Complaint as "Official-1"; (iii) ▮▮▮▮▮▮▮ is the person referred to "Businessman-4" in the Indictment and "the Businessman" in the Complaint; and (iv) the following additional terms in the Indictment refer to the following persons:

    a.    "Turkish Official" - ▮▮▮▮▮▮▮

    b.    "Airline Manager" - ▮▮▮▮▮

    c.    "Promoter" - ▮▮▮▮

4

2017.08.02

    d.   "Businessman-5" - Erden Arkan

    e.   "Businessman-1"- ███████

    f.   "University President" - █████████████

    g.   "Businessman-2" - ████████

    h.   "Businessman-6" - █████████

    i.   "Adams Employee-2" - █████████

    j.   "Adams Fundraiser" - ████████

    k.   "Adams Scheduler" - █████████

    l.   "Adams Liaison" - ████████

    m.   "Adams Staffer" - ████████

**B.  Probable Cause Justifying Search of the Subject Device**

9.     As detailed in the Indictment, Adams and his co-conspirators sent and received numerous electronic messages and emails in connection with certain of the Subject Offenses. As detailed in the Original Search Warrant, there is probable cause to believe that Bahi used phones in his possession (*i.e.*, the Original Phones) until on or about July 12, 2024, to send and receive electronic messages in connection with certain of the Subject Offenses. As detailed in the Complaint, when I and other FBI agents seized Bahi's phones pursuant to the Original Search Warrant on or about July 12, 2024, Bahi deleted the Signal application—which he had previously used to communicate with, among other people, Adams—from one of the Original Phones before the FBI could seize that phone.

10.    On or about October 8, 2024, other FBI agents and I executed the Arrest Warrant. When I approached Bahi to arrest him, he was holding the Subject Device in his hand. I directed him to put the Subject Device down and to put his hands up. Bahi placed the Subject Device on a nearby ledge. As I placed handcuffs on Bahi, two other FBI agents seized the Subject Device and

2017.08.02

SDNY_10_0000010759

placed the Subject Device in "airplane mode" in order to preserve its contents. The agents then brought the Subject Device to 26 Federal Plaza, New York, New York, where it is presently located.

11.    I believe that Bahi has used to the Subject Device to replace the Original Devices because, among other reasons, (a) the Original Devices were seized approximately three months prior to the seizure of the Subject Device;[1] (b) at present, most people regularly carry a cellphone; (c) Bahi was carrying the Subject Device immediately on his person; and (d) GPS and call data for the Subject Device, which I have obtained and reviewed pursuant to a court-authorized search warrant, is consistent with Bahi using the Subject Device, including as explained below.

12.    Based on my training and experience, and my participation in this investigation, I believe that Bahi has likely used the Subject Device to communicate with others, including Eric Adams and ███████████ (whose role in certain Subject Offenses is described in the Indictment and the Original Phones Warrant), about the Subject Offenses. Among other reasons, the Indictment was unsealed on September 26, 2024, and describes criminal conduct committed jointly by Bahi, Adams, ████████ and others known to them, which is likely to have caused the co-conspirators to communicate with each other to share information about what may be known to law enforcement and coordinate any actions they may take to evade culpability. For example, GPS data shows that on October 8, 2024, before I seized the Subject Device, the Subject Devices was in the vicinity of a residence I know to be used by ████████ In addition, I know from public reporting that on or about October 7, 2024, both Bahi and ████████ resigned from their positions

---

[1]    On or about August 2, 2024, the FBI also seized another cellphone from Bahi, pursuant to a warrant issued by the Honorable Leda Dunn Wettre, United States Magistrate Judge, Disrict of New Jersey.

2017.08.02

SDNY_10_0000010760

at City Hall, which would typically involve communication at least with each other and their supervisors, such as Adams.

13.    Based on my experience and participation in this and other investigations, I know that Signal is an encrypted messaging application, which allows users to set the application to automatically delete messages at certain intervals. In the course of this investigation, I have learned that on at least some occasions, law enforcement has been able to retrieve Signal messages from seized electronic devices, even if those messages were not found on an iCloud account used by the device's owner.

14.    I am aware, based on my training and experience, and consultation with other FBI personnel, that electronic devices can be, and often are, found on multiple devices used by the same user.  For example, iMessages—the type of text messages typically sent between users of iPhones—will  typically be found on all iPhones used by the same user, assuming the user continues to use the iCloud account. I know, based on my seizure of cellphones used by Adams and ███████ in the course of this investigation, that some of their previous phones, like the Subject Device, are iPhones.

15.    Although Signal does not readily transfer between devices, as noted in the Original Phones Warrant, Adams and Bahi have used Signal to communicate, and any recent Signal messages between the two are therefore likely to be found on the Subject Device.

16.    Phones can be used to store documents, including emails, text messages, previous electronic chats, and financial documents like bank statements and travel expenditure. Document attachments to communications can be saved intentionally or as a result of a cellphone's operating system or web browser to an electronic device, including a cellphone. Moreover, and more generally, users of cellphones who are engaged in or communicating about the commission of the

7

2017.08.02

Subject Offenses often store documents relevant to that activity on their devices, and also maintain notes of meetings and telephone calls on their devices. Such documents can include, but are not limited to, Microsoft Word and PDF documents, drafts, scans, bank statements received from financial institutions, and government filings.

17.     Electronic files (such as files containing the messages discussed above), or remnants of those files, downloaded to a cellphone, can be stored for years at little or no cost. Even when such files have been deleted, they can be recovered months or years later using readily available forensics tools. When a person "deletes" a file on a cellphone the data contained in the file does not actually disappear; rather, that data remains on the storage medium and within the device unless and until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space–that is, in space on the device that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space–for long periods of time before they are overwritten. In addition, a device's operating system may also keep a record of deleted data in a "swap" or "recovery" file. Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or "cache." The browser typically maintains a fixed amount of electronic storage medium space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages. Thus, the ability to retrieve "residue" of an electronic file from a cellphone depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and cellphone habits.

18.     Additionally, a person can transfer data from an old cellphone to a new device, including, for example, mail, contacts, calendars, photos and videos, books and pdfs, call logs, and text messages. For individuals who regularly change or upgrade their devices, including

2017.08.02

SDNY_10_0000010762

cellphones, it is common to transfer electronic records, such as emails, contacts, calendars, photos and videos, books and pdfs, call logs, and text messages from the old phone to a new phone. Individuals can transfer data in a few ways, including in a cellphone provider or Apple store, through a personal computer containing a backup, or through an iCloud backup. Accordingly, although Bahi no longer possesses the Original Phones, there is probable cause to believe that contents of the Original Phones, including contents Bahi deleted from the Original Devices, will be found on the Subject Device.

19.     Based on the foregoing, I respectfully submit there is probable cause to believe that Bahi participated in the Subject Offenses, and that the evidence, fruits, and instrumentalities of the Subject Offenses listed in Attachment A, which is incorporated by reference herein, will be found on the Subject Device.

## III.  Procedures for Searching ESI

### A.  Review of ESI

20.     Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) will review the ESI contained on the Subject Device for information responsive to the warrant.

21.     In conducting this review, law enforcement may use various techniques to determine which files or other ESI contain evidence or fruits of the Subject Offenses.  Such techniques may include, for example:

- surveying directories or folders and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files);

9

SDNY_10_0000010763

- conducting a file-by-file review by "opening" or reading the first few "pages" of such files in order to determine their precise contents (analogous to performing a cursory examination of each document in a file cabinet to determine its relevance);

- "scanning" storage areas to discover and possibly recover recently deleted data or for deliberately hidden files; and

- performing electronic keyword searches through all electronic storage areas to determine the existence and location of search terms related to the subject matter of the investigation. (Keyword searches alone are typically inadequate to detect all information subject to seizure. For one thing, keyword searches work only for text data, yet many types of files, such as images and videos, do not store data as searchable text. Moreover, even as to text data, there may be information properly subject to seizure but that is not captured by a keyword search because the information does not contain the keywords being searched.)

22.    Law enforcement personnel will make reasonable efforts to restrict their search to data falling within the categories of evidence specified in the warrant.   Depending on the circumstances, however, law enforcement may need to conduct a complete review of all the ESI from the Subject Device to locate all data responsive to the warrant.

**B.  Return of the Subject Device**

23.    If the Government determines that the Subject Device is no longer necessary to retrieve and preserve the data on the device, and that the Subject Device is not subject to seizure pursuant to Federal Rule of Criminal Procedure 41(c), the Government will return the Subject Device, upon request. Data that is encrypted or unreadable will not be returned unless law enforcement personnel have determined that the data is not (i) an instrumentality of the offense, (ii) a fruit of the criminal activity, (iii) contraband, (iv) otherwise unlawfully possessed, or (v) evidence of the Subject Offenses.

2017.08.02

SDNY_10_0000010764

## IV. Conclusion and Ancillary Provisions

24.    Based on the foregoing, I respectfully request the court to issue a warrant to seize the items and information specified in Attachment A to this affidavit and to the Search and Seizure Warrant.

25.    In light of the confidential aspects of the continuing investigation, I respectfully request that this affidavit and all papers submitted herewith be maintained under seal until the Court orders otherwise.

S/ by the Court with permission

_____

Special Agent
Federal Bureau of Investigation

Sworn to me through the transmission of this
Affidavit by reliable electronic means, pursuant to
Federal Rules of Criminal Procedure 41(d)(3) and 4.1, on
October 11, 2024

_____
HON. ROBERT W. LEHRBURGER
UNITED STATES MAGISTRATE JUDGE

11

2017.08.02

SDNY_10_0000010765

**Attachment A**

## I.  The Subject Device

The Subject Device is a Samsung cellphone with IMEI number 352091530069544 seized from Mohamed Bahi, incident to his arrest, on October 8, 2024, which is presently located at 26 Federal Plaza, New York, New York, in the custody of the Federal Bureau of Investigation.

## II.  Seizure and Review of ESI on the Subject Device

### A.  Evidence, Fruits, and Instrumentalities of the Subject Offenses

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the ESI contained on the Subject Device for evidence, fruits, and instrumentalities of violations of (i) 18 U.S.C. §§ 371 and 666(a)(1)(B) (bribery and conspiracy to commit bribery); (ii) 18 U.S.C. §§ 371 and 1343 (wire fraud and attempt and conspiracy to commit wire fraud); (iii) 18 U.S.C. §§ 371 and 1512 (witness tampering and conspiracy to commit the same); and (iv) 18 U.S.C. § 1519 (destruction of records) (collectively, the "Subject Offenses") described as follows:

1.  Evidence concerning the identity or past location of the owner(s) or user(s) of the Subject Device.

2.  Evidence of knowledge or understanding of, or intent to violate, laws and regulations governing the conduct of the 2021 and 2025 mayoral campaigns of Eric Adams (the "Adams Campaigns") on the part of Mohamed Bahi, or on the part of any other person who is or was associated with or employed by the Adams Campaigns.

3.  Evidence relating to Bahi's involvement in fundraising for the Adams Campaigns.

4.  Evidence relating to efforts by Bahi or by any person who is or was associated with or employed by the Adams Campaigns to provide benefits, whether lawfully or unlawfully, to any donor or potential donor to the Adams Campaigns in exchange for campaign contributions.

5.  Evidence relating to payments to any potential or actual donor to the Adams Campaigns to facilitate their making campaign contributions to the Adams Campaigns.

6.  Evidence of individuals or entities who donated to the Adams Campaigns before or after receiving transfers of funds similar to the amount of the donation.

7.  Evidence regarding any persons or entities involved, wittingly or unwittingly, in donations to the Adams Campaign in which the named donor is not the true source of the donated funds ("straw donations").

8.      Evidence regarding any requests by the Adams Campaigns for matching funds based on straw donations, including any discussions of matching funds.

9.      Evidence of fundraising for the Adams Campaigns involving any foreign nationals or officials.

10.     Evidence of the exchange of benefits or favors between foreign nationals or officials, on the one hand, and any person who is or was associated with or employed by the Adams Campaigns, on the other hand.

11.     Evidence relating to any efforts to influence testimony in any investigation relating to the Adams Campaigns, to destroy or conceal evidence, or to otherwise respond to, interfere with, or obstruct any investigation relating to the Adams Campaigns.

12.     Evidence sufficient to establish the owners and users of the Subject Device at times relevant to the Subject Offenses.

13.     Evidence of the geographic location of users or devices involved in the commission of the Subject Offenses at times relevant to the Subject Offensess.

**B.  Review of ESI**

Following seizure of any electronic communications device and/or the creation of forensic image copies, law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the ESI contained therein for information responsive to the warrant.

In conducting this review, law enforcement personnel may use various techniques to locate information responsive to the warrant, including, for example:

- surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files);

- opening or cursorily reading the first few "pages" of such files in order to determine their precise contents;

- scanning storage areas to discover and possibly recover recently deleted files or deliberately hidden files;

- performing key word searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are intimately related to the subject matter of the investigation; and

- reviewing metadata, system information, configuration files, registry data, and any other information reflecting how, when, and by whom the device was used.

Law enforcement personnel will make reasonable efforts to search only for files, documents, or other electronically stored information within the categories identified in Section II.A of this Attachment. However, law enforcement personnel are authorized to conduct a complete review of all the ESI from seized devices or storage media if necessary to evaluate its contents and to locate all data responsive to the warrant.

# EXHIBIT A

## [24 MC 2762]

2022.01.31

SDNY_10_0000010769

# EXHIBIT B

SDNY_10_0000010875

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA | **SEALED INDICTMENT** |
| v. | 24 Cr. |
| ERIC ADAMS, | 24 CRIM 556 |
| Defendant. | |

### Overview

1.     In 2014, ERIC ADAMS, the defendant, became Brooklyn Borough President. Thereafter, for nearly a decade, ADAMS sought and accepted improper valuable benefits, such as luxury international travel, including from wealthy foreign businesspeople and at least one Turkish government official seeking to gain influence over him. By 2018, ADAMS—who had by then made known his plans to run for Mayor of New York City—not only accepted, but sought illegal campaign contributions to his 2021 mayoral campaign, as well as other things of value, from foreign nationals. As ADAMS's prominence and power grew, his foreign-national benefactors sought to cash in on their corrupt relationships with him, particularly when, in 2021, it became clear that ADAMS would become New York City's mayor. ADAMS agreed, providing favorable treatment in exchange for the illicit benefits he received. After his inauguration as Mayor of New York City, ADAMS soon began preparing for his next election, including by planning to solicit more illegal contributions and granting requests from those who supported his 2021 mayoral campaign with such donations.

2.     ERIC ADAMS, the defendant, sought and accepted illegal campaign contributions in the form of "nominee" or "straw" contributions, meaning that the true contributors conveyed their money through nominal donors, who falsely certified they were contributing their own

money.   By smuggling their contributions to ADAMS through U.S.-based straw donors, ADAMS's overseas contributors defeated federal laws that serve to prevent foreign influence on U.S. elections.   Wealthy individuals evaded laws designed to limit their power over elected officials by restricting the amount any one person can donate to a candidate.   And businesses circumvented New York City's ban on corporate contributions by funneling their donations through multiple employees, frustrating a law that seeks to reduce corporate power in politics. ADAMS increased his fundraising by accepting these concealed, illegal donations—at the cost of giving his secret patrons the undue influence over him that the law tries to prevent.

3.    ERIC ADAMS, the defendant, compounded his gains from the straw contributions by using them to defraud New York City and steal public funds.  New York City has a matching funds program that matches small-dollar contributions from individual City residents with up to eight times their amount in public funds, to give New Yorkers a greater voice in elections. ADAMS's campaigns applied for matching funds based on known straw donations, fraudulently obtaining as much as $2,000 in public funds for each illegal contribution.  ADAMS and those working at his direction falsely certified compliance with applicable campaign finance regulations despite ADAMS's repeated acceptance of straw donations, relying on the concealed nature of these illegal contributions to falsely portray his campaigns as law-abiding.   As a result of those false certifications, ADAMS's 2021 mayoral campaign received more than $10,000,000 in public funds.

4.    ERIC ADAMS, the defendant, also sought and received other improper benefits from some of the same co-conspirators who funneled straw donations to his campaigns.   In particular, a senior official in the Turkish diplomatic establishment (the "Turkish Official"), who facilitated many straw donations to ADAMS, also arranged for ADAMS and his companions to receive free or discounted travel on Turkey's national airline (the "Turkish Airline"), which is

2

SDNY_10_0000010877

owned in significant part by the Turkish government, to destinations including France, China, Sri Lanka, India, Hungary, and Turkey itself. The Turkish Official and other Turkish nationals further arranged for ADAMS and his companions to receive, among other things, free rooms at opulent hotels, free meals at high-end restaurants, and free luxurious entertainment while in Turkey.

5.      ERIC ADAMS, the defendant, and others working at his direction, repeatedly took steps to shield his solicitation and acceptance of these benefits from public scrutiny. ADAMS did not disclose the travel benefits he had obtained in annual financial disclosures he was required to file as a New York City employee. Sometimes, ADAMS agreed to pay a nominal fee to create the appearance of having paid for travel that was in fact heavily discounted. Other times, ADAMS created and instructed others to create fake paper trails, falsely suggesting that he had paid, or planned to pay, for travel benefits that were actually free. And ADAMS deleted messages with others involved in his misconduct, including, in one instance, assuring a co-conspirator in writing that he "always" deleted her messages.

6.      In September 2021, the Turkish Official told ERIC ADAMS, the defendant, that it was his turn to repay the Turkish Official, by pressuring the New York City Fire Department ("FDNY") to facilitate the opening of a new Turkish consular building—a 36-story skyscraper— without a fire inspection, in time for a high-profile visit by Turkey's president. At the time, the building would have failed an FDNY inspection. In exchange for free travel and other travel-related bribes in 2021 and 2022 arranged by the Turkish Official, ADAMS did as instructed. Because of ADAMS's pressure on the FDNY, the FDNY official responsible for the FDNY's assessment of the skyscraper's fire safety was told that he would lose his job if he failed to acquiesce, and, after ADAMS intervened, the skyscraper opened as requested by the Turkish Official.

SDNY_10_0000010878

### New York City's Public Matching Funds Program

7.     The New York City Campaign Finance Board ("CFB") oversees and administers a publicly funded campaign finance system for municipal elections in New York City, including a matching funds program (the "Matching Funds Program") that provides eligible candidates with public funds to match small-dollar contributions from New York City residents ("Matching Funds"). The Matching Funds Program is intended to incentivize candidates to finance their campaigns by engaging with average New Yorkers, instead of seeking large contributions from a limited number of influential donors, and to empower more candidates to run for office, even without access to wealth. For mayoral candidates in the 2021 and 2025 election cycles, the Matching Funds Program operated, as relevant here, in the following manner:

          a.     Candidates that collected a minimum number of contributions and raised a minimum amount of qualifying contributions from New York City residents were eligible to opt into the Matching Funds Program.

          b.     Candidates that opted into the Matching Funds Program were required to file a signed and notarized certification attesting, among other things, that they understood that they were responsible for reading, understanding, and complying with, and ensuring their campaigns' compliance with, various statutes and rules; that submitting fraudulent claims for Matching Funds or otherwise furnishing false information to the CFB would constitute a fundamental breach of the obligations affirmed as part of the certification; and that, in the event of such a breach, they would be ineligible to receive additional Matching Funds and would be required to return all Matching Funds previously received.

          c.     The Matching Funds Program would provide up to $8 in Matching Funds for each $1 of eligible contributions up to $250 from New York City residents. In other words,

4

SDNY_10_0000010879

for each eligible contribution of at least $250, a participating candidate could collect up to $2,000 in Matching Funds. The Matching Funds Program would provide up to $12,952,888 in Matching Funds for qualifying mayoral candidates during the primary and general elections in the 2021 election cycle, and up to $14,101,334 in Matching Funds for qualifying mayoral candidates during the primary and general elections in the 2025 election cycle.

        d.      Certain kinds of contributions were prohibited entirely, including (i) straw contributions; (ii) contributions from a person who was not a United States citizen or a lawful permanent resident of the United States; (iii) contributions from foreign entities and organizations; (iv) contributions from corporations; and (v) contributions that were made, received, solicited, or otherwise obtained in violation of any local, state, or federal law.

        e.      Through its Campaign Finance Handbook, the CFB informed candidates and their campaign staff that straw contributions were not only prohibited, but also illegal.

        f.      Candidates that opted into the Matching Funds Program were required to regularly submit to the CFB disclosure statements that, among other things, identified all contributions received during a particular reporting period, regardless of whether those contributions were eligible for matching funds. These disclosure statements were required to be submitted electronically by either the candidate or the campaign's treasurer using a unique login. In order to submit a disclosure statement, the filer was required to (i) identify him or herself as either the candidate or the treasurer and (ii) electronically sign a verification stating, "This disclosure statement is true and correct to the best of my knowledge, information and belief and I understand that by clicking 'Verify' below I am electronically signing my disclosure statement, which shall have the same validity and effect as a signature affixed by hand."

SDNY_10_0000010880

8.      ERIC ADAMS, the defendant, was aware that the law prohibited foreign, conduit, and corporate contributions.  At least as early as 2018, ADAMS, began raising money to fund his first mayoral campaign (the "2021 Campaign").  In September 2019, ADAMS submitted the required certification to opt into the Matching Funds Program.  During the 2021 election cycle, ADAMS and persons acting at his direction regularly submitted and signed disclosure statements attesting to the veracity of the information being provided to the CFB.  ADAMS won his party's primary election in July 2021, and was elected Mayor in November 2021.  While serving as Mayor, ADAMS again opted into the Matching Funds Program and began fundraising for his 2025 reelection campaign (the "2025 Campaign," and together with the 2021 Campaign, the "Adams Campaigns"), continuing at least to the date of this Indictment.

### ADAMS Travels to Turkey and Begins Accepting Illegal Campaign Contributions and Personal Benefits

9.      Within a year of becoming Brooklyn Borough President, ERIC ADAMS, the defendant, began building relationships with foreign nationals who were seeking influence with him.  In the years that followed, ADAMS solicited and knowingly accepted illegal campaign contributions and improper personal benefits from those foreign nationals.

#### In 2015, ADAMS travels to Turkey and establishes corrupt relationships

10.      In 2015, ERIC ADAMS, the defendant, took two official trips to Turkey.  His first trip, in August 2015, was arranged by the Turkish Consulate General in New York City (the "Turkish Consulate") and paid for in part by the Turkish Consulate and in part by a for-profit educational conglomerate based in Istanbul (the "Turkish University").  The second trip, in December 2015, was arranged by the Turkish Official and a Turkish entrepreneur (the "Promoter") whose business includes organizing events to introduce Turkish corporations and businesspeople to politicians, celebrities, and others whose influence may benefit the corporations and

6

businesspeople. For both trips, ADAMS received free business class tickets on the Turkish Airline. Unlike ADAMS's subsequent travel with the Turkish Airline, ADAMS reported his 2015 travel to Turkey on financial disclosure forms filed with the New York City Conflict of Interest Board (the "COIB"), as he was required to do annually at all times relevant to this Indictment.

11. The 2015 travel to Turkey by ERIC ADAMS, the defendant, involved several people relevant to events described in this Indictment, including:

a. The Turkish Official, who helped arrange ADAMS's travel to and within Turkey in 2015, and who later steered illegal contributions and improper gifts to ADAMS to gain influence with and, eventually, to obtain corrupt official action from ADAMS.

b. The Promoter, who arranged straw contributions to both of the Adams Campaigns and favorable treatment in Turkey for ADAMS in 2017 and 2019, hoping to leverage ADAMS's considerable fame in Turkey to benefit the Promoter's clients.

c. The owner and chairman of the Turkish University ("Businessman-1"), who met with ADAMS in Istanbul in 2015 and again in Brooklyn, New York in 2018. Businessman-1, who was considering a business venture in Brooklyn, and also sought to enhance his own status by befriending ADAMS, later made illegal contributions to the 2021 Campaign.

d. A volunteer at Brooklyn Borough Hall (the "Adams Staffer"), who then served as ADAMS's "Liaison to Eastern Europe Muslim Countries," including Turkey. The Adams Staffer subsequently became a paid member of ADAMS's staff at Borough Hall and, later, City Hall. The Adams Staffer accompanied ADAMS on his 2015 travel to Turkey, and later, at ADAMS's direction, coordinated many of the illegal campaign contributions and improper personal travel benefits relevant to this Indictment.

SDNY_10_0000010882

   e. A wealthy Turkish businesswoman (the "Businesswoman"), who later gave ADAMS multiple free or steeply discounted stays in a luxury hotel she owned, and organized contributions to the 2021 Campaign.

*In 2016, ADAMS secretly begins accepting free luxury travel*

   12. After ERIC ADAMS, the defendant, first traveled to Turkey in 2015, the Turkish Official introduced ADAMS to the Turkish Airline's general manager in the New York City area (the "Airline Manager"). In 2016 and twice in 2017, ADAMS solicited and accepted free and heavily discounted luxury air travel from the Turkish Airline, as part of the Turkish Official's efforts to gain influence over ADAMS, on three separate trips:

   a. In October 2016, ADAMS and his domestic partner ("Adams's Partner") traveled to India. Adams's Partner purchased economy class tickets for herself and ADAMS on the Turkish Airline for approximately $2,286. Two days before their flight was scheduled to depart, ADAMS accepted upgrades for himself and his partner by the Turkish Airline to business class at no cost. Business class is the highest class offered by the Turkish Airline. Had ADAMS and his partner purchased their business class tickets, the tickets would have cost approximately $15,000 total.

   b. In July and August 2017, ADAMS, a close relative of ADAMS (the "Adams Relative"), and a member of ADAMS's staff who has served as ADAMS's liaison to the Asian-American communities in New York City (the "Adams Liaison") traveled to Nice, France; Istanbul, Turkey; Columbo, Sri Lanka; and Beijing, China. ADAMS accepted free business class tickets from the Turkish Airline, worth more than $35,000 total, for himself and his companions.

   c. In October 2017, ADAMS and the Adams Liaison traveled to Nepal through Istanbul and Beijing. ADAMS accepted free business class tickets from the Turkish Airline for

8

SDNY_10_0000010883

himself and the Adams Liaison for the flights from New York to Istanbul and Istanbul to Beijing, and for the corresponding return flights, worth more than $16,000 total.

13.     Because the Turkish Airline provided free travel benefits worth tens of thousands of dollars to ERIC ADAMS, the defendant, he flew the Turkish Airline even when doing so was otherwise inconvenient. For example, during the July and August 2017 trip, Adams's Partner was surprised to learn that ADAMS was in Turkey when she had understood him to be flying from New York to France. ADAMS responded, in a text message, "Transferring here. You know first stop is always instanbul [sic]." When Adams's Partner later inquired about planning a trip to Easter Island, Chile, ADAMS repeatedly asked her whether the Turkish Airline could be used for their flights, requiring her to call the Turkish Airline to confirm that they did not have routes between New York and Chile.

14.     ERIC ADAMS, the defendant, also accepted valuable travel and hospitality benefits for himself and his companions during their time in Turkey. For example, during a stay in Istanbul during the July and August 2017 trip, ADAMS, the Adams Relative, and the Adams Liaison accepted a heavily discounted stay at the St. Regis Istanbul, arranged by the Promoter. The St. Regis Istanbul is owned by the Businesswoman, who sought to ingratiate herself with ADAMS. ADAMS stayed in the "Bentley Suite," portions of which are depicted here:

SDNY_10_0000010884



*Bentley Suite Bedroom*



*Bentley Suite Bathroom*

Although booking the Bentley Suite for two nights would have cost approximately $7,000, ADAMS paid a total of less than $600.

10

SDNY_10_0000010885

15.     In order to conceal the valuable flight, hotel, and other travel benefits that ERIC

ADAMS, the defendant, accepted from foreign nationals seeking influence over him, he did not

disclose any of these trips on his annual disclosure forms, despite a legal requirement to do so.

a.     By law, certain New York City elected officials and candidates for elected

office are required to file annual reports with the COIB disclosing their financial information and

outside positions and interests, as well as those of their spouses or domestic partners and

unemancipated children.  The purpose of the annual disclosure law is to provide transparency to

ensure that there are no prohibited conflicts of interest between public servants' official duties and

their private interests.

b.     At all times relevant to this Indictment, ADAMS was an elected New York

City official required to file annual disclosure forms with the COIB.

c.     On his 2016 and 2017 COIB Annual Disclosure Forms, ADAMS was asked

whether he had received "any gift or gifts from the same person, entity or donor or affiliated donors

who had no business dealings with the City, other than a relative, in the total amount or with a total

value of $1,000 or more during" the year.  ADAMS answered "no."  ADAMS also answered "no"

to a similar question asking whether he had received any gifts worth $50 or more from "a person,

entity, donor, or affiliated donors" who did have business with New York City.

d.     The valuable travel benefits ADAMS solicited and accepted—including the

free business class upgrade for two for travel from New York to India; the free business class

tickets for three from New York to France, Turkey, Sri Lanka, and China; the heavily discounted

stay in the Bentley Suite; and the free business class tickets for two from New York to China

through Turkey—for each of the 2016 and 2017 trips described in paragraphs 12 through 14 each

11

SDNY_10_0000010886

exceed $1,000 in value, as would be obvious to anyone who, like ADAMS, had extensive experience traveling overseas.

16.    ERIC ADAMS, the defendant, also sought to conceal the luxury travel benefits he solicited and accepted from foreign nationals by creating fake paper trails, which members of ADAMS's staff assisted in at his direction. For example, ADAMS attempted to create a fake paper trail suggesting he had paid for his 2017 flights on the Turkish Airline, when in fact he had not.

a.    As Brooklyn Borough President, ADAMS employed a scheduler (the "Adams Scheduler") who managed his appointments, meetings, and other official events. Despite her status as a New York City employee, the Adams Scheduler was used by ADAMS to perform personal tasks for him, such as collecting rent at a Brooklyn property he owned. ADAMS also assigned the Adams Scheduler to pay various personal expenses for him, after which ADAMS would reimburse the Adams Scheduler in cash.

b.    In 2017, ADAMS sent a series of emails to the Adams Scheduler, directing the Adams Scheduler to pay for the free 2017 flights he and his companions had already taken on the Turkish Airline. But the emails provided inconsistent explanations: in some, ADAMS suggested that the Adams Scheduler should pay by using ADAMS's credit card, while in others, ADAMS claimed to have left cash in an envelope for the Adams Scheduler to send to the Turkish Airline.

c.    For example, on November 25, 2017, ADAMS sent an email to the Adams Scheduler saying that with respect to the "July trip," meaning the July and August 2017 trip on the Turkish Airline, "I left you the money for the international airline in an envelope in your top desk draw. [sic] Please send it to them." Given the cost of the international business class tickets for ADAMS alone, ADAMS's email suggested that he left, at a minimum, well over $10,000 in cash

12

in the Adams Scheduler's desk drawer to "send" to the Turkish Airline as payment for flights taken months earlier. He did not do that, as records from the Turkish Airline confirm that ADAMS did not pay the airline, in cash or otherwise, because the tickets were complimentary.

17.    In return for travel benefits the Turkish Official provided or arranged in or about 2015 and 2016, ERIC ADAMS, the defendant, granted a political request from the Turkish Official. Prior to ADAMS's 2015 travel to Turkey—which ADAMS knew, and disclosed to the COIB, had been funded by, among other entities, the Turkish Consulate, the Turkish Airline, and three separate municipalities in Turkey—ADAMS had maintained a relationship with a Turkish community center in Brooklyn (the "Community Center"). In or about 2016, the Turkish Official told ADAMS that the Community Center was affiliated with a Turkish political movement that was hostile to Turkey's government, and that if ADAMS wished to continue receiving support from the Turkish government, ADAMS could no longer associate with the Community Center. ADAMS acquiesced.

***ADAMS begins accepting straw contributions and continues to receive luxury travel benefits***

18.    By 2018, ERIC ADAMS, the defendant, began raising funds for the 2021 Campaign. ADAMS was closely involved in the details of fundraising, which he regarded as vital to his success. As he texted a close supporter later in the campaign: "You win the race by raising money . . . . Have to raise money. Everything else is fluff." ADAMS further explained, "I have a 7 million dollar race. I have a clear plan to raise it and each night we are out executing the plan." Throughout the 2021 Campaign, ADAMS solicited and knowingly accepted straw donations, including from foreign sources, while continuing to secretly accept free and heavily discounted travel benefits from the Turkish Official, the Promoter, and the Airline Manager.

13

SDNY_10_0000010888

19.     As part of these efforts, ERIC ADAMS, the defendant, solicited and knowingly accepted straw donations to the 2021 Campaign that were facilitated by the Turkish Official and the Airline Manager, among others.

a.      Beginning at least as early as April 2018, ADAMS asked the Airline Manager to fundraise for the 2021 Campaign, and the Airline Manager sought to organize a fundraiser.

b.      On June 14, 2018, the Turkish Official exchanged messages with the Adams Staffer, asking "how much can companies donate?"[1]  The Adams Staffer explained that only individuals could donate to the 2021 Campaign.

c.      On June 22, 2018, ADAMS attended a fundraiser for the 2021 Campaign. The Airline Manager, among others, organized and attended the event.  Following the event, the Turkish Official messaged the Adams Staffer, asking for the "list of the participants of the June 22 meeting."  The Adams Staffer then sent the Turkish Official "The list for 6/22/18," which included the names of various persons who donated to the 2021 Campaign in the preceding days or who donated in the following days, raising in excess of $15,000.

d.      A promotional flyer for the June 22, 2018 fundraiser listed as one of the fundraiser's hosts a friend of the Airline Manager who owned an airport transportation business ("Businessman-2").  In a series of messages exchanged with the Adams Staffer, Businessman-2 stated that he had facilitated a straw donation through an associate.  Records from the CFB show that the associate ultimately donated $3,000 in his own name and described himself as unemployed.

---

[1]     Many of the conversations quoted in this Indictment, including this conversation between the Adams Staffer and the Turkish Official, were held in a language other than English.

14

SDNY_10_0000010889

20.    ERIC ADAMS, the defendant, also sought to arrange for his campaigns to receive unlawful contributions from Turkish nationals, which would be routed through U.S.-based straw donors.

a.    On June 22, 2018—the same day as the fundraising event just described—the Adams Staffer and the Promoter discussed by text message a possible trip by ADAMS to Turkey. The Promoter stated, in part, "Fund Raising in Turkey is not legal, but I think I can raise money for your campaign off the record." The Adams Staffer inquired, "How will [ADAMS] declare that money here?" The Promoter responded, "He won't declare it . . . Or . . . We'll make the donation through an American citizen in the U.S. . . . A Turk . . . I'll give cash to him in Turkey . . . Or I'll send it to an American . . . He will make a donation to you." The Adams Staffer replied, "I think he wouldn't get involved in such games. They might cause a big stink later on," but "I'll ask anyways." The Adams Staffer then asked, "how much do you think would come from you? $?" The Promoter responded, "Max $100K." The Adams Staffer wrote, "100K? Do you have a chance to transfer that here? . . . We can't do it while Eric is in Turkey," to which the Promoter replied, "Let's think." After this conversation, the Adams Staffer asked ADAMS whether the Adams Staffer should pursue the unlawful foreign contributions offered by the Promoter, and contrary to the Adams Staffer's expectations, ADAMS directed that the Adams Staffer pursue the Promoter's illegal scheme.

b.    In November 2018, Businessman-1—the wealthy Turkish national who owned the Turkish University, a for-profit educational conglomerate in Turkey, and whom ADAMS met there in 2015—visited New York City. ADAMS and the Adams Staffer met with Businessman-1 at Brooklyn Borough Hall. At the close of the meeting, Businessman-1 offered to contribute funds to the 2021 Campaign. Although ADAMS knew that Businessman-1 was a

15

Turkish national who could not lawfully contribute to U.S. elections, ADAMS directed the Adams Staffer to obtain the illegal contributions offered by Businessman-1. Following up on this directive, ADAMS wrote to the Adams Staffer that Businessman-1 "is ready to help. I don't want his willing to help be waisted [sic]." As ADAMS directed, the Adams Staffer maintained contact with Businessman-1 through intermediaries, culminating in ADAMS accepting straw donations of Businessman-1's money, discussed below.

21.    In 2018, ERIC ADAMS, the defendant, also continued to secretly solicit and accept free and heavily discounted luxury travel benefits provided by the Turkish Official and the Airline Manager. In January 2018, ADAMS and Adams's Partner traveled to Budapest, Hungary, through Istanbul. Several months earlier, Adams's Partner had purchased two economy class tickets on the Turkish Airline for approximately $560 each. In December 2017, the Adams Staffer, acting at ADAMS's direction, asked the Airline Manager to upgrade the tickets to business class, which he did for free. Had ADAMS and Adams's Partner purchased their business class tickets, the tickets would have cost more than $14,000 total. Consistent with his prior actions, ADAMS concealed this free and heavily discounted travel the Turkish Airline provided by omitting it from his 2018 COIB disclosure form, despite the requirement to report it.

**As the 2021 Mayoral Election Approaches, ADAMS Continues to Solicit and Accept Illegal Campaign Contributions**

*In 2019, ADAMS travels to Istanbul and solicits foreign contributions*

22.    In January 2019, ERIC ADAMS, the defendant, and Adams's Partner traveled to Turkey, Jordan, and Oman with the assistance of the Promoter. Because ADAMS made his travel arrangements through the Promoter and not through the Airline Manager, the Airline Manager did not upgrade ADAMS's economy class tickets on the Turkish Airline, instead arranging a full upgrade only for Adams's Partner. Had Adams's Partner purchased her business class ticket, it

16

SDNY_10_0000010891

would have cost at least approximately $7,000. In an effort to monopolize flight travel as a method of gaining influence with ADAMS, the Airline Manager observed that difficulty arose in upgrading ADAMS because the arrangements had been made through others. When exchanging messages about another potential trip later in 2019, the Adams Staffer requested an upgrade for ADAMS from the Airline Manager and explained, in part, that "He learned his lesson last time. We're writing directly to you this time." After the 2019 trip, ADAMS exclusively arranged his flights on the Turkish Airline through the Airline Manager, allowing the Airline Manager, the Turkish Official, and the Turkish government to increase their influence over ADAMS.

23.    During his 2019 trip, ERIC ADAMS, the defendant, solicited and accepted travel benefits from the Promoter—the Turkish entrepreneur who, as described above, facilitated ADAMS's second 2015 trip to Turkey and in 2018 proposed to ADAMS via the Adams Staffer raising campaign contributions illegally in Turkey. Specifically, ADAMS solicited and accepted free hotel stays, dinners, and a boat trip, among other things, from the Promoter, including a free two-night stay in the Cosmopolitan Suite of the St. Regis Istanbul, depicted below:



*Cosmopolitan Suite Living Room*

17



*Cosmopolitan Suite Bedroom*

Had ADAMS paid for a two-day stay in this luxury suite, the cost would have been approximately $3,000 total. ADAMS also solicited and accepted from the Promoter free transportation, meals, and entertainment, including a car and driver, a boat tour to the Princes' Islands in the Sea of Marmara, a Turkish bath at a seaside hotel, and at least one meal at a high-end restaurant.

24.    ERIC ADAMS, the defendant, did not report any of the free travel benefits he received during his 2019 stay in Istanbul on his 2019 COIB disclosure form.

25.    ERIC ADAMS, the defendant, also solicited unlawful foreign campaign contributions while in Istanbul in January 2019. During ADAMS's trip, the Promoter arranged for ADAMS to meet a wealthy Turkish businessman ("Businessman-3"). The Turkish Official, through the Adams Staffer, discouraged ADAMS from meeting Businessman-3, who was then under suspicion of wrongdoing. ADAMS did so nonethless. During their meeting, ADAMS and the Promoter solicited campaign contributions from Businessman-3, who as a Turkish national could not lawfully contribute to any U.S. campaign. During the meeting, Businessman-3 agreed

18

SDNY_10_0000010893

to contribute $50,000 or more to the 2021 Campaign, believing that ADAMS might one day be the President of the United States and hoping to gain influence with ADAMS. In subsequent messages, the Promoter and the Adams Staffer discussed how to funnel Businessman-3's planned contributions to the 2021 Campaign through U.S. straw donors. Before any of the discussed straw donations could occur, however, Businessman-3's legal troubles in Turkey and the United States became more public. ADAMS declined to meet with Businessman-3 when Businessman-3 later visited New York, and Businessman-3 did not ultimately contribute to the 2021 Campaign.

26.    Businessman-3 was not the only wealthy Turkish national from whom ERIC ADAMS, the defendant, sought illegal campaign contributions. Also in January 2019, ADAMS continued to seek the illegal foreign contributions promised by Businessman-1 (the Turkish national who owned the Turkish University), telling the Adams Staffer in a text message to confirm Businessman-1's continued willingness to support the 2021 Campaign.

27.    ERIC ADAMS, the defendant, continued to conceal the benefits he received from foreign nationals seeking to gain influence over him. ADAMS did not report any of the 2019 gifts he received from the Airline Manager or the Promoter on his annual disclosure form. In addition, in March 2019, while exchanging text messages to plan another possible to trip to Turkey in which the Airline Manager would arrange travel for ADAMS, the Adams Staffer texted ADAMS, "To be o[n the] safe side Please Delete all messages you send me." ADAMS responded, "Always do."

### In December 2020, ADAMS solicits and accepts straw contributions from a New York construction company

28.    In 2020, ERIC ADAMS, the defendant, solicited and received straw donations from a businessman who operated a construction company in the New York City area ("Businessman-4"). Although Businessman-4 was not part of New York's Turkish community, his contributions were sought and made for similar reasons to the many Turkish nationals and

19

Turkish Americans whom the Turkish Official and the Promoter induced to make illegal contributions to the 2021 Campaign: Businessman-4 was a prominent member of a different ethnic community in New York City, and he was told by ADAMS's representatives that straw contributions would increase Businessman-4's influence, and the standing of his community, with ADAMS.

        a.      In December 2020, two volunteers for the 2021 Campaign who later became employees of ADAMS at City Hall ("Adams Employee-1" and "Adams Employee-2", and together, the "Adams Employees") asked Businessman-4 to contribute $10,000 to the 2021 Campaign. The Adams Employees were liaisons to Businessman-4's community, playing roles similar to the Adams Staffer's role in the Turkish community. The Adams Employees told Businessman-4, among other things, that donating $10,000 would give Businessman-4 influence with ADAMS, which would help Businessman-4's business interests and his community when ADAMS became mayor, and that gaining such influence with ADAMS would be more expensive at a later date.

        b.      Businessman-4 agreed to contribute and offered to write a $10,000 check from his company's bank account. The Adams Employees informed Businessman-4 that he could not donate through his corporate bank account.

        c.      Businessman-4 then offered to write a $10,000 check from his personal bank account. The Adams Employees informed Businessman-4 that he could not donate more than $2,000. The Adams Employees then explained that Businessman-4 should instead direct his employees to contribute to the 2021 Campaign and then reimburse the employees.

        d.      Businessman-4 followed the Adams Employees' directions. Businessman-4 personally contributed $2,000 to the 2021 Campaign and reimbursed four of his

SDNY_10_0000010895

employees for their $2,000 contributions to the 2021 Campaign. Businessman-4 and his employees made these contributions at a fundraiser that ADAMS personally attended, which was held at Businessman-4's offices.

       e.     The 2021 Campaign requested, and received, Matching Funds for these straw donations.

       f.     After ADAMS was elected mayor, Businessman-4 sought to benefit from the influence with ADAMS that the Adams Employees assured Businessman-4 would result from the straw contributions. Among other things, Businessman-4 sought assistance from ADAMS and the Adams Employees with arranging events celebrating the national heritage of Businessman-4's ethnic community, and ADAMS and the Adams Employees worked with Businessman-4 to arrange such events with City sponsorship.

       g.     Businessman-4 also sought and received assistance resolving issues with the New York City Department of Buildings ("DOB"), including from ADAMS himself. On February 5, 2023, Businessman-4 sent a text message to ADAMS saying, among other things, "I always supported you," but that Businessman-4 was "having a hard time with DOB" getting a stop-work order lifted, and that although ADAMS's staff had assisted, "we reached a certain limit that only you can lift." ADAMS responded, "Let me look into this." Approximately a week and a half later, Businessman-4 replied to ADAMS "Mayor, brother I want to thank you for your help. DOB issue partially resolved and they promised to expedite the process. Thank you, you have my continued support."

*In May 2021, ADAMS receives straw contributions from another New York construction company, as arranged by the Turkish Official*

      29.     ERIC ADAMS, the defendant, accepted support from the Turkish Official throughout the 2021 Campaign, and the Turkish Official repeatedly informed ADAMS that he was

SDNY_10_0000010896

providing such support.  When a fundraising effort organized or facilitated by the Turkish Official

failed to raise the amount of funds that the Turkish Official had promised ADAMS, the Turkish

Official told ADAMS and the Adams Staffer that he would "close the gap" by obtaining sufficient

funds from other sources to reach the promised amount.

      30.    In May 2021, ERIC ADAMS, the defendant, sought and accepted straw donations

from another businessman ("Businessman-5") who operated another construction company in the

New York City area.  Businessman-5 is a prominent member of New York City's Turkish

community and made these donations at the behest of the Turkish Official.

      a.    In January 2021, the Turkish Official messaged the Adams Staffer, asking

for a meeting with ADAMS.  The Turkish Official and the Adams Staffer then exchanged the

following messages:

| Adams Staffer: | What will the topic be? |
| --- | --- |
| Turkish Official: | The election<br>that's what |
| Adams Staffer: | okay |
| Turkish Official: | Nov 2nd 2021 [the date of the 2021 mayoral election] |
| Adams Staffer: | His favorite topic |
| Turkish Official: | Turkish community support to him<br>What can we do, let's talk |
| Adams Staffer: | okay |

      b.    ADAMS, the Turkish Official, the Airline Manager, the Adams Staffer, and

the lead fundraiser for the 2021 Campaign (the "Adams Fundraiser") met at a restaurant for dinner

on February 14, 2021.  At the dinner, the Turkish Official committed to "support" the 2021

Campaign.

SDNY_10_0000010897

c.     The Turkish Official then organized a larger dinner to plan specific donations to the 2021 Campaign. Businessman-5, the Turkish Official, ADAMS, the Adams Fundraiser, and the Adams Staffer attended that dinner, which occurred on April 2, 2021. At the dinner, ADAMS explained the Matching Funds Program and solicited contributions from Businessman-5. The Turkish Official told ADAMS, "we are supporting you."

d.     After the April 2, 2021 dinner, Businessman-5 worked with the Turkish Official, the Adams Fundraiser, and the Adams Staffer, among others, to plan a fundraiser for ADAMS. Businessman-5 attempted to recruit others in the construction industry and the Turkish community, writing, in part, this "may feel like swimming against the current but unfortunately this is how things work in this country." The day before the scheduled fundraiser, the Turkish Official sent Businessman-5 at least one check, and Businessman-5 sent the Turkish Official a message confirming that "As of now, the checks that reached us are 17,000."

e.     On May 7, 2021, Businessman-5 held a fundraiser for the 2021 Campaign at his construction company's offices. ADAMS, Businessman-5, the Adams Fundraiser, and the Adams Staffer attended. The Turkish Official did not attend but sent his driver to deliver several additional contribution checks. Prior to the fundraiser, Businessman-5's construction company, at the direction of Businessman-5, had provided $1,250 per employee to ten of its employees. Each of those employees then contributed that amount to the 2021 Campaign, with the exception of one employee who donated in his wife's name, and another who donated $1,200 of the funds. The Adams Staffer sent the Turkish Official a list of the contributions collected at the fundraiser.

f.     Following the fundraiser, the Turkish Official sent Businessman-5 a message asking, "how much is the total?" to which Businessman-5 replied, "I think I got to 22[.] He just left[.] The girls, [ADAMS's] assistants, were very happy[.]" The Turkish Official

23

subsequently asked the Adams Staffer to tell ADAMS, "we will continue supporting you," which the Adams Staffer did.

g.      The 2021 Campaign requested Matching Funds for eight of these straw donations that were made in the names of New York City residents, fraudulently obtaining public funds to which the campaign was not entitled.

### *In September 2021, ADAMS accepts straw contributions from a Turkish national*

31.      In 2021, Businessman-1—the Turkish national who owned the Turkish University, as described above—attempted to make good on his earlier commitments to contribute to ERIC ADAMS, the defendant.  ADAMS and Businessman-1 used the Promoter and the Adams Staffer, among others, to devise and execute a plan to funnel Businessman-1's money to the 2021 Campaign, knowing full well that these donations would violate the law against U.S. political campaigns receiving contributions from foreign nationals.

a.      On July 9, 2021, the Adams Staffer exchanged messages with ADAMS about raising funds from the Turkish University, among other sources.  ADAMS explained that he was "Not doing [an] in person fundraiser for less than $25K."

b.      On July 11, 2021, the Adams Staffer asked the Promoter how much would be donated, explaining in a message that she needed to "tell [ADAMS] a net number."  When the Promoter estimated between $35,000 and $50,000, the Adams Staffer replied that the Promoter earlier "had mentioned 200K."  When the Promoter explained that the requisite number of straw donors could not be gathered, the Adams Staffer offered to help with that aspect of the scheme. The Promoter responded, "Hmmm then great," and when the Adams Staffer then wrote "From what I gathered you'll distribute the money," the Promoter responded "Yes."  The Adams Staffer later told ADAMS that the estimated total amount of the foreign donations would be $45,000.

24

SDNY_10_0000010899

c.      In August 2021, the Promoter, the Adams Staffer, and the president of the Turkish University's American campus (the "University President") exchanged messages and voice notes explicitly discussing the plan to funnel Businessman-1's contribution to the 2021 Campaign through the Turkish University's U.S.-based employees.  The Promoter assured the Adams Staffer that those employees are "[U.S.] citizens and green card holders."  The Adams Staffer told ADAMS about the plan to funnel Businessman-1's contribution through U.S.-based straw donors, and ADAMS approved the plan, knowing that Businessman-1 was a Turkish citizen.

d.      On August 27, 2021, the University President messaged the Adams Staffer that the Turkish University would donate $20,000 to the 2021 Campaign by "dividing it amongst our employees in appropriate amounts."  The Adams Staffer responded that "if the donation is not more than $25K, then Mr. President"—referring to ADAMS, who was then Brooklyn Borough President—"does not participate in person."  The University President then informed the Adams Staffer that in addition to the Turkish University's contribution, others would donate to reach the $25,000 threshold.

e.      On August 27, 2021, the University President informed the Adams Staffer that the Turkish University would donate only $10,000.  Because that meant that ADAMS would no longer appear at an in-person event, the Adams Staffer asked the Adams Fundraiser to create an internet link through which the Turkish University's straw donors could contribute.  In a series of messages with ADAMS and the Adams Staffer, the Adams Fundraiser sent the link to the Adams Staffer.  To remind the Adams Staffer of the mechanics of the plan they had discussed—that the foreign donations would be concealed by routing them through U.S.-based straw donors who could lawfully contribute in their own names—ADAMS wrote to the Adams Staffer and the Adams Fundraiser, "We can't take any money from people who are not US citizens."  The Adams

25

Staffer inquired, "What about green card holders?" The Adams Fundraiser responded, "Yes we can," confirming that the Promoter's plan to use green card holders as straw donors would work.

f.     The Turkish University ultimately made its straw contributions on September 27, 2021, when three U.S.-based employees of the Turkish University made $2,000 contributions to the 2021 Campaign and were then reimbursed, as directed by Businessman-1 and the University President. The University President and another U.S.-based employee of the Turkish University each also made $2,000 contributions from their own funds. The contributions occurred during a period when the 2021 Campaign had begun to wind down fundraising and were ultimately refunded by the campaign, but not before ADAMS submitted a disclosure statement to the CFB that falsely claimed the U.S.-based Turkish University employees were the true donors.

g.     On November 2, 2021, ADAMS was declared the winner of the 2021 mayoral election. The next day, Businessman-1 and the Promoter exchanged the following messages:

| Promoter: | Good morning<br>The president is our brother from now on, sir. |
| --- | --- |
| Businessman-1: | Good morning |
| Promoter: | May it be auspicious for all of us.<br>We messaged each other. |
| Businessman-1: | Are the elections over? |
| Promoter: | It was yesterday, sir<br>Everyone messaged me that he was elected.<br>Congratulations messages<br>He is most likely going to assign me as a representative, sir.<br>I'm going to go and talk to our elders in Ankara about how we can turn this into an advantage for our country's lobby. |
| Businessman-1: | That would be nice |

26

SDNY_10_0000010901

h.    The Promoter also celebrated ADAMS's prospects with additional people, telling others—including ADAMS himself—that ADAMS would soon be President of the United States.  Similarly, the Turkish Official wrote to the Adams Staffer that given ADAMS's increasing prominence, "at this point," the Foreign Minister of Turkey "is personally paying attention to him" and ADAMS "should not bother with" his other Turkish benefactors.

32.    All told, the 2021 Campaign reaped over $10 million in Matching Funds based on the false certifications that the campaign complied with the law, when in fact ERIC ADAMS, the defendant, knowingly and repeatedly relied on illegal contributions.

**In 2021, ADAMS Accepts Bribes From the Turkish Official and Intervenes on the Turkish Official's Behalf with the Fire Prevention Chief**

33.    In 2021, ERIC ADAMS, the defendant, intervened with the FDNY to permit the Turkish Consulate to occupy a skyscraper that had not passed a fire safety inspection, in exchange for, among other things, luxury travel benefits provided by the Turkish Official and the Airline Manager.

34.    In late June 2021, ERIC ADAMS, the defendant, sought luxury travel to Turkey arranged by the Turkish Official and the Airline Manager.  When the Adams Staffer began coordinating this travel for ADAMS, at ADAMS's direction, ADAMS again attempted to create a false record suggesting that he would pay his own way, when, in fact, ADAMS had the Adams Staffer coordinate with the Airline Manager to provide ADAMS with free and steeply discounted travel benefits.  ADAMS approved the itinerary, and, to create the false impression of payment, the Turkish Official, ADAMS, and the Adams Staffer agreed that ADAMS would collect invoices from vendors in Turkey regardless of whether he actually paid and would make some small credit card payments to conceal the fact that he was taking a vacation that was mostly paid for by the Turkish government.

SDNY_10_0000010902

a.    On June 22, 2021, ADAMS, through the Adams Staffer, requested that the Airline Manager book flights to Istanbul for ADAMS. In order to conceal the favorable treatment, the Adams Staffer requested that the Airline Manager charge ADAMS what would appear to be a "real" price:

| Adams Staffer: | How much does he owe?<br>Please, let them call me and I will make the payment. |
| Airline Manager: | It is very expensive because it is last minute. I am working on a discount |
| Adams Staffer: | Okay.<br>Thank you. |
| . . . | |
| Airline Manager: | I am going to charge $50 |
| Adams Staffer: | No |
| Airline Manager: | That would work wouldn't it |
| Adams Staffer: | No, dear. $50? What?<br>Quote a proper price. |
| Airline Manager: | How much should I charge? :) |
| Adams Staffer: | His every step is being watched right now<br>$1,000 or so<br>Let it be somewhat real.<br>We don't want them to say he is flying for free.<br>At the moment, the media's attention is on Eric. |

ADAMS paid approximately $1,100 each for roundtrip economy tickets on the Turkish Airline for himself and Adams's Partner, which were immediately upgraded to business class at no cost. Had ADAMS purchased business class tickets on the open market, they would have cost more than $15,000 total.

28

SDNY_10_0000010903

b.      At ADAMS's direction, the Adams Staffer also coordinated luxury lodging for ADAMS and Adams's Partner, which would be secretly provided at no cost to ADAMS, as the Adams Staffer and the Airline Manager discussed:

| | |
|---|---|
| Adams Staffer: | He is also asking where else they can go in Turkey<br>Do you have a recommendation? |
| Airline Manager: | Four Seasons |
| Adams Staffer: | It's too expensive |
| Airline Manager: | Why does he care?<br>He is not going to pay<br>His name<br>will not be on anything<br>either |
| Adams Staffer: | Super |

c.      The Turkish Official also arranged an itinerary for ADAMS and Adams's Partner in Turkey, which, in addition to the stay at the Four Seasons, would include a yacht tour, a three-day stay at a luxury beach resort, and a car and driver, as well as a domestic flight between Istanbul and the resort. The Adams Staffer forwarded details of this itinerary to ADAMS. To assist ADAMS in concealing the nature and extent of the travel benefits he was soliciting and accepting, the Turkish Official suggested a nominal price of approximately $720, although the true price of this itinerary would in fact have been approximately $8,500 or more. ADAMS approved the itinerary and the nominal price.

d.      On June 26, 2021 (the same day the trip was supposed to start), the Adams Staffer informed the Turkish Official and the Airline Manager that ADAMS was cancelling his trip. The Turkish Airline refunded ADAMS's payment for economy class tickets—the only payment ADAMS had made for the late June 2021 trip to Istanbul.

29

SDNY_10_0000010904

35.     At around the time of this cancellation, ERIC ADAMS, the defendant, solicited various travel benefits for the Adams Fundraiser—the 2021 Campaign's chief fundraiser who, as noted above, helped coordinate the straw contributions from Businessman-5's construction company one month earlier in May 2021—from the Turkish Official and the Airline Manager. Continuing their efforts to influence ADAMS, the Turkish Official and the Airline Manager ultimately provided the Adams Fundraiser with transportation from the airport, a free hotel, and free use of a VIP room in the Turkish Airline's business class lounge.

        a.      On June 27, 2021, when the Adams Fundraiser was scheduled to travel to Istanbul, ADAMS created a message thread between himself, the Adams Fundraiser, and the Turkish Official.  ADAMS informed the Turkish Official that the Adams Fundraiser would be arriving in Istanbul shortly and needed transportation from the airport and a hotel, which the Turkish Official promptly arranged.  When ADAMS suggested that ADAMS would pay for the Adams Fundraiser's expenses, the Turkish Official told ADAMS, "Eric no prob, it was set through Turkish Hospitality Services. I hope she enjoyed her stay." ADAMS responded, "It was amazing. Thanks for all the coordination and attention."  In the same message thread with ADAMS, the Turkish Official also provided the Adams Fundraiser with a fake bill for the hotel stay, to allow ADAMS and the Adams Fundraiser to create the appearance that the Adams Fundraiser had paid for her hotel stay, when in fact, as ADAMS knew, she had not.

        b.      On the day the Adams Fundraiser was scheduled to depart Istanbul, ADAMS created a message thread between himself, the Adams Fundraiser, and the Airline Manager.  ADAMS wrote, "[Adams Fundraiser] this is [the Airline Manager].  1. He will try to help the issue with the form[.] 2. He can see about a hotel or the business class lounge."  The Airline Manager then arranged for the Adams Fundraiser—who was otherwise flying on an

SDNY_10_0000010905

economy ticket—to have access not only to the Turkish Airline's business lounge, but also to an exclusive private suite inside the lounge, complete with a bed and free food. The Airline Manager explained, "This is our suite for our VIPs [a]nd we want you to feel your self [sic] Vip :) ." At another point in this exchange, ADAMS wrote, "Thanks a million [Airline Manager]. My Brother," to which the Airline Manager responded, "Anytime brother."

36.     ERIC ADAMS, the defendant, and the Turkish Official understood that in exchange for the benefits described in paragraphs 34 and 35, and future travel benefits for ADAMS, ADAMS was expected to assist the Turkish Official in the operation of the Turkish Consulate in New York.

37.     On July 6, 2021, ERIC ADAMS, the defendant, declared victory in his party's mayoral primary. On the morning of July 7, 2021, the Airline Manager sent ADAMS the following text message: "Brother congratulations." ADAMS responded, "Cannot thank you enough."

38.     In September 2021, ERIC ADAMS, the defendant, agreed to pressure a New York City agency to help the Turkish Consulate secure a temporary certificate of occupancy ("TCO") for a building it owned and operated.

a.     As Brooklyn Borough President, ADAMS had authority under the New York City Charter to affect the administration of City services within his Borough, such as those provided by the FDNY and other city agencies, including through: holding public hearings; introducing legislation before the City Council; overseeing the coordination of a borough-wide public service complaint program; and consulting with the Mayor of the City of New York on the executive capital budget and other budget recommendations. In addition to, or in the course of, the performance of these duties, as Brooklyn Borough President, ADAMS met with members of the FDNY from time to time.

31

SDNY_10_0000010906

b.      In 2017, construction began on a 36-story building located at 821 United Nations Plaza, New York, New York, and referred to as the Turkish House or Turkevi Center (the "Turkish House").    The Turkish House was designed to serve as, and now serves as, the headquarters of multiple Turkish diplomatic missions, including the Turkish Consulate.    The cost of the Turkish House was significant and was a topic of political debate in Turkey.



*The Turkish House*

c.      The Turkish Consulate planned to open the Turkish House on September 20, 2021, so that Turkey's President could formally open the building during his visit for that year's opening of the United Nations General Assembly.    Ensuring the Turkish House

32

SDNY_10_0000010907

opened on schedule was a priority for the Turkish Official, who was at this time Turkey's Consul General in New York.

d.    As of August 31, 2021, construction on the Turkish House was complete, but the DOB had not yet issued a TCO for the building.  Without a TCO, the Turkish House could not open during the Turkish President's impending visit.

e.    The DOB had not issued a TCO because the FDNY had not yet conducted an inspection and issued what the FDNY refers to as a "letter of defect," which was a prerequisite to the issuance of a TCO for the Turkish House.  Issuing a letter of defect is a regular FDNY procedure which, in substance, identifies remaining defects in a building's fire safety systems, but also serves to signal that the defects are sufficiently limited that the building can be safely occupied.

f.    From on or about August 31, 2021, through on or about September 9, 2021, various New York City officials and employees, among others, sought to help the Turkish Official obtain a TCO for the Turkish House by lobbying the chief of the FDNY's Bureau of Fire Prevention (the "Fire Prevention Chief") to provide a letter of defect.  The Fire Prevention Chief refused, citing numerous reported fire safety defects, some of which were serious, at the Turkish House, and the likelihood that the building would fail any FDNY inspection.

g.    On or about September 5, 2021, the Turkish Official began asking ADAMS, both directly and through the Adams Staffer, to intervene with the Commissioner of the FDNY (the "FDNY Commissioner") in order to secure a TCO for the Turkish House.  ADAMS, the Turkish Official, and the Adams Staffer discussed these requests through phone calls and electronic messages.  In a phone call to the Adams Staffer, the Turkish Official stated that because

33

SDNY_10_0000010908

Turkey had supported ADAMS, it was now "his turn" to support Turkey.  The Adams Staffer relayed this message to ADAMS, and ADAMS responded, "I know."

      h.      On September 6, 2021, ADAMS messaged the Adams Staffer that he would contact the FDNY Commissioner.

      i.      On September 7, 2021, ADAMS messaged the Adams Staffer that he had a scheduled call with the FDNY Commissioner later that day.

      j.      On September 8, 2021, ADAMS messaged the FDNY Commissioner, asking him to call ADAMS.  Until that point, the messages between the FDNY Commissioner and ADAMS had consisted of (i) an August 3, 2021 message from the FDNY Commissioner to ADAMS, requesting to continue serving as FDNY commissioner after ADAMS became mayor, and stressing that he was "loyal and trustworthy," to which ADAMS sent a noncommittal response, and (ii) a September 5, 2021 invitation to a September 11 memorial service from the FDNY Commissioner to ADAMS, to which ADAMS responded that he would try to attend and wished to speak with the FDNY Commissioner for "a half hour . . . about FDNY."

      k.      Also on September 8, 2021, ADAMS messaged the FDNY Commissioner, stating, in part, "They said they needed a letter of Defect from FDNY to DOB. They know they have some issues but according to them with the letter the DOB wi[ll] give the TCO." The FDNY Commissioner responded, "We will get on it tomorrow."  Through the Adams Staffer, ADAMS assured the Turkish Official, "Don't worry," "I am on top of this."

      l.      On September 9, 2021, after a contractor working for the Turkish Consulate sent the FDNY a letter describing the status of the Turkish House's fire alarm system, an FDNY employee with responsibility for inspecting the system sent the Fire Prevention Chief the following email:

34

SDNY_10_0000010909

From: ▮▮▮▮
Sent: Thursday, September 9, 2021 11:51 AM
To: ▮▮▮▮
Subject: FW: Turkish Embassy - Fire Alarm Request - 821 1st Avenue (21021)

Chief,
After reviewing the letter, I do not see any way we would be willing to accept it. They have some major issues like central station and fan shutdowns which would be an automatic violation order. Aside from that, he gave us a list with over 60 defects and some of them list 5-10 problems in each one. FAIU would not go beyond 20 defects without issuing a violation order. In my opinion, this document does not take any liability that we would be comfortable with. I believe it actually tells us this building is not safe to occupy. Feel free to reach out to discuss further.
Thanks

m.    On the morning of September 10, 2021, ADAMS messaged the FDNY Commissioner, stating that the Turkish Official had understood that the FDNY was going to inspect the Turkish House the previous day, and "They really need someone . . . by today if possible. If it is[ im]possible please let me know and I will manage their expectation." The FDNY Commissioner wrote back that "There seems to be a difference of opinion between the inspector" and the private alarm engineer responsible for the building, but that the FDNY Commissioner was "trying to iron it out."

n.    Shortly after noon on September 10, 2021, ADAMS messaged the FDNY Commissioner, "They said the hire [sic] ups at FDNY did not give the inspector authorization to come. The inspector indicated he needs authority to come to day [sic]." The FDNY Commissioner responded, "Working on that as we speak." At approximately 2:06 p.m., ADAMS messaged the Adams Staffer that ADAMS had again spoken with the FDNY Commissioner, and "He again told me he is on the phone as we speak to try and resolve this."

o.    Also on the afternoon of September 10, 2021, the FDNY Chief of Department summoned the Fire Prevention Chief to a meeting. The Chief of Department was the FDNY Commissioner's direct subordinate and the Fire Prevention Chief's superior. The Chief of Department informed the Fire Prevention Chief, in substance, that if the FDNY did not assist the Turkish Consulate in obtaining a TCO, both the Chief of Department and the Fire Prevention Chief would lose their jobs. The Fire Prevention Chief then drafted a "conditional letter of no objection"

35

for the Turkish House. The Fire Prevention Chief had never before written a "conditional letter of no objection," which was not standard FDNY procedure. Instead, the Fire Prevention Chief wrote this letter, which he later described as "unprecedented," to inform the DOB that FDNY did not object to issuing the TCO, provided that the private engineers affirmed that the fire alarm system functioned properly, and "assum[ing] the Department of Buildings has inspected, tested and approved the installed water-based fire suppression systems."

        p.    At 2:17 pm on September 10, 2021, the FDNY Commissioner wrote ADAMS, "Letter being drafted now. Everything should be good to go Monday morning." Four minutes later, ADAMS messaged the Turkish Official, "From the commissioner: Letter being drafted now. Everything should be good to go Monday morning." The Turkish Official responded, "You are Great Eric, we are so happy to hear that 🙏🙏. You are a true friend of Turkey." ADAMS replied, "Yes even more a true friend of yours. You are my brother. I am hear [sic] to help." At 2:30 pm, the Turkish Official confirmed, "You are such a friend 🙏." At 2:31 p.m., the Fire Prevention Chief sent the "conditional letter of no objection" to the private alarm engineer.

        39.    After ERIC ADAMS, the defendant, pressured the FDNY to permit a TCO to be issued for the Turkish House, the Turkish Official continued to fulfill his end of the bargain, by providing additional luxury travel benefits to ADAMS. These benefits, which ADAMS accepted, were worth more than $14,000.

        a.    On September 14, 2021—four days after ADAMS caused the FDNY to acquiesce in the TCO—ADAMS messaged the Adams Staffer, directing her to secure tickets to Pakistan for a trip from November 30 to December 8, 2021. The Adams Staffer relayed the request to the Airline Manager, stating, "He'll pay the economy class price," but asking, "Can we upgrade later?" The Airline Manager replied, "Of course."

SDNY_10_0000010911

b.       On September 21, 2021, the Turkish Official messaged the Adams Staffer, seeking a meeting at a particular time between ADAMS and a Turkish Deputy Minister. The Turkish Official wrote, "This is very important. He"—the Deputy Minister—"is the person who makes all the arrangements with one phone call in Turkey. Flight, yacht tour, hotels, rental cars...." The meeting did not occur, because ADAMS was scheduled to meet with a former President of the United States at the time requested for the meeting with the Deputy Minister.

c.       After the Airline Manager and the Adams Staffer further discussed the price and timing of ADAMS's tickets, on September 28, 2021, ADAMS purchased two roundtrip economy class tickets on the Turkish Airline from New York to Pakistan—arriving in Lahore and departing from Islamabad—for a total price of $1,436. On November 17, 2021, the Adams Staffer messaged ADAMS to confirm that he still intended to travel and that she should therefore have his tickets upgraded to business class. ADAMS responded, "Ok, do so." On November 18, 2021, the Adams Staffer messaged the Airline Manager, requesting the upgrade. The Turkish Airline upgraded ADAMS's tickets to business class at no cost to ADAMS.

d.       On November 25, 2021—four days before he was scheduled to depart for Pakistan—ADAMS asked that his destination be changed to Ghana. The Airline Manager changed ADAMS's and Adams's Partner's tickets to business class flights to Ghana at no cost to ADAMS. Had ADAMS paid full price for the business class tickets to Ghana, they would have cost more than $14,000 total.

e.       On November 26, 2021, the Turkish Official informed the Adams Staffer that "we will take care of the layover in Istanbul," referring to a nine-hour layover in Istanbul during ADAMS's just-scheduled flight from New York to Ghana. The Turkish Official then offered various arrangements for ADAMS, including an escort to meet ADAMS and Adams's

37

SDNY_10_0000010912

Partner at the gate of the Istanbul airport, pickup at the Istanbul airport by "luxury vehicle"—later specified as a "BMW 7"—with a driver, dinner at a high-end restaurant where ADAMS would meet a Turkish government official, drinks at a separate location, a boat tour of the Bosporus Strait, and return to the airport in time for ADAMS's business class flight from Istanbul to Ghana. ADAMS selected the airport escort, driver, and dinner, but declined the Bosporus Strait cruise, explaining that he has "done the boat tour a few times." In touting the benefits he provided, the Turkish Official messaged the Adams Staffer, "don't let [the Airline Manager] and others confuse [ADAMS]. We are the state."

      f.      On November 30, 2021, the Adams Staffer relayed to the Turkish Official requests by ADAMS that his excursion into Istanbul receive no media attention, including social media. The Turkish Official agreed that it would be "confidential." Accordingly, the Turkish Official confirmed that during ADAMS's dinner at the Istanbul restaurant, the Turkish Official's "team did not let anyone take any pictures." This was in stark contrast to the Ghana portion of ADAMS's trip, for which ADAMS actively sought and obtained press coverage, and which ADAMS posted about on his social media account.

      g.      After ADAMS completed the layover, the Turkish Official and the Adams Staffer exchanged the following messages:

| | |
|---|---|
| Turkish Official: | Was Eric satisfied? |
| Adams Staffer: | It was great. Thank you for everything. |
| Turkish Official: | 👍👍<br>it's okay if he is happy<br>. . .<br>Is Eric happy then? |
| Adams Staffer: | He is very happy. He is sending you his thanks. |

SDNY_10_0000010913

40.    During and shortly after the travel to Ghana and Istanbul described in the preceding paragraphs, ERIC ADAMS, the defendant, took additional actions for those who provided him travel benefits, in exchange for those benefits.

a.    In early December 2021, ADAMS announced the members of his transition committees, which were established to advise the mayor-elect and his team on policies and appointments before he took office.  Initially, there were no members of the Turkish community on any of the committees.

b.    On December 8, 2021, the Adams Staffer sent the Airline Manager a link to a list of ADAMS's transition committees and asked the Airline Manager, "Have you looked at the list?" The Airline Manager responded, "It would suit me well to be lead Or Senior Advisor."  Two days later, the Airline Manager sent a message reiterating, "Lead Plz :) Otherwise seat number 52 is empty … On the way back," meaning that if the Airline Manager was not given a position on a transition committee, it would affect ADAMS's travel benefits from the Turkish Airline.

c.    On December 17, 2021, the Adams Staffer sent ADAMS a list of members of the Turkish community to add to ADAMS's transition committees, with the Airline Manager as the top name.  ADAMS informed the Adams Staffer that he had sent the list to the persons responsible for organizing his transition committees.  ADAMS sent the list to a staff member with the direction "Add to transition."  The Airline Manager was subsequently added to ADAMS's Infrastructure, Climate and Sustainability Committee transition committee.

d.    On December 23, 2021, a senior Turkish government official sent the Airline Manager a series of text messages, noting the Airline Manager's membership on ADAMS's Infrastructure, Climate and Sustainability Committee and sending applause emojis. The Airline Manager responded that his membership on the transition committee was in service of

39

SDNY_10_0000010914

Turkey: "Thank you, brother. We are doing our best to serve our country adequately. Your support gives us strength here. Thank you. You are always there for us, and we're trying to be worthy."

41.     ERIC ADAMS, the defendant, continued to conceal the luxury travel benefits he accepted in exchange for taking actions favorable to the Turkish Official, the Airline Manager, and others, by once again not reporting these gifts on his 2021 annual disclosure form. In total, from 2016 through 2021, ADAMS received the following benefits from the Turkish Official, the Airline Manager, the Promoter, and others, none of which he reported on annual disclosure forms:

40

SDNY_10_0000010915

| Year | Destination | Benefits | Value | Disclosed? |
|------|-------------|----------|-------|------------|
| 2016 | India (via Turkey) | Free upgrade to business class for two on roundtrip from New York to India | $12,000+ | No |
| 2017 | France, Turkey, China | Free business class tickets for three on roundtrip from New York to France, Turkey, and China; heavily discounted stay in Bentley Suite of St. Regis Istanbul | $41,000+ | No |
| 2017 | China (via Turkey) | Free business class tickets for two on roundtrip from New York to China | $16,000+ | No |
| 2018 | Hungary (via Turkey) | Free upgrade to business class for two on roundtrip from New York to Hungary | $12,000+ | No |
| 2019 | Turkey | Free upgrade to business class for one on flight from New York to Turkey; free stay at Cosmopolitan Suite of St. Regis Istanbul; free meals, transportation, and entertainment in Istanbul | $9,000+ | No |
| 2021 | Turkey (solicited and accepted but then canceled) | Free upgrade to business class for two on roundtrip from New York to Turkey; free or steeply discounted luxury hotel and resort stays, transportation, entertainment, and meals | $21,000+ | No |
| 2021 | Ghana (via Turkey) | Free upgrade to business class for two on roundtrip from New York to Ghana; free meal and transportation during Istanbul layover | $12,000+ | No |

41

SDNY_10_0000010916

## ADAMS Continues His Corrupt Relationships After Becoming Mayor

*After his inauguration, ADAMS favors those who provided him with illegal benefits over those who fell short*

42.     On January 1, 2022, ERIC ADAMS, the defendant, was inaugurated as Mayor of New York City.  ADAMS soon began preparing for his next election, in part by planning to solicit more straw contributions, and in part by granting requests by those who supported the 2021 Campaign with significant straw donations, while denying requests from those who fell short.

a.     On January 11, 2022, ADAMS met the Promoter, the Adams Staffer, and others at a high-end New York City restaurant frequented by ADAMS.  At one point during the meeting, ADAMS, the Promoter, and the Adams Staffer met separately in a private area.  There, the Promoter discussed his prior efforts to collect campaign contributions for ADAMS in Turkey, stated that he could collect more foreign contributions in the future, and indicated that he would be able to raise more money for the 2025 Campaign if ADAMS visited Turkey and met with Turkish businesspeople.  ADAMS welcomed the offer of foreign contributions and told the Promoter to coordinate with the Adams Staffer to arrange the contributions.

b.     On April 21, 2022, the Turkish Official messaged the Adams Staffer, noting that Armenian Genocide Remembrance Day was approaching, and repeatedly asked the Adams Staffer for assurances that ADAMS would not make any statement about the Armenian Genocide.  The Adams Staffer confirmed that ADAMS would not make a statement about the Armenian Genocide.  ADAMS did not make such a statement.

c.     On November 21, 2022, the Promoter messaged the Adams Staffer that Businessman-1 was visiting New York, and asked that ADAMS meet with Businessman-1.  In support of the requested meeting, the Promoter stated that the Turkish University "gave support, albeit a little."  ADAMS declined the meeting, stating that "they didn't keep their word," meaning

42

SDNY_10_0000010917

that Businessman-1 and the Turkish University had failed to fulfill their commitment to make at least $25,000 in donations to the 2021 Campaign.

43.    ERIC ADAMS, the defendant, also continued his agreement with the Turkish Official to assist in New York City's regulation of the Turkish House in exchange for free or heavily discounted travel benefits from the Turkish Airline for ADAMS and his associates.

a.    From on or about July 8, 2022, to on or about July 12, 2022, the Turkish Official exchanged messages with the Adams Staffer concerning business class upgrades on the Turkish Airline for international travel by four of ADAMS's close associates.

b.    On July 11, 2022, the Turkish Official met with ADAMS's senior advisor and the Adams Staffer, among others, at the Turkish House.  In a message, the Adams Staffer referred the Turkish Official to ADAMS's senior advisor, telling the Turkish Official, "ask [the senior advisor] all your pending problems regarding this building [that is, the Turkish House] ... Like FDNY approvals . . . ."

### *In 2023 and 2024, ADAMS solicits and accepts straw contributions for his 2025 re-election campaign*

44.    In 2023 and 2024, ERIC ADAMS, the defendant, again solicited and knowingly accepted straw and foreign contributions, as part of his efforts to raise funds for the 2025 Campaign.

45.    In 2023, ERIC ADAMS, the defendant, directed his staff to devise a plan for ADAMS to secretly obtain illegal foreign donations offered by the Promoter, and then knowingly accepted donations of foreign money through straw donors.  ADAMS then attended a fundraiser where he thanked the true donors, who he knew to be wealthy foreign nationals.

a.    In the summer of 2023, the Promoter informed the Adams Staffer that he could secure contributions to the 2025 Campaign from Turkish nationals if ADAMS would attend

43

an event with the foreign donors. The Adams Staffer brought this opportunity to ADAMS, who directed the Adams Staffer to work with the Adams Fundraiser to devise a plan to obtain the illegal donations.

b.    The Adams Fundraiser suggested that the true foreign donors make their contributions through straw donors considerably in advance of the event at which ADAMS would meet the true foreign donors, so that the event did not appear connected to the contributions. As the Adams Staffer explained to the Adams Fundraiser in a text message regarding the planned attendees, "Mayor knows most of them from turkey[.] The People who has business here as well." The Adams Staffer and the Promoter agreed to execute this plan, which ADAMS approved.

c.    The Adams Fundraiser, the Promoter, and the Adams Staffer scheduled an event for September 20, 2023 in a private room at a Manhattan hotel. To conceal the event's true purpose, the Promoter provided a PowerPoint presentation billing the event as a dinner hosted by "International Sustainability Leaders" with the subject "Sustainable Destinations" and an attendance price of $5,000. The event was not publicized or listed on ADAMS's public calendar. The Adams Fundraiser entered the event on ADAMS's private calendar as a "Fundraiser for Eric Adams 2025," with the host listed as the Promoter, a goal of "25k," and the note "Total Submitted before the event: $22,800."

d.    Prior to the scheduled fundraiser, the Promoter collected payments of $5,000 or more from attendees, many of whom were foreign nationals. The Promoter then used a portion of the attendees' payments to make straw donations to the 2025 Campaign, by sending cash from the foreign national donors to the Adams Staffer. The Adams Staffer then distributed $2,100 in cash to at least three straw donors who each made an online $2,100 contribution to the 2025 Campaign.

SDNY_10_0000010919

e.    On September 20, 2023, the Promoter hosted the fundraiser, which ADAMS, the Adams Fundraiser, the Adams Staffer, and foreign nationals who had contributed to the 2025 Campaign via straw donors attended. In one video of the event, the Promoter introduced a foreign-national attendee to ADAMS, explaining that the attendee owned a business and lived in London and Istanbul. ADAMS proceeded to thank the attendee.

46.    On October 9, 2023, ERIC ADAMS, the defendant, attended a fundraiser at which attendees agreed to make, and ADAMS agreed to accept, straw donations. The fundraiser was organized by a Turkish American public relations representative (the "PR Representative") and the publisher of a magazine targeted at Turkish Americans (the "Publisher"), both of whom were associates of the Turkish Official, and hosted by the owner of a logistics company ("Businessman-6"), who is part of the Turkish-American community in the New York City area.

a.    From late August 2023 through early September 2023, the Adams Staffer and the Adams Fundraiser discussed the particulars of the fundraiser, including the creation of a unique fundraising link for the event, which the Adams Fundraiser ultimately created.

b.    On September 12, 2023, the PR Representative and the Publisher instructed Businessman-6 on how to make straw donations to the 2025 Campaign, using a system under which the 2025 Campaign routed foreign donations through U.S. citizens, to make it appear that the contribution came from a lawful source.

c.    Beginning at least as early as September 29, 2023, the Adams Staffer sent the Adams Fundraiser updates regarding how much money was being raised in connection with the planned fundraiser. On October 8, 2023, the day before the event, the Adams Staffer and the Adams Fundraiser exchanged the following messages:

Adams Fundraiser:    And okay are they going to make the limit?

45

Adams Staffer:      Yes[.]  They said as agreed we will collect the 25K

Adams Fundraiser:    Ok perfect

d.      Also on October 8, 2023, the Airline Manager sent the Turkish Official the unique fundraising link for the event.

e.      At the October 9, 2023 fundraiser, Businessman-6 told ADAMS that Businessman-6 owned a large corporation and wished to contribute significant amounts of money to the 2025 Campaign.  ADAMS told Businessman-6 to coordinate with the Adams Staffer. Businessman-6 then explained to the Adams Staffer that his company employed many drivers and that Businessman-6 would contribute to the 2025 Campaign through those employees.  ADAMS scheduled a dinner with Businessman-6 for early November, which was canceled after the federal investigation into ADAMS's conduct became public.

### ADAMS and His Co-Conspirators Attempt to Conceal Their Criminal Conduct

47.      Throughout the commission of the conduct described in paragraphs 1 through 46 of this Indictment, ERIC ADAMS, the defendant, and his agents and co-conspirators sought to conceal their wrongful conduct from scrutiny by the public and law enforcement.  As described above, ADAMS repeatedly did not disclose the free and heavily discounted travel benefits he accepted from the Turkish Official, the Promoter, and the Airline Manager; created a false paper trail to suggest he had paid for this travel when, in fact, he had not; assured the Adams Staffer that he had a practice of deleting all his messages with the Adams Staffer; and directed the Adams Staffer to ensure that his activities in Turkey in 2021 were shielded from public view.  In addition, the purpose of conducting the straw donations discussed throughout this Indictment was to allow ADAMS to benefit from illegal campaign contributions by concealing their true source.

SDNY_10_0000010921

48.    ERIC ADAMS, the defendant, and his co-conspirators and agents continued their efforts to defeat scrutiny of their criminal conduct after the federal investigation into those crimes became known to them.    On November 2, 2023, Special Agents of the Federal Bureau of Investigation (the "FBI") executed search warrants at, among other locations, the residences of the Adams Fundraiser, Businessman-5, and the Adams Staffer.    Each took actions to conceal the criminal conduct they had committed with ADAMS.

a.    After learning that FBI agents had arrived at her residence, but before answering their repeated knocks at her door, the Adams Fundraiser called ADAMS five times, even though the agents had not yet given the Adams Fundraiser any indication of the purpose for their visit.    When the Adams Fundraiser then spoke with the FBI agents, she agreed to discuss many subjects, but refused to say who had paid for her 2021 travel to Turkey.    As the FBI agents departed the Adams Fundraiser's residence, ADAMS attempted to call the Adams Fundraiser's phone.    On the morning that the FBI agents executed this search, ADAMS had flown to Washington, D.C. for a publicized official meeting, but upon learning about the search, ADAMS canceled the meeting and immediately returned to New York City.

b.    Businessman-5 also agreed to speak with FBI agents and acknowledged that he and his employees had contributed to the 2021 Campaign.    Businessman-5 further acknowledged that he had spoken with the Turkish Official about his construction company's fundraiser for the 2021 Campaign. But Businessman-5 lied in order to conceal the straw donations he orchestrated, falsely denying that he caused his construction company to reimburse his employees for their contributions and that he knew why the company had issued identical checks to ten employees for the amount of their contributions shortly before the fundraiser.

SDNY_10_0000010922

       c.     The Adams Staffer also agreed to speak with FBI agents and falsely denied the criminal conduct of herself and ADAMS, among others. At one point during her voluntary interview, the Adams Staffer excused herself to a bathroom and, while there, deleted the encrypted messaging applications she had used to communicate with ADAMS, the Promoter, the Turkish Official, the Airline Manager, and others.

       d.     On November 6, 2023, FBI agents executed a search warrant for the electronic devices used by ERIC ADAMS, the defendant. Although ADAMS was carrying several electronic devices, including two cellphones, he was not carrying his personal cellphone, which is the device he used to communicate about the conduct described in this indictment. When ADAMS produced his personal cellphone the next day in response to a subpoena, it was "locked," such that the device required a password to open. ADAMS claimed that after he learned about the investigation into his conduct, he changed the password on November 5, 2024, and increased the complexity of his password from four digits to six. ADAMS had done this, he claimed, to prevent members of his staff from inadvertently or intentionally deleting the contents of his phone because, according to ADAMS, he wished to preserve the contents of his phone due to the investigation. But, ADAMS further claimed, he had forgotten the password he had just set, and thus was unable to provide the FBI with a password that would unlock the phone.

49.     As the federal investigation into the criminal conduct of ERIC ADAMS, the defendant, continued, so did efforts to frustrate that investigation.

       a.     On June 13, 2024, FBI agents interviewed Businessman-4 and the four employees of his company through whom Businessman-4 had made straw donations to the 2021 Campaign, most of whom denied making straw contributions. Businessman-4 then contacted Adams Employee-1, who, as discussed above, had asked Businessman-4 to make the straw

SDNY_10_0000010923

donations to the 2021 Campaign. Later that day, Adams Employee-1 visited Businessman-4 at his

company's offices. Adams Employee-1 stated that he had just met with ADAMS at City Hall.

Adams Employee-1 proceeded to discuss with Businessman-4 what had happened with the FBI

and encouraged Businessman-4 to lie to federal investigators. Adams Employee-1 then asked to

address Businessman-4's four employees who had made straw donations to the 2021 Campaign

and encouraged them to lie to federal investigators as well. Adams Employee-1 then took

photographs of the subpoena that had been issued to Businessman-4 to send to ADAMS.

        b.      On the following day, Businessman-4 met again with Adams Employee-1.

Adams Employee-1 told Businessman-4 that he had met with ADAMS at City Hall earlier that day

and that they had left their cellphones outside the room in which they met so that it would be "safe"

to talk. Adams Employee-1 explained to Businessman-4 that although ADAMS was upset that

law enforcement had approached Businessman-4, ADAMS believed that Businessman-4 would

not cooperate with law enforcement.

## STATUTORY ALLEGATIONS

### COUNT ONE
**(Conspiracy to Commit Wire Fraud, Federal Program Bribery, and to Receive Campaign
Contributions By Foreign Nationals)**

The Grand Jury charges:

50.    The allegations contained in paragraphs 1 through 49 of this Indictment are

repeated and realleged as if set forth fully herein.

51.    From at least in or about 2015 through at least in or about 2024, in the Southern

District of New York and elsewhere, ERIC ADAMS, the defendant, and others known and

unknown, willfully and knowingly combined, conspired, confederated, and agreed together and

with each other to commit offenses against the United States, to wit:

SDNY_10_0000010924

a.      wire fraud, in violation of Title 18, United States Code, Section 1343;

b.      soliciting, accepting, and receiving a campaign contribution by a foreign national, in violation of Title 52, United States Code, Section 30121(a)(2); and

c.      bribery, in violation of Title 18, United States Code, Section 666(a)(1)(B).

52.    It was a part and object of the conspiracy that ERIC ADAMS, the defendant, and others known and unknown, knowingly having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343.

53.    It was further a part and object of the conspiracy that ERIC ADAMS, the defendant, and others known and unknown, would and did knowingly and willfully solicit, accept, and receive, directly and indirectly, a contribution and donation from a foreign national, and express and implied promises to make a contribution and donation, in connection with a local election, to wit, mayoral elections in the City of New York, aggregating $25,000 and more in a calendar year, in violation of Title 52, United States Code, Sections 30121(a)(2) and 30109(d)(1)(A)(i).

54.    It was further a part and object of the conspiracy that ERIC ADAMS, the defendant, being an agent of a local government, to wit, the City of New York, which, in a one-year period, received benefits in excess of $10,000 under a federal program involving a grant, contract, subsidy, loan, guarantee, insurance, and other form of federal assistance, corruptly solicited and demanded for the benefit of a person, and accepted and agreed to accept, a thing of value from a person, intending to be influenced and rewarded in connection with  business, a transaction, and a series

50

SDNY_10_0000010925

of transactions of the City of New York involving a thing of value of $5,000 and more, in violation of Title 18, United States Code, Section 666(a)(1)(B).

<u>Overt Acts</u>

55.    In furtherance of the conspiracy and to effect the illegal objects thereof, the following overt acts, among others, were committed by ERIC ADAMS, the defendant, in the Southern District of New York and elsewhere:

a.    In 2016, ADAMS accepted free upgrades to business class for himself and a companion on roundtrip flights from New York to India.

b.    In July 2017, ADAMS accepted free business tickets for himself and two companions on roundtrip flights from New York to France, Turkey, Sri Lanka, and China.

c.    In July 2017, ADAMS accepted a steeply discounted stay at the Bentley Suite of the St. Regis Istanbul.

d.    In October 2017, ADAMS accepted free business tickets for himself and a companion on roundtrip flights from New York to China.

e.    In January 2018, ADAMS accepted free upgrades to business class for himself and a companion on roundtrip flights from New York to Hungary.

f.    In November 2018, ADAMS directed the Adams Staffer to arrange to accept contributions of foreign funds from Businessman-1.

g.    In January 2019, ADAMS accepted a free stay at the Cosmopolitan Suite of a luxury hotel in Istanbul.

h.    In January 2019, ADAMS met with Businessman-3 in Istanbul, where ADAMS agreed to accept campaign contributions of foreign money.

51

SDNY_10_0000010926

i.      In December 2020, the Adams Employees solicited straw donations to ADAMS's campaign from Businessman-4.

j.      In May 2021, ADAMS attended a fundraiser organized by the Turkish Official, among others, where ADAMS accepted straw donations from Businessman-5.

k.      In May 2021, ADAMS submitted a false disclosure statement to the CFB that concealed the straw donations from Businessman-5.

l.      In June 2021 ADAMS solicited steeply discounted business class tickets, stays at a luxury hotel and luxury resort, and transportation (including a domestic flight and a car and driver).

m.      In June 2021, ADAMS solicited a free hotel stay and free use of a VIP room in a business class lounge of the Turkish Airlines for the Adams Fundraiser.

n.      In or about August 2021, ADAMS directed the Adams Staffer to obtain contributions of foreign funds from the Turkish University.

o.      In September 2021, ADAMS caused the FDNY to issue a letter acquiescing in the occupation of the Turkish House.

p.      In September 2021, ADAMS solicited and accepted steeply discounted business class tickets for himself and a companion on roundtrip flights from New York to Pakistan.

q.      In October 2021, ADAMS submitted a false disclosure statement to the CFB that concealed the straw donations from the Turkish University.

r.      In November 2021, ADAMS solicited and accepted a free car and driver and meal at a luxury restaurant for himself and his companion in Istanbul.

s.      In January 2022, ADAMS attended a meeting with the Promoter, among others, where he agreed to accept contributions of foreign money to the 2025 Campaign.

SDNY_10_0000010927

t.    In July 2022, ADAMS's senior advisor and the Adams Staffer met the Turkish Official at the Turkish House, and the Adams Staffer identified ADAMS's senior official as the point of contact for the Turkish Official's "pending problems regarding" the Turkish House such as "FDNY approvals."

u.    In July 2022, the Turkish Official arranged to provide business class upgrades on the Turkish Airline for four of ADAMS's close associates.

v.    In September 2023, ADAMS attended a fundraiser where he thanked foreign donors for contributions of foreign money to the 2025 Campaign made through straw donors.

w.    In October 2023, ADAMS attended a fundraiser where he directed the Adams Staffer to coordinate the receipt of straw donations from Businessman-6.

(Title 18, United States Code, Section 371.)

### COUNT TWO
### (Wire Fraud)

The Grand Jury further charges:

56.    The allegations contained in paragraphs 1 through 49 of this Indictment are repeated and realleged as if set forth fully herein.

57.    From at least in or about 2018 through at least in or about 2024, in the Southern District of New York and elsewhere, ERIC ADAMS, the defendant, knowingly having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, for the purpose of executing such scheme and artifice, to wit, ADAMS participated in a scheme to fraudulently obtain Matching Funds for

53

the Adams Campaigns by falsely claiming that contributions qualified for Matching Funds when, in fact those contributions did not.

(Title 18, United States Code, Sections 1343 and 2.)

**COUNT THREE**
**(Solicitation of a Contribution by a Foreign National)**

The Grand Jury further charges:

58.     The allegations contained in paragraphs 1 through 49 of this Indictment are repeated and realleged as if set forth fully herein.

59.     In or about 2021, in the Southern District of New Yok and elsewhere, ERIC ADAMS, the defendant, knowingly and willfully solicited, accepted, and received, and aided and abetted and willfully caused the solicitation, acceptance and receipt of, a contribution and donation from a foreign national, and express and implied promises to make a contribution and donation, in connection with a local election, to wit, mayoral elections in the City of New York, aggregating $25,000 and more in a calendar year.

(Title 52, United States Code, Sections 30121 and 30109(d)(1)(A), and
Title 18, United States Code, Section 2.)

**COUNT FOUR**
**(Solicitation of a Contribution by a Foreign National)**

The Grand Jury further charges:

60.     The allegations contained in paragraphs 1 through 49 of this Indictment are repeated and realleged as if set forth fully herein.

61.     In or about 2023, in the Southern District of New York and elsewhere, ERIC ADAMS, the defendant, knowingly and willfully solicited, accepted, and received, and aided and abetted and willfully caused the solicitation, acceptance and receipt of, a contribution and donation

54

SDNY_10_0000010929

from a foreign national, and express and implied promises to make a contribution and donation, in connection with a local election, to wit, mayoral elections in the City of New York, aggregating $25,000 and more in a calendar year.

(Title 52, United States Code, Sections 30121 and 30109(d)(1)(A), and<br>
Title 18, United States Code, Section 2.)

**COUNT FIVE**
**(Bribery)**

The Grand Jury further charges:

62.     The allegations contained in paragraphs 1 through 49 of this Indictment are repeated and realleged as if set forth fully herein.

63.     From at least in or about the summer of 2021, through at least in or about the summer of 2022, in the Southern District of New York and elsewhere, ERIC ADAMS, the defendant, being an agent of a local government, to wit, the City of New York, which, in a one-year period, received benefits in excess of $10,000 under a federal program involving a grant, contract, subsidy, loan, guarantee, insurance, and other form of federal assistance, corruptly solicited and demanded for the benefit of a person, and accepted and agreed to accept, a thing of value from a person, intending to be influenced and rewarded in connection with business, a transaction, and a series of transactions of the City of New York involving a thing of value of $5,000 and more, to wit, ADAMS solicited and accepted free and heavily discounted luxury travel benefits from the Turkish Official and others in exchange for intending to be influenced in connection with the City of New York's regulation of the Turkish House, located at 821 United Nations Plaza, New York, New York.

(Title 18, United States Code, Sections 666(a)(1)(B) and 2.)

55

SDNY_10_0000010930

## FORFEITURE ALLEGATIONS

64.    As a result of committing one or more of the offenses alleged in Counts One, Two, and Five of this Indictment, ERIC ADAMS, the defendant, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), any and all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of said offenses, including but not limited to a sum of money in United States currency representing the amount of proceeds traceable to the commission of said offenses.

SDNY_10_0000010931

## Substitute Assets Provision

65.    If any of the above-described forfeitable property, as a result of any act or omission

of the defendant:

        a.    cannot be located upon the exercise of due diligence;

        b.    has been transferred or sold to, or deposited with, a third person;

        c.    has been placed beyond the jurisdiction of the Court;

        d.    has been substantially diminished in value; or

        e.    has been commingled with other property which cannot be subdivided

without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p) and

Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of the

defendant up to the value of the above forfeitable property.

(Title 18, United States Code, Section 981;
Title 21, United States Code, Section 853; and
Title 28, United States Code, Section 2461.)

<br>

FOREPERSON

Damian Williams
DAMIAN WILLIAMS
United States Attorney

57

SDNY_10_0000010932

# EXHIBIT C

SDNY_10_0000010933

AUSAs: Celia Cohen, Andrew Rohrbach, Hagan Scotten, Derek Wikstrom

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

# 24 MAG 3535

UNITED STATES OF AMERICA

v.

MOHAMED BAHI,

Defendant.

**SEALED COMPLAINT**

Violations of 18 U.S.C. §§ 1512 and 1519

COUNTY OF OFFENSE:
NEW YORK

SOUTHERN DISTRICT OF NEW YORK, ss.:

████████████ being duly sworn, deposes and says that he is a Special Agent with the Federal Bureau of Investigation, and charges as follows:

## COUNT ONE
### (Witness Tampering)

1.      In or about June 2024, in the Southern District of New York and elsewhere, MOHAMED BAHI, the defendant, knowingly used intimidation, threatened, and corruptly persuaded another person, and attempted to do the same, with the intent to hinder, delay, and prevent the communication to a law enforcement officer of information relating to the commission and possible commission of a federal offense, to wit, BAHI met with five potential witnesses and directed them to lie to law enforcement officers in connection with a federal criminal investigation being conducted by the Federal Bureau of Investigation.

(Title 18, United States Code, Section 1512(b)(3).)

## COUNT TWO
### (Destruction of Records)

2.      On or about July 24, 2024, in the Southern District of New York and elsewhere, MOHAMED BAHI, the defendant, knowingly altered, destroyed, mutilated, concealed, covered up, falsified, and made a false entry in a record, document, and tangible object with the intent to impede, obstruct, and influence the investigation and proper administration of a matter within the jurisdiction of a department and agency of the United States, and in relation to and in contemplation of such a matter, to wit, BAHI deleted the encrypted-messaging application Signal from his cellphone upon the Federal Bureau of Investigation's arrival at his home to execute a court-issued warrant authorizing the search of BAHI's home and the seizure of his cellphone.

(Title 18, United States Code, Section 1519.)

The bases for my knowledge and for the foregoing charges are, in part, as follows:

3.      I am a Special Agent with the Federal Bureau of Investigation ("FBI"), and I have been personally involved in the investigation of this matter, which has been jointly investigated

with the New York City Department of Investigation ("DOI"). This affidavit is based upon my personal participation in the investigation of this matter, my conversations with other law enforcement personnel, and my examination of reports and records. Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my participation in the investigation. Where the contents of documents and the actions, statements and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

<u>Background</u>

4.    From approximately 2022 through the present, MOHAMED BAHI, the defendant, has worked as a Senior Liaison in the Community Affairs Unit of the New York City mayoral administration of a certain public official ("Official-1").

5.    Beginning at least in or about 2018, Official-1 campaigned to be New York City Mayor, in connection with an election to be held in 2021 (the "2021 Official-1 Campaign"). In or about 2020, MOHAMED BAHI, the defendant, solicited campaign contributions for the 2021 Official-1 Campaign.

6.    Since in or about 2021, the FBI and DOI have been investigating, among other things, the receipt of so-called "straw" contributions by the 2021 Official-1 Campaign (the "Federal Investigation"). A straw contribution to a political campaign is a contribution that is made in the name of one donor, for which the donated funds in fact came from a different person. The knowing solicitation and acceptance of straw contributions can violate federal law when, for example, a political campaign makes false statements about straw contributions to a public entity to fraudulently obtain public matching funds based on the contributions, or when the straw contributions are used to smuggle foreign money into a campaign. I am one of the FBI Special Agents conducting the Federal Investigation.

7.    As explained in greater detail below, in or about December 2020, MOHAMED BAHI, the defendant, was involved in organizing a fundraiser for the 2021 Official-1 Campaign at which the donors made straw contributions. In or about 2024, when the FBI was investigating the 2021 Official-1 Campaign's solicitation and acceptance of straw contributions, BAHI took steps to obstruct the Federal Investigation by tampering with multiple witnesses and destroying evidence.

<u>The December 2020 Fundraiser</u>

8.    Based on my review of records from the New York City Campaign Finance Board (the "CFB"), I know, among other things, the following:

   a.    On or about December 10, 2020, four individuals (each a "Donor," and collectively, the "Donors") associated with the same employer (the "Construction Company") made contributions to the 2021 Official-1 Campaign. Contribution cards for each of the Donors were submitted to the CFB by the 2021 Official-1 Campaign. Each of the Donors' contribution cards listed the Construction Company in the field "employer."

   b.    A fifth person (the "Businessman") also contributed to the 2021 Official-1 Campaign, on the same date and in the same amount as each of the Donors. The Businessman's

2

SDNY_10_0000010935

contribution card, submitted to the CFB by the 2021 Official-1 Campaign, listed the Businessman's employer as "Self," and his occupation as "President." Based on, among other things, my review of open-source information, I know that the Businessman is the founder and chief executive officer of the Construction Company.

      c.     Each of the four Donors, and the Businessman, contributed to the 2021 Official-1 Campaign by check, in the amount of $2,000.

      d.     All five of the contribution cards submitted by the Donors and the Businessman in connection with these December 10, 2020 contributions had matching, pre-typed information, including the recipient, the names and addresses of the respective Donors, and their employer.

      e.     Each of the five relevant contribution cards contained a signature on a line reading "Contributor's Signature." Above the signature line, each contribution card stated: "I understand that State law requires that a contribution be in my name and be from my own funds. I hereby affirm that I was not, nor, to my knowledge, was anyone else, reimbursed in any manner for this contribution; that this contribution is not being made as a loan; and that this contribution is being made from my personal funds or my personal account, which has no corporate or business affiliation."

    9.     I have reviewed text messages from electronic devices and accounts belonging to the Businessman, which were obtained pursuant to court-authorized search warrants. Based on that review, I have learned, among other things, the following:

      a.     On or about November 19, 2020, a telephone number saved to the Businessman's phone contacts as a variant of the name of MOHAMED BAHI,[1] the defendant, texted the Businessman: "Dec 10th - Thursday 7pm - Your Office," "Private Fundraiser and Dinner for [Official-1]."

      b.     On or about December 9, 2020, BAHI texted the Businessman: "…he moved it tomorrow to 5pm. Is that ok?" The Businessman responded: "yes even better."

      c.     On or about December 10, 2020, at approximately 4:57 p.m., BAHI texted the Businessman: "im coming now," "i think he is about 15 mins away." Less than ten minutes later, BAHI texted the Businessman: "he's outside," "bringing him in."

    10.    Law enforcement has interviewed each of the Donors and the Businessman.[2] Based on my participation in some of those interviews, my discussions with other law enforcement agents

---

[1] Specifically, the number was saved in the Businessman's contacts as "Muhammad Bahi."

[2] Each of these five witnesses was interviewed by the FBI on or about June 13, 2024, and, in sum and substance, denied having been involved in straw donations. Each of these witnesses was subsequently interviewed, pursuant to proffer agreements and while represented by counsel, and it is these counseled, proffer-protected interviews that are described in this paragraph. Each of these witnesses agreed to speak with law enforcement in the hopes of receiving leniency in connection with this investigation. In the course of proffering with the Government, the Businessman admitted his involvement in straw donations to Official-1's mayoral campaigns and

SDNY_10_0000010936

who participated in the interviews, and my review of related reports, I know, among other things, that multiple witnesses confirmed each of the following facts:

      a.    The Donors and the Businessman attended a fundraiser for the 2021 Official-1 Campaign held at the Brooklyn headquarters of the Construction Company on December 10, 2020;

      b.    Official-1 attended the fundraiser;

      c.    MOHAMED BAHI, the defendant, organized and attended the fundraiser, and suggested that the Businessman should reimburse donations by his employees;

      d.    Each of the Donors made straw contributions: each of their $2,000 contributions was either reimbursed by, or paid for in advance by, the Construction Company.

### The June 13, 2024 Interviews and BAHI's Witness Tampering

    11.    On or about June 13, 2024, in connection with the Federal Investigation, FBI agents executed a court-authorized search warrant at the home of the Businessman, and also served him with a subpoena issued by a grand jury in the Southern District of New York. Around the same time the search warrant was executed, FBI agents also approached each of the four Donors with subpoenas issued by a grand jury in the Southern District of New York, and attempted to interview each of them.

    12.    Based on my participation in certain interviews, my discussions with other law enforcement officers who interviewed the Donors and the Businessman as discussed above, and my review of related reports, I have learned, in substance and in part, that:

      a.    On or about June 13, 2024, the Businessman called MOHAMED BAHI, the defendant, and informed BAHI that the FBI had executed a search warrant at the Businessman's home that morning.

      b.    In the afternoon on or about June 13, 2024, BAHI went to the offices of the Construction Company, where he met privately with the Businessman, and then met with the Businessman and the four Donors.

      c.    During the private meeting between BAHI and the Businessman on or about June 13, 2024, BAHI told the Businessman that he had just spoken with Official-1. BAHI then asked the Businessman to describe his interactions with the FBI. After the Businessman told BAHI that the Businessman had denied having funded straw donations to Official-1 when questioned by the FBI, BAHI advised the Businessman that if he continued to tell that lie to federal investigators the Businessman would be ok.

---

in an unrelated fraud offense. The information these witnesses have provided has proven reliable and is corroborated by other evidence.

4

       d.      BAHI then met with the Businessman and the four Donors. BAHI asked each of them to describe their interactions with the FBI. BAHI took photographs of the grand jury subpoenas that had been served on the Donors and the Businessman.

       e.      During the meeting between BAHI, the Businessman, and the four Donors, BAHI encouraged the Donors to lie to federal investigators by denying that they had made straw donations to the 2021 Official-1 Campaign, and remarked that because the Donors' contributions to the 2021 Official-1 Campaign had been reimbursed in cash, the FBI would be unable to prove that the reimbursements had occurred.

       f.      On or about June 14, 2024, BAHI again met with the Businessman. During that meeting, BAHI indicated to the Businessman, in substance and in part, that BAHI had met with Official-1, and that Official-1 believed that the Businessman would not cooperate with law enforcement.

<u>BAHI's Destruction of Evidence</u>

13.     Based on my training and experience, including my experience in the Federal Investigation, I know that Signal is an encrypted-messaging application that allows users to set the application to automatically delete messages at certain intervals. Based on my involvement in the Federal Investigation, and my review of both open-source information and the contents of devices and accounts seized pursuant to court-authorized search warrants, I know that Official-1 used Signal to communicate and sometimes encouraged others to do so, and that people who—like MOHAMED BAHI, the defendant—work for Official-1 also used Signal to communicate with Official-1 and others.

14.     On July 24, 2024, in connection with the Federal Investigation, FBI agents executed a court-authorized search warrant at the home of MOHAMED BAHI, the defendant. Based on my discussions with FBI agents who participated in the search, I have learned, among other things, the following:

       a.      On July 24, 2024, at approximately 6:00 a.m., FBI agents began knocking on the door of BAHI's home, and calling a phone number known to be used by BAHI to announce that they were present to execute a search warrant. No one answered the door, and BAHI did not answer multiple calls from the agents.

       b.      FBI agents then called BAHI's former spouse, who lives at BAHI's home. She answered the phone, and FBI agents identified themselves as federal agents, and told her that they were at the door and wanted to speak with BAHI. BAHI's former spouse initially claimed not to be home. She eventually came to the door, but initially refused to open it.

       c.      Some time after BAHI's former spouse came to the door, BAHI himself came to the door, and let the FBI into his home to execute the search warrant.

       d.      Once FBI agents were inside BAHI's home executing the search warrant, an agent mentioned to BAHI that the agent had repeatedly called BAHI. This prompted BAHI to take a cellphone (the "Bahi Cellphone") out of his pocket, which the agent then seized pursuant to the warrant. Thus, BAHI had uninhibited access to his cellphone between learning that the FBI was present at his home and the FBI entering his home.

5

e.    During an interview with FBI agents who were executing the search warrant, BAHI stated, in substance and in part, that he had used the Bahi Cellphone as his personal cellphone for approximately the last few months. BAHI also stated that he was planning to travel to Egypt that evening.

15.    Based on my review of information from the forensic extraction of the Bahi Cellphone, which was performed after the Bahi Cellphone was seized by FBI agents, I have learned, among other things, that Signal was not on the Bahi Cellphone at the time it was forensically searched. Activity logs for the Bahi Cellphone indicated, however, that the Bahi Cellphone had been used to access the Signal application as recently as approximately 12:04 a.m. on July 24, 2024, the day that BAHI's home was searched and the Bahi Cellphone was seized by FBI agents. In other words, the Signal application was deleted from the Bahi Cellphone sometime between approximately midnight and shortly after 6:00 a.m., when the Bahi Cellphone was seized by FBI agents on July 24, 2024.

16.    In the afternoon of July 24, 2024, FBI agents called MOHAMED BAHI, the defendant, to ask him follow-up questions about the Bahi Cellphone. I participated in that call, along with other agents. During the call, BAHI admitted, in substance and in part, that he had recently deleted the Signal application. When agents asked BAHI when that day he had deleted Signal, BAHI stated that he would not disclose when he deleted Signal.

17.    During the interview described in the preceding paragraph, MOHAMED BAHI, the defendant, claimed, in substance and in part, that he had a practice of deleting applications that were suspicious before traveling internationally, in case he was questioned by authorities during that travel. That statement appears to be false. From my review of travel records, I have learned that BAHI traveled to Egypt on or about February 15, 2024, returning to New York on or about February 23, 2024.[3] And, based on my review of the contents of the Bahi Cellphone, I know that BAHI did not delete Signal on that trip, but instead continued to use Signal, including to exchange messages with Official-1 via Signal. Specifically, the Bahi Cellphone contains a screenshot of messages BAHI and Official-1 exchanged during BAHI's travel to Egypt and Yemen, and metadata for the screenshot indicates that the screenshot was created on or about February 19, 2024, during that trip.

---

[3] Based on my review of the contents of the Bahi Cellphone, I believe that BAHI traveled to Yemen by way of Egypt during this trip.

6

SDNY_10_0000010939

WHEREFORE, I respectfully request that a warrant be issued for the arrest of MOHAMED BAHI, the defendant, and that he be imprisoned or bailed, as the case may be.

S/ by the Court with permission

Special Agent
Federal Bureau of Investigation

Sworn to me through the transmission of this Affidavit
by reliable electronic means, pursuant to
Federal Rules of Criminal Procedure 41(d)(3) and 4.1,

this 7th day of October, 2024.

THE HONORABLE ROBERT W. LEHRBURGER
United States Magistrate Judge
Southern District of New York

7

AO 93C  (08/18) SDNY Rev.  Warrant by Telephone or Other Reliable Electronic Means        ❑ Original        ❑ Duplicate Original

# UNITED STATES DISTRICT COURT
for the
_____ District of _____

| | | |
|---|---|---|
| In the Matter of the Search of | ) | **24 MAG 3629** |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) ) ) ) | Case No. |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:        Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____ District of _____ *(identify the person or describe the property to be searched and give its location)*:

The search and seizure are related to violation(s) of *(insert statutory citations)*:

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

**YOU ARE COMMANDED** to execute this warrant on or before _____ *(not to exceed 14 days)*
❑ in the daytime 6:00 a.m. to 10:00 p.m.     ❑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____ .
*(United States Magistrate Judge)*

❑ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
❑ for _____ days *(not to exceed 30)*   ❑ until, the facts justifying, the later specific date of _____ .

Date and time issued: _____        _____
                                                                              *Judge's signature*

City and state: _____        _____
                                                                              *Printed name and title*

AO 93C  (08/18) Warrant by Telephone or Other Reliable Electronic Means (Page 2)

| **Return** | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name(s) of any person(s) seized:

| **Certification** |
|---|

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

**Attachment A**

## I. The Subject Device

The Subject Device is a Samsung cellphone with IMEI number 352091530069544 seized from Mohamed Bahi, incident to his arrest, on October 8, 2024, which is presently located at 26 Federal Plaza, New York, New York, in the custody of the Federal Bureau of Investigation.

## II. Seizure and Review of ESI on the Subject Device

### A. Evidence, Fruits, and Instrumentalities of the Subject Offenses

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the ESI contained on the Subject Device for evidence, fruits, and instrumentalities of violations of (i) 18 U.S.C. §§ 371 and 666(a)(1)(B) (bribery and conspiracy to commit bribery); (ii) 18 U.S.C. §§ 371 and 1343 (wire fraud and attempt and conspiracy to commit wire fraud); (iii) 18 U.S.C. §§ 371 and 1512 (witness tampering and conspiracy to commit the same); and (iv) 18 U.S.C. § 1519 (destruction of records) (collectively, the "Subject Offenses") described as follows:

1. Evidence concerning the identity or past location of the owner(s) or user(s) of the Subject Device.

2. Evidence of knowledge or understanding of, or intent to violate, laws and regulations governing the conduct of the 2021 and 2025 mayoral campaigns of Eric Adams (the "Adams Campaigns") on the part of Mohamed Bahi, or on the part of any other person who is or was associated with or employed by the Adams Campaigns.

3. Evidence relating to Bahi's involvement in fundraising for the Adams Campaigns.

4. Evidence relating to efforts by Bahi or by any person who is or was associated with or employed by the Adams Campaigns to provide benefits, whether lawfully or unlawfully, to any donor or potential donor to the Adams Campaigns in exchange for campaign contributions.

5. Evidence relating to payments to any potential or actual donor to the Adams Campaigns to facilitate their making campaign contributions to the Adams Campaigns.

6. Evidence of individuals or entities who donated to the Adams Campaigns before or after receiving transfers of funds similar to the amount of the donation.

7. Evidence regarding any persons or entities involved, wittingly or unwittingly, in donations to the Adams Campaign in which the named donor is not the true source of the donated funds ("straw donations").

8.      Evidence regarding any requests by the Adams Campaigns for matching funds based on straw donations, including any discussions of matching funds.

9.      Evidence of fundraising for the Adams Campaigns involving any foreign nationals or officials.

10.     Evidence of the exchange of benefits or favors between foreign nationals or officials, on the one hand, and any person who is or was associated with or employed by the Adams Campaigns, on the other hand.

11.     Evidence relating to any efforts to influence testimony in any investigation relating to the Adams Campaigns, to destroy or conceal evidence, or to otherwise respond to, interfere with, or obstruct any investigation relating to the Adams Campaigns.

12.     Evidence sufficient to establish the owners and users of the Subject Device at times relevant to the Subject Offenses.

13.     Evidence of the geographic location of users or devices involved in the commission of the Subject Offenses at times relevant to the Subject Offensess.

**B.  Review of ESI**

Following seizure of any electronic communications device and/or the creation of forensic image copies, law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the ESI contained therein for information responsive to the warrant.

In conducting this review, law enforcement personnel may use various techniques to locate information responsive to the warrant, including, for example:

- surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files);

- opening or cursorily reading the first few "pages" of such files in order to determine their precise contents;

- scanning storage areas to discover and possibly recover recently deleted files or deliberately hidden files;

- performing key word searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are intimately related to the subject matter of the investigation; and

- reviewing metadata, system information, configuration files, registry data, and any other information reflecting how, when, and by whom the device was used.

Law enforcement personnel will make reasonable efforts to search only for files, documents, or other electronically stored information within the categories identified in Section II.A of this Attachment. However, law enforcement personnel are authorized to conduct a complete review of all the ESI from seized devices or storage media if necessary to evaluate its contents and to locate all data responsive to the warrant.